# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) Ct. No. 21-00380 |
| v. | ) |
|  | ) **PUBLIC VERSION** |
| UNITED STATES, | ) |
|  | ) |
| Defendant, | ) |
|  | ) |
| and | ) |
|  | ) |
| QMC FOODS, INC., *et al.*, | ) Business Proprietary |
|  | ) Information Is Removed |
| Defendant- | ) from Brackets on Pages i, |
| Intervenors. | ) iii, iv, vii, 4-5, 8, 34, 52-53, |
|  | ) 55-59 |

## MEMORANDUM IN SUPPORT OF THE RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD FILED BY PLAINTIFFS, CATFISH FARMERS OF AMERICA, *et al.*

Jonathan M. Zielinski
James R. Cannon, Jr.
Nicole Brunda
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 787-5507
F: (202) 567-2301
E-mail: jzielinski@cassidylevy.com

Dated: February 11, 2022
*Counsel to the Catfish Farmers of America, et al.*

Table of Contents

I.      Statement Pursuant to Rule 56.2 ........................................2

   A. The Administrative Determination Under Review .............2

   B. Issues Presented for Review ....................................................3

II.     Glossary of Case-Specific Acronyms and Abbreviations .....5

III.    Statement of the Facts .........................................................6

   A. Selection of the Primary Surrogate Country ........................7

   B. Incomplete Questionnaire Responses of DOTASEAFOOD..8

   C. Conflicting Record Evidence Regarding Navico's
      Relationship with [            ] and its U.S. Customer
      During the Review Period ....................................................8

   D. Navico's Separate Rate Assignment....................................9

IV.    Argument ...........................................................................10

   A. Standard of Review ............................................................10

   B. Commerce's Rejection of Indonesia and Selection of India as
      the Primary Surrogate Country is Not Supported by the
      Record or Commerce's Practice in this Proceeding...........12

     1. Indonesia was Economically Comparable to Vietnam and
        Commerce Failed to Explain Why Indonesia was Not
        Included in the List of Potential Economically
        Comparable Surrogate Countries....................................14

     2. Indonesia is the Only Significant Producer of Comparable
        Merchandise ...................................................................18

     3. Indonesia Provides Comprehensive Data that are
        Superior to the Indian Data to Value the Factors of
        Production.......................................................................22

     4. Conclusion.......................................................................40

C. Commerce's Determination to Reward DOTASEAFOOD with a Non-Adverse Rate Despite DOTASEAFOOD's Refusal to Cooperate is Not Supported by Substantial Evidence and is Contrary to Commerce's Practice and the Purpose of the Law ................................................................. 42

   1. Commerce's Determination Unlawfully Ignores 19 U.S.C. § 1677e(b) ......................................................................... 43

   2. Commerce's Determination Contradicts its Practice ....... 46

   3. DOTASEAFOOD's Noncooperative Suppliers Should Not Benefit from a Lower Cash Deposit Rate ........................ 51

D. Commerce's Granting of a Separate Rate to Navico was Unsupported by Record Evidence ..................................... 54

E. Even if Commerce's Acceptance of Navico's Separate Rate Submissions were Reasonable, Its Assignment of Vinh Hoan's Zero Margin to Navico Was Not in Accordance with Law ..................................................................................... 59

   1. Commerce Unlawfully Departed from the "General Rule" of 19 U.S.C. § 1673d(c)(5)(A) ........................................... 62

   2. Even if Commerce Correctly Departed from the General Rule of 19 U.S.C. § 1673d(c)(5)(A) Commerce's Decision to Assign Navico a Zero Margin was Not Reasonable Under 19 U.S.C. § 1673d(c)(5)(B) .................................... 64

V.    Conclusion.......................................................................... 68

PUBLIC VERSION

# Table of Authorities

**Page(s)**

## Statutes

19 U.S.C. § 1516a(b)(1)(B) .......... 10

19 U.S.C. § 1673d(c)(5) .......... 59

19 U.S.C. § 1673d(c)(5)(A) .......... *passim*

19 U.S.C. § 1673d(c)(5)(B) .......... *passim*

19 U.S.C. § [ ] .......... 58

19 U.S.C. § [ ] .......... 58

19 U.S.C. § 1677b(c) .......... 12,41

19 U.S.C. § 1677b(c)(4) .......... *passim*

19 U.S.C. § 1677e(a)(1) .......... 49

19 U.S.C. § 1677e(b) .......... *passim*

19 U.S.C. § 1677f-1(c)(2) .......... 59

19 U.S.C. § 3512(d) .......... 45

## Court Decisions

*Allied Pac. Food (Dalian) Co., Ltd. v. United States*, 716 F. Supp. 2d 1339 (Ct. Int'l Trade 2010) .......... 24

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) .......... 15

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018) ........................................................................ 34

*Bando Chem. Indus. v. United States,* 26 F.3d 139 (Fed. Cir. 1994) ........................................................................ 11

*Bando Chem. Indus., Ltd. v. United States,* 787 F. Supp. 224 (Ct. Int'l Trade 1992) ........................................................................ 11

*Bristol Metals L.P. et al. v. United States*, 703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ........................................................................ 23, 24

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...... 11

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ........................................................................ 10

*China First Pencil Co., Ltd. v. United States*, 721 F. Supp. 2d 1369 (Ct. Int'l Trade 2010) ........................................................................ 11

*Consol. Edison Corp. v. NLRB,* 305 U.S. 197 (1938) ........................................................................ 10

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ........................................................................ 11

[

] ........................................................................ 58

*GODACO Seafood Joint Stock Co. v. United States,* 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ........................................................................ 61, 62

*Matsushita Elec. Indus. Co. Ltd. v. United States,* 750 F. 2d 927 (Fed. Cir. 1984) ........................................................................ 11

*Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ........................................................................ 11

*Mueller Commercial De Mexico, S. De R.L. De C.V. v. United States,* 753 F.3d 1227 (Fed. Cir. 2014*)* ........................................................................ 53

*Nation Ford Chem. Co. v. United States*, 985 F. Supp. 133 (Ct. Int'l Trade 1997) ........................................ 12,18

*POSCO v. United States,* 353 F. Supp. 3d 1357 (Ct. Int'l Trade 2018) ................................................................53-54

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir. 2001).................................... 18

*Since Hardware (Guangzhou) Co. v. United States*, 37 F. Supp. 3d 1354 (Ct. Int'l Trade 2014)............................... 24

*SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) ...................................... 14

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ............................................................... 10

*Tianjin Mach. Import & Export Corp. v. United States*, 806 F. Supp. 1008 (Ct. Int'l Trade 1992) .................................... 12

*Trs. in Bankruptcy of N. Am. Rubber Thread Co. v. United States*, 558 F. Supp. 2d 1367 (Ct. Int'l Trade 2008) ............................................................... 17

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951)................................................................... 10

*Wuhan Bee Healthy Co. v. United States*, 29 C.I.T. 1275 (2005)................................................................. 24

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 783 F. Supp. 2d 1343 (Ct. Int'l Trade 2011)............................ 67

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015)............................54-55

## Administrative Determinations

*Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 Fed. Reg. 49,460 (Aug. 13, 2010) ..................................................................................... 25

*Aluminum Extrusions From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission, in Part*, 79 Fed. Reg. 96 (Jan. 2, 2014) ....................................................... 54

*Cast Iron Soil Pipe From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 86 Fed. Reg. 72,929 (Dec. 23, 2021) ........................................................................... 42, 46, 51

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review*, 84 Fed. Reg. 18,007 (Apr. 29, 2019) ..................................................................................... 43

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 81 Fed. Reg. 17,435 (Mar. 29, 2016) .................................... 52, 65

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results, Final Results of No Shipments, and Partial Rescission of the Antidumping Duty Administrative Review*, 83 Fed. Reg. 12,717 (Mar. 23, 2018*)* ............................................................. 52-53

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review*, 80 Fed. Reg. 2,394 (Jan. 16, 2015) ..................................................................................... 65

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 86 Fed. Reg. 36,102 (Jul. 8, 2021) ..................... passim

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam:  Notice of Court Decisions Not in Harmony With Final Results of Administrative Review and Notice of Amended Final Results of Antidumping Duty Administrative Review*, 83 Fed. Reg. 36,876 (Jul. 31, 2018) .................................................................64-65

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam:  Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of no Shipments, and Partial Rescission of the Antidumping Duty Administrative Review*, 85 Fed. Reg. 84,300 (Dec. 28, 2020*)*............................................................................ 6

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper Review*, 78 Fed. Reg. 17,350 (Mar. 21, 2013) ......................................... 35

[

] ..................................................... 58

*Certain Frozen Warmwater Shrimp From the People's Republic of China: Notice of Final Results and Rescission, in Part, of 2004/2006 Antidumping Duty Administrative and New Shipper Reviews*, 72 Fed. Reg. 52,049 (Sept. 12, 2007).................................................... 38

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 Fed. Reg. 47,771 (Aug. 9, 2010) ............................................ 26

*Certain Hardwood Plywood Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 85 Fed. Reg. 77,157 (Dec. 1, 2020) ....................................... 48

*Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review*, 85 Fed. Reg. 7,270 (Feb. 7, 2020) .......................................... 48

*Certain Steel Nails From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*, 84 Fed. Reg. 55,906 (Oct. 18, 2019) ............................................................ *passim*, 42, 46, 50

*Certain Steel Nails From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 85 Fed. Reg. 22,399 (Apr. 22, 2020) .......................... 42, 50-51

*Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of the Eleventh Administrative Review and New Shipper Reviews,* 72 Fed. Reg. 34,438 (June 22, 2007) ........................................... 25

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 84 Fed. Reg. 53,411 (Oct. 7, 2019) ................................................................. 6

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 41,808 (Jul. 19, 2010) ......................................... 66

*Notice of Amended Final Antidumping Duty
Determination of Sales at Less Than Fair Value:
Certain Frozen Fish Fillets from the Socialist
Republic of Vietnam*, 68 Fed. Reg. 43,713 (Jul. 24,
2003) .................................................................................................. 64

*Polyester Textured Yarn From the People's Republic of
China: Preliminary Affirmative Determination of
Sales at Less Than Fair Value, Postponement of Final
Determination and Extension of Provisional
Measures*, 84 Fed. Reg. 31,297 (Jul. 1, 2019) ......................................... 47

*Polyester Textured Yarn From the People's Republic of
China: Final Determination of Sales at Less Than
Fair Value, and Final Affirmative Determination of
Critical Circumstances,* 84 Fed. Reg. 63,850 (Nov. 19,
2019) .................................................................................................. 47

## Other Administrative and Legislative Materials

*Import Admin., U.S. Dep't of Commerce, Non—
Market Economy Surrogate Country Selection Process,*
Policy Bulletin 04.1 (2004) ............................................. 13, 24, 41

Trade Preferences Extension Act of 2015, Sec. 502.
(2015) ................................................................................................. 44

Statement of Administrative Action accompanying
Uruguay Round Agreements Act, H.R. Rep. No. 103-
316 (1994) .......................................................................................... 45

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

|  |  |  |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Ct. No. 21-00380 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| QMC FOODS, INC., *et al.*, | ) | |
| | ) | |
| Defendant- | ) | |
| Intervenors. | ) | |

## THE CATFISH FARMERS OF AMERICA, *et al.*'s MEMORANDUM IN SUPPORT OF THE MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of

International Trade, undersigned counsel hereby submits this

memorandum in support of the motion for judgment upon the agency

record filed by the Catfish Farmers of America and individual U.S.

catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a

Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC

d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA").  CFA challenges various determinations by the U.S. Department of Commerce ("Commerce") in the final results of the sixteenth administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam.  As explained below, the Court should find that Commerce's determinations are not supported by substantial evidence and are not in accordance with law, and remand the issues to Commerce for further consideration.

