NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>QMC FOODS, INC., *et al.*,<br><br>       Defendant-<br>       Intervenors. | Before: Hon. M. Miller Baker,<br>       Judge<br><br>Court No. 21-00380<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages iv, 31, and 32 |

## <u>REPLY BRIEF OF PLAINTIFFS,<br>CATFISH FARMERS OF AMERICA, *et al.*</u>

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: June 3, 2022

NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................... 1

II.  ARGUMENT ....................................................................... 2

    A.  Commerce Erred in its Selection of the Primary
        Surrogate Country ................................................................ 2

        1.  Commerce Erred in Determining that
            Indonesia is not Economically Comparable
            to Vietnam ...................................................................... 5

        2.  Commerce Erred in Determining that India
            is a Significant Producer of Comparable
            Merchandise ................................................................... 10

        3.  Commerce's Reliance on Indian Data to
            Value Specific FOPs was Flawed ................................ 14

    B.  Commerce Erred in Determining
        DOTASEAFOOD's Rate ..................................................... 27

    C.  Commerce Erred in Granting Navico a Separate
        Rate .................................................................................. 31

    D.  Commerce Erred in Determining Navico's
        Separate Rate .................................................................... 33

III.  CONCLUSION ................................................................ 37

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albemarle Corp. & Subsidiaries v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016) ........................................................ 36

*Bosun Tools Co. v. United States,*
    493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ...................................... 36

*Bosun Tools Co. v. United States,*
    No. 2021-1929, 2021-1930, 2022 WL 94172 (Fed. Cir. Jan.
    10, 2022) ............................................................................................ 37

*Bristol Metals L.P. v. United States,*
    34 CIT 478, 703 F. Supp. 2d 1370 (2010) .......................................... 14

*Nation Ford Chem. Co. v. United States,*
    21 CIT 1371, 985 F. Supp. 133 (1997) ............................................... 11

*NTSF Seafoods Joint Stock Co. v. United States,*
    No. 20-00104, slip op. 22-38 (Apr. 25, 2022) ............................. *passim*

*Shakeproof Assembly Components v. United States,*
    268 F.3d 1376 (Fed. Cir. 2001) .......................................................... 11

## Statutes

19 U.S.C. § 1516a(b)(1)(B) ......................................................................... 7

19 U.S.C. § 1673d(c)(5)(A) ....................................................................... 34

19 U.S.C. § 1677a ........................................................................................ 3

19 U.S.C. § 1677b(a) ................................................................................... 3

19 U.S.C. § 1677b(b) ................................................................................... 3

19 U.S.C. § 1677b(c)(1) ............................................................................... 3

19 U.S.C. § 1677b(c)(1)(B) ................................................................ 4, 8, 14

19 U.S.C. § 1677b(c)(4) ................................................................ 3

19 U.S.C. § 1677f-1(d) ................................................................. 3

## Regulations

19 C.F.R. § 351.408(c)(2) ............................................................. 3

Import Administration Policy Bulletin 04.1,
    *Non-Market Economy Surrogate Country Selection Process*
    (Mar. 1, 2004), https://enforcement.trade.gov/
    policy/bull04-1.html ............................................ 3, 8, 12, 13

## Administrative Materials

*Certain Frozen Fish Fillets from the Socialist Republic of*
    *Vietnam*, 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29,
    2020) ............................................................................. 6

*Certain Frozen Warmwater Shrimp from the Socialist*
    *Republic of Vietnam*, 72 Fed. Reg. 52,052 (Dep't
    Commerce Sept. 12, 2007) ........................................... 25

*Certain Steel Nails from the People's Republic of China*,
    84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019) ......... 29

*Certain Steel Nails from the People's Republic of China*,
    85 Fed. Reg. 22,399 (Dep't Commerce Apr. 22, 2020) ......... 29

**Ct. No. 21-00380**                                    **NON-CONFIDENTIAL VERSION**

# GLOSSARY

**AFA**
    Adverse Facts Available

**CFA**
    Catfish Farmers of America, *et al.*

**DOTASEAFOOD**
    Seafood Joint Stock Company No. 4 Branch Dongtam Fisheries
    Processing Company

[            ]
    [                        ]

**FOP**
    Factor of Production

**GNI**
    Gross National Income

**IDM**
    Issues and Decision Memorandum

**MMC**
    MMC Exports Ltd.

**Navico**
    Nam Viet Corporation

**NME**
    Non-Market Economy

**PDM**
    Preliminary Decision Memorandum

**SV**
    Surrogate Value

**Universal**
    Tianjin Universal Machinery Imp. & Exp. Corporation

**VHC**
    Vinh Hoan Corporation

# I. **INTRODUCTION**

The Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"), respectfully submit this reply to the response briefs filed by Defendant the United States ("the Government"), Vinh Hoan Corporation ("VHC"), and Nam Viet Corporation ("Navico"). *See* Def.'s Resp. in Opp'n to Pls.' Mot. for J. on the Agency R. (Apr. 15, 2022), ECF No. 41 ("Government's Brief"); Def.-Intervenors' Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. (May 6, 2022), ECF No. 43 ("VHC/Navico Brief");[1] *see also* Mem. in Supp. of the Rule 56.2 Mot. for J. on the Agency R. Filed by Pls., Catfish Farmers of America, *et al.* (Feb. 14, 2022), ECF No. 34-1 ("CFA's Opening Brief").

---

[1]   QMC Foods, Inc. and Colorado Boxed Beef Company also filed a response brief, arguing that CFA waived Count VI of its complaint. Def.-Intervenors' Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. (May 6, 2022), ECF No. 44. CFA acknowledges that this count of the complaint is waived.

