UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |
|---|---|
| ) | |
| ) | |
| CATFISH FARMERS OF AMERICA, ) | |
| *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | Court No. 21-00380 |
| v. ) | |
| ) | |
| ) | PUBLIC |
| UNITED STATES, ) | VERSION |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| QMC FOODS, INC., *et al.,* ) | |
| ) | |
| Defendant-Intervenors. ) | |
_____ )

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:
HENDRICKS VALENZUELA
Of Counsel
Office of the Chief Counsel
 for Trade Enforcement & Compliance
 U.S. Department of Commerce

KARA M. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044
Tel: (202) 305-7571
Fax: (202) 514-8640

April 15, 2022                              Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ..............................................2

    I.    Administrative Determination Under Review .......................2

    II.   Statement Of The Issues.........................................................3

STATEMENT OF FACTS .....................................................................4

    I.    Initiation Of Administrative Review ....................................4

    II.   Preliminary Results ..............................................................7

    III.  Final Results .........................................................................9

    IV.  CFA's Ministerial Error Submission ...................................11

SUMMARY OF ARGUMENT ............................................................12

ARGUMENT .......................................................................................14

    I.    Standard Of Review .............................................................14

    II.   Non-Market Economy Legal Framework ............................15

          A.   Surrogate Country Selection ......................................16

          B.   Selection Of Surrogate Value Factors Of
               Production .................................................................20

    III.  Legal Framework For Separate Rates .................................22

    IV.  Substantial Evidence Supports Commerce's Selection Of
        India As The Primary Surrogate Country...........................25

          A.   Commerce Reasonably Determined That India Is
               Economically Comparable To Vietnam Based Upon Its
               Surrogate Country Selection Policy ...........................25

B.  Commerce Reasonably Determined That India Is A Significant Producer Of Comparable Merchandise.....30

C.  Commerce Reasonably Found That The Indian Data Were The Best Available Information On The Record To Value The Factors Of Production ..........................36

    1.  The Indian Data Were The Best Available Information To Value The Main Inputs .............37

    2.  The Indian Data Were The Best Available Information To Value By-Products...... And Labor, And CFA Failed To Exhaust Its Administrative Remedies With Respect To These Surrogate Values....................................................................42

    3.  The Indian Financial Statements Were The Best Available Information ...........................................48

    4.  Substantial Evidence Supports Commerce's Determination That The Indonesian Data Suffered From Drawbacks ...................................53

V.  Substantial Evidence Supports Commerce's Determination That DOTASEAFOOD Is Not Entitled To A Separate Rate ........................................................................56

VI.  Commerce's Determination To Grant NAVICO A Separate Rate Is Supported By Substantial Evidence And In Accordance With Law ...........................................61

VII.  Commerce's Assignment Of Vinh Hoan's Separate Rate To NAVICO, Pursuant To 19 U.S.C. § 1673(c)(5)(B), Is Supported By Substantial Evidence And In Accordance With Law ......................................................................67

A.  CFA Failed To Exhaust Its Administrative Remedies With Respect To NAVICO's Rate .................................69

B.  Commerce's Assignment Of NAVICO's Rate Is In Accordance With  Law .................................................72

CONCLUSION ......................................................................................... 75

TABLE OF AUTHORITIES

Cases                                                                          Page(s)

*Albemarle Corp. & Subsidiaries v. United States*,
   821 F.3d 1345 (Fed. Cir. 2016) .................................................... passim

*AMS Assocs. v. United States*,
   719 F.3d 1376 (Fed. Cir. 2013) .................................................... passim

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   179 F. Supp. 3d 1256 (Ct. Int'l Trade 2016)........................................28

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018)............................... passim

*Calgon Carbon Corp. v. United States*,
   190 F. Supp. 3d 1224 (Ct. Int'l Trade 2016).......................................34

*Catfish Farmers of Am. v. United States*,
   641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009).......................................21

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*,
   467 U.S. 837 (1984)..............................................................................15

*Coalition of Fair Trade in Garlic v. United States*,
   437 F.Supp.3d 1347 (Ct. Int'l Trade 2020)...........................................2

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938)..............................................................................14

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007) ......................................... 46, 47, 52, 72

iv

*Diamond Sawblades Mfrs. Coalition v. United States,*
  866 F.3d 1304 (Fed. Cir. 2017) .......................................... 23

*Dorbest Ltd. v. United States,*
  462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ....................... 31

*Dorbest Ltd. v. United States,*
  604 F.3d 1363 (Fed. Cir. 2010) ........................................ 73

*Fresh Garlic Producers Ass'n v. United States,*
  121 F. Supp.3d 1307, 1316 (Ct. Int'l Trade 2015) ................. 35

*Fujian Lianfu Forestry Co., Ltd. v. United States,*
  638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009) ....................... 18

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) .......................................... 14

*Guangdong Chems. Imp. & Exp. v. United States,*
  460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006) ................ 20, 37, 56

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,*
  28 C.I.T. 1185 (2004) .................................................... 21

*Heze Huayi Chem. Co., Ltd. v. United States,*
  532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) ....................... 35

*Home Meridian Int'l, Inc. v. United States,*
  772 F.3d 1289 (Fed. Cir. 2014) ..................................... 20, 42

*Itochu Bldg. Prods. v. United States,*
  733 F.3d 1140 (Fed. Cir. 2013) ........................................ 47

*Jacobi Carbons AB v. United States,*
  313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ....................... 31

*Jiaxing Bro. Fastener Co. v. United States*,
    11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .......................................... 22

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) .................................................... passim

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
    961 F. Supp. 2d 1323 (Ct. Int'l Trade 2014) ........................................ 17

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) ................................................. 16, 20, 42

*Nippon Steel Corp. v. U.S.*,
    458 F. 3d 1345 (Fed. Cir. 2006) ..................................................... 14, 15

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) ........................................................... 14

*Paul Muller Industrie GmbH & Co. v. United States*,
    502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) ............................. 46, 52, 72

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ................................................. 20, 30, 42

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ........................................................... 20

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ................................................. 46, 52, 72

*Sigma Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) .................................................... passim

*Torrington Co. v. United States*,
    82 F.3d 1039 (Fed. Cir. 1996) ........................................................... 15

*United States v. Great Am. Ins. Co. of New York*,
738 F.3d 1320 (Fed. Cir. 2013) .............................................................2

*Vinh Hoan Corp. v. United States*,
49 F. Supp. 3d 1285 (Ct. Int'l Trade 2015)........................................54

*Yantai CMC Bearing Co. v. United States*,
203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017)......................................24

*Zenith Radio Corp. v. United States*,
437 U.S. 443 (1978)..............................................................................15

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011) ....................................................21, 53

Statutes

19 U.S.C. § 1516a(b)(1)(B) .................................................................14
19 U.S.C. § 1673 ...................................................................................15
19 U.S.C. § 1673d(c)(5)....................................................................67, 68
19 U.S.C. § 1673d(c)(5)(A) .............................................11, 68, 71, 73
19 U.S.C. § 1673d(c)(5)(B) ........................................................ passim
19 U.S.C. § 1677(33) .............................................................................62
19 U.S.C. § 1677b(c) .............................................................................20
19 U.S.C. § 1677b(c)(1) ........................................................................16
19 U.S.C. § 1677b(c)(1)(B) ..................................................................20
19 U.S.C. § 1677b(c)(4) ........................................................................36
19 U.S.C. § 1677b(c)(4)(A) ......................................................16, 25, 28
19 U.S.C. § 1677b(c)(4)(B) ......................................................16, 31, 33
19 U.S.C. § 1677e(b) .............................................................................57

Regulations

19 C.F.R. § 351.102(b)(3)........................................................62, 63, 65
19 C.F.R. § 351.106 ...............................................................................52
19 C.F.R. § 351.107(d) ..........................................................................61
19 C.F.R. § 351.225(f) ...........................................................................11
19 C.F.R. § 351.309(c)(2) .................................................................12, 46
19 C.F.R. § 351.402(f) ...........................................................................63

19 C.F.R. § 351.408(c)(2) .......................................................... 22, 45, 53
19 C.F.R. § 351.408(c)(4) ........................................................ 50

Administrative Determinations

*Diamond Sawblades from China,*
   71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) ........ 24

*Certain Frozen Warmwater Shrimp from Vietnam,*
   72 Fed. Reg. 52,052 (Dep't of Commerce Sept. 12, 2007) .................... 52

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
   75 Fed. Reg. 12,726 (Dep't of Commerce Mar. 17, 2010) .................... 38

*Pure Mangesium from the People's Republic of China,*
   75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010) .................... 18

*Certain Preserved Mushrooms from the People's Republic of China,*
   77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) .................... 21

*Certain Frozen Warmwater Shrimp from the Socialist Republic of
   Vietnam,*
   78 Fed. Reg. 56,211 (Dep't of Commerce Sept. 12, 2013) .............. 18, 19

*Antidumping Proceedings: Announcement of Change in Department
   Practice for Respondent Selection in Antidumping Duty Proceedings
   and Conditional Review of the Nonmarket Economy Entity in
   Nonmarket Economy Antidumping Duty Proceedings,*
   78 Fed. Reg. 65,963, 65,970 (Dep't of Commerce Nov. 4, 2013) .......... 60

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
   80 Fed. Reg. 2,394 (Dep't of Commerce Jan. 16, 2015) ...................... 32

*Initiation of Antidumping and Countervailing Duty Administrative
   Review,*
   84 Fed. Reg. 53,411 (Dep't of Commerce Oct. 7, 2019) ........................ 5

*Certain Steel Nails from the People's Republic of China,*

84 Fed. Reg. 55,906 (Dep't of Commerce Oct. 18, 2019) ....................59

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020)..............30, 32

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   85 Fed. Reg. 84,300 (Dep't of Commerce Dec. 28, 2020)..................5, 9

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
   86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021).............3, 10, 11

*Cast Iron Soil Pipe from the People's Republic of China*,
   86 Fed. Reg. 43,523 (Dep't of Commerce Aug. 9, 2021) .....................59

*Cast Iron Soil Pipe from the People's Republic of China*,
   86 Fed. Reg. 72,929 (Dep't of Commerce Dec. 23, 2021)....................60

H.R. Rep. No. 103-316, at 873, reprinted in 1994 U.S.C.C.A.N. 4040,
   4199 (1994) ...........................................................................................69

# GLOSSARY

CASEAMEX:              Can Tho Import Export Joint Stock Company

CBBC:                  CBBC

CBP:                   U.S. Customs and Border Protection

CFA:                   Catfish Farmers of America, *et al.*

DOTASEAFOOD:           Seafood Joint Stock Company No. 4 Branch
                       Dongtam Fisheries Processing Company

[█████]:               [███████████████████]

GNI:                   Gross National Income

HVG:                   Hung Vuong Group

IDM:                   Issues and Decision Memorandum

NAVICO:                Nam Viet Corporation

PDM:                   Preliminary Decision Memorandum

QMC:                   QMC Foods, Inc.