I.     STATEMENT PURSUANT TO RULE 56.2

     A.     The Administrative Determination Under Review

The administrative determination under review is the *Final Results* of Commerce's sixteenth administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't of Commerce Jul. 8, 2021) (fin. results admin. rev.) ("*Final Results*"), P.R. 552,

Appx___, and accompanying unpublished Issues and Decision
Memorandum ("IDM"), P.R. 540, Appx___.[1]

B.    Issues Presented for Review

1.    Was Commerce's selection of India rather than Indonesia as
the primary surrogate country for Vietnam supported by substantial
evidence and in accordance with law when Commerce had selected
Indonesia as the primary surrogate in several prior administrative
reviews, Indonesia's per-capita gross national income ("GNI") was closer
to Vietnam's than in the past, and Indonesia was a significant exporter
of comparable merchandise with a greater number of usable, high-
quality surrogate values?

2.    Was Commerce's refusal to apply an adverse facts available
("AFA") rate to Seafood Joint Stock Company No. 4 Branch Dongtam
Fisheries Processing Company ("DOTASEAFOOD") supported by
substantial evidence and in accordance with law when it failed to
cooperate with Commerce's investigation?

---

[1] "P.R." denotes the Public Record document item number identified in the
Index to Administrative Record filed in this action on October 12, 2021, ECF No. 22;
"C.R." denotes the Confidential Record document item number.

**PUBLIC VERSION**

3.      Was Commerce's determination that non-examined respondent Nam Viet Corporation ("Navico") qualified for a separate rate supported by substantial evidence when the record indicates that Navico provided false information regarding its continued affiliation with Vietnamese exporter [


]?

4.      Having accepted Navico's false information, did Commerce err when it assigned Navico the zero margin calculated for only one mandatory respondent, without considering the rates assigned to all mandatory respondents?

## II.   GLOSSARY OF CASE-SPECIFIC ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **AFA** | Adverse facts available |
| **[** | **]** |
| **CFA** | Catfish Farmers of America, *et al*. |
| **DOTASEAFOOD** | Seafood Joint Stock Company No. 4 Branch Dongtam Fisheries Processing Company |
| **[** | **]** |
| **FAO** | United Nations, Food and Agriculture Organization |
| **GNI** | Gross National Income |
| **HVG** | Members of the collapsed single entity, Hung Vuong Group.  PDM, P.R. 493, at 2, Appx___. |
| **IDM** | Issues and Decision Memorandum |
| **ILOSTAT** | International Labor Organization, labor statistics database |
| **LTFV** | Less-than-fair-value investigation |
| **MMAF** | Ministry of Marine Affairs and Fisheries of the Republic of Indonesia |
| **PDM** | Preliminary Decision Memorandum |
| **[** | **]** |
| **NAVICO** | Nam Viet Corporation |
| **RFI** | Rebuttal Factual Information |
| **SAA** | The Statement of Administrative Action |
| **SRA** | Separate Rate Application |
| **SV** | Surrogate value |

III.   STATEMENT OF THE FACTS

On October 1, 2019, Commerce initiated an administrative review of the antidumping duty order on certain frozen fish fillets from Vietnam.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 53,411, 53,415-16 (Dep't of Commerce Oct. 7, 2019) (notice of initiation), P.R. 28, Appx___.  Commerce selected Vinh Hoan Corporation and its affiliates (collectively, "Vinh Hoan") and DOTASEAFOOD as mandatory respondents.  *See* Commerce's Respondent Selection Memoranda, C.R. 48, Appx___; C.R. 94, Appx___.  Commerce published the preliminary results on December 28, 2020.  *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 84,300 (Dep't of Commerce Dec. 28, 2020) (prelim. results of admin. rev.) ("*Preliminary Results*"), and accompanying unpublished Preliminary Decision Memorandum ("PDM"), P.R. 493, Appx___.  Commerce published the *Final Results* on July 8, 2021.

A.   Selection of the Primary Surrogate Country

For many reviews over the past decade, Commerce selected Indonesia as the primary surrogate country because of its economic comparability to Vietnam, its significant production of frozen fish fillets similar to those produced in Vietnam, and its reliable surrogate values. However, in this review, Commerce did not include Indonesia on its list of potential surrogate countries, deeming it not economically comparable to Vietnam in terms of GNI even though Indonesia was closer to Vietnam than ever before.  *See* Commerce's Surrogate Country List, P.R. 224-226, at Attachment I, Appx___; *see also* CFA's Surrogate Country List Comments, P.R. 227-228, at 8, Exhibits 1, 3, Appx___, Appx___, Appx___. Commerce provided no explanation.  Instead, Commerce selected India as the primary surrogate country despite India not being a producer of merchandise comparable to Vietnam and Indonesia, and India having unreliable surrogate factor of production values.

B.    Incomplete Questionnaire Responses of DOTASEAFOOD

On November 1, 2019, DOTASEAFOOD filed its separate rate

certification.  C.R. 26, Appx___.  Subsequently, DOTASEAFOOD was

selected as a mandatory respondent and required to respond to

Commerce's questionnaires.  Commerce's Respondent Selection

Memorandum, C.R. 94, Appx___.  DOTASEAFOOD chose to cease

cooperating with Commerce's investigation and to stop responding to

Commerce's questionnaires.  IDM, P.R. 540, at 4, 39-40, Appx___,

Appx___.  Despite DOTASEAFOOD's refusal to cooperate, Commerce

did not apply an adverse rate consistent with 19 U.S.C. § 1677e(b) but

instead simply denied DOTASEAFOOD a separate rate and assigned it

the more beneficial rate applicable to the Vietnam entity.

C.    Conflicting Record Evidence Regarding Navico's
       Relationship with [                    ] and its U.S. Customer During
       the Review Period

In the *Final Results*, Commerce granted Navico a separate rate.

IDM, P.R. 540, at 4, 40-42, Appx___, Appx___.  Yet, record evidence

showed that Navico continued to be affiliated with [

                              ].  The record further indicated that Navico was

8.

affiliated with its U.S. customer.  Nevertheless, Commerce relied upon Navico's false information to determine that it was eligible for a separate rate.  IDM, P.R. 540, at 4, 40-42, Appx___, Appx___.

     D.   <u>Navico's Separate Rate Assignment</u>

Pursuant to its established practice in antidumping reviews, Commerce preliminarily assigned Navico the above *de minimis* rate it calculated for mandatory respondent Vinh Hoan.  However, in the *Final Results*, Commerce calculated a zero margin for Vinh Hoan and assigned this margin to Navico without taking into account the above *de minimis* rate assigned to the other mandatory respondent, DOTASEAFOOD.  On July 22, 2021, following a ministerial error allegation filed by CFA, Commerce determined that it had correctly assigned Navico a rate based upon only one mandatory respondent and declined to make any changes to its *Final Results*.  Commerce's Ministerial Error Allegation Memorandum, P.R. 549, Appx___.

IV. ARGUMENT

A.   Standard of Review

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  To determine whether Commerce's interpretation of a statute is "in accordance with law," the courts apply *Chevron*.  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778 (1984).

Substantial evidence "is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F. 3d 978, 985 (Fed. Cir. 1994).

The Court must determine whether the evidence and reasonable inferences from the record support the agency's findings. *Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F. 2d 927, 933 (Fed. Cir. 1984). Careful scrutiny of surrogate value choices is particularly important because "{i}f the proxy values selected prove unrepresentative, reliance on them defeats their purpose, namely, to derive a dumping margin that is as accurate as possible." *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1269 (Ct. Int'l Trade 2006).

Finally, Commerce "may not act arbitrarily in reaching its decision." *China First Pencil Co., Ltd. v. United States*, 721 F. Supp. 2d 1369, 1375 (Ct. Int'l Trade 2010). Its determinations "must have a reviewable, reasoned basis" to be affirmed. *Bando Chem. Indus., Ltd. v. United States*, 787 F. Supp. 224, 227 (Ct. Int'l Trade 1992), *aff'd*. 26 F. 3d 139 (Fed. Cir. 1994). "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

B. <u>Commerce's Rejection of Indonesia and Selection of India as the Primary Surrogate Country is Not Supported by the Record or Commerce's Practice in this Proceeding</u>

In antidumping proceedings involving non-market economy countries, Commerce calculates a dumping margin by comparing U.S. sales to the cost of the factors of production used to produce the subject merchandise in a surrogate market economy country.  19 U.S.C. § 1677b(c).  The purpose of this methodology is to calculate a normal value for the non-market economy producer as close as possible to the value "if such prices or costs were determined by market forces."  *See Tianjin Mach. Import & Export Corp. v. United States*, 806 F. Supp. 1008, 1018 (Ct. Int'l Trade 1992).  Commerce thus attempts to select surrogate values that are "as representative of the situation in the non-market economy as is feasible."  *Nation Ford Chem. Co. v. United States*, 985 F. Supp. 133, 137 (Ct. Int'l Trade 1997) ("*Nation Ford*").