## II. ARGUMENT

This appeal arises from the 2018-2019 administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"). *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't Commerce July 8, 2021) (fin. results of antidumping duty admin. rev. and fin. deter. of no shipments; 2018-2019), P.R. 552, Appx___-___, and accompanying Issues and Decision Memorandum, P.R. 540 ("IDM"), Appx___-___. CFA challenges Commerce's (1) selection of India as the primary surrogate country, (2) decision not to apply adverse facts available ("AFA") to Seafood Joint Stock Company No. 4 Branch Dongtam Fisheries Processing Company ("DOTASEAFOOD"), (3) finding that Navico was eligible for a separate rate, and (4) reliance on only VHC's margin in determining Navico's separate rate. *See* CFA's Opening Brief at 3-4.

### A. Commerce Erred in its Selection of the Primary Surrogate Country

Normally, Commerce calculates dumping margins by comparing the prices that foreign producers charge for subject goods in the United

States ("export price") against the prices that they charge for those goods in their home market ("normal value"). *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). However, in proceedings involving a non-market economy ("NME") like Vietnam, Commerce determines normal value by building up surrogate, market-economy values for (1) production inputs ("factors of production" or "FOPs"), (2) general expenses and profit, and (3) packing costs. *Id.* § 1677b(c)(1).

The Tariff Act of 1930 ("the Act") directs Commerce, in selecting surrogate values, to:

> utilize . . . to the extent possible . . . prices . . . in one or more market economy countries that are—
>
> (A)  at a level of economic development comparable to that of the nonmarket economy country, and
>
> (B)  significant producers of comparable merchandise.

*Id.* § 1677b(c)(4). The agency "normally will value all factors in a single surrogate country" that complies with the statutory requirements. 19 C.F.R. § 351.408(c)(2). If more than one country meets those requirements, Commerce will rely on values from the country that provides the highest quality data. Import Administration Policy

3

Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004), https://enforcement.trade.gov/ policy/bull04-1.html ("Policy Bulletin"). In all cases, the Act requires Commerce to rely on the "best available information." 19 U.S.C. § 1677b(c)(1)(B).

In this review, Commerce identified six countries, not including Indonesia, as having a level of economic development comparable to Vietnam's. *See* Commerce's Surrogate Country List, P.R. 224-226, at Attachment I, Appx___-___. CFA argued that Indonesia was also economically comparable with Vietnam, a significant producer of comparable merchandise, and provided high quality data, and accordingly requested that Indonesia be selected as the primary surrogate country. Commerce selected India instead, stating that (1) Indonesia was not economically comparable to Vietnam, (2) India was a significant producer of comparable merchandise, and (3) Indian data were "superior" to Indonesian data and "best satisfie{d} Commerce's selection criteria." IDM, P.R. 540, at 28, Appx___.

In its opening brief, CFA explained why Commerce's selection of India, and rejection of Indonesia, as the primary surrogate country was unsupported by substantial evidence and not in accordance with law.

CFA's Opening Brief at 12-41. Nonetheless, the Government, VHC, and Navico argue that Commerce's selection of India should be affirmed. *See* Government's Brief at 25-56; VHC/Navico Brief at 10-12. First, they argue that Commerce reasonably found that India, but not Indonesia, is at a level of economic development comparable to Vietnam. Government's Brief at 25-30; VHC/Navico Brief at 11. Second, they argue that the agency reasonably treated India as a significant producer of goods comparable to subject goods. Government's Brief at 30-36; VHC/Navico Brief at 11-12. Third, they argue that India provided the best available information to value the main inputs into the production of subject goods. Government's Brief at 36-56; VHC/Navico Brief at 11-12.

For the reasons discussed below, these arguments should be rejected, and Commerce's selection of India as the primary surrogate country should be remanded for further consideration.

1. <u>Commerce Erred in Determining that Indonesia is not Economically Comparable to Vietnam</u>

Commerce failed to adequately explain or support its determination that Indonesia was not economically comparable to Vietnam. CFA's Opening Brief at 14-18. Notably, Commerce's explanation for its

conclusion is largely identical to the explanation it provided for reaching same conclusion in the 2017-2018 review. *Compare* IDM, P.R. 540, at 15-18, Appx___-___, *with* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29, 2020) (fin. results of antidumping duty admin. rev. and fin. deter. of no shipments; 2017-2018) at 12-14 ("2017-2018 IDM"). This court recently remanded Commerce's determination in the 2017-2018 review, finding that the agency failed to adequately explain or support its conclusion that Indonesia was not economically comparable to Vietnam. *NTSF Seafoods Joint Stock Co. v. United States*, No. 20-00104, slip op. 22-38 (Apr. 25, 2022) at 39 ("Slip Op. 22-38").

Commerce's explanation in the review at bar differs substantively from the remanded explanation only through the addition of two brief paragraphs. *Compare* IDM, P.R. 540, at 15-18, Appx___-___, *with* 2017-2018 IDM at 12-14. In these paragraphs, Commerce states that "{n}othing in the Act requires Commerce to consider any particular country as a surrogate country," and avers that the agency has latitude to "perform its duties in the way it believes most suitable." IDM, P.R.

540, at 17, Appx___. Notwithstanding its finding that India provided "superior" data, Commerce states that it was not obliged to consider whether Indonesia provided "superior" data. *Id.* at 17, 28, Appx___, Appx ___. Commerce then concludes that Indonesia is not economically comparable with Vietnam, because its 2018 gross national income ("GNI") was higher than the 2018 GNI of any of the six countries included in the agency's list of economically comparable countries. *Id.*

The additional paragraphs do not meaningfully distinguish the agency's analysis here from the remanded analysis. As in the 2017-2018 review, Commerce found that Indonesia was not economically comparable with Vietnam because Indonesia was not on the list of economically comparable countries, *id.* at 15-18, Appx___-___, "with no explanation of how mere inclusion on that list could somehow be determinative." Slip Op. 22-38 at 39. And while Commerce stated that it was not legally required to consider Indonesia as a potential surrogate country, IDM, P.R. 540, at 17, Appx___, the standard of review requires Commerce to make reasonable, non-arbitrary, adequately-explained determinations grounded in substantial record evidence. 19 U.S.C. § 1516a(b)(1)(B). CFA submitted information and

argument below in favor of Indonesia's selection, triggering Commerce's
duties to provide a reasonable, non-arbitrary explanation, backed by
substantial evidence, of why it found that information and argument
unconvincing.