SAA:                   Statement of Administrative Action

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

———————————————————————— )
CATFISH FARMERS OF AMERICA,                )
*et al.*,                                                         )
                                                                      )
                          Plaintiffs,                        )
                                                                      )    Court No. 21-00380
               v.                                                 )
                                                                      )
UNITED STATES,                                      )
                                                                      )
                          Defendant,                       )
                                                                      )
                          and                                  )
                                                                      )
QMC FOODS, INC., *et al.*,                          )
                                                                      )
                          Defendant-Intervenors.    )
———————————————————————— )

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response in opposition to the Rule 56.2 motion for judgment on the agency record filed by the plaintiffs, Catfish Farmers of America, America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and

Simmons Farm Raised Catfish, Inc. (collectively, CFA), CFA Br., ECF
No. 34, challenging certain aspects of the United States Department of
Commerce's (Commerce) final results in the administrative review of
the antidumping duty order covering certain frozen fish fillets from the
Socialist Republic of Vietnam (Vietnam).[1]  For the reasons explained
below, the Court should sustain the final results because they are
supported by substantial evidence and are otherwise in accordance with
law.

STATEMENT PURSUANT TO RULE 56.2

I.    Administrative Determination Under Review

The administrative determination under review is the final
determination in the administrative review of the antidumping duty
order covering certain frozen fish fillets from Vietnam covering the

---

[1]  Because CFA did not address Count Six of its complaint,
challenging Commerce's determination that CBBC and QMC have
standing to request a review of the antidumping duty order, Compl.,
ECF No. 12, the Court should deem this issue waived.  "It is well
established that arguments that are not appropriately developed in a
party's briefing may be deemed waived."  *United States v. Great Am.
Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013); *accord
Coalition of Fair Trade in Garlic v. United States*, 437 F.Supp.3d 1347,
1358 (Ct. Int'l Trade 2020).  As such, we do not address this argument.

2

period of review August 1, 2018, through July 31, 2019. *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021) (final results) (P.R. 552), Appx1088-1091,[2] and accompanying Issues and Decision Memorandum (Dep't of Commerce June 25, 2021) (IDM) (P.R. 540), Appx1042-1087.

## II.   Statement Of The Issues

1.   Whether Commerce's selection of India as the primary surrogate country to calculate normal value is supported by substantial evidence and in accordance with law.

2.   Whether substantial evidence supports Commerce's determination that Indian data were the best available information for the calculation of surrogate values.

3.   Whether CFA failed to exhaust its administrative remedies with respect to Commerce's by-products and labor surrogate value determinations.

4.   Whether substantial evidence supports Commerce's decision not to grant a separate rate to Seafood Joint Stock Company No. 4

---

[2]   "P.R." refers to public documents in the administrative record; non-public record documents are designated as "C.R."

3

Branch Dongtam Fisheries Processing Company (DOTASEAFOOD).

5.      Whether Commerce's decision to grant Nam Viet

Corporation (NAVICO) a separate rate is supported by substantial

evidence and in accordance with law.

6.      Whether, CFA failed to exhaust its administrative remedies

in challenging Commerce's separate rate methodology with respect to

NAVICO.

7.      Whether Commerce's calculation of a separate rate for

NAVICO is supported by substantial evidence and in accordance with

law.

STATEMENT OF FACTS[3]

## I.      Initiation Of Administrative Review

Following requests by interested parties, Commerce initiated the

present administrative review of the antidumping duty order covering

certain frozen fish fillets from Vietnam on October, 7, 2019.  *See*

*Initiation of Antidumping and Countervailing Duty Administrative*

*Review*, 84 Fed. Reg. 53,411 (Dep't of Commerce Oct. 7, 2019) (P.R. 28),

---

[3]  To avoid repetition, the relevant facts pertaining to individual
issues appear below in the argument section.

Appx14086-14099.  Commerce initially selected the two largest exporters as mandatory respondents, Bien Dong Seafood Co., Ltd. (Bien Dong) and Vinh Hoan Corporation (Vinh Hoan).  *See* Respondent Selection Memo (P.R. 78; C.R. 48), Appx60880-60885.  Bien Dong, the Hung Vuong Group (HVG)[4], NAVICO, DOTASEAFOOD, and Vinh Hoan all requested separate rate status, and numerous companies filed no shipment certifications.  *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 84,300 (Dep't of Commerce Dec. 28, 2020) (preliminary results), Appx1000-1010, and accompanying Preliminary Decision Memorandum (PDM) at 2-3 (P.R. 493), Appx1012-1013.

Commerce issued its standard nonmarket economy questionnaire to the mandatory respondents, Bien Dong and Vinh Hoan.  PDM at 3, Appx1013.  Subsequently, all parties timely withdrew their requests for review of Bien Dong, as well as 15 other companies.  *Id.*  Because all

---

[4] The HVG collapsed entity includes: An Giang Fisheries Import and Export Joint Stock Company; Asia Pangasius Company Limited; Europe Joint Stock Company; Hung Vuong Ben Tre Seafood Processing Company Limited; Hung Vuong Joint Stock Company; Hung Vuong Mascato Company Limited; Hung Vuong—Sa Dec Co. Ltd.; and Hung Vuong—Vinh Long Co., Ltd. (collectively, HVG).

review requests for Bien Dong had been withdrawn, Commerce

selected DOTASEAFOOD as an additional mandatory respondent, and

issued it the standard nonmarket economy questionnaire. *Id.*; *see also*

Replacement Respondent Selection Memo (P.R. 167; C.R. 94),

Appx6886-6889.

In February and March 2020, DOTASEAFOOD submitted initial

responses to sections A and C of Commerce's questionnaire but failed to

submit a complete section D response, claiming it was unable to collect

factors of production information from unaffiliated suppliers.[5]  PDM at

3-4, Appx1013-1014; *see also* DOTASEAFOOD Additional Section D

Questionnaire Response (P.R. 220; C.R. 164), Appx8185-8204.

DOTASEAFOOD also failed to respond to an additional supplemental

questionnaire from Commerce regarding Sections A and C of the

original questionnaire.  PDM at 5, Appx1015; *see also* DOTASEAFOOD

Supplemental Questionnaire for Sections A and C (C.R. 463).

With respect to companies who had submitted separate rate

---

[5] In a nonmarket economy standard questionnaire, Section A of
Commerce's questionnaire requests general information regarding the
company, its corporate structure and its eligibility for a separate rate.
Section C relates to a company's U.S. sales.  Section D relates to normal
value and factors of production.

applications (SRA), in October 2020, Commerce issued a supplemental

separate rate questionnaire to NAVICO, and NAVICO timely

responded.  PDM at 5, Appx1015; *see also* NAVICO Supplemental SRA

Questionnaire Response (NAVICO Supp. SRA Response) (P.R. 418; C.R.

477), Appx12956-13025.

## II.   Preliminary Results

Vietnam is a non-market economy country.  As a result,

Commerce does not use prices in Vietnam to determine normal value,

but instead determines normal value based on surrogate values from

economically comparable market economy countries that are

significant producers of comparable merchandise.  From April through

November 2020, interested parties, including CFA, submitted

comments regarding surrogate country selection and placed surrogate

value data on the record for valuing factors of production.  *See*

Commerce's Surrogate Country List (P.R. 224-226), Appx14100-14108;

CFA's Surrogate Country List Comments (P.R. 227-228), Appx14109-

14434; CFA's Surrogate Country Comments (P.R. 234-236).

Commerce published the preliminary results in December 2020,

and preliminarily determined that Vinh Hoan and NAVICO

demonstrated their eligibility for a separate rate.  PDM at 10-11, Appx1020-1021.  Commerce explained that because it had preliminarily calculated a dumping margin for Vinh Hoan that was not zero, *de minimis*, or based entirely on facts available, pursuant to 19 U.S.C. § 1673d(c)(5)(B), it would "apply the rate determined for Vinh Hoan to NAVICO."[6]  *Id.* at 11, Appx1021.

Commerce also preliminarily determined that DOTASEAFOOD was not eligible for a separate rate because it had failed to respond to Commerce's "subsequent request for information regarding its separate rate status," and thus, failed to demonstrate absence of government control.  *Id.* at 9, Appx1019.  Because no party had requested a review of the Vietnam-wide entity, the Vietnam-wide rate of $2.39 per kilogram was not subject to change.  *Id.* at 12, Appx1022.

Moreover, Commerce preliminarily selected India as the primary surrogate country, because:  (1) it was at the same level of economic development as Vietnam; (2) it was a significant producer of merchandise comparable to the subject merchandise such that could be

---

[6] Commerce mistakenly cited 19 U.S.C. § 1673d(c)(5)(B), but it applied the general rule pursuant to section 1673d(c)(5)(A).  *See* Ministerial Error Memo (P.R. 549), Appx21961-21964.

determined from the information available; and (3) it provided the best usable data and information with which to value Vinh Hoan's factors of production. *See id.* at 12-15, Appx1022-1025. In doing so, Commerce preliminarily calculated a margin of $0.09 per kilogram for Vinh Hoan, the sole remaining mandatory respondent receiving a calculated rate, and applied Vinh Hoan's rate to separate rate respondent, NAVICO. *Id.* at 11, Appx1021; *see also Preliminary Results*, 85 Fed. Reg. at 84,301, Appx1004.

Thereafter, in February 2021, Commerce received administrative case and/or rebuttal briefs from CFA, Vinh Hoan, HVG, Colorado Boxed Beef Company (CBBC) and QMC Foods, Inc. (QMC), NAVICO, and Can Tho Import Export Joint Stock Company (CASEAMEX). IDM at 2, Appx1043.

## III.   Final Results

On June 25, 2022, Commerce published its final results, and continued to determine that it was appropriate to use India as the primary surrogate country because it was at the same level of economic development as Vietnam; a significant producer of merchandise comparable to the subject merchandise based on the information

9

available; and provided the best data and information with which to value the factors of production.  *See* IDM at 14-33, Appx1055-1074. Accordingly, Commerce calculated the normal value using Indian surrogate value data to value Vinh Hoan's factors of production, with the exception of the fish oil by-product, for which it used Indonesian data.  *See id.* at 30, Appx1071.

Commerce also determined that Vinh Hoan and NAVICO continued to be eligible for a separate rate, 20 companies had no shipments,[7] and 27 companies, including DOTASEAFOOD, did not qualify for a separate rate and thus were part of the Vietnam-wide entity.  *See Final Results*, 86 Fed. Reg. at 36,104-05, Appx1089; IDM at 4, Appx1045.

For the final results, Commerce used the same methodology as applied in the preliminary results, except it corrected for errors in the factors of production calculations.  *See* IDM at 4, Appx1045.  Commerce calculated a final dumping margin for Vinh Hoan of 0.00 percent, and

---

[7] Commerce preliminarily determined that Thanh Binh Dong Thap One Member Company Limited (Thanh Binh) made no shipments during the period of review, but after evaluating comments from parties, Commerce determined in the final results that Than Binh was part of the Vinh Hoan single entity.  *See* IDM at 44-45, Appx1085-1086.

again assigned NAVICO, the sole separate rate non-examined

respondent, Vinh Hoan's rate of 0.00 percent in accordance with 19

U.S.C. § 1673d(c)(5)(B).  *See Final Results*, 86 Fed. Reg. at 36,103,

Appx1089; *see also* Ministerial Error Memo at 3-4, Appx21963-21964.