To achieve this goal, the statute directs Commerce to value factors of production using, to the extent possible, the prices or costs in one or more market economy countries that are: (1) at a *comparable* level of economic development to the non-market economy country; and (2) significant producers of comparable merchandise.  19 U.S.C. §

1677b(c)(4).  If more than one market economy country satisfies both statutory criteria, Commerce will select the country that provides the highest quality surrogate value data.  *See* CFA's Surrogate Country List Comments, P.R. 227, at Exhibit 1 (Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process" (Mar. 1, 2004)), Appx___.

Here, Commerce rejected Indonesia as the primary surrogate country in favor of India because it found: (1) that Indonesia was not economically comparable to Vietnam, (2) that India was a significant producer of merchandise comparable to Vietnamese frozen fish fillets, and (3) that Indian data on the record were "superior" to Indonesian data and offered "SV information that best satisfie{d} Commerce's selection criteria."  IDM, P.R. 540, at 28, Appx___.  As explained below, Commerce's determinations are not supported by substantial evidence and are not in accordance with law.

1.    <u>Indonesia was Economically Comparable to
Vietnam and Commerce Failed to Explain Why
Indonesia was Not Included in the List of
Potential Economically Comparable Surrogate
Countries</u>

As explained above, the statute directs Commerce to select

surrogate countries that are (1) at a comparable level of economic

development to the non-market economy country in question, and (2)

significant producers of comparable merchandise.  19 U.S.C. §

1677b(c)(4).  Here, Commerce developed a "non-exhaustive" list of

potential surrogate countries that it deemed to be closest to Vietnam in

terms of per capita GNI and thus at the "same level" of economic

development.  Without explanation, and despite Indonesia's GNI being

closer to Vietnam's than it had been in previous years where Commerce

included Indonesia, Commerce did not include Indonesia on its list, *i.e.*,

it determined that Indonesia was not economically comparable to

Vietnam.  Commerce's determination is arbitrary, unsupported by

substantial evidence, and not in accordance with law.  *See, e.g.,*

*SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct. Int'l

Trade 2016) ("{A} determination is arbitrary when it fails to consider an

14.

important aspect of the problem, or treats similar situations in dissimilar ways.") (internal quotations and citations omitted).

In the *Final Results*, Commerce conceded that it had deemed Indonesia to be economically comparable to Vietnam in prior proceedings "even when it was not on the non-exhaustive list of countries" it determined to have the closest GNI to Vietnam.  IDM, P.R. 540, at 16, Appx___.  However, Commerce did not explain why Indonesia's per-capita GNI, or any other economic indicia, were no longer "comparable" to Vietnam.  Nor, for that matter, did it explain the reasonableness of limiting its definition of economic comparability to a six-country, exclusively GNI-based list.  It simply said circularly that Indonesia was not comparable to Vietnam because Commerce did not include it on its comparability list.  This Court has expressed concern over this practice, explaining that "{t}he opacity and brevity of Commerce's economic comparability analysis makes it difficult for parties to predict what potential surrogate countries may be considered for SV purposes."  *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1265 (Ct. Int'l Trade 2017) at n. 8.

Indeed, record evidence demonstrated the absurdity of Commerce's conclusions in this case:  the ratio of the two countries' GNIs were closer in 2018 than in all prior years, including those in which Indonesia was selected as the primary surrogate.  *See* Table 1.

| Table 1. †Prior Segments of *Frozen Fish Fillets from Vietnam* Where Indonesia Was Selected as the Primary Surrogate, Whether or Not Included on the Commerce List | | | | |
|---|---|---|---|---|
| Review Period | World Bank GNI Data (Year) | Vietnam GNI (A) | Indonesia GNI (B) | (B/A) |
| 2010 − 2011 (8th AR)†* | 2010 | $1,100 | $2,580* | 2.35 |
| 2011 − 2012 (9th AR)† | 2011 | $1,260 | $2,940 | 2.33 |
| 2012 − 2013 (10th AR)† | 2011 | $1,270 | $2,940 | 2.31 |
| 2013 − 2014 (11th AR)† | 2013 | $1,740 | $3,580 | 2.06 |
| 2014 − 2015 (12th AR)†* | 2014 | $1,890 | $3,650* | 1.93 |
| 2015 − 2016 (13th AR)†* | 2016 | $2,050 | $3,400* | 1.66 |
| 2016 − 2017 (14th AR)† * | 2016 | $2,050 | $3,400* | 1.66 |
| 2017 − 2018 (15th AR) | 2017 | $2,170 | $3,540 | 1.63 |
| 2018 − 2019 (16th AR) | 2018 | $2,400 | $3,840 | 1.60 |

* Indonesia was included on Commerce's "List of Surrogate Countries" at the comparable or "same" level of economic development as Vietnam. *See* CFA Surrogate Country List Comments, P.R. 227-228, at 8, Exhibits 1, 3, Appx___, Appx___, Appx___.

Commerce claimed that its use of Indonesia as an economically comparable primary surrogate in past reviews was distinguishable due to "other countries on {its surrogate country lists in those reviews} not

being significant producers of comparable merchandise and/or lacking suitable SV data." IDM, P.R. 540, at 16, Appx___. However, these factors have nothing to do with economic comparability which, as noted above, is a separate and distinct requirement of the statute.

Commerce's initial arbitrary action was its unexplained decision to not include Indonesia on its list of economically comparable countries when it had done so in previous reviews where Indonesia's GNI was *further* from Vietnam. *Trs. in Bankruptcy of N. Am. Rubber Thread Co. v. United States*, 558 F. Supp. 2d 1367, 1370 (Ct. Int'l Trade 2008) ("Generally, an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (quotation and alteration marks and citation omitted)).

Commerce's arbitrarily self-limiting focus on GNI was also erroneous because it ignored other relevant portions of the statute. Notably, Commerce dismissed Indonesia as a potential surrogate because its GNI indicated that it was not at the "same level" of economic development as Vietnam. IDM, P.R. 540, at 17, Appx___. However, the statute does not require countries to be at the "same level" of economic development. Instead, 19 U.S.C. § 1677b(c)(4) requires

17.

them to be at a "comparable" level of economic development and be significant producers of comparable merchandise.  Indonesia satisfies these criteria and Commerce's rejection of Indonesia from consideration as a surrogate country is not supported by substantial evidence and not in accordance with law.

<div align="center">

2.  <u>Indonesia is the Only Significant Producer of<br>Comparable Merchandise</u>

</div>

As discussed above, Commerce declined to consider Indonesia's merits as the primary surrogate country based solely on its arbitrary and unexplained determination to exclude Indonesia from its list of potential surrogate countries.  IDM, P.R. 540, at 15-18, Appx___.  In so doing, Commerce ignored this Court's caution that "a surrogate value must be as representative of the situation in the {non-market economy} country as is feasible, if it is to further the basic purpose of the statute—determining current margins as accurately as possible."  *See Nation Ford*, 985 F. Supp. at 137; *see also Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the

<div align="center">

18.

</div>

best available information and establishes antidumping margins as accurately as possible.").  Indeed, the entire point of the statute's non-market economy methodology is to match the production experience of the respondent as closely as possible as if it were operating in a market economy.

The record establishes that Indonesia's export-oriented industry is a better surrogate for Vietnam and Indonesia offers more accurate surrogate values "representative of the situation" in Vietnam, than does India.  Specifically:

- FAO data indicate that Indonesia ranks second, following Vietnam, in volume of frozen fish fillet exports worldwide. *See* CFA's Surrogate Country Comments, P.R. 234, 236, at 9, Exhibit 2, Appx___, Appx___.

- Indonesia exports more than 40 times the frozen fish fillets exported by India.  *See id*. (FAO).

- India was a net *importer* of frozen fish fillets by a substantial volume (*see* Vinh Hoan's Surrogate Country Comments, P.R. 253, at Exhibit 1, Appx___), which included a substantial volume of frozen pangasius fillets from Vietnam during the review period (*see* CFA's Rebuttal Surrogate Country Comments, P.R. 305, at Exhibit 2, Appx___).

- Indonesia, like Vietnam, was a net exporter of comparable merchandise.  *See* CFA's Surrogate Country Comments, P.R. 236, 240, at Exhibits 2, 6, Appx___, Appx___.

- Only Indonesia produces export-quality frozen fish fillets that compete with those produced by Vietnam (including subject merchandise). *See id.*, P.R. 235, at Exhibit 1 (*Aquaculture Frontiers Report* at 26-27), Appx___ ("Only Indonesia…competes to some degree with Vietnam in {the} export market."); P.R. 237, 239, Exhibit 4, Appx___ (identifying Indonesia as a top-five producer of frozen fish fillets in Asia, including "premium-quality" frozen tilapia fillets which are exported to the United States and European Union); P.R. 240, Exhibit 6, (export data), Appx___; CFA's Pre-Prelim SV Submission, P.R. 450, at Exhibit 8-B, Appx___, (2019 Annual Financial Statement, Japfa Comfeed, at 11, citing exports to countries like Europe and the United States of America); *see also id.*, P.R. 451, at Exhibit 8-B, Appx___ (showing significant exports of Indonesian farm-raised, frozen tilapia fillets to the United States during the review period); Vinh Hoan's Second Supplemental Section C Questionnaire Response, C.R. 503, 504, at Exhibits C-53 and C-60, Appx___, Appx___ (sales documents identifying the merchandise sold by Vinh Hoan to U.S. customers).

- Vietnamese pangasius exporters do not see India as a serious threat or viable competitor. In 2019 a Vietnamese exporter "guessed that it would take India a decade to catch up with Vietnam," as India is currently unable to process the same quality fillets or access the cold storage and processing necessary to supply year-round exports. CFA's Surrogate Country Comments, P.R. 235, at Exhibit 1 (*Aquaculture Frontiers Report* at 26-27), Appx___. Meanwhile, Indian-produced fish is of a lower quality and sold domestically. *See id.*, P.R. 235, at Exhibit 1 (*Aquaculture Frontiers Report* at 26), Appx___; Vinh Hoan Final SV Submission, P.R. 462, at Exhibit FDSV-4, Appx___.

Commerce did not deny the above record evidence demonstrating

that Indonesia's frozen fish fillet market is comparable to Vietnam's

and that India's is not.  Instead, it found that the evidence was
irrelevant to Commerce's comparability analysis because quality/grade
are not mentioned in the scope of this order and are not considered as
product characteristics in the control number buildup in this
proceeding.  IDM, P.R. 540, at 20, Appx___.  Such arguments are
without merit.