Moreover, while Commerce states that the Act does not require it to
consider whether Indonesia offered "superior" data, IDM, P.R. 540, at
17, Appx___, the statute requires Commerce to rely on the "best
available information" to value FOPs. 19 U.S.C. § 1677b(c)(1)(B).
Indeed, Commerce's Policy Bulletin states that "the country with the
best {FOP} data is selected as the primary surrogate country." *See*
Policy Bulletin. Given that Commerce explicitly found that India
provided "superior" data, IDM, P.R. 540, at 28, Appx___, the agency
could not logically treat the question of data superiority as irrelevant.

Commerce's analysis is not rehabilitated by its observation that
Indonesia's GNI exceeded that of any of the six countries included in its
list of economically comparable countries. *Id.* at 17, Appx___. Commerce
did not explain why the upper GNI limit of the six countries on its list
was determinative of comparability. *Id.* Nor did it meaningfully address
CFA's argument that the difference between Vietnam's GNI and

Indonesia's GNI was lower in this review than it had been in prior segments of the proceeding in which Commerce relied on Indonesian data. *Id.* at 17-18, Appx___-___. And as in the 2017-2018 review, Commerce found that Indonesia was not at the "same level" of economic development as Vietnam, a finding that "potentially misapplies the statutory standard that Commerce use a surrogate country that is 'at a level of economic development comparable to that of the nonmarket economy country.'" Slip Op. 22-38 at 39 (quoting 19 U.S.C. § 1677b(c)(4)).

The defense's arguments in support of Commerce are unpersuasive, largely repeating Commerce's own unsatisfactory explanations. Government's Brief at 26-30; VHC/Navico Brief at 11. The defense also observes that Indonesia's GNI was "60 percent greater than {} Vietnam's." Government's Brief at 26. But Commerce's list of comparable countries included Angola, with a GNI 40% greater than Vietnam's. IDM, P.R. 540, at 17, Appx___. Commerce did not explain why a 40% difference was indicative of comparability, but a 60% difference was not. *Id.* Further, Commerce has previously treated Indonesia as economically comparable with Vietnam despite greater

GNI differences than seen here. *See, e.g.*, CFA's Opening Brief at 16-17. While the defense contends that Commerce reasonably determined that India is economically comparable with Vietnam, Government's Brief at 28-30, Commerce failed to appropriately address the question of whether Indonesia is also economically comparable to Vietnam. *See* Slip Op. 22-38 at 39. Accordingly, the Court should remand Commerce's economic comparability analysis for further explanation.

2. <u>Commerce Erred in Determining that India is a Significant Producer of Comparable Merchandise</u>

In selecting India as its primary surrogate country, Commerce failed to appropriately assess the significance of India's production of frozen fish fillets, and the comparability of the goods produced there to subject goods. CFA's Opening Brief at 18-22. The defense nonetheless contends that Commerce's analysis of production comparability and significance should be affirmed. Government's Brief at 31-36; VHC/Navico Brief at 11-12. It argues that Commerce appropriately found that India's exportation of frozen fish fillets generally demonstrated India's status as a significant producer of comparable merchandise. Government's Brief at 31-32; VHC/Navico Brief at 11. It also argues that Commerce not only found that India is a significant producer of frozen fish fillets

as a general mater, but a significant producer of frozen pangasius fillets specifically. Government's Brief at 32-33. The defense characterizes CFA's argument that India does not produce goods of a quality comparable to subject merchandise as "improper," *id.* at 33-34, and argues that it is irrelevant whether India was a net exporter of fish fillets. *Id.* at 34-35. Finally, the defense argues that Commerce's practice is not to consider the "significance" of a potential surrogate country's production in relation to the subject country's volume of production. *Id.* at 35-36.

These arguments are unconvincing. Like Commerce itself, the defense ignores the ultimate purpose of determining whether a potential surrogate country is a significant producer of comparable merchandise. "{A} surrogate value must be as representative of the situation in the NME country as is feasible if it is to further 'the basic purpose of the statute—determining current margins as accurately as possible.'" *See Nation Ford Chem. Co. v. United States*, 21 CIT 1371, 1375-76, 985 F. Supp. 133, 137 (1997); *see also Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). Moreover, Commerce's judgment regarding whether a country's

production of comparable merchandise is significant "should be made consistent with the characteristics of world production of, and trade in" such goods. *See* Policy Bulletin.

The record establishes that Indonesia's industry more closely replicates that of Vietnam than does India's, and that India's production is not significant in light of "world production of, and trade in" such goods. *See* CFA's Opening Brief at 18-22; Policy Bulletin. Indonesia is the second largest global exporter of frozen fish fillets (after Vietnam) and its frozen pangasius fillets compete with Vietnam's in the global market. *See* CFA's Opening Brief at 19-20. By contrast, India's global exports are much smaller and of lower quality product. *Id.* at 19-21.

The insignificance of India's production in the context of "world production of, and trade in" goods comparable with fish fillet is reflected in the lack of quality Indian data to value FOPs. *See id.* at 22-40. While the Indonesian government conducts annual aquaculture production surveys that result in reliable, high-quality, nationwide FOP data, the only Indian data for important FOPs came from private surveys of dubious provenance, coverage, and reliability. *See, e.g., id.* at 26-31.