## IV.    CFA's Ministerial Error Submission

After Commerce issued its final results, in a ministerial error

allegation, CFA contested the methodology Commerce applied in

assigning a separate rate to NAVICO.  *See* CFA's Ministerial Error

Comments (P.R. 548), Appx21953-21960.  Commerce admitted to a

citation error in the final results and explained that while it stated it

had assigned NAVICO's rate in accordance with 19 U.S.C.

§ 1673d(c)(5)*(A)*, the proper citation should have been 19 U.S.C.

§ 1673d(c)(5)*(B)*.  *See* Ministerial Error Memo at 3-4, Appx21963-21964.

Because ministerial errors are limited to errors in "addition,

subtraction, or other arithmetic functions, clerical error resulting from

inaccurate copying, duplication, or the like, and any other similar type

of unintentional error which the Secretary considers ministerial," 19

C.F.R. § 351.225(f), Commerce properly determined that CFA's

arguments regarding the representativeness of Vinh Hoan's rate to

11

NAVICO was a methodological argument that should have been made in case briefs and did not address it.  Commerce explained that "{t}his assertion, however, clearly disregards the methodological choice made by Commerce."  Ministerial Error Memo at 4, Appx21964; *see also* 19 C.F.R. § 351.309(c)(2).

SUMMARY OF ARGUMENT

Commerce's final determination is supported by substantial evidence and in accordance with law.  First, substantial evidence supports Commerce's determination to use India as the primary surrogate country because India is economically comparable to Vietnam, is a significant producer of comparable merchandise, and had superior data for the overwhelming majority of reported factors of production, including major inputs.  CFA is wrong to say that Commerce did not explain why it did not select Indonesia, CFA's preferred primary surrogate country.  Commerce *did* explain its reasoning: CFA simply disagrees.  Further, the Court should decline to consider CFA's specific challenges to by-products and labor surrogate values because CFA did not adequately exhaust its administrative remedies before Commerce.

Second, Commerce's determination to not assign DOTASEAFOOD a separate rate is supported by substantial evidence and in accordance with law.  Because it failed to respond to requests for information regarding its SRA, DOTASEAFOOD failed to meet the burden of showing it was autonomous of government control.

Third, Commerce's determination to grant NAVICO a separate rate is supported by substantial evidence and in accordance with law. Commerce reasonably determined that NAVICO provided adequate responses to requests for information regarding its SRA, and the record does not support a finding that NAVICO failed to report any affiliations during the period of review, as CFA alleges.

Finally, CFA failed to exhaust its administrative remedies for challenging Commerce's separate rate methodology with respect to the rate Commerce assigned NAVICO, because it first raised this challenge in the ministerial error allegation, following the final results.  In any event, Commerce's determination to assign NAVICO a separate rate based on Vinh Hoan's calculated dumping margin pursuant to 19 U.S.C. § 1673d(c)(5)(B) is supported by substantial evidence and in accordance with law.

ARGUMENT

I.   Standard Of Review

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. U.S.*, 458 F. 3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). That is because "{s}ubstantial evidence" is defined as "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The Court must affirm the agency's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusion. *Nippon Steel*, 458 F.3d

14

at 1352.  Even if it is possible to draw two inconsistent conclusions from the evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence.  *Id.*

In reviewing whether Commerce's actions are in accordance with law, the Court relies upon the two-step test articulated by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).  In the first step, the Court determines "whether Congress has directly spoken to the precise question at issue" and clearly expressed its purpose and intent in the governing statute. *Id.* at 842-43.  If the statute is silent, then the Court must assess whether Commerce's interpretation achieves a "sufficiently reasonable" interpretation of the statute.  *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-51 (1978) (citations omitted).  "Any reasonable construction of the statute is a permissible construction."  *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

II.   Non-Market Economy Legal Framework

The antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price." 19 U.S.C § 1673.  If the proceeding involves products from a non-market

15

economy, and Commerce determines that available information does not permit a standard normal value calculation, then Commerce determines normal value on the basis of surrogate values for "the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1).  This statutory scheme "construct{s} a hypothetical market value" of the subject merchandise in the non-market economy.  *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

A.   Surrogate Country Selection

Commerce examines the reliability and availability of the data from countries identified as potential surrogates in making its surrogate country selection.  Commerce values a respondent's factors of production based on "the values of such factors in a market economy country or countries considered to be appropriate{.}"  19 U.S.C. § 1677b(c)(1).  The statute defines an "appropriate" market economy country as one "at a level of economic development comparable to that of the nonmarket economy country" that also is a "significant producer{}" of comparable merchandise."  *Id.* § (c)(4)(A)-(B).

16

Commerce employs a four-step approach to select the most appropriate surrogate country. Under the first two steps, Commerce: (1) compiles a list of countries at a level of economic development comparable to the country under review; and (2) determines which among them, if any, produce comparable merchandise. Import Administration Policy Bulletin 04.1: Non–Market Economy Surrogate Country Selection Process at 2 (Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (Policy Bulletin 04.1). Commerce next determines which of these countries, if any, produce significant amounts of comparable merchandise. *Id.* Finally, the agency evaluates the reliability and availability of the data from those countries. *Id.* at 3. Commerce "may also consider other countries on the case record if the record provides . . . adequate information to evaluate them." *Id.*; *see Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323, 1328 (Ct. Int'l Trade 2014) (describing Commerce's four-step process and the "non-exhaustive" nature of the list).

Commerce's long-standing, judicially-affirmed practice is to rely on gross national income (GNI) for purposes of identifying countries at a

level of economic development comparable to the non-market economy whose products are under review. *See, e.g.*, *Pure Magnesium from the People's Republic of China*, 75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010) (final admin. review), and accompanying IDM at Cmt. 4; *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1347-50 (Ct. Int'l Trade 2009). For example, in the seventh review of the antidumping duty order covering shrimp from Vietnam, Commerce explained that there is "no requirement" that it "select the country that has the GNI that is *closest* to Vietnam's GNI," because Commerce considers all countries identified by Import Administration's Office of Policy to satisfy the comparable level of economic development requirement of the statute for the purposes of selecting a surrogate country." *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 78 Fed. Reg. 56,211 (Dep't of Commerce Sept. 12, 2013) (final admin. review), and accompanying IDM at cmt. 1.A (emphasis added). As a result, Commerce explained that it "continue{d} to consider each of the six countries comparable to Vietnam in terms of economic development," because "Policy Bulletin 04.1 states that the countries appearing on the surrogate country list should not be

considered distinct in terms of economic development (and thus economic comparability)." *Id.*

Moreover, Commerce's surrogate country selection policy explains that the agency considers data quality to be "a critical consideration affecting surrogate country selection." Policy Bulletin 04.1 at 4. Commerce evaluates the quality and specificity of the data available from the remaining potential choices and "the country with the best factors data is selected as the primary surrogate country." *Id.* As Commerce's policy recognizes, "a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." *Id.* Hence, because economically comparable countries may offer varying data quality, and because the statute does not require Commerce to select the country that is most comparable to the target non-market economy country, Commerce's methodology is reasonable and appropriate. *See Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1300 (Fed. Cir. 2016) (finding "no error in Commerce's . . . preference to appraise surrogate values from a single surrogate country" with statistics that

were "specific, contemporaneous, and represented broad market averages").

B.  <u>Selection Of Surrogate Value Factors Of Production</u>

As explained above, the statute requires Commerce to value a respondent's factors of production using the "best available information." 19 U.S.C. § 1677b(c)(1)(B).  "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  The data selected need not be perfect, *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014), and the statute "does not mandate that Commerce use any particular data source" in reaching its determination.  *Guangdong Chems. Imp. & Exp. v. United States*, 460 F. Supp. 2d 1365, 1368-69 (Ct. Int'l Trade 2006).

This statutory gap leaves Commerce with considerable discretion to determine what constitutes the best available information.  *See Nation Ford*, 166 F.3d at 1377 ("While {19 U.S.C.} § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords

20

Commerce wide discretion in the valuation of factors of production in the application of those guidelines."). In filling this gap, Commerce has established several criteria that it considers as part of its analysis, including whether the data is "product-specific, representative of a broad market average, publicly available, contemporaneous with the period of review, and free of taxes and duties." *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) (final admin. review), and accompanying IDM at 9.

Commerce's surrogate value choice is supported by substantial evidence if the data bears "a rational and reasonable relationship to the factor of production it represents." *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1191 (2004). A reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011); *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with

the choice of selecting from among imperfect alternatives, it has the

discretion to select the best available information for a surrogate value

so long as its decision is reasonable").

Finally, Commerce also has a regulatory preference to use as

much data as possible from a single primary surrogate country. *See* 19

C.F.R. § 351.408(c)(2). Commerce will "only resort to a secondary

surrogate country if data from the primary surrogate country are

unavailable or unreliable." *Jiaxing Bro. Fastener Co. v. United States*,

11 F. Supp. 3d 1326, 132–33 (Ct. Int'l Trade 2014), *aff'd*, 822 F.3d 1289

(Fed. Cir. 2016).

III.   Legal Framework For Separate Rates

In antidumping proceedings involving non-market economy

countries such as Vietnam, respondents have no statutory or

regulatory right to their own separate rates. Rather, Commerce has

developed a longstanding practice which presumes that all companies

within a non-market economy country are subject to government

control over their export activities and should be assessed a single

antidumping duty rate. *AMS Assocs. v. United States*, 719 F.3d 1376,

1379 (Fed. Cir. 2013) (citing *Sigma Corp. v. United States*, 117 F.3d

22

1401, 1405 (Fed. Cir. 1997)).  Under this presumption, which has been

upheld repeatedly by the Court of Appeals for the Federal Circuit, a

respondent receives the non-market economy country-wide rate unless

it *affirmatively* demonstrates an absence of both *de jure* and *de facto*

government control.  *AMS Assocs.*, 719 F.3d at 1379.  If it does, and

only then, will it obtain its "entitlement to a separate, company-

specific margin."  *Sigma Corp.*, 117 F.3d at 1405.  But if the company

fails to rebut the presumption of government control, it continues to

receive the single, country-wide, dumping rate.  *See Diamond*

*Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304, 1311 (Fed.

Cir. 2017).  That is, under Commerce's longstanding practice, the

company applying for a separate rate bears the burden to demonstrate

that its export activities are free from *de jure* and *de facto* government

control.  *AMS Assocs.*, 719 F.3d at 1379-80.

Commerce's practice further allows a party to establish an

absence of *de jure* control by references to legislation and

governmental measures that demonstrate a company's legal

independence.  *AMS Assocs.*, 719 F.3d at 1379.  In evaluating whether

a company is free from *de jure* government control, Commerce

considers:  (1) whether there is an absence of restrictive stipulations associated with the individual exporter's business and export licenses; (2) the applicable legislative enactments decentralizing control of a company; and (3) any other formal measures by the government decentralizing control of a company. *Diamond Sawblades from China*, 71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final admin. determ.).

A party may demonstrate the absence of *de facto* government control by providing evidence that:  (1) the exporter sets its prices independently of the government and other exporters; (2) negotiates its own contracts; (3) keeps the proceeds of its sales (not including taxes); and (4) selects its management autonomously. *AMS Assocs.*, 719 F.3d at 1379; Policy Bulletin No. 05.1 at 1, *available at* http://enforcement.trade.gov/policy/bull05-1.pdf.