All subject merchandise imported from Vietnam into the United
States is subject to quality inspections both prior to departing from
Vietnam and upon entry to the United States.  *See* CFA's
Administrative Case Brief, C.R. 617, at 16-17, Appx___ (detailing
various inspection requirements).  Thus, subject merchandise must
meet certain quality standards simply by virtue of being subject
merchandise and Commerce must attempt to replicate these stringent
standards when seeking a surrogate country.

Similarly, the Vietnamese industry is a world leader in the
production of export-grade frozen pangasius fillets.  The record
demonstrates that, among comparable market-economy countries, *only*
Indonesia is a significant producer of an equivalent quality frozen fish
fillet.  India is not.  Indonesia's pangasius market and industry, and

more importantly, its frozen fish fillet market and industry, closely represent and compete with the Vietnamese frozen fish fillet market and industry.  Consequently, Indonesian surrogate values for the inputs to fish processing are the best representation of the situation in Vietnam and the appropriate choice to calculate margins as accurately as possible.

By refusing to consider whether Indonesia or India produce merchandise that is most comparable to Vietnam, Commerce contradicted the purpose of the non-market economy statute, *i.e.*, to replicate the experience of the respondent as if it were in a market economy.  Consequently, Commerce's determination is not supported by the record and is not in accordance with law.

> 3.  Indonesia Provides Comprehensive Data that are Superior to the Indian Data to Value the Factors of Production

Even if Indonesia and India were equivalent in terms of production of comparable merchandise for purposes of 19 U.S.C. § 1677b(c)(4) (as explained above they are not), the Indonesian surrogate value data would still be superior because they are time-tested, more

specific, and provide better coverage of production factors than the Indian data.  Commerce did not consider Indonesia and India on an equivalent basis when analyzing the surrogate value data, *i.e.*, considering whether the proposed surrogate values are (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the period of review; (4) representative of a broad market average; and (5) publicly available. *See, e.g., Bristol Metals L.P. et al. v. United States*, 703 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2010) ("*Bristol Metals*").  Instead, Commerce emphasized first that the Indonesian data were inferior because Indonesia was not on the list of potential surrogate countries.  But the purpose of comparing the data in the first instance was to see which country should be selected as the primary surrogate country.  Thus, Commerce's analysis was unreasonably circular, and is not supported by substantial evidence.

In any event, as explained below, Commerce's data comparison is not supported by substantial evidence and arbitrarily ignores Commerce's previous determinations regarding identical Indonesian data.

a. *The Indian Fishing Chimes and Undercurrent News data were obtained from unknown sources, do not represent broad market averages, and are not credible or reliable*

Commerce has a longstanding preference for using publicly-available, published, nationwide data to determine surrogate values. *See* CFA's Surrogate Country List Comments, P.R. 227, at Exhibit 1 (Policy Bulletin 04.1, at 3-4), Appx___; *see*, *also, e.g.*, *Bristol Metals,* 703 F. Supp. 2d at 1374. There are several reasons for this preference. The use of broad market averages helps ensure accuracy insofar as unique conditions in one part of the market are less likely to distort a broad average. *See, e.g., Wuhan Bee Healthy Co. v. United States*, 29 C.I.T. 1275, 1278 (2005); *Allied Pac. Food (Dalian) Co., Ltd. v. United States*, 716 F. Supp. 2d 1339, 1341-50 (Ct. Int'l Trade 2010); *Since Hardware (Guangzhou) Co. v. United States*, 37 F. Supp. 3d 1354, 1356-60 (Ct. Int'l Trade 2014). Additionally, published statistics from international organizations, surrogate-country governments, major trade associations, or similar bodies are reliable because they are regularly collected, represent a large number of transactions, and are likely to include details concerning the methodology and sources for the reported

data.  *See, e.g., Fresh Garlic from…China*, 72 Fed. Reg. 34,438 (Dep't of Commerce June 22, 2007) (fin. results admin. rev.), and accompanying IDM at Comment 2.B. (noting that Commerce generally finds "official government publications to be reliable and credible sources of information" and that it generally considers country-wide data to be preferable to regional data "because the more broad-based the value, the greater the likelihood that the value is representative") (citations omitted).  By contrast, Commerce has previously rejected as unreliable prices published in a private "opinion piece" that failed to provide "actual prices and broad ranges of data, supported by information showing the conditions under which prices were gathered or researched."  *See, e.g., Certain Frozen Warmwater Shrimp from…China*, 75 Fed. Reg. 49,460 (Dep't of Commerce Aug. 13, 2010) (fin. results admin. rev.), and accompanying IDM at Comment 3.

Here, despite its established preference for published nationwide government statistics, Commerce rejected high quality, reliable aquaculture data published on an annual basis by the Indonesian Ministry of Marine Affairs and Fisheries ("MMAF") in favor of unreliable Indian data from one-off private surveys.

Specifically, the Indonesian data, which Commerce has determined to be reliable in multiple prior reviews, are based on an annual "aquaculture production survey" conducted for the past two decades by the MMAF.  *See*, *e.g.*, CFA's Pre-Prelim SV Submission, P.R. 445-446, at Exhibit 4, Appx___; CFA's Surrogate Country Comments, P.R. 240-241, 243, at Exhibits 7-A, 7-B, Appx___, Appx___.  These production data are published for six different provinces in Indonesia, comprised of 34 local jurisdictions.  *See id*.

By contrast, the Indian data comes from one-off private surveys published in the *Fishing Chimes* magazine and *Undercurrent News*' online "Prices Portal."  In particular, the *Fishing Chimes* data are the result of a single private survey covering just 54 farmers in two districts of a single Indian state, Andhra Pradesh.  IDM, P.R. 540, at 28, Appx___; Vinh Hoan's SV Submission, P.R. 291, Exhibits SV-4(b)-SV-4(c), Appx___.  Commerce has previously found just such a geographical limitation sufficient to reject surrogate pricing data.  *See generally Certain Frozen Warmwater Shrimp from…Vietnam*, 75 Fed. Reg. 47,771 (Dep't. Commerce Aug. 9, 2010) (fin. results admin. rev.) and accompanying IDM at Comment 1 (rejecting Indian pricing data for raw

26.

shrimp because they were limited to "a single state, Andhra Pradesh").

Such rejection was even more justified here as the authors of the

*Fishing Chimes* study themselves acknowledge the "paucity of

information on pangasius aquaculture in India" which left Commerce

with no method to corroborate the reliability of the privately-collected,

geographically limited data.  Vinh Hoan's SV Submission, P.R. 291, at

Exhibits SV-4(b)-SV-4(c), Appx___.

Similarly, the *Undercurrent News* data are the result of private

surveys from an unknown source that represent prices from unspecified

regions of India.  Vinh Hoan's Final SV Submission, P.R. 462-463, at

Exhibits FDSV-6 through FDSV-10, Appx___.  Indeed, the record

indicates that these data are irregular and distortive.  CFA's Response

to Vinh Hoan's Pre-Prelim Comments & RFI Submission, P.R. 481, at

Appendix 1, Appx___ (release of Indian pangasius prices were not

regular or announced, unlike other prices reported by *Undercurrent

News*), P.R. 481-482, Appendix 2, Appx___ (summary and printout of all

*Undercurrent News* "Seafood prices" datasets published in its "Prices

Portal" demonstrating that the Indian pangasius pricing data are clear

outliers).  Commerce dismissed this evidence without explanation.

IDM, P.R. 540, at 29, Appx___ ("With respect to the petitioners'
suggestion that the {*Undercurrent News*} data may have been generated
for the purpose of this proceeding, there is no evidence to support the
claim").

The record demonstrates that the primary sources of Indian data,
*Fishing Chimes* magazine and *Undercurrent News*, are unreliable and
do not satisfy Commerce's normal surrogate value criteria.  Conversely,
the Indonesian data are based primarily upon government statistics
and Commerce has determined previously that they satisfy the breadth
of its surrogate value criteria.  In these circumstances, Commerce's
reliance on Indian data and its selection of India as the primary
surrogate was unreasonable and unsupported by the record.

> b. *The Indian surrogate data for the main production*
> *inputs do not represent broad market averages and are*
> *not specific to the respondent's inputs*

Commerce's determination to rely upon Indian data to value main
production inputs (*i.e.,* whole live fish, fingerlings, and fish feed) instead
of the more accurate, more reliable, and previously used Indonesian
data was unsupported by substantial evidence.  As has been the case for

many years, the record contained reliable Indonesian pricing data for

all major production inputs.  In particular, the record contained:

- Indonesian government-sourced production data for <u>whole live fish</u> harvested from freshwater ponds in 31 different Indonesian jurisdictions that record evidence demonstrates are specific to *pangasius hypophthalmus* (or as it is known in Indonesia, patin siam) and reflective of the review period, *see* CFA's Pre-Prelim SV Submission, P.R. 445-447, at Exhibits 3-5, Appx___;

- Indonesian government-sourced <u>fingerling</u> pricing data information from hatcheries throughout Indonesia that are specific to the *pangasius hypophthalmus* species and overlap with all of Vinh Hoan's fingerling size ranges (*i.e.*, 4-5 inches, 5-6 inches, and greater than 6 inches), *see* CFA's SV Submission, P.R. 265, at Exhibit 5-B, Appx___; CFA's Additional Pre-Prelim SV Submission, P.R. 465-468, at Exhibit, Appx___;

- Indonesian price lists for <u>fish feed</u> specific to the type used by Vinh Hoan that are regularly collected throughout Indonesia, accompanied by sworn affidavits explaining their collection methodology, and corroborated by country-wide feed pricing data from the Indonesian government and Indonesian feed mill association, *see* CFA's Pre-Prelim SV Submission, P.R. 445, 447, at Exhibits 1, 6, Appx___, Appx___; *see also* CFA's SV Submission, P.R. 265-267, at Exhibit 5-D, Appx___; CFA's Additional Pre-Prelim SV Submission, P.R. 465-468, at Exhibit, Appx___.

Commerce determined that these data were sufficiently specific and

representative of broad market averages in prior administrative

reviews.  Yet here, Commerce rejected these data in favor of

unvalidated Indian pricing data that did not represent nationwide, or

even province-wide prices, and which were not specific to the inputs used by Vinh Hoan.