Similarly, the record provided contemporaneous labor rates for Indonesia's aquaculture industry, reliable and appropriate Indonesian values for co- and by-products, and multiple financial statements for Indonesian companies – including a fully integrated processor of frozen fish fillets. *Id.* at 31-40. By contrast, the record lacked Indian data of equal breadth, contemporaneity, reliability, and specificity. *Id.*

Finally, the defense's contention that Commerce reasonably determined that India is a significant producer specifically of frozen pangasius fillets is unpersuasive. Government's Brief at 32-33. The defense points to a single footnote in the IDM. *Id.*; *see also* IDM, P.R. 540, at 20 n.106, Appx___. While the footnote cites certain record information as indicating that pangasius fillets are produced in India, Commerce did not explain why that production was significant in light of "world production of, and trade in" either frozen pangasius fillets specifically, or comparable merchandise generally. IDM, P.R. 540, at 20 n.106, Appx___; *see also* Policy Bulletin.

CFA recognizes that in its recent opinion regarding the 2017-2018 review, the court found that Commerce adequately explained and supported its determination that India is a significant producer of goods

comparable to subject merchandise. Slip Op. 22-38 at 35-38. CFA nonetheless respectfully submits that in light of the overall purpose of the selection of surrogate values – replicating as closely as possible the experience of Vietnamese producers, but in a market economy setting – Commerce's determination in this review was unsupported by the record and otherwise not in accordance with law.

3. <u>Commerce's Reliance on Indian Data to Value Specific FOPs was Flawed</u>

The Act requires Commerce to rely on "the best available information" to value FOPs. 19 U.S.C. § 1677b(c)(1)(B). Indeed, "data quality is so important" in selecting surrogate values that it can trump economic comparability and production significance. Slip Op. 22-38 at 34 (citing Policy Bulletin). Even in the review at bar, despite selecting India as its primary surrogate country, Commerce used Indonesian data to value fish oil byproducts, after finding that Indian values "produced anomalous results." IDM, P.R. 540, at 30, Appx___.

In making data quality assessments, Commerce typically considers whether proposed surrogate values are (1) input-specific; (2) exclusive of taxes/duties; (3) contemporaneous with the review period; (4) represent broad market averages; and (5) publicly available. *See, e.g.*, *Bristol*

*Metals L.P. v. United States*, 34 CIT 478, 481, 703 F. Supp. 2d 1370, 1374 (2010). But rather than even-handedly assess the quality of Indonesian data using these factors, Commerce here treated Indonesian data as presumptively inferior because Indonesia was not on its list of economically comparable countries. IDM, P.R. 540, at 26-28, Appx___-___. As a result, Commerce's data quality assessments were unreasonably circular.

Commerce's data quality assessments were also flawed in other ways. In finding that Indian *Fishing Chimes* and *Undercurrent News* data for the main FOPs reflected broad market averages and were otherwise reliable, Commerce failed to adequately account for geographical limitations in these data, a lack of information regarding how the data were collected and how much trade they reflected, and a lack of specificity as to relevant inputs. CFA's Opening Brief at 25-31. Commerce relied on decades-old, non-specific Indian labor rates, despite having contemporaneous, specific Indonesian rates available. *Id.* at 31-33. It relied on anomalous and non-specific Indian data to value certain by- and co-products. *Id.* at 33-35. Commerce also relied on financial statements for unhealthy Indian companies with questionably

15

relevant operations, which only partially overlapped the review period, while rejecting Indonesian statements on the circular basis that "India is the primary surrogate financial country." *Id.* at 36-40.

The defense supports Commerce's data quality assessments, arguing that Commerce appropriately (1) relied on Indian data to value the main FOPs; (2) relied on Indian data to value labor, by-, and co-products; (3) relied on Indian financial statements; and (4) found that the Indonesian data were imperfect. Government's Brief at 38-56; VHC/Navico Brief at 11-12. As detailed below, these arguments are not compelling.

### a. *Commerce Erred in Relying on Indian Data to Value the Main FOPs*

The defense argues that Commerce appropriately relied on Indian *Fishing Chimes* and *Undercurrent News* data to value whole fish, fingerlings, and feed. Government's Brief at 38-42; VHC/Navico Brief at 12. But this court recently remanded the use of *Fishing Chimes* data in the 2017-2018 review, finding that Commerce failed to adequately explain or support its conclusion that those data represent a "broad market average." Slip Op. 22-38 at 41-48. The same issues are present on this record. *See id.*; *compare* IDM, P.R. 540, at 28-30, Appx___-___,

*with* 2017-2018 IDM at 18-20; *see also* VHC's April 16, 2020 Surrogate Country Comments, P.R. 253, at Exhibit 4, Appx___-___ (indicating that Andhra Pradesh accounted for 80% of 2017 Indian pangasius production, but that this amount fell to 60% by 2018); VHC's SV Submission, C.R. 188-201, P.R. 284-296, at Exhibit SV-4(b), Appx___-___ (reproducing the July 2019 issue of *Fishing Chimes*, containing the study from which Commerce drew values for whole fish, fingerlings, and feed in both the 2017-2018 review and the review at bar). The defense's arguments in support of the *Fishing Chimes* data are thus unavailing.

Nor does the defense persuade that Commerce appropriately found that *Undercurrent News'* pricing portal provides broad market data for valuing whole fish, fingerlings, and feed. The defense repeats Commerce's conclusion that *Undercurrent News* "sources its information from numerous sources across major producing regions" and "identifies key characteristics and the location of" its data sources. Government's Brief at 39. But the portal provides no volume data, making it impossible to determine how much trade the prices represent. VHC's November 15, 2020 Submission, P.R. 457-463, at Exhibits FDSV-6 – FDSV-10, Appx___-___. Further, while the portal states that

"{d}ata {were} collected via interviews with" farmers or feed mills "in all major producing regions," it does not identify the number of interviewees in each region or even what areas are treated as "major producing regions." *Id.* Commerce's conclusion that the data represent a broad market average is both unexplained and unsupported.