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria.  *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017).

24

IV.    Substantial Evidence Supports Commerce's Selection Of India As The Primary Surrogate Country

Substantial evidence supports Commerce's selection of India as the primary surrogate country, because India is at a level of economic development comparable to Vietnam; is a significant producer of comparable merchandise; and, when compared to alternatives, provides the best data for valuing certain factors of production for the subject merchandise.  *See* IDM at 14-33, Appx1055-1074.  The Court should reject CFA's various arguments challenging Commerce's determination, CFA Br. at 12-41, which we address in each section below.

A.    Commerce Reasonably Determined That India Is Economically Comparable To Vietnam Based Upon Its Surrogate Country Selection Policy

Commerce reasonably determined that India is at a level of economic development comparable to that of Vietnam.  As mentioned above, 19 U.S.C. § 1677b(c)(4)(A) is silent with respect to how Commerce should determine whether a market economy country is at a level of economic development comparable to the non-market economy in question.  Thus, in accordance with Commerce's longstanding practice, Commerce used 2018 GNI data to provide parties with a list of potential surrogate countries determined to be at Vietnam's level of

25

economic development, which included Angola, Bolivia, Egypt, Honduras, Nicaragua, and India.[8]  *See* PDM at 12-13, Appx1022-1023; IDM at 16-18, Appx1057-1059; Surrogate Country Memo, Appx14100-14108; Policy Bulletin 04.1 at 2-3.  Indonesia was not on the list.

In the final results, Commerce explained why it rejected CFA's argument that Indonesia was nonetheless economically comparable to Vietnam.  For example, "with respect to economic comparability, Indonesia's per-capita GNI of $3,840 is not at the same level of economic development as Vietnam," which is "$2,400, and the highest GNI reflected on the Surrogate Country List is Angola's GNI of $3,370." IDM at 17, Appx1058.  Indonesia's GNI is thus 60 percent greater than that of Vietnam's.  *See id.*

And although CFA had advocated for Commerce to consider using the World Bank's classification of economies, Commerce explained that it "has consistently rejected parties' arguments to use the World Bank's reported upper-middle or lower-middle income thresholds or categories for the purposes of determining the level of economic development."  *Id.*

---

[8] No interested party submitted information regarding Angola, Bolivia, Egypt, Honduras, and Nicaragua.

at 17-18, Appx1058-1059.  Rather, Commerce explained that "{t}he band of countries" that it had selected in this review, "in absolute terms, is a reasonable range of countries given the entire worldwide range of GNIs." *Id.* at 18, Appx1059.  Although CFA had argued that "Indonesia is closer to Vietnam in terms of per-capita GNI in 2018 than it was in the prior review periods in which Commerce selected it as the primary surrogate," Commerce also declined to use such relative measures of GNI comparison.  *Id.* at 17-18, Appx1058-1059.

Rather than contest India's economic comparability to Vietnam, CFA argues that Indonesia should have been included on the surrogate country list because the statute does not require countries to be at the "same level" of economic development.  *See* CFA Br. at 14-18.  CFA's argument misses the mark.

In the final results, Commerce referenced its statutory obligation which "requires Commerce to value the factors of production, to the extent possible, in a surrogate country that is: (a) at a level of economic development *comparable* to Vietnam…", and that "record information shows that India," was "on the list of economically-*comparable* surrogate countries{.}"  IDM at 15-16, Appx1056-1057 (emphasis

added).  Although Commerce explained that "Indonesia is not at the

*same* level of economic development as Vietnam," IDM at 17, Appx1058

(emphasis added), the surrogate country memo shows that out of the six

countries listed, none had the "same" per capita GNI as Vietnam, but

instead reflected a range which Commerce determined was *comparable*

to Vietnam, which 19 U.S.C. § 1677b(c)(4)(A) required.  *See* Surrogate

Country Memo, Appx14100-14108.

In certain past reviews of this antidumping order, CFA is correct

that Commerce used Indonesia as the primary surrogate country, even

when it was not listed on the non-exhaustive list of countries.  *See* CFA

Br. at 15-17; IDM at 16, Appx1057; *see also An Giang Fisheries Imp. &*

*Exp. Joint Stock Co. v. United States*, 179 F. Supp. 3d 1256, 1265 (Ct.

Int'l Trade 2016) ("It is not unreasonable for Commerce to consider

countries proposed by interested parties that are not included on the OP

List so long as Commerce satisfies its statutory mandate of choosing an

economically comparable country to the extent possible.").  Commerce

used Indonesia in these prior reviews because the other countries on the

surrogate country lists were not significant producers of comparable

merchandise and/or lacked suitable surrogate value data.  *See* IDM at

16, Appx1057.  In contrast, the record of this review shows that India, which is on the surrogate country list *and* is a significant producer of comparable merchandise, has usable data to value the primary material inputs which account for the majority of normal value, thus satisfying the statutory requirements.  *Id.*

Moreover, Commerce explained that the statute does not *require* it to consider Indonesia as surrogate country, and nor has CFA cited any authority for that proposition.  IDM at 17, Appx1058; *see also Jiaxing*, 822 F.3d at 1298 ("We discern nothing in the statute that requires Commerce to consider any particular country as a surrogate country.").  Commerce further explained that it selects the primary surrogate country for each segment of a proceeding based on the record facts of the individual segment, regardless of whether the potential surrogate countries under consideration have been previously selected as surrogate countries.  IDM at 17, Appx1058; *see also Jiaxing*, 822 F.3d at 1299 ("Commerce is required to base surrogate country on the facts presented in each case, and not on grounds of perceived tradition. '{E}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in

29

the record.'") (quoting *Qingdao*, 766 F.3d at 1387).  Indeed, in the

segment immediately preceding this administrative review, Commerce

also selected India as the primary surrogate country.[9]  *See Certain*

*Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg.

23,756 (Dep't of Commerce Apr. 29, 2020) (final admin. review).

Therefore, Commerce reasonably determined that the record of

this review did not demonstrate Indonesia was at a level of economic

development comparable to Vietnam, regardless of surrogate country

decisions in past segments of this order.  *See* IDM at 16-17, Appx1057-

1058.  More importantly, Commerce determined that India, a country

on the surrogate country list, *was* at a level of economic development

comparable to Vietnam *and* was a significant producer of comparable

merchandise, as we explain below.  *Id.*

B.   Commerce Reasonably Determined That India Is A
     <u>Significant Producer Of Comparable Merchandise</u>

CFA also argues that India is not a significant producer of

comparable merchandise because Indonesia is the "only" significant

_____

[9]  CFA also appealed Commerce's selection of India as the primary
surrogate country in the prior segment, although a decision has not yet
been issued in *Catfish Farmers of America, et al. v. United States*, No.
20-105 (Ct. Int'l Trade).

producer of comparable merchandise.  CFA Br. at 18-22.  This argument is meritless.

As explained above, neither 19 U.S.C. § 1677b(c)(4)(B) nor Commerce's regulations provide guidance on which country may be considered a significant producer of comparable merchandise.  This Court has affirmed as reasonable "Commerce's interpretation of significant producer, which looked to whether the country exported comparable merchandise." *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1327 (Ct. Int'l Trade 2018); *see also* Policy Bulletin 04.1; *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1273 (Ct. Int'l Trade 2006) ("{c}omparable merchandise is a broader category than the 'such or similar' merchandise comparison which is usually used in antidumping investigations.").

In the final results, Commerce explained that it has found in prior segments of this review, "that the appropriate metric for determining which countries are significant producers of comparable merchandise is to examine which countries are significant producers of frozen fish fillets."  IDM at 19-20, Appx1060-1061 (citing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 80 Fed. Reg. 2,394 (Dep't

of Commerce Jan. 16, 2015) (*AR10 Final Results*), and accompanying

IDM at Comment I.B; *Certain Frozen Fish Fillets from the Socialist*

*Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29,

2020) (*AR15 Final Results*), and accompanying IDM at Comment 2)).

Commerce explained that "although 'frozen fish fillets' represent a

broader category than in-scope *pangasius* frozen fish fillets, the

category is nonetheless comparable because it allows for the selection of

surrogate financial rations from producers of similar products with

similar capital structures." *Id.* at 20, Appx1061; *see also* Policy Bulletin

04:1 at n.6 ("If considering a producer of identical merchandise leads to

data difficulties, the operations team may consider countries that

produce a broader category of reasonably comparable merchandise").

Specifically, Commerce determined that India is a significant

producer of comparable merchandise because it "exported 955,000

{kilograms} of frozen fish fillets," *i.e.*, comparable merchandise. *Id.* at

20, Appx1061; *see also* Vinh Hoan Surrogate Country Comments at

Exhibit 1 (P.R. 253), Appx14442-14443. Commerce also cited record

evidence indicating India is a significant producer of identical

merchandise, that is, *pangasius* fillets. *Id.* n.106 (citing Vinh Hoan

Surrogate Values (P.R. 291) at Exhibits SV-4(b), Appx12243-12310; SV-4(c), Appx12311-12335; SV-4(g), Appx12403-12481) (explaining the status and trends of *Pangasius* farming, production, and marketing in India). Thus, substantial evidence supports Commerce's determination that India is a significant producer of comparable merchandise within the meaning of 19 U.S.C. § 1677b(c)(4)(B). IDM at 20, Appx1061.

Yet, CFA improperly attempts to narrow the requirement for what merchandise Commerce may determine is "comparable" to subject merchandise, such as imposing a requirement that comparable merchandise must meet the same quality inspection standards that subject merchandise is subjected to when imported to the United States. CFA Br. at 21. However, Commerce explained in the final results that "there is no basis to presume that the quality/grade of merchandise exported from a potential surrogate country must be the same as that exported from Vietnam in order to be considered comparable merchandise for surrogate country selection." IDM at 20, Appx1061. Furthermore, "while various forms of subject merchandise are discussed in the scope, quality {and} grades are not mentioned" and are also "not considered as product characteristics in the control number (CONNUM)

33

in this proceeding." *Id.* Thus, the Court should reject CFA's attempts to narrow unilaterally Commerce's analysis of what product(s) constitute comparable merchandise. *See id.*

In support for its contention that Indonesia is the only possible significant producer of comparable merchandise, CFA argues that India is not a "net exporter" of frozen fish fillets, and that the relative size of production does not support selecting India as a potential surrogate country. CFA Br. at 19-20.