*First*, as explained above, neither the *Fishing Chimes* nor *Undercurrent News* data reflect broad market averages. Instead, the *Fishing Chimes* study reflects input prices reported by only 54 farmers in one Indian state or their suppliers. Meanwhile, the *Undercurrent News* data are devoid of production data corresponding to the reported prices and were compiled by unspecified means by unknown individuals and supplied by unnamed sources. Vinh Hoan's Final SV Submission, P.R. 462-463, at Exhibits FDSV-6 through FDSV-10, Appx___.

*Second*, for both the fingerling and fish feed inputs, the *Fishing Chimes* and *Undercurrent News* data were not as specific as the Indonesian data to the production inputs used by Vinh Hoan in this review. In particular, while the Indonesian fingerling data was contemporaneous and size- and species- specific, the Indian data sources were only partially-specific and partially-contemporaneous, as the *Fishing Chimes* study covered only part of the review period and the *Undercurrent News* data "do not capture one size used by Vinh Hoan." IDM, P.R. 540, at 29, Appx___. Similarly, unlike the Indonesian data

(which included surrogate data for feed containing 22% and 26% protein content), the Indian data were not specific to the types of feed used by Vinh Hoan.  In particular, Commerce valued 22% protein-content feed using less-specific 24% protein-content Indian surrogate values.  *Id*.  To value Vinh Hoan's 26% protein-content fish feed, Commerce used the average of the average of the 2018 *Fishing Chimes* data for feed with 26% protein content and the Jan.-July 2019 *Undercurrent News* data for feed with 28% protein content.  Commerce's SV Memorandum, P.R. 498, at Attachment 1, Appx___.

For all these reasons, the Indonesian main input data were superior to the Indian data and justified Indonesia's selection as the primary surrogate country.

### c.  *Indonesian wage rates were contemporaneous with the review period and superior to the Indian rates*

Commerce's determination to rely upon decades-old Indian labor rate data instead of the more recent and more accurate Indonesian labor rate data was unsupported by substantial evidence.  In particular, the record contained Indonesian labor rates from the International Labor Organization's ILOSTAT statistics database which are

contemporaneous and specific to Vinh Hoan's farming and processing
activities, representing wages paid to "Agriculture" and
"Manufacturing" workers, respectively.  CFA's SV Submission,
P.R. 267-268, at Exhibit 9, Appx___.  However, Commerce chose instead
to value all five of Vinh Hoan's labor inputs using a 2006 Indian labor
rate from the ILOSTAT statistics database, that included no
explanatory or supporting information on the relevant sector.
Commerce's SV Memorandum, P.R. 498, at Attachment 1, Appx___
(citing Vinh Hoan SV Submission, P.R. 292, at Exhibit SV-9, Appx___);
*see also* Commerce's Final Analysis Memorandum, C.R. 632, at
Attachments 1, 3, Appx___, Appx___.

Commerce justified its selection of the less-specific and
noncontemporary Indian labor data based on its observation that labor
comprised a "very small proportion" of the normal value compared to
the main inputs.  IDM, P.R. 540, at 30, Appx___.  However, such
reasoning is circular because it is based on the inappropriate 2006
Indian labor rates at issue.  It is also contradicted by the record, which
indicates that labor can represent a significant portion of a respondent's
processing costs.  *See*, *e.g.*, CFA's Feb. 13th RFI Submission, P.R. 191-

192, at Exhibit 7, Appx___ ("Description of the Pangasius value chain in Vietnam" report, at 40, showing that labor can represent roughly 8% of its total processing costs, which is significant).

> ### d. *Commerce correctly relied upon Indonesian fish oil data because the Indian data were unreliable but ignored the same unreliability for other by-products and fish meal*

In the *Final Results*, Commerce admitted that the Indian surrogate value data for fish oil—a by-product of the production of subject merchandise—was "lacking" and "produced anomalous results" and therefore properly concluded that the Indonesian value was superior.  IDM, P.R. 540, at 30, Appx___.  However, Commerce relied upon Indian frozen by-product and fish meal data even though they also "produced anomalous results."  In particular, Commerce relied on an Indian surrogate value for Vinh Hoan's frozen by-products (309.80 Rs./kg.) that was four times higher than the surrogate value it used for whole live fish (76.20 Rs./kg.).  Commerce's Final Analysis Memorandum, C.R. 632, at Attachment 1, Appx___.  Similarly, Commerce used an Indian surrogate value for Vinh Hoan's fish meal co-product (100.82 Rs./kg.) that was substantially higher than the whole

live fish input (76.20 Rs./kg.).  *Id.*  As Commerce and this Court have determined previously in this proceeding, it is absurd that by-product and co-product output values would exceed the value of the main input. *See*, *e.g.*, *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304, 1311 (Ct. Int'l Trade 2018).  In that case, the Court also affirmed Commerce's finding that the import heading was not specific to the fish oil input.  The identical lack of specificity is present here because the import headings are not specific to "pangasius" frozen by-products and fish meal.  Rather, Indian import ship manifest data that none of the Indian imports of frozen by-products and fish meal pertained to pangasius (showing, for example, that Indian imports under the 0304.99 heading pertain to non-pangasius frozen <u>fillets</u> and "frozen fish paste" which are not specific to respondent's frozen by-products).  *See* CFA's Rebuttal SV Submission, P.R. 319-320, at Exhibit 6, Appx___.

Commerce's use of these distortive Indian values [

] respondent's normal value.  Indeed, to combat the distortion caused by using surrogate by-product or co-product values that exceed the value of the main inputs, Commerce normally caps the

by-product or co-product offset so that it cannot exceed the value of the inputs.  *See, e.g., Certain Frozen Fish Fillets from…Vietnam*, 78 Fed. Reg. 17,350 (Dep't of Commerce Mar. 21, 2013) (fin. results admin. rev.), and accompanying IDM at Comment XXIII (Commerce has "the practice of rejecting or capping the by-product SV based on the premise that the by-product should not be priced in excess of the value of the product from which it was derived.").  However, Commerce did not do so here and instead chose to rely on distortive, non-specific Indian by-product and fish meal co-product data, despite the record containing quality, and internally consistent, Indonesian data.

These absurd and distortive results would not have occurred had Commerce relied only upon Indonesian data.  Rather, Indonesian data would have yielded by-product and co-product values that are lower than the main input value and that are in line with normal by-product and co-product processing.  Commerce's determination is not supported by the record and common sense, and demonstrates again why Indonesia should have been selected as the primary surrogate country.

e. *Commerce admittedly relied upon questionable Indian financial statements despite having multiple reliable Indonesian statements on the record representing the operations of profitable processors of comparable merchandise covering the entire review period*

Commerce relied on the financial statements of Indian "cold processors of marine products" to value Vinh Hoan's financial ratios. IDM, P.R. 540, at 31, Appx___.  Commerce admitted that the record lacks detailed information to fully ascertain whether their operations pertain to comparable merchandise or whether they have capital structures similar to Vinh Hoan for surrogate valuation purposes ("key criterion for surrogate financial statements selection").  *Id*.  Despite these shortcomings, Commerce inexplicably limited its analysis of the Indian surrogate financial statements to whether they produced "fish fillets" and determined that the Indian financials were viable surrogates.  *Id*.  That determination is not supported by substantial evidence.

First, it is no surprise that the record does not contain reliable financial statements from Indian frozen fish fillet producers because, as detailed above, India was not a significant producer of comparable merchandise (*i.e.*, export-quality <u>frozen</u> fish <u>fillets</u>).  Instead, the Indian

data represent companies that are "marine cold processors." But even Commerce admitted that "there is no evidence on the record demonstrating that marine processing is anything other than cold processing." IDM, P.R. 540, at 31, n.165, Appx___. That is, "cold processing" is not frozen fish fillet production. For example, the record does not include evidence that MMC Exports Limited ("MMC") produced comparable merchandise during the review period (*i.e.*, export-quality frozen fish fillets). Unlike the Indonesian financials, MMC's financials do not reference any deep freezers or other assets that would indicate it sold marine products in frozen form. Vinh Hoan's SV Submission, P.R. 296, at Exhibit SV-15(b), Note-5 (Fixed Assets – Tangible Assets), Appx___. Ignoring this evidence, Commerce determined that MMC's "marine products" included "fish fillets" but there is no evidence on the record to support this determination. IDM, P.R. 540, at 31, n.165, Appx___.

Second, Commerce's stated practice in selecting surrogate financial statements is "to use financial statements for a fiscal year which overlaps during the greatest number of months of the appropriate {review period}." *Id.* However, here Commerce rejected the

37.

four sets of Indonesian financial statements—which together cover the entire period of review—in favor of Indian financial statements that were only partially contemporaneous and therefore less representative. IDM, P.R. 540, at 30, Appx___ (only overlapping with the review period for eight months).

Third, the record indicates that MMC and Mulpuri Aqua Processors Private Limited ("Mulpuri Aqua") are unhealthy companies, with financials resulting in *de minimis* profit rates of 0.01% and 1.30%[2], respectively.  Commerce has an established practice of "disregarding financial ratios with a zero profit when there are other financial statements of other surrogate companies that have earned positive profit on the record."  *See*, *e.g.*, *Certain Frozen Warmwater Shrimp from…Vietnam*, 72 Fed. Reg. 52,049 (Dep't of Commerce Sept. 12, 2007) (fin. results admin. rev.), and accompanying IDM at Comment 2. Similarly, Commerce should not rely on financials that produce *de*

---

[2] Other record evidence shows that Mulpuri Aqua's processing operations were not profitable, yet Commerce dismissed this evidence as "speculation" because it came from the Chief Executive Officer of Mulpuri's "competitor" (*i.e.*, Mr. U. Murali Anand Varma of Ananda Enterprises).  IDM, P.R. 540, at 32, Appx___; *see also* CFA's Rebuttal SV Submission, P.R. 314-318, at Exhibit 2, Appx___.  Yet, there is nothing on the record impugning the credibility of this evidence.

*minimis* profit ratios as doing so distorts its surrogate profit ratios and by extension its normal value calculations, particularly when it averages *de minimis* profit ratios with non-*de minimis* profit ratios. The Indonesian data do not present this problem because they include above *de minimis* profit ratios.

As shown, none of the Indian financial statements were viable surrogates.  However, the record also provided four, viable Indonesian financial statements.  CFA's SV Submission, P.R. 273-274, 276-277, at Exhibits 12-A, 12-D, Appx___, Appx___; CFA's Pre-Prelim SV Submission, P.R. 449-451, at Exhibits 8-A, 8-B, Appx___, Appx___. Commerce did not even address the superior quality of these statements, instead noting that it relied on the Indian financial statements to compute surrogate financial ratios "because India is the primary surrogate financial country."  IDM, P.R. 540, at 33, Appx___. As noted previously, such circular logic does not substantial evidence make.