The defense notes Commerce's finding that the *Undercurrent News* prices were "corroborated" by other sources. Government's Brief at 40. But as the court has observed, corroboration does not establish that a price represents a broad market average. Slip Op. 22-38 at 47-48. Finally, the defense repeats Commerce's conclusion that no evidence indicated that the *Undercurrent News* prices were generated for purposes of the review. Government's Brief at 39; IDM, P.R. 540, at 29, Appx___. But this is not a meaningful rejoinder to CFA's arguments that the prices were "irregularly collected" and "clear outliers." CFA's Case Brief, C.R. 617, P.R. 510, at 26-27, Attachment B, Appx___-___, Appx___-___; *see also* CFA's Opening Brief at 27 (glossing case brief arguments). Overall, Commerce's analysis of the relative quality of Indian and Indonesian data to value the main FOPs did not support its

selection of India as the primary surrogate country, and was otherwise unreasonable and unsupported by substantial evidence.

> b. *Commerce Erred in Valuing Labor, By-, and Co-Products*

The Government defends Commerce's reliance on Indian data for labor, by-, and co-products primarily by arguing that CFA failed to exhaust its administrative remedies regarding valuation of these FOPs. Government's Brief at 42-47. This argument is unavailing.

With respect to labor, CFA's case brief explicitly referred to CFA's November 16, 2020 comments, in which it argued that the Indian labor data were unreasonably outdated. CFA's Case Brief, C.R. 617, P.R. 510, at 37, Appx___; CFA's November 16, 2020 Pre-Prelim Comments, C.R. 600, P.R. 469, at 17, Appx___. Commerce responded to those comments in its IDM, properly treating them as incorporated by reference into the case brief. IDM, P.R. 540, at 30, Appx___. Accordingly, the Government's argument that CFA failed to exhaust its claim regarding Indian labor data is untenable. While the Government faults CFA for not anticipating the grounds upon which Commerce later rejected its case brief argument, Government's Brief at 43-45; IDM, P.R. 540, at 30 & n.162, Appx___, the exhaustion doctrine cannot reasonably be

stretched that far. CFA had, and took advantage of, its opportunity to argue in its case brief why Commerce should not use Indian labor data. It was not also required to anticipate Commerce's as-yet unarticulated basis for rejecting that claim.

Tellingly, the Government offers no substantive defense of Commerce's rationale for relying on decade-old, non-specific Indian labor data. Government's Brief at 43. Instead, it simply repeats Commerce's explanation that labor accounts for a "very small proportion" of normal value. IDM, P.R. 540, at 30 & n.162, Appx___. But not only is this explanation beside the point in terms of the factors that the agency typically analyzes in considering data quality, Commerce cited no record evidence in support. *Id.* Instead, it cited its findings in the 2017-2018 review. *Id.* However, the record here indicated that labor can account for up to 8% of the cost of total processing costs. CFA's Opening Brief at 32-33. Moreover, the Court recently remanded Commerce's reliance on the same outdated Indian data in the 2017-2018 review. Slip Op. 22-38 at 48-49.

Regarding by- and co-products, Commerce noted CFA's argument before the agency that the record lacked Indian data specific to relevant

by- and co-products, but stated that there were "other advantages of selecting India as the primary surrogate country." IDM, P.R. 540, at 30, Appx___; CFA's Case Brief, C.R. 617, P.R. 510, at 37, Appx___; CFA's November 16, 2020 Pre-Prelim Comments, C.R. 600, P.R. 469, at 17-19, Appx___-___. To start, Commerce's acknowledgement of CFA's claim fatally undermines any assertion that CFA failed to exhaust its remedies regarding that claim. Moreover, in defending Commerce's valuation of by- and co-products, the Government explains that the agency disfavors non-specific data. Government's Brief at 47 (discussing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018)). This is exactly the point. But Commerce offered no meaningful response to CFA's arguments that the Indian data were not as specific as the Indonesian data, instead alluding vaguely to the "other advantages" of the Indian data. IDM, P.R. 540, at 30, Appx___; CFA's Opening Brief at 34.

Commerce also explained that while it did not value fish oil using Indian data because those data "produced anomalous results," fish oil was the only by-/co-product for which Indian data was "lacking" in this way. IDM, P.R. 540, at 30, Appx ___. Although CFA's arguments below

focused on specificity, CFA submits that Commerce's explanation provided an appropriate basis for CFA to argue on appeal that the Indian data were not only non-specific, but produced anomalous results as well.

As with its analysis of the relative quality of Indian and Indonesian data to value the main FOPs, Commerce's analysis regarding labor, by-, and co-products did not support its selection of India as the primary surrogate country, and was otherwise unreasonable and unsupported by substantial evidence.

c. *Commerce Erred in Relying on Indian Financial Statements*

The defense argues that Commerce appropriately found that Indian financial statements provided the best available information for valuing financial factors. Government's Brief at 47-52; VHC/Navico Brief at 12. However, it fails to recognize that Commerce conducted no meaningful comparison of the Indonesian and Indian statements, instead stressing that "India is the primary surrogate . . . country" without discussing the Indonesian statements at all. IDM, P.R. 540, at 33, Appx___. This unreasonable circularity merits remand.