However, as Commerce explained, "the Policy Bulletin does not indicate that a surrogate country must be a net exporter; it merely states that a country that is a net exporter could be considered a significant producer." IDM at 20, Appx1061; *see also* Policy Bulletin 04:1. CFA's own definition of "significant producer," thus, is unduly narrow, because this Court has held that "Commerce's interpretation of significant producer, which looked to whether the country *exported* comparable merchandise, is reasonable." *Calgon Carbon Corp. v. United States*, 190 F. Supp. 3d 1224, 1243 n.25 (Ct. Int'l Trade 2016) (emphasis added); *see also Heze Huayi Chem. Co., Ltd. v. United States*, 532 F. Supp. 3d 1301, 1312 (Ct. Int'l Trade 2021) ("Rather than

34

adopting a single definition of 'significant producers,' this court has recognized instead that 'Commerce identifies a significant producer based on a totality of the circumstances, and makes its decision concerning significance on a case-by-case basis.'") (citation omitted); *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1307, 1316 (Ct. Int'l Trade 2015) ("Because the Court has previously held, the phrase significant producer 'is not statutorily defined, and is inherently ambiguous,' the only question to be answered is whether Commerce's definition of significant producer is 'based on a permissible construction of the statute.'"). Again, Commerce explained that record evidence indicated that not only was India a significant producer of comparable merchandise, but it also exported 955,000 kilograms of frozen fish fillets, which was "comparable merchandise." IDM at 20, Appx1061.

Finally, although CFA argues that "*only* Indonesia is a significant producer of an equivalent quality frozen fish fillet," CFA Br. at 21, Commerce's analysis of whether a country is a significant producer of the comparable merchandise is not based on the size of its production relative to that of the country under review. IDM at 20-21, Appx1061-1062; *see also* Policy Bulletin 04:1 ("the extent to which a country is a

significant producer should not be judged against the nonmarket

economy country's production level…").  Accordingly, CFA's argument

that India is not a significant producer of comparable merchandise

simply misunderstands Commerce's analysis.  *See* IDM at 19-21,

Appx1060-1062; 19 U.S.C. § 1677b(c)(4).

    C.    **Commerce Reasonably Found That The Indian Data Were The Best Available Information On The Record To Value The Factors Of Production**

After examining the Indian and Indonesian data that the parties

had placed on the record, Commerce reasonably found that the Indian

data were superior and offered the best surrogate value information

available, because the data met the following criteria:  (i) product-

specific; (ii) representative of a broad-market average; (iii) publicly

available; (iv) contemporaneous with the period of review, and (v) tax

and duty exclusive.  *See* PDM at 14, Appx1024; IDM at 28-33,

Appx1069-1074.  We explain below why the Court should sustain

Commerce's determination that Indian data were the best information

available, and reject CFA's arguments challenging various factors of

production.  *See* CFA Br. at 22-40.

1.     The Indian Data Were The Best Available Information
       To Value The Main Inputs

In the final results, consistent with its practice of preferring

surrogate values from the primary surrogate country, Commerce

selected Indian surrogate values for most of the factors of production,

including the main inputs of fingerlings, fish feed, whole fish, by-

products, and financial ratios, among others.  IDM at 28-29, Appx1069-

1070.  CFA challenges Commerce's selection of Indian data as surrogate

value for main inputs (*i.e.,* whole live fish, fingerlings and fish feed),

claiming Indian data were obtained from unknown sources, do not

represent a broad market average, are not credible or reliable, and not

specific to respondent's inputs.  CFA Br. at 24-33.  Rather than

undermine Commerce's selections, CFA primarily offers alternative

data sources that it believes are better selections.  *See id.*  The Court

should reject CFA's challenges because, as addressed above, Commerce

has broad discretion when determining what constitutes the "best

available information" and the statute "does not mandate that

Commerce use any particular data source" in reaching its

determination."  *Guangdong Chems.*, 460 F. Supp. 2d at 1368-69.

First, Commerce relied on the publications *Fishing Chimes* and

*Undercurrent News* to value main inputs.  IDM at 28, Appx1069.  To the extent CFA argues that Indian data were not publicly available or unreliable because they was not a government publication, CFA Br. at 24-25, Commerce explained that it has a longstanding practice of relying on data maintained in fee-based sources.  IDM at 28, Appx1069.

Commerce also disagreed with CFA that Indian data does not represent a broad market average and are from unknown sources.  *Id.* at 28-29, Appx1069-1070.  Commerce explained that it has determined data from a region where the predominant production is located, from a one-time study, to be a broad market average and reliable in past reviews.  *Id.* at 28, Appx1069 (citing *AR15 Final Results* IDM at Comment 2; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 75 Fed. Reg. 12,726 (Dep't of Commerce Mar. 17, 2010) (final admin. review), and accompanying IDM at Comment 1.A).

For the publication *Fishing Chimes*, the feed and whole fish data were based on survey responses from 54 farmers within two districts of the Indian state of Andhra Pradesh.  *Id.*; *see also* Vinh Hoan Surrogate Values at Exhibit SV-4(c) (P.R. 291), Appx12311-12335.  Moreover, Commerce explained that record evidence demonstrates Andhra

38

Pradesh is the largest *pangasius*-producing area of India, accounting for approximately 60-80 percent of *pangasius* production.  IDM at 28, Appx1069.  Regarding the fingerling data in *Fishing Chimes*, the data were from "commercial nurseries in two locales, which collectively supplied fingerlings to 96 percent of the *pangasius* farms in 2018."  *Id.* Finally, Commerce explained that while the *Fishing Chimes* source does not identify each individual survey participant, "it clearly identifies key characteristics and the location of the participants."  *Id.*

For *Undercurrent News*, Commerce explained that record evidence demonstrates the publication "collects the information it publishes from a variety of sources, including interviews with farmers/mills in all major producing regions."  *Id.* at 29, Appx1070 (citing Vinh Hoan Final Direct Surrogate Values at Exhibit FDSV-5 through FDSV-10 (P.R. 462-463), Appx20893).  Like *Fishing Chimes*, *Undercurrent News* "identifies key characteristics and the location of the participants," "representing a broad market average, as {the publication} sources its information from numerous sources across major producing regions."  *Id.*

However, CFA continues to argue that "the primary sources of

Indian data, *Fishing Chimes* magazine and *Undercurrent News*, are unreliable." CFA Br. at 28. Commerce also addressed this speculative argument, and noted that "{w}ith respect to {CFA's} suggestion that the {*Undercurrent News*} may have been generated for the purpose of this proceeding, there is no evidence to support the claim." IDM at 29, Appx1070. Further, Commerce determined that the *Fishing Chimes* and *Undercurrent News* data are corroborated by other sources, which demonstrate comparable prices for whole live fish, fish feed, and fingerlings in 2018 and 2019. *Id.* at 30, Appx1071 (citing Vinh Hoan Final Direct Surrogate Values at Exhibit FDSV-4 (P.R. 462)).

Regarding the fingerling data, CFA argues that the Indian data were not "as specific as the Indonesia data," and that the Indian data were "only partially-specific and partially-contemporaneous." CFA Br. at 30. This argument directly contradicts its administrative case brief, where CFA admitted that "Indonesian and Indian data cover the *same* fingerling sizes (4-5 {inches} and 5-6 {inches}) and rely on proxy data for Vinh Hoan's fingerling inputs greater than 6 inches." CFA Admin Br. at 33 (P.R. 510; C.R. 617), Appx13815 (emphasis added). Moreover, CFA also recognized in its administrative case brief that Indonesian

40

fingerling data were *less* contemporaneous, pointing to prior cases in which Commerce has relied on surrogate value data that were "somewhat less contemporaneous" in support for its use.  *Id.* at 30-31, Appx13812-13813 ("{w}ith respect to fingerlings and fish feed, Commerce rejected the Indonesian data in part on the ground that the Indian data were more 'contemporaneous with the period of review.' Yet, the Indonesian statistics, *albeit from a somewhat early period*, were corroborated by other record information concerning {period of review} prices") (emphasis added).

While Commerce has "broad discretion" in deciding what record evidence meets the criteria and the data need not be perfect, *see Jiaxing*, 822 F.3d at 1301, Commerce explained that the Indian fingerling data are size- and species-specific, and although the *Undercurrent News* data does not capture one size used by Vinh Hoan (the *Fishing Chimes* data do contain figures for this fingerling size), the one size in question represents only a small percentage of the fingerlings consumed during the period of review, and does not render the Indian data unusable or unreliable.  *See* IDM at 29, Appx1070.

Regarding specificity for fish feed, Commerce explained that the

*Fishing Chimes* data contain values for the 26 percent protein content feed, which was one of the feeds types Vinh Hoan used. *Id.* (citing Vinh Hoan Surrogate Values Submission at Exhibit SV-4(c) and SV-6 (P.R. 291-92), Appx12311-12335). Moreover, for the other feed type with 22 percent protein content, Commerce explained that the surrogate value that it "relied on has a very similar, and slightly higher, protein content" of 24 percent. *Id.* Although the surrogate value for the 22 percent protein content feed is not an identical match, the data need not be perfect, and Commerce is not required to duplicate the respondent's exact experience. *See Jiaxing,* 822 F.3d at 1301.

Therefore, substantial evidence supports Commerce's determination that the Indian data satisfied the surrogate value selection criteria and presented the "best available information" to value the main inputs. *See* IDM at 28-30, Appx1069-1071; *Qingdao,* 766 F.3d at 1386.

> 2.   The Indian Data Were The Best Available Information To Value By-Products And Labor, And CFA Failed To Exhaust Its Administrative Remedies With Respect To These Surrogate Values

As Commerce explained in the final results, it "did not rely on one Indian {surrogate value} (fish oil) because it produced anomalous

42

results," and it was "the only instance where Indian data are lacking." IDM at 30, Appx1071. But Commerce was "able to rely on Indian sources for the other 12 by-products," and determined "{t}he fact that a reliable Indian {surrogate value} for one non-input is unavailable does not outweigh the other advantages of selecting India as the primary surrogate country." *Id.*

With respect to labor, Commerce explained that CFA "claim{s} that certain other minor Indian surrogate values were not contemporaneous, *e.g.*, labor." *Id.* While Commerce conceded these minor values were not contemporaneous, Commerce explained these "lesser inputs comprise a very small proportion of {normal value} compared to the main inputs," and it nonetheless "inflated these minor Indian {surrogate values} to reflect {period of review} values." *Id.*

However, CFA *now* argues that the frozen by-product and fish meal data *also* produce anomalous results because it is "absurd[10] that by-product and co-product output values would exceed the value of the

---

[10] CFA provides no explanation or evidence to demonstrate *why* it is "absurd" for by-product and co-product output values to exceed the value of the main input. This is a fact-specific evaluation depending on the product at issue and processing involved in producing subject merchandise, by-products and co-products.

main input." CFA Br. at 33-34 (citing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304, 1311 (Ct. Int'l Trade 2018)). CFA also argues that Commerce should have "cap{ped} the by-product or co-product offset so that it cannot exceed the value of the inputs." *Id.*

Also with respect to labor, CFA argues that Commerce should have used the Indonesian data that was "contemporaneous and specific to Vinh Hoan's farming and processing activities, representing wages paid to 'Agriculture' and 'Manufacturing' workers, respectively." *Id.* at 32. Instead, by relying on the Indian data, CFA argues that Commerce improperly "justified its selection of the less-specific and non-contemporary Indian data based on its observation that labor comprised a 'very small proportion' of the normal value," but this reasoning was "circular because it is based on the inappropriate 2006 Indian labor rates at issue." *Id.*

In its administrative case brief, however, CFA only argued that, "{t}he record shows that for other reported {factors of production}, including labor, the limited valuation data available from India are either less specific, less contemporaneous, or less reliable than the data

44

available from Indonesia, which further demonstrates that India is not a suitable surrogate country." CFA Admin. Br. at 37 (P.R. 510; C.R. 617), Appx13819. Instead, according to CFA, "{b}ecause Indonesia provides complete surrogate value data by which to value all of Vinh Hoan's {factors of production} (including labor, by-products, and boat freight) accurately, unlike India, Commerce should select Indonesia as the primary surrogate consistent with 19 C.F.R. § 351.408(c)(2)." *Id.*

Thus, CFA made *no* arguments about why it believed the frozen by-products and fish meal data also "produced anomalous results," or why it believed that any of the other 12 by-products were possibly distortive to calculating normal value. *Compare* CFA Br. at 33-34, *with* CFA Admin Br. at 37, Appx13819. The same is true for labor. CFA did not argue before Commerce that labor "can represent a significant portion of a respondent's processing costs." CFA Br. at 32; *see* CFA Admin. Br. at 37, Appx13819.