Instead, the existence of multiple financial statements in Indonesia (including the operations of a fully integrated processor of

frozen fish fillets) further tip the scale toward Indonesia, not India, as the primary surrogate country.

4. Conclusion

As shown above, the record evidence establishes that, as in prior administrative reviews, Indonesia remained economically "comparable" to Vietnam in terms of GNI. Commerce's determination that Indonesia did not meet the requirement of 19 U.S.C. § 1677b(c)(4) solely because it was not on Commerce's "non-exhaustive" six-country list was an arbitrary departure from past practice in this proceeding. More importantly, though, the record establishes that Indonesia, unlike India, had a large, export-oriented industry producing frozen fish fillets and competing in the world market with Vietnam. The record thus demonstrates that only Indonesia, and not India, was a significant producer of product comparable to the Vietnamese frozen fish fillets covered by the underlying antidumping duty order.

Finally, examining the quality of the individual factors of production data, record evidence demonstrates that Indonesian data were reported in regularly published government reports covering the

entire country.  Even the Indonesia fingerling price lists, which were collected by private survey, were broad-based, regularly and systematically conducted, documented over many years, and corroborated by government data.  By contrast, the Indian data Commerce utilized in this proceeding were obtained from a one-off private survey of a limited number of pangasius producers in a single Indian state and private data collected from unknown sources and non-specific regions in India.  Moreover, record evidence establishes that various Indian factor data were not specific or distortive.

For these reasons, applying the criteria set forth in 19 U.S.C. § 1677b(c) and in Policy Bulletin 04.1, the record evidence did not support the selection of India as the primary surrogate.  This matter should therefore be remanded with instructions to reconsider and revise the determination using Indonesia as the primary surrogate for Vietnam.

C.   Commerce's Determination to Reward DOTASEAFOOD
     with a Non-Adverse Rate Despite DOTASEAFOOD's Refusal
     to Cooperate is Not Supported by Substantial Evidence and
     is Contrary to Commerce's Practice and the Purpose of the
     Law

In non-market economy proceedings, Commerce presumes that all
entities are subject to government influence and are part of the non-
market economy-entity unless they demonstrate entitlement to a
separate rate.  PDM, P.R. 493, at 7-9, Appx___.  Under a separate
provision of the statute, Commerce may apply adverse inferences to
companies that fail to cooperate to the best of their ability during a
proceeding.  19 U.S.C. § 1677e(b).  Commerce's practice is to assign non-
cooperative companies the highest rate from the history of the
proceeding as an AFA rate.  *See, e.g., Certain Steel Nails from…China*,
84 Fed. Reg. 55,906, 55,907 (Dep't of Commerce Oct. 18, 2019) (prelim.
results admin rev.), and accompanying PDM ("*Steel Nails from China
PDM*") at 13-15 (unchanged in *Final Results*, 85 Fed. Reg. 22,399,
22,400 (Dep't of Commerce Apr. 22, 2020); *Cast Iron Soil Pipe
from…China*, 86 Fed. Reg. 72,929, 72,930 (Dep't of Commerce Dec. 23,
2021) (fin. results admin. rev.), and accompanying IDM ("*Soil Pipe from
China IDM*") at Comment 1.

In its *Final Results*, Commerce acknowledged that mandatory respondent DOTASEAFOOD had failed to respond to Commerce's supplemental requests for information.  IDM, P.R. 540, at 40, Appx___. However, rather than apply a separate, AFA rate to DOTASEAFOOD pursuant to 19 U.S.C. § 1677e(b), which Commerce has done under analogous circumstances, Commerce instead assigned DOTASEAFOOD the current Vietnam-wide entity rate of $2.39/kg.  This rate is not adverse because it is far lower than the traditional AFA rate in this proceeding, *i.e.*, $3.87/kg. (the highest rate applied in prior segments). *See*, *e.g.*, *Certain Frozen Fish Fillets from…Vietnam*, 84 Fed. Reg. 18,007, 18,008 (Dep't of Commerce Apr. 29, 2019) (fin. results admin. rev.), and accompanying IDM at 37.  As explained below, Commerce's determination to reward DOTASEAFOOD with a non-adverse rate is contrary the purpose of 19 U.S.C. § 1677e(b), inconsistent with agency practice, and negates adverse rates assigned to other respondents.

    1.  <u>Commerce's Determination Unlawfully Ignores 19 U.S.C. § 1677e(b)</u>

There is no dispute that DOTASEAFOOD failed to cooperate and ceased participating in Commerce's review.  However, Commerce

provided no explanation for its refusal to apply 19 U.S.C. § 1677e(b) in the face of this non-cooperation.  IDM, P.R. 540, at 40, Appx___.  Rather, Commerce simply reiterated its preliminary determination, which focused solely on the impact of DOTASEAFOOD's non-cooperation on its eligibility for a separate rate.  *Id.*  Commerce's determination ignores its statutory obligation to enforce its antidumping duty laws.

The statute, Statement of Administrative Action ("SAA"), and agency and court precedent unanimously affirm Commerce's application of AFA to deter noncooperation.  Indeed, Congress recently affirmed this tenet of enforcement as part of the Trade Preferences Extension Act of 2015, Sec. 502.  Pub. L. No. 114-27, 129 Stat. 362, 384 (2015) (where Congress confirmed that Commerce has the "discretion to apply {the} highest rate" as AFA).  As explained above, 19 U.S.C. § 1677e(b) provides that if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . {Commerce} may use an inference that is *adverse to the interests of that party* in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b) (emphasis added).  The SAA – the

authoritative expression of the United States concerning the statute –
adds that the use of adverse inferences is "the only incentive to foreign
exporters and producers" to comply with the agency's requests for
information.  SAA accompanying the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, vol. 1, at 868, 870 (1994), *reprinted in* 1994
U.S.C.C.A.N. 4040, 4199; *see also* 19 U.S.C. § 3512(d) (stating that the
SAA "shall be regarded as an authoritative expression by the United
States concerning the interpretation and application of the Uruguay
Round Agreements and this Act in any judicial proceeding in which a
question arises concerning such interpretation or application").  The
SAA specifically instructs that, where a party has not cooperated,
Commerce is authorized to use adverse inferences "to ensure that the
party does not obtain a more favorable result by failing to cooperate
than if it had cooperated fully, {and} in employing adverse inferences,
one factor the agenc{y} will consider is the extent to which a party may
benefit from its own lack of cooperation."  SAA at 870, 1994
U.S.C.C.A.N. at 4199.

    In the instant review, DOTASEAFOOD's refusal to respond to
Commerce's supplemental questionnaire satisfies the statutory

requirement for adverse inferences.  Yet, Commerce inexplicably did not

reach this determination.  Instead, Commerce ignored the adverse

inferences warranted by DOTASEAFOOD's failure to cooperate and

found only that DOTASEAFOOD failed to establish its eligibility for

separate rate status.  In doing so, Commerce assigned DOTASEAFOOD

a rate that is lower than the traditional AFA rate in this proceeding.

This means that DOTASEAFOOD benefitted from its refusal to

cooperate, *i.e.*, Commerce's determination failed to fulfill its statutory

mandate to ensure that a respondent does not benefit from its failure to

cooperate.

### 2. Commerce's Determination Contradicts its Practice

As noted above, Commerce's longstanding practice when a

respondent fails to cooperate is to assign that respondent the highest

rate from the history of the proceeding.  *Steel Nails from China PDM* at

13-15; *Soil Pipe from China IDM* at Comment 1.  Commerce cited two

cases to support its refusal to assign an adverse rate to

DOTASEAFOOD.  PDM, P.R. 493, at 9, n. 63, Appx___; IDM, P.R. 540,

at 40, n. 216, Appx___.  However, these cases are distinguishable from

46.

the instant case and do not support Commerce's failure to assign

DOTASEAFOOD an adverse rate in this review.

In the first case, *Polyester Textured Yarn from China*, Commerce

was conducting an antidumping *investigation*, not an administrative

review.  This is relevant because it meant in that case the China-wide

entity was subject to investigation and thus was subject to an adverse

rate that would apply to any non-cooperative company.  Indeed, because

of the reporting failures of the three respondents (and others),

Commerce assigned the China-wide entity (and all companies within it)

the highest petition rate as an AFA rate.  *Polyester Textured Yarn*

*from…China*, 84 Fed. Reg. 31,297 (Dep't of Commerce Jul. 1, 2019)

(prelim. LTFV deter.), and accompanying PDM at 10, 13-17, unchanged

in *Final Determination*, 84 Fed. Reg. 63,850, 63,852 (Dep't of Commerce

Nov. 19, 2019).  Consistent with the statute, this assignment ensured

that noncooperative respondents would not benefit from their failure to

cooperate and would encourage them to cooperate in the future.

By contrast, here the Vietnam-wide entity was not subject to

review, meaning its previously assigned rate, which is lower than the

current AFA rate in this proceeding, would remain unchanged.  IDM,

47.

P.R. 540, at 14, Appx___.  By assigning DOTASEAFOOD a rate lower than the AFA rate, Commerce missed the point of *Polyester Textured Yarn from China*, which was to apply the highest rate possible to noncooperative respondents.

The second case, *Certain Hardwood Plywood Products from China*, also does not support Commerce's determination.  As here, that case involved an administrative review where the China-wide entity was not subject to review.  *Certain Hardwood Plywood Products from…China*, 85 Fed. Reg. 7,270 (Dep't of Commerce Feb. 7, 2020) (prelim. results admin. rev.), and accompanying PDM at 11-12, unchanged in *Final Results*, 85 Fed. Reg.  77,157 (Dep't of Commerce Dec. 1, 2020).  Critically however, the non-cooperative respondents in that case were not selected as mandatory respondents.  This means they could only be subject to the China-wide entity rate or a separate rate based upon the mandatory respondents' data.  That is, the respondents did not have the ability to consider whether their own data would produce a better result than the AFA rate.  In any event, and just like in *Polyester Textured Yarn from China*, the rate assigned to the China-wide entity in *Certain Hardwood Plywood Products from China*

48.

was the highest dumping margin calculated in any segment of that proceeding. *Id.* Thus, it fulfilled the deterrent purpose of the statute.