Further, while Commerce stressed the importance of contemporaneity in selecting surrogate financial statements, *id.* at 30, Appx___, the four Indonesian statements on the record collectively covered the entire review period; the Indian statements collectively were only partly contemporaneous. *Id.*; *see also* CFA's SV Submission, P.R. 255-282, at Exhibits 12-A, 12-D, Appx___-___, Appx___-___; CFA's Pre-Prelim SV Submission, P.R. 444-456, at Exhibits 8-A, 8-B, 14, Appx___-___, Appx___-___, Appx___-___; VHC's SV Submission, C.R. 188-201, P.R. 284-296, at Exhibit SV-15, Appx___-___. The defense argues that the relevant issue is not collective contemporaneity, but which country provides an individual statement covering the most months of the review period. Government's Brief at 48-49. But the difference in contemporaneity here was only one month – two of the Indonesian statements each covered the final seven months of the review, while the Indian statements each covered the first eight months. Moreover, the majority of the review period took place in 2019; the Indian statements cover only the first quarter of that year. CFA's SV Submission, P.R. 255-282, at Exhibits 12-A, 12-D, Appx___-___, Appx___-___; CFA's Pre-Prelim SV Submission, P.R. 444-456, at

Exhibits 8-A, 8-B, 14, Appx___-___, Appx___-___, Appx___-___; VHC's SV Submission, C.R. 188-201, P.R. 284-296, at Exhibit SV-15, Appx___-___.

The defense argues that Commerce appropriately determined that the Indian statements came from companies that produced goods comparable to fish fillets and had capital structures similar to fish fillet producers. Government's Brief at 49-50. But Commerce relied on the statements of MMC Exports Ltd. ("MMC") although they reflect no relevant production assets (such as deep freezers), but merely possession of an air conditioner worth less than the company's office equipment. CFA's Opening Brief at 36-37; *see also* IDM, P.R. 540, at 31 n.165, Appx___; VHC's SV Submission, C.R. 188-201, P.R. 284-296, at Exhibit SV-15(b) ("Note – 5"), Appx___. Those same statements identified MMC's "principal" activity as "retail sales," not processing, and reflected minimal processing expenses. VHC's SV Submission, C.R. 188-201, P.R. 284-296, at Exhibit SV-15(b) ("Business Overview," "Extract of Annual Return," and "Statement of Profit and Loss"), Appx___, Appx___-___, Appx___. MMC's overall financial ratios likewise indicated that the company's focus was not on sales, not processing

activity. *Id.* at Exhibit SV-15(c), Appx___-___; *see also* CFA's Pre-Prelim SV Submission, P.R. 444-456, at Exhibit 14, p.1, Appx___.

The defense argues that CFA failed to exhaust its administrative remedies with respect to the Indian companies' profitability. Government's Brief at 51-52. But CFA contrasted the Indonesian statements, which represented "the operations of profitable processors," with the Indian statements on that basis that the Indian producers were unable to sell pangasius fillets profitably. CFA's Case Brief, C.R. 617, P.R. 510, at 38, Appx___ (citing CFA's July 6, 2020 Rebuttal SV Submission, P.R. 313-321, at Exhibit 2 (discussing inability of MMC and Mulpuri Aqua Products to sell pangasius products profitably)).

Tellingly, as support for using the Indian statements, Commerce cited a prior case holding that Commerce will not rely on unprofitable companies' statements where alternatives are available. *See* IDM, P.R. 540, at 30 n.163, Appx ___ (citing Issues and Decision Memorandum accompanying *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 72 Fed. Reg. 52,052 (Dep't Commerce Sept. 12, 2007) (fin. results of the first antidumping duty admin. rev. and first new shipper rev.) at cmt. 2A ("2007 Shrimp IDM")); *see also* 2007

Shrimp IDM at cmt. 2B. While the defense contends that none of the
Indian companies here had a zero profit rate, Government's Brief at
51-52, MMC's rate was 0.01%. VHC's SV Submission, C.R. 188-201,
P.R. 284-296, at Exhibit SV-15(c), Appx___-___. It is not readily
apparent why a profit rate of 0.01% appropriately "account{s} for the
interconnectedness of {} overhead and SG&A." 2007 Shrimp IDM at
cmt. 2B.

Overall, Commerce's data quality analysis regarding financial factors
did not support its selection of India as the primary surrogate country,
and was otherwise unreasonable and unsupported by substantial
evidence.

### d. *Commerce Did Not Appropriately Assess the Relative Merits of the Indonesian and Indian Data*

The Government argues that Commerce appropriately found the
Indonesian surrogate data imperfect. Government's Brief at 53-56. But
Commerce failed to even-handedly assess the relative merits of the
Indonesian and Indian data. For example, while Commerce concluded
that Indonesian data for whole live fish were not "species-specific," *id.*
at 54 (quoting Preliminary IDM, P.R. 493, at 15, Appx___), the record
indicated otherwise; the Indonesian data were also broad based and

reliable, unlike the Indian data. CFA's Opening Brief at 29-30; *see also* CFA's Pre-Prelim SV Submission, P.R. 444-456, at Exhibits 3-5, Appx\_\_\_-\_\_\_. Likewise, the Indonesian fingerlings and fish feed data were (1) specific to VHC's fingerlings sizes, (2) specific to VHC's fish feed protein content, (3) broad based, and (4) reliable. IDM, P.R. 540, at 27, 29, Appx\_\_\_, Appx\_\_\_; CFA's Opening Brief at 29-31; *see also* CFA's SV Submission, P.R. 255-282, at Exhibits 5-B, 5-D Appx\_\_\_-\_\_\_, Appx\_\_\_-\_\_\_; CFA's Additional Pre-Prelim SV Submission, P.R. 464-468, at Exhibit, Appx\_\_\_-\_\_\_. By contrast, the Indian data sources were only partially-specific or partially-contemporaneous, and were not based on reliable, broad-market data. *See, e.g.*, CFA's Opening Brief at 30-31. Again, Commerce's selection of India as the primary surrogate country was unreasonable and both inadequately explained and supported.

## B. Commerce Erred in Determining DOTASEAFOOD's Rate

DOTASEAFOOD, a mandatory respondent, failed to cooperate in the review. However, rather than determine DOTASEAFOOD's margin using AFA, Commerce assigned it the lower Vietnam-wide entity rate, unreasonably allowing DOTASEAFOOD and its suppliers to benefit from their non-cooperation. *Id.* at 42-54.