By failing to raise these arguments before Commerce, CFA has failed to exhaust its administrative remedies and is precluded from now making these arguments. *See* 19 C.F.R. § 351.309(c)(2) (stating that a party's case brief to Commerce "must present all arguments that

45

continue in the submitter's view to be relevant to {Commerce's} . . . final results."); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion requirement protects administrative agency authority and promotes judicial efficiency). Indeed, the Federal Circuit has held that a party's obligation to exhaust its administrative remedies in proceedings before Commerce applies both to broad issues and arguments related to those issues. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with contention that courts can consider new arguments so long as the general issue was raised at the agency level); *Paul Muller Industrie GmbH & Co. v. United States,* 502 F. Supp. 2d 1271, 1275 (Ct. Int'l Trade 2007) (holding that when a party raises a general issue, but fails to incorporate a specific argument among other arguments that relate to the same issue, it fails to exhaust administrative remedies with respect to that argument). Exceptions to the exhaustion requirement are limited,[11] as such the Court "generally takes a 'strict

---

[11] None of the exceptions to the exhaustion requirement are applicable here, which include futility, pure question of law, lack of timely access to the confidential record, no administrative procedure to exhaust, or new interpretation from an intervening judicial decision. *See*

46

view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV*, 502 F.3d at 1379.

Moreover, even assuming that CFA's by-product arguments were not waived, *An Giang Fisheries* still would be distinguishable. In *An Giang*, Commerce determined the available HTS data were more representative of refined rather than unrefined fish oil, and thus not specific to the respondents' by-product. 317 F. Supp. 3d at 1311-12.

Commerce made no such similar determination in this review; quite the opposite, Commerce determined that the *fish oil* surrogate data, *not* frozen by-product or fish meal data, was the "only instance where Indian data are lacking." IDM at 30, Appx1071. Further, Commerce also determined that the frozen by-product and fish meal surrogate value data were contemporaneous. *See* Preliminary Surrogate Value Memo at 6 (P.R. 498), Appx21934.

---

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).

### 3. The Indian Financial Statements Were The Best Available Information

Commerce relied on Indian financial statements because they "represent the best available information on the record of this review." IDM at 30, Appx1071. CFA argues that Indian financial statements lacked detailed information to ascertain whether their operations pertain to comparable merchandise and are only partially contemporaneous. *See* CFA Br. at 36-38. Also, CFA claims that these surrogate companies are "unhealthy companies" as their financials produce "*de minimis* profit ratios." *Id.* at 38-39. These arguments are meritless, and do not undermine Commerce's conclusion that the Indian financial statements were the best available information.

As to contemporaneity of Indian financial statements, Commerce explained that its practice is to use financial statements for a fiscal year which overlaps during the greatest number of months of the appropriate period of review. IDM at 30, Appx1071. The Indian financial statements from Mulpuri Aqua Processors Pvt. Ltd. (Mulpuri), MMC Exports Limited (MMC), and Ananda contain values for the 2018-2019 fiscal year, which overlap with the period of review for eight of the 12 months of the period of review. *Id.* Although CFA argues that "four

48

sets of Indonesian financial statements—which *together* cover the entire period of review," CFA Br. at 38 (emphasis added), are the better data, it notably does not break down or specify how many months of the period of review any particular financial statement covers.

As such, Commerce determined that the Indian financial statements are sufficiently contemporaneous and found they represent the best available information.  IDM at 30, Appx1071.

Further, although CFA continues to argue that the Indian financial statements lacked detailed information to ascertain whether their operations pertain to comparable merchandise, CFA Br. at 36-37, Commerce explained that it is not required, "when selecting surrogate producers, to undertake a broad analysis of the industry producing identical or comparable merchandise in the surrogate country, or to compare that industry to the applicable industry in the exporting country." IDM at 30-31, Appx1071-1072.  Rather, Commerce is required to "ensure that the *producers* in the surrogate country themselves produce identical or comparable merchandise." *Id.* at 31, Appx1072 (emphasis added).  In other words, Commerce determined that "each of the surrogate producers" on the record of this review

49

"produce merchandise comparable to fish fillets (*i.e.*, they are cold processors of marine products). *Id.*; *see also* 19 C.F.R. § 351.408(c)(4).

Relatedly, Commerce explained that there is no requirement to rely on companies that produce species-specific merchandise, but instead, Commerce relies on companies that have a similar capital structure for surrogate valuation purposes. IDM at 31, Appx1072. Regarding MMC, Commerce explained that although the financial statements "have only general information about the company's business activities, the financial statements indicate that MMC is engaged in the business of marine cold processing and trading in marine products and allied activities." *Id.* (citing Vinh Hoan's Surrogate Values Submission at Exhibit SV-15(b) (P.R. 296; C.R. 201), Appx12952-12955). Commerce determined that "record evidence clearly shows that Mulpuri, as a marine cold processor, also has a similar capital structure to a producer of fish fillets." *Id.* at 31-32, Appx1072-1073. Although CFA makes the blanket statement that "none of the Indian financial statements were viable surrogates," CFA Br. at 39, it did not make any "specific arguments" before Commerce with respect to Ananda, and even acknowledged that "both Ananda and Mulpuri are

50

producers of identical merchandise." IDM at 23 n.120, Appx1064.

To the extent that CFA now argues that Commerce should not consider the financial statements of MMC and Mulpuri because they allegedly only have *de minimis* profit rates of .01 percent and 1.30 percent, respectively, CFA Br. at 38, CFA failed to raise this argument before Commerce. Specifically, CFA did not argue these profit rates are "*de minimis*" and failed to even challenge the profitability of MMC's financial statements at all. *See* CFA Admin Br. at 38-39, Appx13820-13821. The Court should decline to consider this argument for failure to exhaust administrative remedies. *See Corus Staal*, 502 F.3d at 1379; *Rhone Poulenc*, 899 F.2d at 1191; *Paul Muller Industrie GmbH,* 502 F. Supp. 2d at 1275.

However, CFA conflates how Commerce defines *de minimis* dumping margins, into an unrelated analysis–evaluation of financial statements. *See* 19 C.F.R. § 351.106. Commerce's regulations do not contain a definition of what is considered a "*de minimis* profit rate;" rather, Commerce evaluated the companies' financial statements, including their profit and loss statements, and reasonably determined that the record contained usable financial statements from all three

Indian producers of comparable merchandise. *See* IDM at 33, Appx1074. While CFA cites an administrative review in which in which Commerce disregarded a financial statement demonstrating a zero profit, CFA Br. at 38 (citing *Certain Frozen Warmwater Shrimp from Vietnam*, 72 Fed. Reg. 52,052 (Dep't of Commerce Sept. 12, 2007), and accompanying IDM at Comment 2), here, none of the companies in question have a zero profit.

Given the above, the record demonstrates that Commerce reasonably determined to use the financial statements of Indian producers of comparable merchandise to compute the surrogate financial ratios in accordance with its practice to rely on financial statements from the primary surrogate country, India. *See* IDM at 33, Appx1074.

In conclusion, substantial evidence supports Commerce's determination that Indian surrogate data, with the exception of a single by-product, constituted the "best available information," and "a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang*, 652 F.3d at 1341; *see also* 19 C.F.R. § 351.408(c)(2) (explaining Commerce's preference to use as much data

52

as possible from a single primary surrogate country).

      4.     Substantial Evidence Supports Commerce's
                Determination That The Indonesian Data Suffered
                From Drawbacks

Finally, CFA incorrectly argues that Indonesian data were superior to Indian data and that Commerce used "circular" logic in rejecting Indonesian data.  CFA Br. at 23.

In the final results, Commerce considered that because Indonesia is not on the surrogate country list and its GNI is not economically comparable to Vietnam, it "need not compare" the Indonesian and Indian data.  IDM at 17, Appx1058; *see Jiaxing,* 822 F.3d at 1293 (referring to Commerce's practice where it compares data only "if more than one country" *on the surrogate country list* is a significant producer of comparable merchandise).

As an initial matter, if the Court sustains Commerce's determinations that Indonesia is not economically comparable to Vietnam and that India is a significant producer of comparable merchandise, then it need not address CFA's arguments regarding the superiority of the data between India and Indonesia.  As Commerce explained, it is not required to determine whether the Indian or

Indonesian data are "superior," as Indonesia is not on the surrogate country list, and India satisfies the surrogate country and surrogate value criteria.  IDM at 17, Appx1058; *see Jiaxing*, 822 F.3d at 1293 (citing *Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285, 1292) (Ct. Int'l Trade 2015) (quoting Policy Bulletin 04:1)) (laying out the four steps in Commerce's hierarchical surrogate country selection methodology). Here the requirement for step (4), that more than one country satisfy steps (1)-(3), was not met–of the countries on the list of potential surrogate countries, only India satisfied steps (1)-(3).

However, despite not having been required to do so, in the preliminary determination, Commerce *had* considered the Indonesian data CFA had placed on the record and explained why the Indian data were the best available source of information.  PDM at 15, Appx1025. Specifically, Commerce had considered that "{a}lthough the Indonesian data may be partially from a governmental source, while the Indian data come from fisheries and aquaculture journals or publications, the Indonesian data generally are less preferable than the Indian data for use in this review." *Id.*  The Indonesian data included other species of fish for the most important input (whole live fish), "and are, thus, not

species-specific, unlike the Indian data." *Id.*

For another main input, fingerlings, the Indonesian data "are not contemporaneous and are only partially specific (*i.e.*, specific with respect to size) unlike the Indian data." *Id.* Finally, Commerce explained that the Indonesian data for "another main input, fish feed, are not contemporaneous with the {period of review}, and are only partially specific with regard to protein content, unlike the Indian data." *Id.* Thus, Commerce preliminarily determined that "the Indian data are the superior source for purposes of this administrative review." *Id.*

Again, despite not having been required to do so by its hierarchical methodology, Commerce analyzed the Indonesian data and determined they were not superior to the Indian data, and Commerce explained that it "preliminarily f{ound} no compelling reason to deviate from selecting from among those countries on the surrogate country list." *Id.* Then, in the final results, Commerce explained that "{n}o new information on the record exists to make {it} reverse {its} finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data." IDM at 27, Appx1068.