Here, DOTASEAFOOD was selected as a mandatory respondent, meaning that it was subject to a full dumping calculation to determine its rate. DOTASEAFOOD had the opportunity to analyze its own data and see the rate it was facing, and it chose to stop cooperating because it knew it would obtain a better rate by not cooperating. Commerce's practice of assigning the highest rate as an AFA rate in this situation is designed to discourage just such behavior, but instead Commerce assigned DOTASEAFOOD the Vietnam-wide entity rate, which is *lower* than the adverse rate Commerce previously assigned to non-cooperative respondents in this proceeding.

More demonstrative of Commerce's practice under similar facts is its recent review of *Certain Steel Nails from China*. There, the non-market economy-wide entity was not subject to review and the mandatory respondent, Universal, submitted a separate rate certification but then chose to cease participating in the review. Commerce correctly applied an AFA rate to Universal. In particular, Commerce explained that under 19 U.S.C. § 1677e(a)(1):

{N}ecessary information needed to calculate a margin is not available on the record of this proceeding.  Further, based upon Universal's failure to submit responses to Commerce's questionnaire, Commerce finds that Universal withheld requested information, failed to provide the information by the deadline for submission, and significantly impeded this proceeding, pursuant to sections 776(a)(2)(A), (B), and (C) of the {Tariff Act of 1930, as amended}.  Therefore, Commerce must rely on the facts otherwise available in order to determine the preliminary margin for Universal.

*Steel Nails from China PDM* at 13-14.

Commerce also found that Universal's failure to respond demonstrated a failure to act to the best of its ability in complying with Commerce's requests pursuant to section 776(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1677e(b)).  *Id.* at 14.  Accordingly, Commerce found that the application of AFA to Universal was warranted and assigned Universal a separate rate of 118.04 percent, which was the highest rate applied in any segment of that proceeding. Although the adverse rate was the same as the rate assigned to the China-wide entity in that case, Commerce explicitly did not simply assign Universal the non-market economy-rate without considering its failure to cooperate.  *Id.* at 14-15.  To the contrary, Commerce was clear that Universal's rate was its own AFA rate and Commerce included

50.

Universal's adverse rate in its calculation of the average rate for all
mandatory respondents and assigned this average rate to separate rate
respondents which were not individually examined.  *Id*. at 20
(unchanged in *Final Results*, 85 Fed. Reg. 22,399, 22,400 (Dep't of
Commerce Apr. 22, 2020), and accompanying IDM at Comment 1).

Following Commerce's determination in *Certain Steel Nails from
China* and, for the reasons outlined above, Commerce's determination
to assign DOTASEAFOOD a non-adverse rate here violates Commerce's
practice in similar cases.  IDM, P.R. 540, at 40, Appx___; *see also Soil
Pipe from China* IDM at Comment 1.

### 3. DOTASEAFOOD's Noncooperative Suppliers Should Not Benefit from a Lower Cash Deposit Rate

Not only did Commerce's failure to assign DOTASEAFOOD an
adverse rate reward DOTASEAFOOD for its noncooperation, but it also
benefited the DOTASEAFOOD suppliers that were previously assigned
the AFA rate for failing to cooperate.  DOTASEAFOOD did not have an
active registration to export self-produced merchandise during the
period of review.  *See* CFA's Oct. 29th RFI Submission at Exhibit 2, C.R.
9-10, Appx___.  Thus, it could not export its own production into the

U.S. market.  However, DOTASEAFOOD did have a relatively low duty deposit rate of $0.69/kg. and it chose to take advantage of that fact by reselling subject merchandise produced by other, registered suppliers that were subject to the AFA rate because of their previous noncooperation.

Specifically, the Hung Vuong Group ("HVG") and its affiliates Europe and Mascato, which received a duty deposit rate of $3.87/kg. in the 13th (2015-2016) review, funneled their U.S. exports through DOTASEAFOOD, which had a duty deposit rate of only $0.69/kg. during the current review period.  *See Certain Frozen Fish Fillets from…Vietnam*, 83 Fed. Reg. 12,717, 12,718 (Dep't of Commerce Mar. 23, 2018) (fin. results admin. rev.) ("*2015-2016 Final Results*"); *Certain Frozen Fish Fillets from…Vietnam*, 81 Fed. Reg. 17,435, 17,437 (Dep't of Commerce Mar. 29, 2016) (fin. results admin. rev.) ("*2013-2014 Final Results*") (noting a rate of $0.69/kg. for Seafood Joint Stock Company No.4 Branch Dongtam Fisheries Processing Company, the full name of DOTASEAFOOD).  Likewise, [

] entries were subject to a cash deposit rate of $3.87/kg. during the review period.  *See 2015-2016 Final*

*Results*, 83 Fed. Reg. at 12,718.  Rather than export for its own account,

[                    ] instead sold subject merchandise that it produced to

[          ], who in turn sold the merchandise to DOTASEAFOOD.

DOTASEAFOOD Section D Response, C.R. 163, at 2, Appx___.

DOTASEAFOOD then resold this merchandise back to [                ]

U.S. affiliate, [                              ].  *See id.*; *see also*

CFA's Mar. 27th RFI Submission, C.R. 166, at Exhibit 3, Appx___

(identifying [                              ]) and CFA's Nov. 15th RFI

Submission, C.R. 34, at Exhibit 3, Appx___ (together this information

shows that [

                                                        ]).

Through this scheme, [                ] thus avoided the $3.87/kg.

antidumping cash deposit and instead its U.S. entries were subject to

the far lower DOTASEAFOOD rate of $0.69/kg.

　　　Both HVG and [                ] were thus able to "evade {their}

own AFA  rate … by exporting {their} goods through

{DOTASEAFOOD}."  *Mueller Commercial De Mexico, S. De R.L. De C.V.
v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014); *see also*, *e.g.*,

*POSCO v. United States,* 353 F. Supp. 3d 1357, 1381 (Ct. Int'l Trade

2018).  Because Commerce did not apply the adverse rate to DOTASEAFOOD, all Vietnamese producers with the adverse rate are now incentivized to ship through DOTASEAFOOD and DOTASEAFOOD is incentivized to not cooperate and receive the lower Vietnam-entity rate.

### D. Commerce's Granting of a Separate Rate to Navico was Unsupported by Record Evidence

When a respondent applies for a separate rate, it must report its affiliated companies and demonstrate that none is subject to government influence.  *See*, *e.g.*, *Aluminum Extrusions from…China*, 79 Fed. Reg. 96 (Dep't of Commerce Jan. 2, 2014) (fin. results admin. rev.), and accompanying IDM at Comment 6 (upheld in *Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1308 (Ct. Int'l Trade 2015) ("Commerce reviewed all components that constitute the collapsed entity, that is, Xinya, Guang Ya, and Zhongya.  Any responses should have included data for all three companies. Xinya and Guang Ya did not respond with their data.  Therefore, Commerce correctly concluded that the collapsed entity failed to demonstrate that it was eligible for a separate rate and thus it is part of the China-wide

entity").  If any affiliated entity is subject to government influence, then

Commerce does not assign the respondent a separate rate.  *See id.*

Commerce granted Navico a separate rate despite record evidence

indicating that Navico was affiliated with [

                                            ].  IDM, P.R. 540, at 41-42, Appx___.

Commerce rejected this evidence because it determined that it "largely

pre-dates the POR and/or is otherwise not dispositive regarding

affiliation."  *Id.*  Commerce's explanation is not supported by the record.

The record showed that Navico and related entities were owned

and operated by [



                                ].  *See* Navico's Supplemental SRA Response,

C.R. 477, at 2-4, Exhibit 1, Appx___; *see also* CFA's Nov. 2ⁿᵈ RFI

Submission, C.R. 484, at Attachment 1 (an [

                                            ]), Appx___.  The

record also showed that [



        ].  *See* [

].  The record further indicated that

[                                    ] the current review period, [

], Navico [

].  CFA's Oct. 29th RFI Submission, C.R. 16, 20, at Exhibit 5,

Appx___ ([

].  *See* [

]; *see also*, *e.g.*, CFA's Nov. 2nd RFI Submission, C.R. 484, at

Exhibit, Appx___.

Although this [

], the record demonstrated that the

connections between Navico [                ] nonetheless continued into

the review period.  Specifically:

- [        ] business registration information indicated that
  one of Navico's current shareholders, [

PUBLIC VERSION

] pertaining to the review period.  *See* Navico's Supplemental SRA Response, C.R. 477 at Exhibit 1, Appx___ ([

]); CFA's Nov. 2nd RFI Submission, C.R. 484, at Attachment 1, Appx___ ([


]).  Indeed, the record shows that during the review period, specifically between [


].  CFA's Nov. 2nd RFI Submission, C.R. 484, at Attachment 1, Appx___ (listing [                                                  ]), Appx___ (specifying that the [


]); and;

- Navico [


] (*see* Navico's SRA, C.R. 2, at Exhibit 2, Appx___ (Navico's business registration); Navico's Supplemental SRA Response, C.R. 477, at Exhibit 3, Appx___ ([


]); CFA's Nov. 2nd RFI Submission, C.R. 484, at Exhibit, Appx___ ([


])).  Hence, these data pertain the review period.

57.

The above referenced evidence demonstrates that Navico and

[                ] were affiliated during the review period, pursuant to

19 U.S.C. §§ [                              ].  However, Navico repeatedly failed

to disclose this affiliation.

Furthermore, although Navico claimed that it was not affiliated

with its U.S. customer, the record indicated otherwise.  *See*, *e.g.*,

Navico's Supplemental SRA Response, C.R. 477, at 6, Appx___.  Record

evidence established that Navico's U.S. customer, [                    ],

was owned and operated by [


].  CFA's Nov. 2nd RFI Submission, C.R. 484, at Attachment

1, Appx___.  Commerce determined in previous reviews of this

proceeding that [                                    ].  *See id.*, Appx___;

*see also*, *e.g.*, [

].  The record

indicates that these entities continue to be related during the review

period.  In fact, [

].  *See* CFA's Nov. 2nd

RFI Submission, C.R. 484, at Attachment 1, Appx___.

In light of this significant evidence, Commerce's determination to

grant Navico a separate rate is not supported by the record.