The Government argues that because DOTASEAFOOD's lack of cooperation implicated its eligibility for a separate rate, Commerce was required to assign DOTASEAFOOD the lower Vietnam-wide entity rate. Government's Brief at 56-58. The Government also claims that the administrative precedents cited in CFA's Opening Brief do not support CFA's position. *Id.* at 59-60. These defenses are not persuasive, given the statute, the unique facts of this case, and relevant precedent.

In determining DOTASEAFOOD's margin, Commerce unreasonably ignored its responsibility to "ensure that {a non-cooperating} party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." CFA's Opening Brief at 45 (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 868, 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199). While it is common for country-wide rates in NME proceedings to equal the highest rate determined in the proceeding, that is not the case here. By assigning DOTASEAFOOD the lower, Vietnam-wide entity rate instead of the higher, AFA rate, Commerce rewarded DOTASEAFOOD and its suppliers in contravention of the Act. *Id.* at 44-46.

28

Importantly, Commerce's decision here is utterly at odds with its treatment of a similar fact-pattern elsewhere. In the 2017-2018 administrative review of the antidumping duty order on Chinese steel nails, Commerce received a separate rate certification from Tianjin Universal Machinery Imp. & Exp. Corporation ("Universal"), a company later selected as a mandatory respondent. Preliminary Decision Memorandum accompanying *Certain Steel Nails from the People's Republic of China*, 84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019) (prelim. results of the antidumping duty admin. rev. and prelim. deter. of no shipments; 2017-2018) at 3-4, 10 ("Nails PDM").[2] Although Universal failed to respond to Commerce's section A questionnaire, which contains inquiries relevant to separate rate status, Commerce did not deny the company a separate rate. Instead, Commerce granted Universal a separate rate, and then applied adverse inferences to determine its margin. *Id.* at 13-14.

---

[2] Commerce made no changes to its analysis of Universal's separate rate status in the final results of the review. *See generally Certain Steel Nails from the People's Republic of China*, 85 Fed. Reg. 22,399 (Dep't Commerce Apr. 22, 2020) (fin. results of antidumping duty admin. rev. and fin. deter. of no shipments; 2017-2018).

The defense argues that this precedent is irrelevant, because Commerce found that Universal, unlike DOTASEAFOOD, was eligible for a separate rate. Government's Brief at 59. But this only shows that Commerce has arbitrarily failed to treat similar situations equally, without adequate explanation. Commerce explained its treatment of DOTASEAFOOD by noting its failure to respond to all relevant questions – a failure of which Universal was equally guilty. Preliminary IDM, P.R. 493, at 9, Appx___; Nails PDM at 3-4, 9-10. Commerce also stated that its initiation notice indicated that mandatory respondents would be ineligible for a separate rate unless they responded to all questionnaires. Preliminary IDM, P.R. 493, at 9, Appx___. But the same language was included in the initiation notice underlying the nails review. Nails PDM at 9-10 nn.44-46. Yet the result that Commerce reached here is inexplicably – and arbitrarily – distinct.

The defense argues that CFA should have requested a review of the Vietnam-wide entity. Government's Brief at 59-60. But not only is this a point that Commerce did not make, IDM, P.R. 540, at 40, Appx___, it is illogical. It makes no sense to treat the Vietnam-wide entity as not

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

subject to review while simultaneously treating a company under review as part of that entity.

In sum, Commerce failed to adequately explain or support its decision not to apply AFA to DOTASEAFOOD, but to instead assign it the lower, Vietnam-entity rate. The decision inappropriately rewarded DOTASEAFOOD and its suppliers' non-cooperation, and was inexplicably distinct from the agency's treatment of a similarly situated company in a prior proceeding. It also deviated from the agency's longstanding practice of assigning noncooperative parties the highest rate.

## C. **Commerce Erred in Granting Navico a Separate Rate**

Commerce granted Navico, a non-selected respondent, a separate rate despite evidence indicating that it was affiliated with [

], as well as its U.S. customer. *Id.* at 41-42, Appx___-___; CFA's Opening Brief at 55-59. Commerce found this evidence outdated and/or "not dispositive," but this finding was inadequately explained and unsupported by the record. IDM, P.R. 540, at 41-42, Appx___-___; CFA's Opening Brief at 55-59.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

The defense argues that the agency appropriately explained why it found that Navico and [        ] were not affiliated. Government's Brief at 61-67; VHC/Navico Brief at 13-14. But Commerce's evaluation of the evidence is lacking. For example, Commerce concluded that "there is inadequate information" to confirm whether Navico and [        ] operated out of the same address during the review period. IDM, P.R. 540, at 42, Appx___. But the record data on this point came from Navico's own filings and data including [

                        ]. CFA's Case Brief, C.R. 617, P.R. 510, at 50 & n.186, Appx___; CFA's October 29, 2019 Comments on CBP Data, C.R. 25, P.R. 47, at Exhibit 2, pp. 379-80, Appx___-___.

The Government claims that CFA's arguments regarding Navico's relationship with its U.S. customer were irrelevant in light of the agency's conclusion regarding [        ]. Government's Brief at 65-67. But Commerce's conclusion regarding [      ] is inadequately explained and supported. Further, Commerce's failed to address CFA's argument that Navico's U.S. customer and [                    ] were [                                ]. IDM, P.R. 540, at 42, Appx___; CFA's Case Brief, C.R. 617, P.R. 510, at 50-51, Appx___-___;

CFA's November 2, 2020 Rebuttal Factual Information, C.R. 483-484, P.R. 433-434, at Attachment 1 (pdf pages 124, 137, 139), Appx___, Appx___, Appx___. Overall, Commerce's decision to grant Navico a separate rate was inadequately explained and supported.