Thus, the Court should sustain Commerce's determination that the Indian data were the best available source of information, *see* IDM at 28-33, Appx1069-1074, and reject CFA's invitation to use its preferred Indonesian data. *See Guangdong Chems.*, 460 F. Supp. 2d at 1368-69.

### V.   Substantial Evidence Supports Commerce's Determination That DOTASEAFOOD Is Not Entitled To A Separate Rate

Substantial evidence supports Commerce's determination that DOTAEAFOOD is not entitled to a separate rate because it failed to respond to Commerce's request for information regarding its separate rate status.  IDM at 40, Appx1081.  Among other topics, the supplemental questionnaire had requested information regarding DOTASEAFOOD's legal structure and shareholder list, relationships with other producers or exporters of subject merchandise, sales price negotiation process and sales documentation, and further information regarding its suppliers.  *See generally* DOTASEAFOOD Supplemental Questionnaire for Sections A and C.  Without this information, Commerce could not do a separate rate analysis.  PDM at 9, Appx1010.

Moreover, Commerce acknowledged in the final results that although CFA had argued that Commerce should apply facts available

with an adverse inference rate to DOTASEAFOOD, Commerce explained that "once a company fails to demonstrate the absence of *de jure* and *de facto* government control, the company *is not eligible for a separate rate*." *Id.* (emphasis added). Thus, "{i}n the absence of a separate rate, the company must be treated as part of the country-wide entity and is assigned the country-wider rate." *Id.*; *see also Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1348 (Fed. Cir. 2016).

CFA argues, however, that Commerce should have assigned DOTASEAFOOD an adverse facts available rate, pursuant to 19 U.S.C. § 1677e(b), because DOTASEAFOOD failed to cooperate to the best of its ability. CFA Br. at 42-45. But a company must first pass the threshold of demonstrating eligibility for a separate rate by affirmatively showing an absence of *de jure* and *de facto* government control, before it is entitled to a separate rate. *See* IDM at 40, Appx1081; *AMS Assocs.*, 719 F.3d at 1379-80.

However, CFA's argument would have Commerce skip the step of determining whether a company is actually *eligible* for separate rate status by affirmatively rebutting the presumption of government

57

control, and instead directly apply adverse facts available if the
company chooses (or refuses) to cooperate.  In other words, CFA entirely
ignores the presumption of government control in the nonmarket
economy context, and automatically presumes DOTASEAFOOD is
entitled to a separate rate in this review, which would *then* presumably
permit assignment of an adverse facts available rate for non-
cooperation.  *See* CFA Br. at 43 (arguing that Commerce should have
applied a "separate, {adverse facts available} rate to DOTASEAFOOD").

CFA does not, and indeed cannot, argue that substantial evidence
supports that DOTASEAFOOD demonstrated an absence of *de jure* and
*de facto* government control.  Indeed, it is illustrative that CFA argues
with regard to NAVICO, that to receive a separate rate, "a respondent .
. . must report its affiliated companies and demonstrate that none is
subject to government influence." *Id.* at 54.  But CFA then disregards
DOTASEAFOOD's failure to answer questions regarding its legal
structure and relationship with other producers and exporters of subject
merchandise that would permit the same analysis to proceed with
respect to DOTASEAFOOD.  *See* DOTASEAFOOD Supplemental
Questionnaire for Sections A and C.

Although CFA repeatedly characterizes the Vietnam-wide entity rate as a "benefit" to DOTASEAFOOD and its allegedly non-cooperative suppliers, and that the Vietnam-wide entity rate of $2.39 per kilogram is "far lower than the traditional {adverse facts available} rate in this proceeding" of $3.87 per kilogram, CFA Br. at 42-53, Commerce did not have any statutory or regulatory authority to assign any other rate to DOTASEAFOOD.  IDM at 40, App1081.  Further, the administrative decisions CFA relies on in support of its position are distinguishable, because Commerce first found that the relevant companies were entitled to a separate rate *before* applying adverse facts available.  *See Certain Steel Nails from the People's Republic of China*, 84 Fed. Reg. 55,906 (Dep't of Commerce Oct. 18, 2019), and accompanying PDM at 9-13 (finding that for the 16 companies, including the respondent Universal to whom Commerce applied adverse facts available, the record evidence demonstrated an absence of *de jure* and *de facto* governmental control); *Cast Iron Soil Pipe from the People's Republic of China*, 86 Fed. Reg. 43,523 (Dep't of Commerce Aug. 9, 2021), and accompanying PDM at 5-6 ("Commerce preliminarily finds that HengTong has established that it qualifies for a separate rate...")

(unchanged in *Final Results*, 86 Fed. Reg. 72,929 (Dep't of Commerce Dec. 23, 2021), and accompanying IDM at Comment 1)).

If CFA, as a domestic interested party in the proceeding, believes the Vietnam-wide entity rate is unrepresentative of the industry and "rewards" uncooperative companies who may "cho{ose} to stop cooperating" once they "see the rate{s}" they are facing when pursuing a separate rate, CFA Br. at 49, then it may request a review of the Vietnam-wide entity in future segments. *See Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in Nonmarket Economy Antidumping Duty Proceedings*, 78 Fed. Reg. 65,963, 65,970 (Dep't of Commerce Nov. 4, 2013) ("{T}he {nonmarket economy} entity will not be under review unless {Commerce} specifically receives a request for … a review of the {nonmarket economy} entity").

In conclusion, DOTASEAFOOD failed to respond to certain of Commerce's requests for information, and in doing so, it failed to rebut the presumption that it was operating separate from government control. *See* IDM at 40, Appx1081. Therefore, it is not entitled to a

60

separate rate, adverse facts available rate, or otherwise.  As such, Commerce's determination that DOTASEAFOOD is part of the Vietnam-wide entity is supported by substantial evidence and in accordance with law.  *See* IDM at 40, Appx1081; *AMS Assocs.*, 719 F.3d at 1379-80; *Sigma Corp.*, 117 F.3d at 1405-6.

## VI. Commerce's Determination To Grant NAVICO A Separate Rate Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination that NAVICO met the criteria for separate rate status is supported by substantial evidence and in accordance with law.  IDM at 41-42, Appx1082-1083.  As explained above, in proceedings involving nonmarket economy countries, Commerce maintains a rebuttable presumption that all companies within such countries are subject to government control and, therefore, should be assigned a single antidumping margin.  *See* PDM at 7-8, Appx1017-1018; 19 C.F.R. § 351.107(d); *see also Albemarle Corp.*, 821 F.3d at 1348.  The exporter of subject merchandise bears the burden of showing it is autonomous of government control.  *AMS Assoc., Inc.*, 719 F.3d at 1379-80.  NAVICO met this burden by establishing that it operates outside of both *de jure* and *de facto* government control.  PDM at 10-11, Appx1020-1021.

61

Namely, Commerce received a timely SRA and subsequent supplemental response relating to NAVICO's separate rate status. *Id.* Commerce evaluated the submitted information and determined that such evidence supports a finding of absence of government control, both *de jure* and *de facto*. *See id.*; IDM at 41-42, Appx1082-1083.

CFA argues, however, that record evidence demonstrates NAVICO's failure to disclose relevant affiliations during the period of review. CFA Br. at 54-59. But in the final results, Commerce considered and rejected this argument, explaining that the information CFA relied on "largely pre-dates the {period of review} and/or is otherwise not dispositive regarding affiliation." IDM at 42, Appx1083.

Pursuant to 19 U.S.C. § 1677(33), what persons shall be considered "affiliated" or "affiliated person" under, and a claim that two entities are affiliated turns on whether one entity "controls" another. 19 C.F.R. § 351.102(b)(3) then provides further guidance on factors considered in evaluating affiliation, such as whether control over another exists in "corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships." But "{Commerce} will not find that control exists on the basis of these

factors unless the relationship has the potential to impact decision concerning the production, pricing, or cost of the subject merchandise or foreign like product," considering such things as the "temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control." *Id.*; *see also* 19 C.F.R. § 351.402(f) (explaining when Commerce treats affiliated producers as a single entity).

In the final results, Commerce addressed each of CFA's arguments now before the Court. Commerce explained that claims that one of NAVICO's current shareholders was an officer of [███████ ██████████████], referred to in the final results as Exporter X, is supported by information predating the period of review. IDM at 42, Appx1083; *see also* CFA Br. at 55-56 (citing [██████████████████ ██████████████] as evidence that ████████████████████████ ███████████████████]). Commerce collects and analyzes such information from separate rate applicants in each review period because each segment stands on its own record. *See* IDM at 42, Appx1083. Also, Commerce noted that this third-party company profile web page provided as evidence is unclear with regard to the accuracy

and effective date of the information.  *Id.*  In fact, the web page which

CFA relies on specifically states █████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████].  *See* CFA's Rebuttal Submission

at Attachment 1 (C.R. 484), Appx13031-13192.  And while it states that

the web page was [████████████████], it is not clear what

information was [██████] at that time.  *Id.*  Moreover, CFA even

acknowledges NAVICO [███████████████████████████████

████████████████] the current period of review.  CFA Br. at

56; *see also* NAVICO Separate Rate Application at Exhibit 8 (C.R. 3),

Appx1247-1367.

To CFA's argument that one of NAVICO's current shareholders is

involved with [████████████████████], NAVICO explained that

"there are thousands of individuals and entities who buy and sell shares

of NAVICO on a daily basis."  NAVICO SRA at 10 (P.R. 29; C.R. 2),

Appx1107.  Moreover, that particular individual, [████████████] is a

[███████████] shareholder of NAVICO.  NAVICO Supplemental

SRA at Exhibit 1 (C.R. 477), Appx12973-13015.  Commerce explained in

the final results, that although it appears that a person with a name

64

similar to the name of this NAVICO shareholder was involved with

[■], it is again not clear from the third-party company profile web

page whether the information is pertinent to the period of review, thus,

Commerce determined that this web page was unreliable.  IDM at 42,

Appx1083.

Further, regarding CFA's claims that NAVICO and [■] had the

same address during the period of review, Commerce explained that

"having the same address does not automatically confer affiliation."  *Id.*

Moreover, Commerce called into question the reliability of the

information on the record that the address information is accurate for

the current period of review, "because there {w}as inadequate

information on the record to confirm the accuracy of this information for

the current {period of review}."  *Id.*  Commerce explained affiliation is

evaluated upon a range of factors, and "the information on the record

does not demonstrate that the traditional indicia of affiliation are

necessarily met."  *Id.*; *see also* 19 C.F.R. § 351.102(b)(3) (explaining

Commerce considers factors such as corporate or family groupings,

franchise or joint venture agreements, debt financing, and close

supplier relationships).

As to CFA's arguments regarding NAVICO's U.S. customer, the claim is based upon a presumption of affiliation between NAVICO and [████]. CFA Br. at 58-59 (pointing to prior findings by Commerce that [███] and [██████████████████████████], and NAVICO's U.S. customer, [████████], also [██████████████████████ ██████████████████]). However, because Commerce determined that NAVICO and [████] were not affiliated, then it also follows that NAVICO and its U.S. importer were also not affiliated through any affiliations with [████]. IDM at 42, Appx1083 ("the record does not demonstrate that NAVICO was affiliated with its U.S. importer."). As Commerce determined, the record does not support CFA's claims of affiliation regarding NAVICO, and, in addition to much of the evidence pre-dating the period of review, the remaining evidence is inconclusive at best. *Id.* Commerce noted, however, that it "intend{ed} to take steps to solicit additional information concerning NAVICO's affiliations in future segments, if necessary." *Id.*

Therefore, Commerce reasonably determined that NAVICO was responsive to its requests for information and provided all documentation requested to support its application for a separate rate.