    E.    <u>Even if Commerce's Acceptance of Navico's Separate Rate
Submissions were Reasonable, Its Assignment of Vinh
Hoan's Zero Margin to Navico Was Not in Accordance with
Law</u>

When Commerce reviews a large number of respondents, the

statute permits Commerce to select a limited number of respondents for

individual investigation and to determine the rate for the other

respondents based upon the rates it determines for the investigated

respondents.  *See* 19 U.S.C. §§ 1677f-1(c)(2) and 1673d(c)(5).

Specifically, the statute requires that Commerce assign to the non-

investigated respondents the average of the rates calculated for the

mandatory respondents, disregarding rates that are zero, *de minimis*,

or based entirely upon AFA. *See* 19 U.S.C. § 1673d(c)(5)(A). If the only rates available are zero, *de minimis*, or based entirely upon AFA, Commerce is expected to assign the average of those rates unless doing so would produce an unreasonable result. *See* SAA at 873.

In the *Final Results*, Commerce calculated a zero or *de minimis* dumping margin for one mandatory respondent (Vinh Hoan) and assigned the second mandatory respondent (DOTASEAFOOD) the Vietnam-entity rate. *Final Results*, 86 Fed. Reg. at 36,103, Appx___. Commerce ignored the rate assigned to DOTASEAFOOD and assigned Vinh Hoan's zero margin to the non-investigated respondent (Navico). Following a ministerial allegation by CFA, Commerce explained that its separate rate determination was based upon the statutory "exception" provision in 19 U.S.C. § 1673d(c)(5)(B). Commerce Ministerial Error Allegation Memorandum, P.R. 549, at 3, Appx___.

As explained below, Commerce's determination was not in accordance with law because Commerce should not have reached the "exception" provision of 19 U.S.C. § 1673d(c)(5)(B). And even if reliance upon the exception were proper, Commerce incorrectly assigned Navico an unreasonable rate. However, 19 U.S.C. § 1673d(c)(5)(B) also does

not support Commerce's decision to assign a zero dumping margin to Navico. As the statute makes clear, 19 U.S.C. § 1673d(c)(5)(B) is only applicable as an "exception" when following the "general rule" of 19 U.S.C. § 1673d(c)(5)(A) is not possible. *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294, 1306 (Ct. Int'l Trade 2021) ("*GODACO Seafood*"). Moreover, 19 U.S.C. § 1673d(c)(5)(B) requires that whatever method Commerce utilizes to calculate the all-others rate be "reasonable." In other words, 19 U.S.C. § 1673d(c)(5)(B) permits Commerce to use zero or *de minimis* margins in determining the rate to assign non-individually examined producers or exporters, *but only to the extent the use of such margins was reasonable*. Indeed, the Court has required that Commerce "support its application of the 'any reasonable method' exception in 19 U.S.C. § 1673d(c)(5)(B) by demonstrating that the calculated margin is reasonable." *GODACO Seafood*, 494 F. Supp. 3d at 1306. Commerce's use of 19 U.S.C. § 1673d(c)(5)(B) here was neither necessary nor reasonable and thus unsupported by the statute.

1.   Commerce Unlawfully Departed from the "General Rule" of 19 U.S.C. § 1673d(c)(5)(A)

Commerce may only depart from the "general rule" of 19 U.S.C. § 1673d(c)(5)(A) when all rates assigned to mandatory respondents are zero, *de minimis*, or based entirely upon AFA. *GODACO Seafood*, 494 F. Supp. 3d at 1306.  This was not the case here because one mandatory respondent, DOTASEAFOOD, did not receive a rate that was zero, *de minimis*, or based entirely upon AFA.  As explained above, although Commerce *should* have assigned DOTASEAFOOD a rate based upon AFA, Commerce explicitly refused to do so.[3]  Because a mandatory respondent received a non zero, non *de minimis*, and non AFA rate, Commerce was required to assign that rate to the non-investigated companies pursuant to the "general rule" of 19 U.S.C. § 1673d(c)(5)(A).

Commerce declined to follow this statutory mandate, claiming that the Vietnam-entity "rate was not available for consideration in this segment of the proceeding" because DOTASEAFOOD was not assigned

---

[3] If this Court determines that Commerce unlawfully refused to apply an AFA rate to DOTASEAFOOD (*see* Section C *supra*), then Commerce should appropriately apply 19 U.S.C. § 1673d(c)(5)(B) by assigning Navico a rate that is equal to the average of the zero dumping margin assigned to Vinh Hoan and the AFA rate assigned to DOTASEAFOOD.

a separate rate and the Vietnam-wide entity was not under review.
Commerce's Ministerial Error Allegation Memorandum, P.R. 549, at 3,
Appx___. However, 19 U.S.C. § 1673d(c)(5)(A) includes neither of these
requirements. Instead, 19 U.S.C. § 1673d(c)(5)(A) states only that
Commerce must use as the all-others rate the average of the dumping
margins established for exporters and producers individually
investigated, excluding any zero or *de minimis* margins or margins
based entirely upon AFA. The statute does not require individually
examined respondents to have qualified for a separate rate, *i.e.*, it does
not exclude margins "established" for individually investigated
respondents that are found to be part of the non-market economy-wide
entity. Here, Commerce "established" a dumping margin for mandatory
respondent (*i.e.*, "individually investigated") DOTASEAFOOD that was
not zero, not *de minimis*, and not based upon AFA. That
DOTASEAFOOD did not qualify for a separate rate is irrelevant.

It is also irrelevant that the Vietnam-wide entity was not subject
to review. There is no dispute that DOTASEAFOOD was properly
under review and was an individually investigated respondent. Thus,
the rate "established" for DOTASEAFOOD is the rate at issue. That it

also happens to be the rate assigned to the Vietnam-wide entity has no effect on the application of 19 U.S.C. § 1673d(c)(5)(A).

Therefore, Commerce's determination to ignore the rate established for individually investigated respondent, DOTASEAFOOD, and departing from the general rule of 19 U.S.C. § 1673d(c)(5)(A) when determining the rate for Navico, is not in accordance with law. Rather, Commerce should have followed 19 U.S.C. § 1673d(c)(5)(A) and assigned Navico the rate established for DOTASEAFOOD.

2. Even if Commerce Correctly Departed from the General Rule of 19 U.S.C. § 1673d(c)(5)(A) Commerce's Decision to Assign Navico a Zero Margin was Not Reasonable Under 19 U.S.C. § 1673d(c)(5)(B)

Even if Commerce lawfully departed from the general rule of 19 U.S.C. § 1673d(c)(5)(A), its determination to assign Navico a zero margin is not in accordance with 19 U.S.C. § 1673d(c)(5)(B) because that is not a reasonable rate for Navico based on Navico's history of dumping in this proceeding (summarized in the table below). *See Certain Frozen Fish Fillets from…Vietnam*, 68 Fed. Reg. 43,713, 43,715 (Dep't of Commerce Jul. 24, 2003) (amended fin. LTFV deter.); *Certain*

64.

*Frozen Fish Fillets from…Vietnam*, 83 Fed. Reg. 36,876, 36,878 (Dep't of Commerce Jul. 31, 2018) (*Timken* notice); *Certain Frozen Fish Fillets from…Vietnam*, 80 Fed. Reg. 2,394, 2.396 (Dep't of Commerce Jan. 16, 2015) (fin. results admin. rev.); *2013-2014 Final Results*, 81 Fed. Reg. at 17,437.

| Proceeding Segment | Dumping Margin |
|---|---|
| LTFV Investigation | 53.68% (*ad valorem* rate) |
| Administrative Review (2010-2011) | $1.28/kg. |
| Administrative Review (2012-2013) | $0.97/kg. |
| Administrative Review (2013-2014) | $0.69/kg. |

Indeed, Commerce explained that just such a history of pricing behavior would likely prevent another Vietnamese exporter, HVG, from similarly receiving a zero all-others rate margin if Commerce had accepted its request for a new separate rate determination.  In particular, Commerce said:

> We also note that, even if we were to accept the premise that HVG was permitted to obtain a new separate rate {without any shipments during the review period}, it is unclear that the assignment of Vinh Hoan's rate would be appropriate for HVG, given HVG's history of dumping at significantly higher rates than the zero percent computed for Vinh Hoan.

IDM, P.R. 540, at 39, n. 211, Appx___.

As seen above, Navico has a "history of dumping at significantly higher rates than the zero percent computed for Vinh Hoan." *Id*. Thus, Commerce's use of a zero all-others rate for NAVICO was arbitrary and unreasonable under Commerce's own logic, and was not permitted under 19 U.S.C. § 1673d(c)(5)(B).

Commerce's determination is also inconsistent with its determination in *Ribbons from China*, which involved a similar situation. There, using the "exception" outlined in 19 U.S.C. § 1673d(c)(5)(B), Commerce assigned the separate rate respondents the average of the *de minimis* margin calculated for one of the mandatory respondents and the China-wide entity rate (which included the only other individually investigated respondent which was found to be ineligible for a separate rate). *See Narrow Woven Ribbons with Woven Selvedge from. . .China*, 75 Fed. Reg. 41,808, 41,810 (Dep't of Commerce Jul. 19, 2010) (fin. LTFV deter.) ("In this case, because there are no rates other than *de minimis* or those based on AFA, we have determined to take a simple average of the AFA rate assigned to the {China}-wide entity and the *de minimis* rate calculated for Yama as a reasonable method for purposes of determining the rate assigned to the

**PUBLIC VERSION**

Separate Rate Applicants.  We note that this methodology is consistent with {Commerce's} past practice.") (internal citations omitted).  This methodology was upheld by this Court in *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 783 F. Supp. 2d 1343, 1349-50 (Ct. Int'l Trade 2011) (remanded on other grounds).  Hence, even if Commerce correctly departed from the general rule of 19 U.S.C. § 1673d(c)(5)(A), its application of the "exception" in 19 U.S.C. § 1673d(c)(5)(B) was not reasonable and contrary to its practice.

V.   CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand the *Final Results* to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

/s/ Jonathan M. Zielinski

Jonathan M. Zielinski
James R. Cannon, Jr.
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 787-5507
F: (202) 567-2301
Dated:  February 11, 2022      E-mail:  jzielinski@cassidylevy.com

*Counsel to the Catfish Farmers of America, et al.*

<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 12,504 words, exclusive of the corporate disclosure statement, table of contents, table of authorities, glossary of case-specific acronyms and abbreviations, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.


By:     <u>/s/ Jonathan M. Zielinski</u>
          Jonathan M. Zielinski

69.