### D. Commerce Erred in Determining Navico's Separate Rate

Commerce stated that it relied on 19 U.S.C. § 1673d(c)(5)(B) in determining Navico's separate rate. Commerce's Ministerial Error Allegation Memorandum, P.R. 549, at 3, Appx___. But that statutory provision applies only when 19 U.S.C. § 1673d(c)(5)(A) is inoperative – and it was not inoperative here. CFA's Opening Brief at 60-64. Further, even if 19 U.S.C. § 1673d(c)(5)(A) had been inoperative, the separate rate does not comply with 19 U.S.C. § 1673d(c)(5)(B), because it was unreasonable in light of Navico's history of dumping and inconsistent with prior precedent. *Id.* at 64-67.

The Government argues that CFA did not exhaust its administrative remedies regarding the calculation of Navico's separate rate. Government's Brief at 69-71. It also argues that CFA's arguments are based on the "false premise" that DOTASEAFOOD received a "separate rate." *Id.* at 71-72. Finally, it argues that the separate rate

appropriately complies with 19 U.S.C. § 1673d(c)(5)(B). *Id.* at 72-75.
These arguments are not convincing.

First, the Government does not establish that CFA failed to exhaust
its remedies. The purpose of the exhaustion doctrine is to ensure that
Commerce has the opportunity to consider parties' arguments
administratively. CFA made its arguments at the administrative level,
and Commerce responded to them. CFA's Ministerial Error Comments,
P.R. 548, at 2-5, Appx___-___; Commerce's Ministerial Error Allegation
Memorandum, P.R. 549, Appx___-___. Therefore, the exhaustion
doctrine has been satisfied.

In claiming that CFA presumes that DOTASEAFOOD received a
separate rate, the Government mischaracterizes CFA's claims
regarding 19 U.S.C. § 1673d(c)(5)(A). That provision states that the
margin for non-selected companies must be the weighted average of the
"dumping margins established for exporters and producers individually
investigated, excluding any zero and *de minimis* margins, and any
margins determined entirely under section 1677e {}." 19 U.S.C.
§ 1673d(c)(5)(A). DOTASEAFOOD here was individually examined. It
did not receive a zero or *de minimis* margin, or margin determined

entirely under 19 U.S.C. § 1677e. The statute accordingly called upon Commerce to use DOTASEAFOOD's margin alone—given VHC's zero margin—to determine the margin for Navico. CFA's Opening Brief at 62-64; CFA's Ministerial Error Comments, P.R. 548, at 2-4, Appx___-___.

The Government argues that DOTASEAFOOD did not receive a "calculated" margin, because the Vietnam-wide entity was not under review. Government's Brief at 72-73. But 19 U.S.C. § 1673d(c)(5)(A)'s applicability does not hinge on whether a margin is "calculated." Moreover, DOTASEAFOOD was clearly subject to the review as a mandatory respondent, and remained so even as it was determined to be part of the Vietnam-wide entity.

Finally, the Government argues that Commerce properly applied 19 U.S.C. § 1673d(c)(5)(B). *Id.* at 73-74. The Government chides CFA for glossing that provision in its ministerial error comments, *id.* at 73, treating that gloss as an admission that the provision applied here. But that is not a reasonable or necessary reading of CFA's comments. CFA's Ministerial Error Comments, P.R. 548, at 2-4, Appx___-___. Moreover, Commerce failed articulate a reasonable, non-arbitrary basis for

rejecting CFA's argument that, even if 19 U.S.C. § 1673d(c)(5)(B) were applicable, it would not permit reliance on VHC's margin alone, due to Navico's history of dumping. Commerce's Ministerial Error Allegation Memorandum, P.R. 549, at 3-4, Appx___-___. As CFA explained, the agency conceded in its IDM that a company's history of dumping was relevant to determining the separate rate. CFA's Ministerial Error Comments, P.R. 548, at 5, Appx___; IDM, P.R. 540, at 39 n.211, Appx___.

The Government nonetheless argues that it would have been inconsistent with *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) for Commerce to consider Navico's dumping history in establishing the separate rate. Government's Brief at 73-74. But this is a *post-hoc* defense. Commerce's Ministerial Error Allegation Memorandum, P.R. 549, Appx___-___. Further, it ignores cases in which this Court has explicitly found a particular respondent's history of dumping relevant to determining whether it has received a "reasonable" separate rate pursuant to 19 U.S.C. § 1673d(c)(5)(B). *See, e.g.*, *Bosun Tools Co. v. United States*, 493 F. Supp. 3d 1351, 1356-57 (Ct. Int'l

Trade 2021), *aff'd*, No. 2021-1929, 2021-1930, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022).

In sum, Commerce's determination of Navico's separate rate ignored applicable law and was otherwise unreasonable.

## III.   <u>CONCLUSION</u>

For the reasons discussed above and in CFA's Opening Brief, CFA respectfully submits that the Court should remand Commerce's final results in the 2018-2019 administrative review of the antidumping duty order covering frozen fish fillets from Vietnam for further consideration.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: June 3, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies

that this brief complies with the word limitation requirement. The word

count for Reply Brief of Plaintiffs, Catfish Farmers of America, *et al.*, as

computed by Wiley Rein LLP's word processing system (Microsoft Word

2021), is 6,734 words.


_____*/s/ Nazak Nikakhtar*_____
(Signature of Attorney)

_____Nazak Nikakhtar_____
(Name of Attorney)


The Catfish Farmers of America and individual U.S. catfish processors
America's Catch, Inc., Alabama Catfish, LLC
d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC
d/b/a Country Select Catfish, Delta Pride Catfish, Inc.,
Guidry's Catfish, Inc., Heartland Catfish Company,
Magnolia Processing, Inc. d/b/a Pride of the Pond, and
_____Simmons Farm Raised Catfish, Inc._____
(Representative Of)


_____June 3, 2022_____
(Date)