*Id.* Further, Commerce's determination that the record does not support a finding that NAVICO failed to report any affiliations during the period of review is supported by substantial evidence. *Id.* Thus, Commerce's determination that NAVICO is entitled to a separate rate should be sustained.

VII. **Commerce's Assignment Of Vinh Hoan's Separate Rate To NAVICO, Pursuant To 19 U.S.C. § 1673(c)(5)(B), Is Supported By Substantial Evidence And In Accordance With Law**

Commerce's determination to assign the rate calculated for Vinh Hoan, the sole mandatory respondent with a calculated rate in this review, to NAVICO is supported by substantial evidence and in accordance with law. *See* PDM at 11, Appx1021. In the nonmarket economy context, because the statute does not specifically provide for a separate rate methodology in an administrative review, when Commerce determines the rate to apply to companies that establish their independence from government control, but were not selected for individual examination, Commerce looks to 19 U.S.C. § 1673d(c)(5), which provides the method for determining the estimated all-others rate in an investigation. *Albemarle Corp.*, 821 F.3d at 1351-53 (applying 19 U.S.C. § 1673d(c)(5) in the nonmarket economy

67

administrative review context).

Under the general rule in section 1673d(c)(5)(A), Commerce determines the estimated all-others rate by weight averaging the weighted average dumping margins for the individually examined respondents, excluding any margins that are zero, *de minimis*, or determined entirely based on the facts available.  The exception to the general rule in section 1673d(c)(5)(B), however, provides that if all the margins determined for the individually examine respondents are zero, *de minimis*, or determined entirely based on the facts available, Commerce may use "any reasonable method" to determine the all-others rate, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated (*i.e.,* the zero, *de minimis*, or facts available dumping margins).

The Statement of Administrative Action (SAA) provides that in such situations the expected method is to weight-average the zero and *de minimis* margins and the margins determined pursuant to the facts available, unless doing so is not feasible or would not be reasonably reflective of potential dumping margins.  SAA, H.R. Rep. No. 103-316,

at 873, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994).  The United States Court of Appeals for the Federal Circuit further clarified in *Albemarle* that "Congress has spoken directly to this precise situation in § 1673d(c)(5)(B), and the {SAA} unambiguously provides that the expected method to calculate the separate rate {when all individually examined respondents are assigned *de minimis margins*} is to average the individually examined respondents' *de minimis* margins."  821 F.3d at 1354.

A.    CFA Failed To Exhaust Its Administrative Remedies With Respect To NAVICO's Rate

As explained above, Commerce stated in the preliminary results that it intended to apply Vinh Hoan's rate to NAVICO.  PDM at 11, Appx1021.

CFA, in its administrative case brief, argued Commerce should reject NAVICO's SRA and supplemental response, and that Commerce should place NAVICO in the Vietnam-wide entity and assign to NAVICO the Vietnam-wide rate of $3.87 per kilogram.  CFA Admin. Br. 49, 52, Appx13831,13834.  CFA did not make any arguments as to how Commerce should calculate NAVICO's separate rate if the agency were to disagree with its argument regarding NAVICO's separate rate

69

eligibility. *See id.* Specifically, CFA did not argue in its case brief that the separate rate, for which Commerce preliminarily determined NAVICO was eligible, should not be based on Vinh Hoan's calculated dumping margin for the period of review. *See generally id.*; *see also* PDM at 11, Appx1021 (granting NAVICO a separate rate and assigning Vinh Hoan's rate to NAVICO).

After Commerce issued its final results, in a ministerial error allegation, CFA raised the arguments that it does now before this Court contesting the methodology applied in assigning a separate rate in this review. *See* CFA's Ministerial Error Comments, Appx21953-21960. Indeed, CFA argues that even if Commerce's acceptance of NAVICO's separate rate submissions was reasonable, Commerce's assignment of Vinh Hoan's zero margin to NAVICO was not in accordance with law. CFA Br. at 59. Inextricably intertwined with this argument, is CFA's belief that because DOTASEAFOOD was a mandatory respondent, and it received a non-zero, non-*de minimis*, and non-adverse facts available rate, "Commerce was required to assign that rate to the non-

investigated companies pursuant to the 'general rule' of 19 U.S.C. §

1673d(c)(5)(a)," that is, the Vietnam-wide rate.  *Id.* at 62.

CFA also argues that section 1673d(c)(5)(A) does not "require

individually examined respondents to have qualified for a separate

rate," rather, because Commerce "established" a rate for

DOTASEAFOOD, Commerce should have used the average of the

investigated companies for establishing the separate rate.  *Id.* at 62-63.

Still further, CFA argues that even if Commerce correctly departed

from the "general rule" and used "any reasonable method" pursuant to

section 1673d(c)(5)(A), then a zero margin was "not a reasonable rate for

NAVICO based on NAVICO's history of dumping in this proceeding."

*Id.* at 64.

Based on the false premise that DOTASEAFOOD received a

separate rate that was not zero, *de minimis,* or based entirely upon

adverse facts available, CFA's arguments are nothing more than a

results-oriented application of the law under 19 U.S.C. § 1673d(c)(5)(B).

*Id.* at 59-66.  Not only do these miss the mark, but CFA failed to

exhaust its administrative remedies with regard to these arguments by

not raising them in its case brief before Commerce, only in its

ministerial error allegation following the final results.

Thus, the Court should decline to consider these arguments for failure to exhaust administrative remedies. *See Corus Staal*, 502 F.3d at 1379; *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (holding that Dorbest failed to exhaust its administrative remedies when it failed to raise arguments in case briefs, and only did so in a footnote in its rebuttal brief and again during the ministerial comment period).

### B. Commerce's Assignment Of NAVICO's Rate Is In Accordance With Law

To the extent the Court disagrees that CFA failed to exhaust its administrative remedies on this argument, Commerce's assignment of Vinh Hoan's rate to NAVICO is in accordance with law.

As Commerce clarified, it assigned the separate rate for NAVICO in this review under section 1673d(c)(5)(B). *See* Ministerial Error Memo at 4, Appx21964. CFA attempts to muddy the facts by arguing that Commerce overlooked that DOTASEAFOOD was assigned a separate rate that was not zero, *de minimis*, or based entirely on facts available, that is, the Vietnam-wide entity rate. CFA Br. at 62.

But as explained above, DOTASEAFOOD did *not* receive a

72

separate rate, because it had failed to establish its independence from government control and was thus placed into the Vietnam-wide entity rate.  IDM at 40, Appx1081; *see also* Ministerial Error Memo at 3, Appx21963.  As the Vietnam-wide entity was not under review in this review, no period of review-specific rate was actually *calculated* for the Vietnam-wide entity in this review, and thus its rate was not available for consideration in this segment of the proceeding.  IDM at 14, Appx1055; *see also* Ministerial Error Memo at 3, Appx21963.  Having been assigned the Vietnam-wide entity rate, DOTASEAFOOD also did not receive a calculated rate.  *See* IDM at 40, Appx1081.

With Vinh Hoan's zero percent calculated margin as the *only* period of review-specific dumping margin available in this review, Commerce properly departed from the general rule of 19 U.S.C. § 1673d(c)(5)(A) and reasonably applied the expected method under 19 U.S.C. § 1673d(c)(5)(B) in assigning NAVICO the zero margin from Vinh Hoan.  *See* PDM at 11, Appx1021; *see generally* Ministerial Error Memo, Appx21961-21964.

Next, CFA argues that even if Commerce correctly applied 19 U.S.C. § 1673d(c)(5)(B), that it did so unreasonably by applying Vinh

Hoan's zero margin.  Yet, in its own ministerial error allegation, CFA

"recognize{d} that {19 U.S.C. § 1673d(c)(5)(B}) permits the use of zero

rates in determining the rate to assign non-individually examined

producers/exporters when the only mandatory respondent rates are

zero, *de minimis*, or based entirely upon the facts available."  CFA

Ministerial Error Comment at 4, Appx21956; *see also Albemarle Corp.*,

821 F.3d 1345, 1359 (requiring Commerce to follow the "expected

method" of utilizing the *de minimis* of the individually examined

respondents from the contemporaneous period.)

　　Contrary to the Federal Circuit's guidance in *Albemarle*, CFA now

argues against the reasonableness of applying the "expected method" to

NAVICO because of NAVICO's "history of dumping in this proceeding."

CFA Br. 64-65.  As support for its argument, CFA presents rates

assigned to NAVICO in prior reviews going back to rates from five or

more administrative review periods ago, including the investigation,

with the 2013-2014 administrative review being the most

contemporaneous.[12]  CFA Br. at 65.  This argument cuts directly

---

　　　　[12] CFA also does not address why it is unreasonable to assign Vinh
Hoan's period of review-specific calculated rate to NAVICO as a separate

against the "purpose of {a} periodic administrative review," which is "to reassess dumping margins previously calculated in light of data made available during the intervening period since the antidumping order was issued." *Albemarle*, 821 F.3d at 1356.

Thus, Commerce's determination to apply the expected method under 19 U.S.C. § 1673d(c)(5)(B) and assign Vinh Hoan's calculated dumping margin to NAVICO as a separate rate is supported by substantial evidence and in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the final results in their entirety and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

---

rate in light of the trend of diminishing rates assigned to NAVICO as presented in CFA's motion to this Court.  *See* CFA Br. at 65.

OF COUNSEL:

| | |
|---|---|
| HENDRICKS VALENZUELA | /s/ Kara M. Westercamp |
| Of Counsel | KARA M. WESTERCAMP |
| Office of the Chief Counsel | Trial Counsel |
|  for Trade Enforcement & Compliance | U.S. Department of Justice |
| U.S. Department of Commerce | Civil Division |
| | Commercial Litigation Branch |
| | P.O. Box 480 |
| | Ben Franklin Station |
| | Washington D.C.  20044 |
| | Tel: (202) 305-7571 |
| | Fax: (202) 514-8640 |

April 15, 2022                              Attorneys for Defendant

76

_____
                                        )
CATFISH FARMERS OF AMERICA,             )
*et al.*,                               )
                                        )
            Plaintiffs,                 )
                                        )     Court No. 21-00380
      v.                                )
                                        )
UNITED STATES,                          )
                                        )
            Defendant,                  )
                                        )
      and                               )
                                        )
QMC FOODS, INC., *et al.*,              )
                                        )
            Defendant-Intervenors.      )
_____ )

## ORDER

Upon consideration of the plaintiffs' motion for judgment upon the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's motion is denied; and it is further

ORDERED that judgment is entered for the United States.

                              _____
                              M. MILLER BAKER, JUDGE

Dated: _____
      New York, NY

77

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 13,698 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>
KARA M. WESTERCAMP
Trial Attorney