A-552-801
Remand
Slip Op. 23-97
POR: 08/01/2018 – 07/31/2019
**Public Document**
E&C/OV: RG, JB

*Catfish Farmers of America v. United States*,
**Court No. 21-00380, Slip Op. 23-97 (CIT July 7, 2023)**
**Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) in *Catfish Farmers of America v. United States*, Court No. 21-

00380, Slip Op. 23-97 (CIT July 7, 2023) (*Remand Opinion*).  These final results of

redetermination concern the *Final Results* in the sixteenth administrative review of the

antidumping duty (AD) order on certain frozen fish fillets (fish fillets) from the Socialist

Republic of Vietnam (Vietnam)[1] covering the period of review (POR) August 1, 2018, through

July 31, 2019.[2]

The Court sustained, in part, and remanded, in part, the *Final Results*.  In particular, the

Court remanded for further explanation Commerce's selection of the primary surrogate country,

determining that "Commerce applied the wrong legal standard in its surrogate country selection"

and directing Commerce "to conduct a new analysis using the correct standard."[3]  In accordance

---

[1] *See Notice of Antidumping Duty Order:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 36102 (July 8, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Opinion* at 20; and CIT Order, ECF No. 64 (July 7, 2023) (*Remand Order*).

with the *Remand Opinion*, Commerce:  (i) further explains its surrogate country selection process; and (ii) provides a revised analysis, consistent with the Court's directive, in which we continue to find that India is an appropriate primary surrogate country in this review, as discussed below.

## II.    BACKGROUND

### A.  Commerce's *Final Results*

On October 7, 2019, Commerce initiated the sixteenth administrative review of the *Order*.[4]  On December 13, 2019, Commerce selected Bien Dong Seafood Co., Ltd. (Bien Dong) and Vinh Hoan Corporation (Vinh Hoan) as mandatory respondents.[5]  Because all review requests for Bien Dong were timely withdrawn, on January 22, 2020, Commerce selected Seafood Joint Stock Company No.4 Branch Dongtam Fisheries Processing Company (DOTASEAFOOD) as an additional mandatory respondent.[6]

On December 28, 2020, Commerce published the *Preliminary Results*.[7]  In the *Preliminary Results*, Commerce calculated a dumping margin for Vinh Hoan and, in so doing, selected India as the primary surrogate country because we found that it:  (1) was at the same level of economic development as Vietnam; (2) was a significant producer of comparable merchandise; and (3) provided appropriate information with which to value Vinh Hoan's factors of production (FOP).[8]

---

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 53411 (October 7, 2019).
[5] *See* Memorandum, "Selection of Respondents for Individual Review," dated December 13, 2019.
[6] *See* Memorandum, "Selection of Replacement Respondent for Individual Review," dated January 22, 2020.
[7] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission of the Antidumping Duty Administrative Review; 2018-2019*, 85 FR 84300 (December 28, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[8] *Id.* at 12-15.

On July 8, 2021, Commerce published its *Final Results*.[9]  In the *Final Results*, Commerce continued to select India as the primary surrogate country.[10]  Commerce also again provided its analysis regarding the three surrogate country selection criteria:  level of economic development; significant producer of comparable merchandise; and data availability and quality.[11]  We found that India was a significant producer of comparable merchandise.[12]  With regard to level of economic development, Commerce stated:

> {b}ecause Vietnam is {a non-market economy (NME)} country, when calculating {normal value}, section 773(c)(4) of {the Tariff Act of 1930, as amended (the Act)} requires Commerce to value the FOPs, to the extent possible, in a surrogate country that is:  (a) at a level of economic development comparable to Vietnam; and (b) a significant producer of comparable merchandise.  Section 773(c)(4)(A) of the Act is silent with respect to how Commerce determines that a country is at a level of economic development comparable to the NME country in question. Thus, Commerce's longstanding practice has been to identify those countries that are at a level of economic development similar to the NME in question based on gross national income (GNI) data reported in the *World Bank Development Report*.  Using 2018 GNI data, Commerce provided parties with a list of potential surrogate countries found to be at Vietnam's level of economic development, including Angola, Bolivia, Egypt, Honduras, Nicaragua, and India.
>
> The petitioners note that economic comparability is not always the exclusive starting point for selecting a primary surrogate.  In certain past reviews of this AD order, Commerce has indeed used Indonesia as the primary surrogate country even when it was not on the non-exhaustive list of countries, due to the other countries on that list not being significant producers of comparable merchandise and/or lacking suitable {surrogate value (SV)} data.  Unlike those segments, however, and as discussed in further detail below in the "Significant Producer of Comparable Merchandise" and "Data Considerations" subsections of this issue, this is not the case in this administrative review.  Here, record information shows that India, which is on the list of economically-comparable surrogate countries, is a significant producer of comparable merchandise.
>
> …

---

[9] *See generally Final Results*.

[10] *See Final Results* IDM at Comment 3.

[11] *Id*.

[12] *Id*. ("Record evidence supports our determination and shows that India is a significant producer of comparable merchandise.  Specifically, the record indicates that India exported 955,000 kg of frozen fish fillets which, as we have noted previously, constitutes comparable merchandise.") (internal citation omitted).

>Moreover, with respect to economic comparability, beyond the fact that India is on the Surrogate Country List and Indonesia is not, Indonesia's per-capita GNI of $3,840 is not at the same level of economic development as Vietnam. Specifically, Vietnam's 2018 GNI is $2,400, and the highest GNI reflected on the Surrogate Country List is Angola's GNI of $3,370.
>
>…
>
>{W}e find that Indonesia is not at the same level of economic development as Vietnam, while India is, and, thus, we disagree that we should accord Indonesia the same weight and consideration by Commerce as a potential surrogate country with respect to this criterion.[13]

Therefore, Commerce expressed a preference for relying on SV data from a country that most closely approximated Vietnam's level of economic development, in terms of GNI.

Notwithstanding our assessment that a country on the Surrogate Country List[14] provided usable data, we also referenced the relative quality of the Indian data as compared with the Indonesian data.[15]  We explained that, when considering what constitutes the best available information, Commerce considers several criteria, including whether the SV data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question.[16]  Then, applying those criteria to the record, consistent with our *Preliminary Results*, we explained that such considerations weighed in favor of using the Indian SV data.  We highlighted that:

>for the most important input (whole live fish), the Indonesian data include other species of fish and are, thus, not species-specific, unlike the Indian data … with regard to another main input, fingerlings, {the Indonesian data} are not contemporaneous and are only partially specific (*i.e.*, specific with respect to size) unlike the Indian data … {and} the Indonesian data for another main input, fish feed, are not contemporaneous with the POR, and are only partially specific with regard to protein content, unlike the Indian data.[17]

---

[13] *Id*. (internal citations omitted).
[14] *See* Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated April 2, 2020 (Surrogate Country List).
[15] *Id*.
[16] *Id*.
[17] *Id*. (internal citations omitted).

4

We concluded that the Indian data were the superior source for purposes of the administrative review, and stated that "{n}o new information on the record exists to make us reverse our finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data."[18] In the *Final Results*, using India as the surrogate country, we calculated a weighted-average dumping margin of 0.00 dollars/kilogram for Vinh Hoan.[19]

Additionally, in the *Final Results*, we assigned DOTASEAFOOD to the Vietnam-wide entity, granted a separate rate to Nam Viet Corporation (Navico), and determined that two domestic wholesalers had standing to request review. The petitioners[20] appealed.

### B.   *Remand Opinion*

On July 7, 2023, the Court issued its *Remand Opinion*.[21]  The Court upheld Commerce's *Final Results* regarding the: (1) granting of a separate rate to Navico (and the selection of that rate); (2) treatment of DOTASEAFOOD as part of the Vietnam-wide entity; and (3) decision concerning the standing of two domestic wholesalers to request review.[22]  However, the Court remanded Commerce's selection of India as the primary surrogate country for valuing FOPs.[23]

With respect to the selection of India as the primary surrogate country, the Court found that "Commerce applied the wrong legal standard in its surrogate country selection" by favoring countries within the GNI range set forth in the Surrogate Country List (*i.e.*, countries designated as being at the "same" level of economic development as Vietnam) while the Act requires only

---

[18] *Id.*
[19] *Id.*, 86 FR at 36103.
[20] The petitioners are the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.
[21] *See generally Remand Opinion*.
[22] *Id.* at 35-36.
[23] *Id.* at 35.

that surrogate countries be at a "comparable" level of economic development.[24]  The Court also found that Commerce "has given no indication as to what criteria it employs (other than looking to a range of GNI chosen via unspecified means) to determine what constitutes either 'the same' or 'a comparable' level of economic development."[25]  Thus, the Court held as follows:

> Because the administrative record shows that Commerce applied the wrong legal standard in its surrogate country selection, and because there is nothing in the administrative record showing what GNI level Commerce considered "economically comparable," Commerce's surrogate country selection is both contrary to law and not supported by substantial evidence.  The court therefore remands that issue for {Commerce} to conduct a new analysis using the correct standard.[26]

### C.  Draft Results of Redetermination

Commerce released the Draft Results on October 4, 2023,[27] finding that its selection of India as the primary surrogate country in the underlying administrative review was appropriate.  The petitioners and Vinh Hoan/Navico submitted comments on the Draft Results on October 13, 2023.[28]

## III.    ANALYSIS

Commerce continues to find that its selection of India as a surrogate country was appropriate.  We have provided additional discussion of our surrogate country selection process and our generation of the Surrogate Country List here, and, in accordance with the Court's *Remand Opinion*, have considered the relative merits of the Indonesia data.

---

[24] *Id*. at 20.
[25] *Id*. at 18.
[26] *Id*. at 20.
[27] *See* Draft Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Court No. 21-00380, Slip Op. 23-97 (CIT July 7, 2023), dated October 4, 2023 (Draft Results).
[28] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated October 13, 2023 (Petitioners' Comments); and Vinh Hoan/Navico's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated October 13, 2023 (Vinh Hoan/Navico Comments).

### A.  Background on Sequential Surrogate Country Selection Process

Section 773(c)(4) of the Act states that Commerce shall, to the extent possible, utilize the prices, or costs, of FOPs in one or more market economy (ME) countries that are "at a level of economic development comparable to that of the nonmarket economy country" and are "significant producers of comparable merchandise."  The Act is silent with respect to how, or on what basis, Commerce may make this determination.  Commerce has, thus, developed a surrogate country selection process that is guided by Policy Bulletin 04.1[29] and subsequent case law and administrative practice.

The basic outline of this sequential approach is as follows:  (1) using per capita GNI information from the World Bank in conjunction with other criteria,[30] Commerce identifies a list of countries that are at the "same" level of economic development[31] to the NME country in question, thus meeting the requirement that the surrogate countries be at a comparable level of development; (2) Commerce determines whether the potential surrogate countries are "significant" producers of comparable merchandise; and (3) if there are multiple countries that meet the first two prongs of the analysis, Commerce takes into consideration the relative quality of data offered by those countries.  Commerce has applied – and the Court and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) have affirmed – the use of a sequential surrogate country selection process.[32]  Through this approach, Commerce first analyzes which

---

[29] *See* Enforcement and Compliance's Policy Bulletin 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 04.1), available on Commerce's website at https://enforcement.trade.gov/policy/bull04-1.html.

[30] *See* section III.B. titled "Commerce's Surrogate Country List," *infra*.

[31] As explained below, in identifying countries that are at a "comparable" level of economic development, Commerce generally seeks to select countries that are at the "same" level of economic development.  While Commerce uses the term "the same" in this context, the term is one of convenience; Commerce signifies by this term that these countries are most proximate in their level of economic development to the level of economic development of the NME country under consideration.

[32] *See, e.g.*, *Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1335 (CIT 2014) (*Jiaxing*

7

countries meet the level of economic development and significant producer criteria; then, Commerce will rely on the data considerations prong to facilitate the selection of a country, where multiple countries have met the first two criteria.[33]

In identifying countries that are at a "comparable" level of economic development to the NME country in question, Commerce identifies countries at the "same" level of economic development as the NME in its surrogate country list.  The goal of this process is to present a range of potential surrogate countries that reasonably represent the market values that would be present in the NME country, if it were an ME country, for consideration by interested parties and Commerce.  Commerce's identification of a group of countries that are considered to be at the same level of economic development for surrogate country selection purposes is consistent with the statutory requirement under section 773(c)(4) of the Act to value FOPs using data from ME countries at a comparable level of economic development to the NME at issue, because the same level of economic development between two countries will necessarily also be comparable.  This approach has been sustained in prior cases.[34]  For example, in *Jacobi Carbons*, the Court held that "Commerce properly may narrow a list of countries within a band for purposes of

---

*Brother*), *aff'd* 822 F.3d 1289, 1293-96, 1298 (Fed. Cir. 2016) (*Jiaxing Brother CAFC*); and *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1171-75 (CIT 2017) (finding Commerce's sequential surrogate country selection methodology to be lawful).

[33] *See Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301, 1318 (n. 9) (CIT 2021) (*Heze Huayi*) ("In general, however, 'the criteria outlined in the section of Policy Bulletin 04.1 captioned 'Data Considerations' were developed to serve as a 'tie-breaker,' if necessary, in Commerce's identification of a surrogate country'") (citing *Jinan Yipin Corp., Ltd. v. United States*, 800 F. Supp. 2d 1226, n. 7 (CIT 2011))).  If there are no countries that meet the first prong on the analysis, Commerce may rely on a country that is not at a comparable level of economic development.

[34] *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1320 (CIT 2018) (*Jacobi Carbons*) (citing *Juangcheng Kangtai Chem. Co., Ltd. v. United States*, Consol. Ct. 14-56, Slip Op. 15-93 (CIT August 21, 2015) (*Juangcheng Kangtai*), at 7-8; and *Baoding Yude Chem. Indus. Co., Ltd. v. United States*, 170 F. Supp. 2d 1335, 1343 (2001) (*Baoding Yude*)).

administrative feasibility" and "Commerce's decision to limit {its} list of potential surrogates to six countries represents precisely the type of discretion left within the agency's domain."[35]

As a general practice, Commerce selects a surrogate country that is at the same level of economic development as the NME country unless it is determined that none of the countries are viable options because they:  (1) are not significant producers of comparable merchandise; (2) do not provide sufficient, reliable sources of publicly available SV data; or (3) are not suitable for use because of other factors.[36]  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected if data considerations outweigh level-of-economic-development differences or significant producer considerations.  Thus, Commerce considers countries at the "same" level of economic development to be "comparable," meeting the statutory requirement set forth in section 773(c)(4) of the Act.

While other countries may, where necessary, be selected from outside of the range of countries identified by Commerce in its surrogate country list, those countries are not considered to be at the same level of economic development.  The Court has affirmed this practice in *Clearon III*, explaining:

> {e}xamining Commerce's primary country surrogate selection process as a general matter, *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the *same level of economic development* as the home country measured by per capita GNI, and it observed that Commerce

---

[35] *See Jacobi Carbons*, 313 F. Supp. 3d at 1320 (citing *Juangcheng Kangtai*, Slip Op. 15-93 at 7-8; and *Baoding Yude*, 170 F. Supp. 2d at 1343).

[36] *See, e.g.*, *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013), and accompanying IDM at Comment 2; *Certain Steel Threaded Rod from the People's Republic of China:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 67332 (November 9, 2012), and accompanying IDM at Comment 1; and *Certain Steel Wheels from the People's Republic of China:  Notice of Preliminary Determination of Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 76 FR 67703, 67708 (November 2, 2011), unchanged in *Certain Steel Wheels from the People's Republic of China:  Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012).

will compare data from countries on the surrogate country list with data from a "less comparable country" when it becomes persuaded that none of the listed countries provide the requisite "scope of quality data." … Commerce on second remand concluded from the foregoing that absent adequate showing that the Philippines lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development.  The court is unable to conclude that is an unreasonable interpretation of *Clearon II*, and the results of the second remand comply to that extent with what was ordered.[37]

Similarly, in *Jacobi Carbons*, the Court recognized that, "{a}lthough the statute only requires Commerce to seek a surrogate market economy country whose economic development is 'comparable' to the subject nonmarket economy (NME), when possible, the agency selects a surrogate country at the *same* level of economic development as the NME country" and "Commerce considers those countries that occupy a 'relatively narrow per capita GNI range that is *centered* on the per capita GNI of the NME country' to have attained the same level of economic development."[38]  The Court also recognized the following rationale behind Commerce's selection of countries at the same level of economic development:

> The {surrogate country} list is non-exhaustive, and is intended to provide interested parties with a "manageable set of potential surrogate countries" to focus on.  When an interested party proposes an alternative country with a per capita GNI within the range of countries on the list, Commerce affords that country the same consideration as others on the list.  When an interested party proposes a country with a per capita GNI outside the selected range, Commerce will consider the country only if its data quality and availability, and significant producer status, outweigh its deficient economic comparability, and only when none of the countries at the same level of economic development (*i.e.*, within Commerce's per capita GNI range) present viable surrogate country options.[39]

---

[37] *See Clearon Corp. v. United States*, Consol. Court No. 13-00073, Slip-Op 16-110, 40 CIT at 3 (CIT November 23, 2016) (*Clearon III*) (internal citations omitted and emphasis added).
[38] *See Jacobi Carbons*, 313 F. Supp. 3d at 1316 (emphasis in original).
[39] *Id.*, 313 F. Supp. 3d at 1318.

Thus, the Court acknowledged and affirmed Commerce's preference to rely on countries at the "same" level of economic development, where possible.[40]

This approach has been applied in numerous proceedings.[41]  For example, in *Nails from China*, Commerce explained:

> Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development. … Here, because we have adequate data from those countries on the list of economically comparable countries, we find it reasonable to continue to limit our consideration to countries that are on the list.  Therefore, because Mexico and Russia are both countries on the Surrogate Country List and both fulfill these selection criteria, there is no need to resort to countries that are not at the same level of economic development, such as Thailand and Romania.[42]

---

[40] *Id.*, 313 F. Supp. 3d at 1319-22 (holding that Commerce provided a reasoned explanation of how it generated the surrogate country list, including why it considers those countries on the list to be at the same level of economic development as the People's Republic of China).

[41] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 68881 (December 17, 2019) (*Activated Carbon from China 2017-2018*), and accompanying IDM at Comment 1 (explaining that "Malaysia and Romania are both economically comparable to China, as both countries are on the OP List, and are therefore determined, based on per capita GNI, to *be at the same level of economic development* as China." (internal citations omitted and emphasis added)); *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 30, 2020), and accompanying IDM at Comment 2 (noting that "pursuant to section 773(c)(4)(A) of the Act, both Russia and Brazil are considered to be at *the same level of economic development* as China.  Thus, they are not ranked and are considered equal in terms of economic comparability.") (internal citations omitted and emphasis added); *Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 8821 (February 18, 2020), and accompanying IDM at the section titled "Surrogate Country" (noting that "{w}e selected Romania as the primary surrogate country, pursuant to section 773(c)(4) of the Act and 19 CFR 351.408(c)(2), because it is at *the same level of economic development* as China, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Romanian data for valuing FOPs." (internal citations omitted and emphasis added)); *Forged Steel Fittings from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 53629 (September 28, 2021), and accompanying IDM at Comment 1 (noting that "consistent with our practice, and section 773(c)(4) of the Act, Commerce identified Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey as countries at *the same level of economic development* as China, based on per capita GNI data from the World Bank's World Development Report.  Therefore, we consider all six countries as having met this economic comparability prong of the {surrogate country} selection criteria.") (internal citations omitted and emphasis added); and *Polyester Textured Yarn from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 58877 (October 25, 2021), and accompanying IDM at the section titled "Surrogate Country" (explaining that "{w}e selected India as the primary surrogate country, pursuant to section 773(c)(4) of the Act and 19 CFR 351.408(c)(2) because it is at *the same level of economic development* as Vietnam, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Indian data for valuing factors of production (FOPs)." (internal citations omitted and emphasis added)).

[42] *See Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative*

We further explained in *Nails from China* that "data considerations do not favor selecting a country not on the Surrogate Country List because the record contains factor values from Mexico that are specific to the inputs, are tax- and duty-exclusive, represent a broad market average, and are contemporaneous and useable."[43]  Thus, in view of the usable data from a country at the same level of economic development as the NME in question, consideration of countries at comparable, but not the same, levels of development was unwarranted.  Again, in *Activated Carbon from China 2017-2018*, we explained:

> consistent with its practice and section 773(c)(4) of the Act, Commerce considers Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia to be at the same level of economic development as China.  Commerce treats each of these countries as equally comparable.  Therefore, Commerce considers all six countries identified in the {Surrogate Country List} as having met this prong of the surrogate country selection criteria.  Unless Commerce finds that none of these countries is a significant producer of comparable merchandise, does not provide a reliable source of publicly available surrogate data, or is unsuitable for use for other reasons, or Commerce finds that another *equally comparable* country is an appropriate surrogate within the GNI range, Commerce will rely on data from one of these countries.  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.  As discussed below, Commerce preliminarily determines that one or more of these six countries are significant producers of comparable merchandise and provide usable SV information, and as such, Commerce will not rely on data from Thailand, whose 2017 GNI do not fall within the range of GNI represented by the countries included on the surrogate country list issued by Commerce.[44]

---

*Review and Final Determination of No Shipments; 2018-2019*, 86 FR 33219 (June 24, 2021) (*Nails from China*), and accompanying IDM at Comment 1; *see also Certain Quartz Surface Products from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019), and accompanying IDM at Comment 8 ("Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.").

[43] *See Nails from China* IDM at Comment 1 (emphasis added).

[44] *See Certain Activated Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 7758 (June 14, 2019), and accompanying PDM at "Surrogate Country and Surrogate Value Data" (internal citations omitted), unchanged in *Activated Carbon from China 2017-2018*.

Commerce has also applied its sequential surrogate country selection process in the context of administrative reviews covering merchandise from Vietnam.  In *OCTG from Vietnam*, Commerce explained:

> … Commerce identified Bolivia, Egypt, Honduras, India, Morocco, and Nicaragua as countries that are at the same level of economic development as Vietnam, based on per capita GNI.  Accordingly, we preliminarily find that these six countries meet the economic comparability criterion of the surrogate country analysis.
>
> Additionally, the domestic interested parties claimed that Indonesia is at a level of economic development comparable to Vietnam, although Indonesia does not appear on Commerce's list countries that are at the same level of economic development as Vietnam based on per capita 2019 GNI data.  We preliminarily find that Indonesia's gross national income per capita (GNI) of $4,050 reflects that it is not at the same level of economic development as Vietnam.  Specifically, Vietnam's 2019 GNI is $2,540, and the highest GNI of the six countries identified in Commerce's Surrogate Country Letter is Bolivia's GNI of $3,530.
>
> … We preliminarily find that the record contains factor values from India for all of {the respondent's} reported FOPs, and that these factor values are specific to the inputs, are tax- and duty-exclusive, represent a broad market average, and are contemporaneous and useable.  Because a country on the surrogate country list contains useable data, in accordance with our practice, we preliminarily find that there is no compelling reason to deviate from the surrogate country list in selecting a surrogate country.[45]

In each of the above determinations, Commerce applied its sequential surrogate country selection process (*i.e.*, selecting a surrogate country that:  (1) was at the same level of economic development as the NME country in question, if possible; (2) was a significant producer of comparable merchandise; and, then (3) had usable data) and declined to accord countries that were not at the same level of economic development as the NME country equivalent treatment.

---

[45] *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 86 FR 55807 (October 7, 2021) (*OCTG from Vietnam*), and accompanying PDM at the section titled "Surrogate Country," unchanged in *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 21094 (April 11, 2022).

The practice demonstrates a concerted effort by Commerce to achieve consistency and transparency in its approach while also adopting an implementation of the economic comparability requirement that is administratively practical.

### B. Commerce's Surrogate Country List

In its *Remand Opinion*, the Court also found that Commerce did not provide sufficient detail with respect to its creation of the Surrogate Country List.[46]  With regard to establishing the set of countries on the list, there are two basic objectives that underlie Commerce's approach to developing the Surrogate Country List.  The first objective is to provide a consistent starting point for all proceedings involving the same NME country, in this case Vietnam, at a given point in time.  The second objective is to provide a reasonably predictable process so that, in any proceeding involving an NME country, interested parties may understand the process and methodology that Commerce follows.  At the same time, however, as noted and upheld by the Court, Commerce's long-standing practice is to treat each segment of an AD proceeding, including the less-than-fair-value investigation and any subsequent administrative reviews that may follow, as independent segments with separate records and which lead to independent determinations.[47]  Thus, while Commerce seeks to ensure a consistent process to establish the Surrogate Country List, there is no requirement that the process must yield an identical result from one review period to the next.

Here, we applied the same process as in all NME investigations and reviews.  The annual release of the *World Bank Development Report*, which includes the latest per capita GNI data by country, initiates the process of generating a list of countries at the same level of economic

---

[46] *See Remand Opinion* at 18.
[47] *See E.I. DuPont de Nemours & Co. v. United States*, Court No. 96-11-02509, Slip Op. 98-07 (CIT January 29, 1998); *see also Jiaxing Brother CAFC*, 822 F.3d at 1289-99 (Commerce only examines the record before it, and each record stands on its own).

development as the NME country in question.  Commerce examines the new per capita GNI data

for the NME (and the change in per capita GNI from the year before) and compares the change

in the country's per capita GNI to the respective changes in per capita GNIs of the surrogate

countries from the prior list.  Commerce places emphasis on achieving a degree of balance in the

GNI range represented by the list.  We try to preserve the same number of surrogate countries

above and below the NME country (*i.e.*, three countries with per capita GNIs higher/lower than

the per capita GNI for the NME, for a total of six).  In arriving at this list of countries,

Commerce considers a range of factors, including the expected data quality for the potential

surrogate countries in question, the availability of alternative surrogate countries, the economic

diversity of the manufacturing sector in the alternative countries, and the degree of specificity in

the import data potentially relied on to value the FOPs.[48]  When generating the Surrogate

Country List, Commerce also takes certain factors into account which may influence the

availability and quality of the price and cost data such as whether the country is experiencing

civil unrest or extreme levels of inflation.  When an interested party identifies another alternative

surrogate country with a GNI within the GNIs set forth in the list, Commerce can accord that

alternative surrogate country the same consideration as given to those identified on the Surrogate

Country List.[49]

   Taken in this context, the list of potential surrogate countries on the Surrogate Country

List represents a starting point for interested parties, consistent with the statutory criteria

enumerated under section 773(c)(4)(A) of the Act and 19 CFR 351.408(b).  It is intended to

---

[48] *See, e.g.*, *Clearon Corp. et al. v United States*, Ct. No. 13-00073, Slip Op. 15-91 (CIT August 20, 2015)) (*Clearon II*), at 6 and n.5.

[49] *See Jacobi Carbons*, 313 F. Supp. 3d at 1355 (noting that the list is non-exhaustive, and that an interested party may propose an alternative surrogate country with a per capita GNI that falls within the range reflected in the list to be afforded the same treatment as an on-list country).

initiate a process whereby parties can focus their attention on a manageable set of potential surrogate countries that are at a similar level of economic development to the NME country in question.  One benefit of this approach is that interested parties do not expend their resources focusing on potential surrogate countries that are not at the same level of economic development as the NME country in question when there is a same-level country that provides adequate data.

The Surrogate Country List here, as in all cases, is largely based on an assessment of the countries with per capita GNIs closest to per capita GNI to the NME country in question, and that are likely to provide usable data, *at a given point in time*.  Thus, a country that is represented on the list at one point in time can be removed from the list if the per capita GNI of one or more other potential surrogate countries converges with the per capita GNI of the NME country in question.  As the Court explained in *Jacobi Carbons*, in its response to a party's argument, the expansion of the GNI range need not exactly match China's increasing per capita GNI for Commerce's development of the surrogate country list to be reasonable:

> Commerce's compilation of the list is reasonably based on its examination of annual changes to China's per capita GNI and re-centering of the list based on China's rapid economic expansion … {and} it would be inappropriate for this court to impose that type of bright-line requirement.  As {Commerce} notes, {t}he GNI data on which the surrogate country list is based is a fluid measurement that can change from year to year.[50]

Thus, a country does not remain on the list indefinitely based on an earlier classification or based on nominal differences in per capita GNI.  Instead, the subset of countries that are designated as being at the same level of economic development may fluctuate year to year.  As noted above, Commerce tries to preserve the same number of surrogate countries on the list (*e.g*., three countries each with per capita GNIs higher and lower than the NME country, for a total of six) to limit the number of potential surrogate countries for analysis.  If Commerce were required to

---

[50] *Id.*, 313 F. Supp. 3d at 1317-23 (internal citations omitted).

maintain Indonesia on the list, despite the relative changes in economic development and per capita GNIs of Vietnam and Indonesia and other potential surrogate countries over time, Commerce would potentially have to include numerous additional countries on the list in any given year (*i.e.*, by necessarily broadening the outer bounds of the list to force the inclusion of all countries that previously had been on the list), which defeats the purpose of Commerce's court-approved[51] approach in this regard.



Here, the per capita GNI data on the record reveal a tight proximity between India and Vietnam throughout the entire period shown.  Specifically, the chart highlights the economic comparability between India and Vietnam both before and during the instant POR.

Commerce identified India as one of six countries at the same level of economic development as Vietnam, based on per capita GNI data and the other considerations identified above.  Moreover, Commerce determined that India was a significant producer of comparable merchandise and that the record contained usable data for India.[52]  Thus, this review does not

---

[51] *See Jacobi Carbons*, 313 F. Supp. 3d at 1320 (noting that "Commerce properly may narrow a list of countries within a band for purposes of administrative feasibility" and "Commerce's decision to limit {its} list of potential surrogates to six countries represents precisely the type of discretion left within the agency's domain.") (citing *Juangcheng Kangtai*, Slip Op. 15-93 at 7-8; and *Baoding Yude*, 170 F. Supp. 2d at 1343).
[52] *See Final Results* IDM at Comment 3.

present an instance where "none of the countries on the list are significant producers of

comparable merchandise or have suitable sources of surrogate value data," requiring the

selection of a country that was not at the same level of economic development.[53]  In short,

Commerce applied its practice – consistent with numerous agency decisions and court precedent

– in generating a Surrogate Country List and focusing its analysis on a country that was at the

same level of economic development.

### C.  Comparison of the Indian and Indonesian Data

Notwithstanding the discussion above relating to Commerce's economic development

analysis, we recognize that the Court directed Commerce to undertake a modified surrogate

country selection process on remand.  Specifically, the Court directed Commerce to:

> consider countries at a "comparable level of economic development" as potential
> surrogates on an equal basis with countries {Commerce} deems to be at 'the same
> level of economic development,' including … either considering Plaintiffs' data
> regarding Indonesia as a potential primary surrogate country or else explaining
> why {Indonesia} is not at a "comparable level of economic development" {to
> Vietnam}.[54]

In compliance with the Court's directive, we have compared the Indonesian data on the

record to the Indian data used in the underlying review.  Consistent with our analysis in the

underlying administrative review,[55] we continue to find that the Indian data are superior to the

Indonesian data, and that the Indian data are appropriate for valuing SVs here.

---

[53] *See Jacobi Carbons*, 313 F. Supp. 3d at 1318 n. 12.

[54] *See Remand Order*.  While the *Remand Order* stated that Commerce could explain "why India is not at a 'comparable level of economic development,'" we clarify that Commerce did not find that India is not at a comparable level of economic development during this administrative review.  Thus, Commerce has further explained in this draft redetermination its finding that *Indonesia* is not at a comparable level of economic development with India.

[55] *See Preliminary Results* PDM at 15 (noting that the "Indonesian data generally are less preferable than the Indian data for use in this review"); and *Final Results* IDM at Comment 3 ("No new information on the record exists to make us reverse our {preliminary} finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data.").

When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs.[56]  There is no hierarchy among these criteria.  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[57]  Commerce must weigh the available information with respect to each input value and make product-specific and case-specific decisions as to what constitutes the "best" available SV for each input.[58]  Here, such an analysis does not support using the Indonesian data over the Indian data on the record.

With respect to the main inputs – whole live fish, fingerlings, and fish feed – we find that the Indian data, which were sourced from the *Fishing Chimes* and *Undercurrent News* publications, best meet the above-referenced criteria.  The whole live fish data are:  publicly available (*i.e.*, provided in a long-running industry publication); contemporaneous (*i.e.*, 2018/2019 monthly data[59]); representative of broad market average[60] pricing data; tax- and duty-exclusive; and specific to the inputs, including the particular species of *pangasius* in question.[61]

The corresponding Indonesia data meet several of these criteria as well, but the Indian data are superior.  The Indonesian data for whole live fish include prices for other species of fish

---

[56] *See* Surrogate Country List.

[57] *See* Policy Bulletin 04.1.

[58] *See* section 773I(1) of the Act; *see also Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

[59] *See* Vinh Hoan's Letters, "Vinh Hoan Corporati–n - Surrogate Values," dated April 24, 2020 (Vinh Hoan's April 24, 2020 SV Submission), at Exhibit SV-4 (containing 2018 monthly prices for whole live fish for the POR months); and "Vinh Hoan Corporation – Final Direct Surrogate Values," dated November 15, 2020 (Vinh Hoan's November 15, 2020 SV Submission), at Exhibit FDSV-6 (containing 2019 monthly prices for whole live fish).

[60] *See* Vinh Hoan's April 24, 2020 Submission at Exhibit SI(c) (noting that the data were from "54 farmers in 46 villages" and stating that the underlying survey focused on the major/representative pangasius producing locations); and Vinh Hoan's November 15, 2020 Submission at Exhibit FDSV-6 (noting that the data were "collected via interviews with farmers in all major producing regions").

[61] *See* Vinh Hoan's April 24, 2020 Submission at ExhibiIV-4(c) (noting that the relevant industry for the pricing was for "Pangasianodon hypophthalmus"); and Vinh Hoan's November 15, 2020 Submission at Exhibit FDSV-6 (containing 2019 monthly prices for "Pangasianodon hypophthalmus").

and are, thus, not exclusively species-specific,[62] unlike the Indian data.[63]  Although the petitioners submitted various information to suggest that the species in question (*i.e.*, *Pangasianodon hypophthalmus*) is the predominant species in Indonesia and, thus, the underlying data are likely to be *predominantly* specific,[64] this information is suggestive, rather than definitive, and the petitioners' conclusion is based on speculation.  Further, there is no basis to conclude that the Indian data contain data for multiple species.

With respect to another key input, fingerlings, the Indonesian data are not contemporaneous; they predate the POR by approximately six years.[65]  They are also only partially specific with respect to size (*i.e.*, they do not capture sizes greater than six inches), and there is no basis to conclude that they are specific with regard to species, as they cover the broad category *Pangasius*.[66]  In contrast, the Indian data are contemporaneous, as they are from 2017-2018, and 2019.[67]  As with the whole live fish data, the Indian fingerlings data are also specific to the species in question.[68]

---

[62] *See* Petitioners' Letter, "Submission of Proposed Surrogate Factor Values," dated April 24, 2020 (Petitioners' April 24, 2020 SV Submission) at Exhibit 2-F, Attachment 2 ("The statics {*sic*} contained in the IAS listed under the common name Patin (Pangas Cat Fishes) can contain data related to any of the above subspecies; the data is {sic} not limited to *Pangasius Hypopthalmus*.").

[63] *See* Vinh Hoan's April 24, 2020 SV Submission at ExhIt SV-4(c); and Vinh Hoan's November 15, 2020 SV Submission at Exhibit FDSV-6.

[64] *See, e.g.*, Petitioners' April 24, 2020 SV Submission at Exhibit 2-F, Attachment 5 ("{P}roduction of patin siam {*i.e.*, pangasius} is more dominant than the production of patin jambal and patin pasopati.  However, we do not have any data on the percentage of such dominant species.").

[65] *Id.* at Exhibit 5-B (containing data for 2011 and 2012).

[66] *Id.* (containing a heading for fingerling prices that states "*Pangasius* Fingerlings," and descriptions in the accompanying affidavit for "pangasius fingerlings," without specifying the species *Pangasius Hypophthalmus*).

[67] *See* Vinh Hoan's April 24, 2020 SV Submission at EIbits SV-4(c) and SV-5; and Vinh Hoan's November 15, 2020 SV Submission at Exhibits FDSV-9 and FDSV-10.

[68] *See* Vinh Hoan's April 24, 2020 Submission IExhibit SV-4(c) (noting that the relevant industry was for "*Pangasianodon hypophthalmus*"); and Vinh Hoan's November 15, 2020 SV Submission at Exhibit FDSV-9 and FDSV-10 (relating to *Pangasianodon Hypophthalmus* fingerlings in India).

The Indonesian data[69] for another main input, fish feed, are not contemporaneous with the POR, and are only partially specific with regard to protein content.[70]  The Indian data, in contrast, are contemporaneous and cover a wide set of specific protein contents that more closely match the respondent's protein content.[71]

Moreover, and separately, we have relied on these publications in multiple segments of this proceeding,[72] and elsewhere,[73] and have determined that the publications meet Commerce's SV criteria.  Given that these three inputs, in the aggregate, comprise a substantial portion of the normal value calculated for Vinh Hoan, we find it significant that the Indian data are superior to the Indonesia data for these FOPs.  Given the Indonesian data's shortcomings, we find the Indian data are superior in this review.

Regarding the surrogate financial ratios, we also find that the Indian sources are preferable.  Vinh Hoan placed on the record contemporaneous financial statements from two Indian seafood processors, Mulpuri Aqua Processors Private Limited (Mulpuri) and MMC Exports Limited (MMC Exports).[74]  In addition, the petitioners placed on the record contemporaneous financial statements from Indian producer Ananda Enterprises (India) Private

---

[69] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-B.
[70] *Id*. (providing a price for feed with a protein content of 26 to 30 percent, which is a broad range and includes prices for feed with protein contents other than respondent's 26 percent).
[71] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(c) and SV-6; and Vinh Hoan's November 15, 2020 SV Submission at Exhibits FDSV-7 and FDSV-8.  The Indian data cover multiple feed percentages (24, 26, 27, 28, and 32 percent), which captures respondent's 26 percent feed, and better approximates respondent's 22 percent feed, *i.e.*, through the use of 24 percent feed as a proxy).
[72] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 FR 23756 (April 29, 2020) (*Fish from Vietnam 2017-2018*), and accompanying IDM at Comment 2; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 15912 (March 21, 2022), and accompanying IDM at Comment 10.
[73] *See, e.g.*, *Third Administrative Review of Frozen Warmwater Shrimp from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 FR 46565 (September 10, 2009) (*Warmwater Shrimp from China*), and accompanying IDM at 17 (valuing shrimp larvae using an article published in *Fishing Chimes*).
[74] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-15.

Limited (Ananda).[75]  We find that the record demonstrates that each of these companies substantially engages in the processing and sales of frozen seafood products.[76]  We relied on all three financial statements and found that they provided a reliable basis for valuing the surrogate financial ratios.[77]

With respect to Indonesia, the petitioners provided the financial statements of PT Dharma Samudera Fishing Industries Tbk (Dharma) and PT Japfa Comfeed Indonesia Tbk (Japfa).[78]  The Indonesia financial statements are less favorable in certain aspects.  The statements from Dharma are accompanied by an unqualified auditor's opinion, but contain a note regarding the company's ability to continue as a going concern.[79]  Regarding Japfa's financial statements, information therein indicates that "Aquaculture" comprises a relatively small percentage of the company's sales.[80]  Although we do not find that either of these observations necessarily render the statements unusable or unreliable, they are relevant to our determination that the Indonesian statements are not preferable to the Indian statements.

Further, it is Commerce's preference to use multiple companies' financial statements whenever practicable, because "using the greatest number of financial statements possible will yield the most representative data from the relevant manufacturing sector to calculate accurate

---

[75] *See* Petitioners' Letter, "CFA Pre-Preliminary Surrogate Value and Factual Information Submission," dated November 13, 2020 (Petitioners' November 13, 2020 SV Submission), at Exhibit 14.
[76] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibits SV-15(b) (noting that MMC Exports "is engaged in the business of processing and trading in marine products and allied activities") and SV-15(a) (referencing Mulpuri's freezing equipment, frozen fillet sales/inventories, and frozen sales revenue); *see also* Petitioners' November 13, 2020 SV Submission at Exhibit 14 (identifying Ananda's business purpose as follows:  "Description of product or service:  Processed Frozen Shrimp, Fish.").
[77] *See Final Results* IDM at Comment 3.
[78] *See* Petitioners' November 13, 2020 SV Submission at Exhibit 8.
[79] *Id*. at Exhibit 8-A (page 2 of Auditor's Report:  Emphasis of matter).
[80] *See* Petitioners' November 13, 2020 SV Submission at Exhibit 8-B (Note 24. Net Sales).

surrogate financial ratios."[81]  Therefore, we find that the more numerous Indian statements offer an advantage over the Indonesian statements in this regard as well.[82]

      With respect to the other categories of data, there are limited differences across the SVs when comparing them on the dimensions identified above.  Many of the remaining material inputs are based on Global Trade Atlas (GTA) trade data, regardless of which surrogate country is selected.  Because neither country's trade data offer an advantage with respect to the evaluation criteria (*e.g.*, contemporaneity, public availability, specificity, *etc.*), there is no basis to conclude that the Indonesian data are preferable to the Indian data in this regard.

      There are only two areas where the Indonesian data fare better.  First, the Indian data used to value labor inputs are not contemporaneous with the POR.  Commerce used 2006 International Labor Organization wage data for India.[83]  Although Commerce prefers to value each FOP with contemporaneous SVs, in prior cases, Commerce has selected a labor value from the primary surrogate country regardless of there being other values on the record that may have been more contemporaneous with the period of investigation or POR.[84]  Here, the wage data were specific to India, a country which, for the reasons discussed above, provides better surrogate data overall.  Given this finding, Commerce inflated that data to reflect wage rates for the POR.  Moreover, there is nothing on the record to suggest, nor do parties argue, that the

---

[81] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2020-2021*, 87 FR 67671 (November 9, 2022) (*Activated Carbon from China 2020-2021*), and accompanying IDM at Comment 6; and *Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews:  Wooden Bedroom Furniture from the People's Republic of China*, 72 FR 46957 (August 22, 2007), and accompanying IDM at Comment 17.
[82] *See* Petitioners' November 13, 2020 SV Submission at Exhibit 8.
[83] *See* Memorandum, "Surrogate Values for the Preliminary Results," dated December 15, 2020, at 4, unchanged in *Final Results*; *see also* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-9.
[84] *See, e.g.*, *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1284 (CIT 2020) (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) (recognizing that Commerce has discretion in SV selection and may select non-contemporaneous data)); *see also Certain Aluminum Foil From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018), and accompanying IDM Comment 1 (noting instances wherein "Commerce used non-contemporaneous SV data to value labor," and stating that "we continue to find South African data are an appropriate basis to value labor.").

values are anomalous.  For instance, the Indonesian value for labor is $0.71 per hour on average;[85] the Indian value, after being inflated, is $0.90 per hour.[86]  Accordingly, we continue to find it appropriate to use the inflated Indian labor SV for these final results of redetermination.

Second, the record contains an Indonesian SV to value one by-product (fish oil), whereas we found the Indian data for the fish oil by-product to be aberrational.[87]  Given this, in the *Final Results*, we relied on the corresponding Indonesia source.  For the other 12 by-products,[88] the by-product data are not otherwise better for Indonesia, and, in fact, the Indian data for certain by products are superior as they are from publications or subscription services (*i.e.*, *Fishing Chimes*/GTA) rather than price quotes.[89]  Accordingly, for the reasons stated above, the need to rely on a different surrogate country for one production factor SV from Indonesia does not outweigh the various significant advantages offered by the Indian data.

In conclusion, consistent with our analysis in the underlying administrative review,[90] we continue to find that the Indian data are superior overall to the Indonesian data, and that the Indian data are appropriate for valuing SVs here.  Moreover, assuming *arguendo* that the Indonesian data and Indian data were equivalent, Commerce has the discretion to choose

---

[85] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 9.  The average price is $0.71/Hr = Average 9,963 Indonesia rupiah × 0.0000711 (average exchange rate for 2018 from SAS Indonesian Exchange Rate Database).

[86] *See* Vinh Hoan's April 24, 2020 SV Submission at SV-9.  The average price is $0.90/Hr = 23.51 Indian rupees × 0.022115 (Average Exchange Rate for 2006 from SAS Indian Exchange Rate Database) × 1.722887 (inflator used for the *Final Results*).

[87] *See Final Results* IDM at Comment 3.C.2.

[88] These include:  fish meal; frozen (broken meat, skin, fin, stomach); and fresh (waste, bladder, stomach, broken meat, skin, belly, fin).

[89] *See* Petitioners' April 24, 2020 SV Submission at Exhibits 10-A and 10-B.

[90] *See Preliminary Results* PDM at 15 (noting that the "Indonesian data generally are less preferable than the Indian data for use in this review"); and *Final Results* IDM at Comment 3 ("No new information on the record exists to make us reverse our {preliminary} finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data.").

between potential surrogate countries;[91] in such case, it is reasonable to rely on relative economic comparability as a deciding factor in our analysis.

## IV.    INTERESTED PARTY COMMENTS

As noted above, we released the Draft Results on October 4, 2023.  Interested parties provided comments on the Draft Results relating to Commerce's analysis of economic comparability, as well as our assessment of data considerations (*i.e.*, comparing the Indian and Indonesian SV data).  We address the arguments, in turn.

*Petitioners' Comments*

- Commerce's Draft Results do not fully or adequately address the concerns raised in the Court's opinion regarding economic comparability.  Moreover, Commerce has not properly assessed the merits of the Indian and Indonesian data for valuing whole live fish, fingerlings, fish feed, financial factors, labor, or co-/by-products.

**Economic Comparability**[92]

- The Draft Results fail to address the Court's concern that Commerce misapplied the economic comparability statutory standard, and Commerce's citations to court and agency precedent are not instructive.

- In *Clearon III*, cited by Commerce, the parties focused their arguments on relative data quality and significant producer status, and the court was not required to opine on Commerce's "same"-level analysis.[93]  Thus, the case is inapplicable here.  Additionally, in the Draft Results, Commerce did not discuss the opinion that led to the final results of

---

[91] *See GGB Bearing Tech (Suzhou) Co., Ltd. v. United States,* 279 F. Supp. 3d 1233, 1249 (CIT 2017) (noting that section 773(c)(1) of the Act "grants Commerce wide discretion in selecting potential surrogate countries and the information available in those countries.").
[92] *See* Petitioners' Comments at 3-16.
[93] *Id*. at 8 (citing *Clearon III*).

redetermination reviewed in *Clearon III*.  That context is distinguishable because, there, Commerce provided a full explanation of how it generated the list of surrogate countries used in that segment.[94]

- Commerce's citation of *Jacobi Carbons* is also unhelpful to the agency's position because the Court has already determined that, at least in the context of this proceeding, the same-level methodology is unsound.  Additionally, unlike here, in that case, Commerce explained, at length, the Office of Policy's process for identifying countries at the same level of economic development.[95]

- Several other cited cases – *Jiaxing Brother*, *Juangcheng Kangtai*, and *Baoding Yude* – similarly do not support Commerce's position.

  - *Jiaxing Brother* was not about the process of narrowing potential surrogate countries to same-level countries; rather, the case focused on the reasonableness of Commerce finding India not to be economically comparable to China.[96]

  - In *Juangcheng Kangtai*, the Court approved Commerce's inclusion of only a narrow band of GNIs in its surrogate country list, but that case is distinguishable because, unlike here, the parties to that proceeding focused their arguments on countries that *did* appear on the list.[97]

  - *Baoding Yude* concerned whether the agency erred in valuing a specific FOP and did not directly address the "same"-level methodology.[98]

---

[94] *Id*. (citing *Clearon II*, Slip Op. 15-91 at 8).
[95] *Id*. at 9 (citing *Jacobi Carbons*, 313 F. Supp. 3d at 1316-18).
[96] *Id*. at 9-10 (citing *Jiaxing Brother*, 961 F. Supp. 2d at 1327-32).
[97] *Id*. at 10 (citing *Juancheng Kangtai*).
[98] *Id*. (citing *Baoding Yude*).

- Although Commerce cites *Heze Huayi* in support of its sequential surrogate country analysis, the sequential analysis is not in question here.[99]

- Commerce's citation of administrative precedent does not help its position either. The fact that Commerce has repeatedly focused on same-level countries as potential surrogate countries in the past does not establish that the methodology is lawful and appropriate in this review.

- With respect to the development of a Surrogate Country List, Commerce's explanation is inadequate.

  o First, Commerce does not state why it considered the particular range of GNIs here (and only that range) as determinative of economic sameness, and does not state what GNI range constitutes economically comparability. Although Commerce lists factors that it considers in deriving the Surrogate Country List, it does not identify which of the enumerated factors it used here or cite to where such considerations are memorialized.

  o Second, Commerce continues to view Indonesia as being neither at the same level, nor an economically comparable level, as Vietnam, without stating the basis for this conclusion. With respect to the latter, Commerce inexplicably treated Indonesia as not economically comparable with Vietnam, despite Indonesia having a GNI closer to Vietnam's than in preceding reviews in which Commerce considered Indonesia to be at the same level of economic comparability.

---

[99] *Id*. at 10-11 n.52 (citing *Heze Huayi*).

**Comparison of Indian and Indonesian Data**[100]

- Commerce's assessment of the relative quality of the Indian and Indonesia data is not evenhanded.  Commerce's analysis of the data for the main FOPs, financial factors, labor, and by-/co-products is colored by its unlawful and unsupported economic comparability methodology.

- <u>Whole live fish, fingerlings, and feed</u>[101]

  - In finding the Indian data superior for these inputs, Commerce ignored the fact that the underlying sources (*Fishing Chimes* and *Undercurrent News*) do not reflect broad market averages and are otherwise unreliable.

    - The *Fishing Chimes* data for whole live fish represent prices from a maximum of 11 farmers and do not contain volume figures.  The *Fishing Chimes* data for fingerlings appear to relate to fingerlings obtained only from nurseries in two villages in a single district within Andhra Pradesh.  Finally, the *Fishing Chimes* data for fingerlings and feed do not indicate the number of survey respondents or the trade volume for each fingerling size and feed type.[102]

    - With respect to *Undercurrent News*, there is no volume information or identification of the number of farmers interviewed, and the data reflect outliers.

---

[100] *Id.* at 16-30.
[101] *Id.* at 16-22.
[102] Moreover, the petitioners assert that the fact that Commerce used different *Fishing Chimes* data in the context of another AD order, and it used such data in other segments of this proceeding, does not establish that the source is reliable.

o   Commerce improperly finds that the Indonesian sources for whole live fish and
     fingerlings are not sufficiently specific.  With respect to whole live fish,
     Commerce stated that the Indonesian data were not species-specific, but did not
     address the fact that an industry expert stated that 99 percent of the production
     volumes and values reflect *pangasius hypophthalmus/patin siam* (*i.e.*, the species
     in question).

o   With respect to fingerlings, Commerce stated that the petitioners' proffered data
     were not size-specific for fingerlings over six inches in length, but there are, in
     fact, other Indonesian data on the record for fingerlings of six to seven inches and
     seven to eight inches in length (and the *Undercurrent News* data do not cover
     sizes above six inches for 2019).

o   With respect to feed, Commerce criticizes Indonesian pricing data for feed with a
     26-30 percent protein content as both non-contemporaneous and overbroad, but it
     fails to recognize that the record contains contemporaneous Indonesian data
     regarding 22 percent feed and 26 percent feed – the very protein contents that
     were used by the mandatory respondent here, and Commerce does not squarely
     grapple with the fact that the Indian surrogate data lack 2019 information on feed
     at either a 22 percent or 26 percent content.

o   Commerce's reliance on *Fishing Chimes* and *Undercurrent News* data in other
     segments for other orders does not establish that the data are reliable or reflect a
     broad market average.

29

- Financial Factors[103]

  - Commerce overstated the flaws associated with the Indonesian statements and downplayed the deficiencies of the Indian statements.

  - First, the Indian statements only overlap with a portion of the POR, while the Indonesian statements cover the full POR.

  - Second, although Commerce states that the Indian surrogate companies substantially engage in the processing and sales of frozen seafood, MMC Exports has no deep freezers and is principally engaged in retail sales. Processing reflects a small percentage of its expenses, as the company primarily sells and purchases merchandise. Additionally, MMC Exports has a profit rate of only 0.01 percent, and it is not readily apparent why a profit rate that is this low is an appropriate surrogate.

  - Third, Commerce states that the Dharma (Indonesian) statement has a note regarding the company's ability to operate as a going concern; it is not obvious why such an observation is relevant.

  - Fourth, Commerce's observation that aquaculture reflects a relatively small proportion of Indonesian company Japfa's operations appears to be arbitrary, given that MMC Exports is involved in limited/no aquaculture processing.

  - Fifth, as the MMC Exports statement is unusable, there are not, in fact, more Indian statements on the record, and thus, India provides no advantage in terms of the number of financial statement available.

---

[103] *Id.* at 22-25.

- Labor and Other FOPs[104]

    o The Indonesian labor data are preferable, as they are contemporaneous and industry specific.  Given that Commerce concedes that the Indonesian data are better in this regard, it is not clear why Commerce would not use the Indonesian data in its analysis.

    o With respect to the Indian by-product data, several SVs were anomalous.  The SV used for Vinh Hoan's frozen by-products was four times higher than the SV used for whole live fish; similarly, the SV for Vinh Hoan's fish meal co-product was substantially higher than the whole live fish input.  The Court and Commerce have held that it is inappropriate for a by-product SV to exceed the value of the main input.[105]  Additionally, the frozen by-product and fish meal SVs were insufficiently specific.

    o Commerce's explanation that the Indian data were from publications and subscription services does not render them reliable (or representative of a broad market average, insofar as the data were sourced from *Fishing Chimes*).

- In conclusion, Commerce should revise its analysis and select Indonesia as the surrogate country.  Additionally, to the extent that India and Indonesia are equal in terms of data quality, Commerce's reliance on economic comparability, *i.e.*, relative GNI comparisons, to favor India is inconsistent with Policy Bulletin 04.1 and Commerce's statements to the effect that it rejects "relative" GNI comparisons.

---

[104] *Id*. at 26-29.
[105] *Id*. at 29 (citing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304, 1311 (CIT 2018) (*An Giang*)).

*Vinh Hoan/Navico Comments*[106]

- Commerce's Draft Results provide a revised analysis regarding the selection of India as the primary surrogate country and, thus, fully comply with the Court's directive. As a result, Commerce should adopt the Draft Results as the final results of redetermination.

**Commerce's Position:** Consistent with the *Final Results*, we continue to rely on India as the surrogate country. We have provided extensive discussion of Commerce's practice regarding economic comparability in the context of our surrogate country selection process, as well as additional detail with respect to our generation of the Surrogate Country List used in this segment. Furthermore, in accordance with the Court's *Remand Opinion*, we have considered the relative merits of the Indonesia data – and provided an expanded comparison of the Indian and Indonesia SVs on the record – and continue to find that the data supports selection of India as the primary surrogate country.

**Economic Comparability**

As detailed above, Commerce's economic comparability analysis, as performed in this review, has been applied in numerous administrative proceedings involving NME countries. Specifically, Commerce has a practice of identifying a subset of countries that are at the same level of economic development as the NME country in question and, if one or more of those countries (or another country within the range of GNIs specified on that list) provide adequate data, Commerce prefers to use such data over countries which do not appear on the list and are not within the same band of GNI.

The petitioners attempt to dismiss the numerous court opinions that endorse, or acknowledge, the existence of Commerce's practice in this regard. Although certain opinions

---

[106] *See generally* Vinh Hoan/Navico Comments.

involved different factual contexts (*e.g.*, were proceedings involving China) or entailed litigation involving issues extending beyond economic comparability or beyond surrogate country selection, these opinions support the proposition that Commerce has consistently and properly applied the sequential surrogate country selection process described above.  We cited extensive precedent in this regard,[107] and we disagree that it is appropriate to summarily dismiss either the administrative precedent or the relevant judicial opinions.

The petitioners assert that the Court should dismiss Commerce's citation of *Clearon III*, contending that, there, the parties focused their arguments on relative data quality and significant producer status such that the *Clearon* court was not required to opine on Commerce's "same"-level analysis.[108]  That is incorrect.  In *Clearon III*, the Court explained:

> *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the same level of economic development as the home country measured by per capita GNI, and it observed that Commerce will compare data from countries on the surrogate country list with data from a less comparable country when it becomes persuaded that none of the listed countries provide the requisite scope of quality data.
>
> …
>
> Commerce on second remand concluded from the foregoing that absent adequate showing that the {Philippines, *i.e.*, the primary surrogate country selected} lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development.  *The court is unable to conclude that is an unreasonable interpretation of Clearon II*, and the results of the second remand comply to that extent with what was ordered.[109]

Thus, *Clearon II* and *Clearon III* dealt squarely with Commerce's practice of relying on a surrogate country at the same level of economic development as the NME country in question, insofar as that surrogate country offered adequate data.  Accordingly, the reviewing court in

---

[107] *See* pages 7-18, *supra*.
[108] *See* Petitioners' Comments at 8.
[109] *See Clearon III*, Slip-Op 16-110 at 11-12 (internal citations and quotations omitted and emphasis added).

*Clearon III* affirmed Commerce's approach, and this was upheld (without an opinion) by the Federal Circuit.[110]

The petitioners next assert that Commerce's citation of *Jacobi Carbons* (wherein Commerce focused its analysis on a band of countries at the same level of economic development) is unhelpful to the agency's position because the Court "has already determined that, at least in the context of this proceeding, the 'same'-level methodology is statutorily unsound."[111]  This point is conclusory and does not serve to distinguish or otherwise undermine the cited case – the very purpose of the citation was to demonstrate that Commerce acted in a manner consistent with a court-affirmed practice.  Nevertheless, in *Jacobi Carbons*, as here, Commerce "provided a reasoned explanation of how it generated the Surrogate Country List, including why it considers those countries on the list to be at the same level of economic development" as the NME in question.[112]  We identified the factors that we considered in deriving the Surrogate Country List used in this proceeding,[113] and we explained why doing so is appropriate.  The *Jacobi Carbons* court explicitly recognized that Commerce properly may

---

[110] *See Clearon III*, Slip-Op 16-110, *aff'd* 711 Fed. Appx. 648 (Fed. Cir. 2018).  The *Clearon II* court explained that "Commerce therefore acts not unreasonably in burdening the party proposing a non-listed country with demonstrating that no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection."  *See Clearon II*, Slip Op. 15-91 at 10-11.  We also note that the *Clearon II* court stated that "Commerce's primary reliance on per capita GNI to identify economically comparable countries was not unreasonable and was in accordance with law" and observed that "Commerce provided a reasonable explanation of how it generated the Surrogate Country List" and selected the range of GNIs of the countries listed therein.  *See Clearon II*, Slip Op. 15-91 at 8; *see also Jacobi Carbons*, 313 F. Supp. 3d at 1321 ("Commerce's decision to exclude the Philippines is supported by substantial evidence demonstrating the widening gap between its per capita GNI and China's, and the apparent availability of other suitable countries."); and *Juancheng Kangtai*, Slip Op. 15-93 at 22 ("The court in this matter adheres to precedent holding that primary reliance on per capita GNI in compiling the surrogate country list is reasonable and in accordance with law").
[111] *See* Petitioners' Comments at 9.
[112] *See Jacobi Carbons*, 313 F. Supp. 3d at 1322.
[113] *See* page 15, *supra*.  The petitioners assert that "Commerce does not state why it considered the particular range of GNIs here (and only that range) as determinative of economic same-ness."  *See* Petitioners' Comments at 14.  However, Commerce explained at length how it identified potential surrogate countries based on GNI proximity, in conjunction with several other considerations; we also stated that the range of GNIs represented by the Surrogate Country List is dynamic.  *See* pages 15-18, *supra*.  To the extent that the petitioners are arguing that Commerce did not adopt a permanent/nominal GNI range as the basis for defining economic same-ness, we agree.

"narrow a list of countries within a band for purposes of administrative feasibility," and found that Commerce's "decision to limit {the Office of Policy's} list of potential surrogates to six countries represents precisely the type of discretion left within the agency's domain."[114]  The petitioners' arguments in this regard do nothing to undermine the persuasiveness of the Court's holding in *Jacobi Carbons* or the related holdings cited by Commerce.[115]

The petitioners also dismiss Commerce's citation to *Jiaxing Brother*, *Juancheng Kangtai*, and *Baoding Yude*, claiming that the underlying facts (or the arguments raised by the parties) were sufficiently distinct from those presented in this litigation so as to render the cases uninstructive.  We disagree.  While *Jiaxing Brother* centered on the economic comparability of India and China, we cited this opinion in support of Commerce's sequential analysis process, whereby we develop a list of countries to be considered in the economic comparability analysis.  Moreover, the *Jiaxing Brother* court observed "{t}hat India has a long history as serving as the surrogate country to China does not mean Commerce is restrained from considering the adequacy of other countries to serve that role{, because} Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition."[116]  This observation is directly applicable here.  Simply because we previously relied on Indonesia as a surrogate country does not require that we must ignore economic changes that resulted in other countries becoming closer to Vietnam in terms of GNI; nor must Commerce continuously increase the number of countries on its Surrogate Country List in order to ensure that particular countries remain on the list indefinitely.

---

[114] *See Jacobi Carbons*, 313 F. Supp. 3d at 1320.
[115] *Id.*; *see also Clearon II*, Slip Op. 15-91 at 8-11; and *Juancheng Kangtai*, Slip Op. 15-93 at 22.
[116] *See Jiaxing Brother CAFC*, 822 F.3d at 1299.

With respect to *Juancheng Kangtai*, the petitioners assert that the Court's decision to approve a narrow band of per capita GNIs on the Surrogate Country List in that case was distinguishable because, there, the parties primarily made arguments about the on-list countries. That interpretation overlooks a large portion of the Court's opinion.  Although the parties offered numerous arguments regarding the selection of the Philippines and Thailand (both on-list countries), the respondent also maintained that Commerce should consider India (a country which was previously on the list, but was not during the POR in question).  In fact, the first point in the opinion is titled "Primary Surrogate Country Selection; India's Non-consideration."[117] Commerce's treatment of an off-list country was not simply an ancillary or irrelevant consideration in *Juancheng Kangtai*.  There, the Court stated that "India has not been included in the list of countries at comparable economic development, and the court rejects the notion that Commerce's policy of narrowing the list of countries to a band, around a 'level', of economic comparability is in violation of the statute."[118]  The opinion also directly addressed numerous arguments about the appropriate basis for Commerce to ascertain countries at the same level of economic development, and upheld Commerce's approach in this regard.[119]

Concerning *Baoding Yude*, the petitioners assert that the opinion considered whether the agency erred in valuing a specific FOP and did not directly address the "same"-level methodology.  The *Baoding Yude* court, however, stressed that Commerce must have "substantial discretion to choose the best information available" and noted that establishing numerical thresholds reflect the "type of line-drawing exercise {that} is precisely the type of

---

[117] *See Juancheng Kangtai*, Slip Op. 15-93 at 7.
[118] *Id.*, Slip Op. 15-93 at 14-15.
[119] *Id.*, Slip Op. 15-93 at 22 ("The court in this matter adheres to precedent holding that primary reliance on per capita GNI in compiling the surrogate country list is reasonable") (internal citations and quotations omitted).

discretion left within the agency's domain"[120] – a point relevant to Commerce's established practice of selecting six countries for (explicit) inclusion on the Surrogate Country List.[121]

The petitioners summarily dismiss *Heze Huayi*, contending that the opinion's approval of Commerce's sequential analysis is not relevant because the sequential surrogate country selection process is not in question here.[122]  However, by calling into question Commerce's economic comparability standard, the petitioners implicitly seek to undermine the sequential selection process.  Notwithstanding, while we primarily cited *Heze Huayi* in support of Commerce's surrogate country practice more generally, this opinion acknowledges Commerce's practice regarding analysis of the "Data Considerations" prong of our surrogate country analysis.  Specifically, the Court there noted that data considerations were developed to serve as a tie-breaker, rather than imposing a mandatory requirement that Commerce conduct a complete side-by-side comparison of data submitted for any number of potential surrogate countries, regardless of their relative level of economic development.[123]

The petitioners also dismiss Commerce's citation of voluminous administrative precedent as irrelevant in light of the Court's specific directive.  However, given that the practice has been applied and approved by the Court in other cases, we find citations to this consistent practice to be meaningful.

We note that, in the course of their comments on the remand, the petitioners mischaracterize certain aspects of Commerce's analysis here.  For instance, the petitioners assert that "the agency has yet to provide a reasonable explanation of why it found only the six

---

[120] *See Baoding Yude*, 170 F. Supp. 2d at 1343.
[121] In fact, the *Jacobi Carbons* court cited the case for exactly this proposition in the context of a discussion on the establishment of a Surrogate Country List.  *See* 313 F. Supp. 3d at 1320 (citing *Juangcheng Kangtai*, Slip Op. 15-93 at 7-8; and *Baoding Yude*, 170 F. Supp. 2d at 1343).
[122] *See* Petitioners' Comments at 10-11 n.52 (citing *Heze Huayi*).
[123] *See Heze Huayi*, 532 F. Supp. 3d at 1318 (n. 9).

countries on the Office of Policy's list to be at the 'same' level of economic development as

Vietnam."[124]  That simply does not reflect the practice in place for the underlying administrative

review, and the petitioners' characterization of the Surrogate Country List as comprising the

"only" countries at the same level of economic development is incorrect.  As noted above, when

an interested party identifies another alternative surrogate country with a GNI within the GNIs

set forth in the list, Commerce may accord that alternative surrogate country the same

consideration as given to those countries explicitly identified on the Surrogate Country List,[125]

and it has done so in numerous circumstances.[126]

      The petitioners also assert that "Commerce continues to view Indonesia as being neither

at the same level, nor an economically comparable level, as Vietnam, without stating the basis

---

[124] *See* Petitioners' Comments at 11.

[125] *See Jacobi Carbons*, 313 F. Supp. 3d at 1355 (noting that the list is non-exhaustive and that an interested party may propose an alternative surrogate country with a per capita GNI that falls within the range reflected in the list to be afforded the same treatment as an on-list country).

[126] *See, e.g.*, *Certain Aluminum Foil from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 935 (January 7. 2022), and accompanying IDM at Comment 1 ("However, we agree with Zhongji that we should find Bulgaria to be economically comparable to China.  Because the record shows that Bulgaria's 2019 per capita GNI is within the range of the GNI of the six potential primary surrogate countries identified on the 2019 surrogate country list, *i.e.*, the six countries that are at the same level of economic development as China, we determine that Bulgaria is at a level of economic development comparable to China and, thus, meets the statutory threshold to serve as a source of surrogate values pursuant to section 773(c)(4) of the Act."); *Certain New Pneumatic Off-the-Road Tires Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 61166 (October 9, 2015), and accompanying PDM at 22 ("Additionally, although Peru was not included in the Surrogate Country List, Peru's GNI falls within the range of GNIs for those countries listed in the Surrogate Country List.  Because Peru's GNI falls within the highest GNI and lowest GNI … of the countries listed in the Surrogate Country List, for economic comparability, {Commerce} finds Peru to also be at the same level of economic development as {China} for these preliminary results."), unchanged in *Certain New Pneumatic Off-the-Road Tires Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 23272 (April 20, 2016); and *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; Rescission, in Part; and Preliminary Determination of No Shipments; 2020-2021*, 87 FR 54970 (September 8, 2022), and accompanying PDM at 19 ("Additionally, the petitioner identified Panama and Russia as countries at the same level of economic development as China, based on per capita GNI data from the World Bank's World Development Indicators.  Therefore, we preliminarily consider all eight countries as having met this economic comparability prong of the surrogate country selection criteria. … Under Commerce's practice, when an interested party proposes an alternative country with a per capita GNI within the range of countries on the list, Commerce may afford that country the same consideration as others on the list."), unchanged in *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 15663 (March 14, 2023).

for this conclusion."[127]   Commerce, however, *has* explained the reasoning behind its strong

preference to select countries at the same level of economic comparability, and we discussed in

detail why we do not consider Indonesia to be at the same level as Vietnam during the POR.   We

have also set out in detail our reasoning for limiting the number of countries to those on the

Surrogate Country List.   Ultimately, Commerce's goal is to select a surrogate country that

reasonably represents the market values that would be present in the NME country, if it were an

ME country.   Here, we are best able to achieve that goal through the selection of India, which

maintained a similar GNI to Vietnam through the POR.   In any event, we have analyzed and

explained our rationale in regard to the data in Indonesia for purposes of this remand, as directed

by the Court, and, thus, the petitioners' point is moot.

      In short, we disagree that Commerce should either disregard relevant precedent or,

alternatively, ignore relevant legal holdings based on tenuous factual differences.   Commerce's

practice is reasonable, and the fundamental holdings of the cited court cases have a bearing on

the outcome here.   Moreover, we emphasize that, "{t}o survive judicial scrutiny, an agency's

construction need not be the only reasonable interpretation" of the law.[128]   Therefore, "when

faced with more than one reasonable statutory interpretation, 'a court must defer to an agency's

reasonable interpretation … even if the court might have preferred another.'"[129]   Commerce's

surrogate country selection process was supported by substantial evidence, and is in accordance

with the Act and relevant precedent.

---

[127] *See* Petitioners' Comments at 13.
[128] *See Usinor v. United States*, Slip Op. 22-70 (CIT July 19, 2002), at 7-8 (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994)).
[129] *See U.S. Steel Grp. v. United States*, 225 F.3d 1284, 1287 (Fed. Cir. 2000) (quoting *NSK Ltd. v. United States*, 115 F.3d 965, 973 (Fed. Cir. 1997)).

**Comparison of Indian and Indonesian Data**

Regardless of what significance, if any, is accorded to Commerce's Surrogate Country List in the surrogate country selection process, Commerce continues to find that India is the more appropriate surrogate country in this review. As noted in the *Preliminary Results* and *Final Results* of this review, and as further described below, we find that the Indian data are preferable for valuing Vinh Hoan's FOPs.

In their comments, the petitioners highlight certain favorable aspects of the Indonesian data and several drawbacks associated with the Indian data. However, as explained throughout these final results of redetermination, although both countries may offer usable data to value Vinh Hoan's FOPs, there is no basis to conclude that the Indonesian data are superior. The petitioners' comments in this regard simply amount to a request that Commerce place greater emphasis on certain SV selection criteria than others in order to justify their desired outcome of reliance on Indonesia as a primary surrogate country. We address the petitioners' various arguments in turn, as we reexamine the relative merits of the data on the record.

With respect to whole live fish, fingerlings, and fish feed, the petitioners assert that Commerce ignored evidence that the underlying sources (*Fishing Chimes* and *Undercurrent News*) do not reflect broad market averages. We disagree. Consistent with Commerce's extensive analysis of this issue in the context of the prior review, we continue to find that *Fishing Chimes* data are representative of a broad market average. With respect to these data, the petitioners incorrectly claim that the data came from "a maximum of 11 farmers."[130]  In reaching this conclusion, it appears that the petitioners simply picked a month that had the highest number of farms reported (which was December 2018, with 11 farms harvested) and determined that the

---

[130] *See* Petitioners' Comments at 19.

figure represented the entire universe of reporting entities.[131]  There is no basis for such a

conclusion.  The study showed 83 harvests in 2017 and 2018, 34 of which were during the seven

months of the POR.  As surveyed farms averaged three harvests over the two year period,[132]

record evidence cannot support the petitioner's argument that 11 farms produced 83 harvests

during that time period.  Thus, the petitioners' presumption that there are 11 total farms – and

that only these farms, or a subset thereof, report each month – is unfounded.[133]

Regarding the petitioners' claim that there was limited information for certain months,[134]

the record indicates that this is not because of missing data.  Rather, the study noted that stocking

patterns are not constant and change according to many factors, such as market price, the

prevalence of other types of farming activities, and water availability.[135]  Furthermore, the study

observed that the peak stocking season during 2017 and 2018 was in the early part of the year.[136]

Thus, we also find no basis to conclude that variations in response rates by month are somehow

suspect; rather, the clustering of reporting times is due to the nature of the farmers' stocking

patterns and subsequent harvesting.

We disagree with the petitioners' claim that the publication does not contain volume data

for whole live fish sales.[137]  Although the study did not quote specific volumes on a transaction-

or entity-specific basis, the study does enumerate certain parameters allowing an estimation of

---

[131] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(c).
[132] *Id.*
[133] *Id.*  Stated differently, not all farms would be expected to report data for every month; for instance, some farms might harvest in June while others harvest in July.  Accordingly, the record does not demonstrate that there were only 11 farms providing survey responses during the POR.  The names of the individual respondent entities are not indicated in the survey and, therefore, it is simply speculation to assume the same 11 responders, or a subset of those same responders, are the only entities providing a response to the survey.  Even accepting the petitioners' interpretation, *arguendo*, we do not agree that numerous data points over time, from 11 responders, would necessarily be insufficient to establish that data represent a broad market average or be otherwise unreliable.
[134] *See* Petitioners' Comments at 19.
[135] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(c).
[136] *Id.*
[137] *See* Petitioners' Comments at 19.

the total volume covered.  For example, the publication states that:  (1) the study covered farms ranging in size from 0.4 hectares to 56 hectares with a median value of four hectares; (2) average productivity per hectare, per harvest, was 17.9 metric tons (2017) and 18.4 metric tons (2018); (3) 45 farms reported in 2017, and 38 in 2018 (with 34 farms reporting during the POR); and (4) on average, farms had three harvests over a two year period.[138]  Using these parameters, and assuming a four hectares per farm size (*i.e.*, the median average), the *pangasius* prices in the *Fishing Chimes* are based on approximately 9.03 million kilograms of *pangasius* fish in 2017 and 2018, and approximately 3.75 million kilograms during the POR.[139]  This is a significant volume of fish.

With respect to the fingerling data from *Fishing Chimes*, the petitioners argue that the "data for fingerlings appear to relate to fingerlings obtained only from nurseries in two villages in a single district within Andhra Pradesh" and the publication does not indicate how many farmers actually provided data regarding fingerling prices, or "what the volume of trade is represented by the pricing data for each size of fingerling and each kind of feed."[140]  With respect to the representativeness of the sample, the study stated that it involved 108 data sets that were collected in 2017 and 2018 from 54 farmers in Krishna and West Godavari, *i.e.*, the two largest *pangasius*-producing districts in Andhra Pradesh.[141]  The authors of the *Fishing Chimes* study specifically addressed why the research team selected the sample that it did.  For instance, the study stated that data relating to *pangasius* farming was limited in other states prior to

---

[138] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(b) and SV-4(c).
[139] We calculated the volume of whole live *pangasius* fish by multiplying the average MT productivity per hectare per harvest by the median average MT size of the farm (4Ha) and by the number of farms.  We then multiplied this by the average harvest per year (1.5) and finally by 1,000, *i.e.,* (2017 all months, $4 \times 17.9 \times 45 \times 1.5 \times 1000 = 4,833,000$ kg); (2018 all months, $4 \times 18.4 \times 38 \times 1.5 \times 1000 = 4,195,200$ kg); and (2018 POR months, $4 \times 18.4 \times 34 \times 1.5 \times 1000 = 3,753,600$ kg).
[140] *See* Petitioners' Comments at 19.
[141] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(c).

2018.[142]  In addition, the study explicitly states that the "study team focused on Andhra Pradesh as it has major representation in production of *pangasius*."[143]  Thus, the researchers deemed the region to be representative from a sampling standpoint, and that statement is consistent with our analysis of the large volume of transactions represented for whole live fish and the other key inputs.

As in the context of whole live fish, the petitioners again critique the lack of specific volume data relating to fingerlings.[144]  Although the study did not quote transaction- or size-specific volumes, the study does enumerate certain parameters allowing for an estimation of the total volume.  For example, in addition to the parameters included in the calculation of the whole live fish volumes above, the study states that the average stocking density is recorded as 25,000 pieces per hectare.[145]  Using this figure, the *pangasius* fingerling prices in *Fishing Chimes* are based on approximately 12.5 million pieces in 2017 and 2018, and approximately 5.1 million pieces during the POR.[146]  This is a significant quantity of fingerlings.  Accordingly, we find that the *Fishing Chimes* fingerling data – based on the pricing experience of the numerous farmers in Andhra Pradesh – are representative of a broad market average.

The petitioners similarly assert that *Fishing Chimes* does not indicate how many farmers reported data, or what the volume was, for each kind of feed contained in the study.  Similar to our analysis above, we note that the study provided parameters regarding the feed conversion ratio (FCR) during the study period, in this case 1.35 to 1.46 kilograms of feed to one kilogram

---

[142] *Id.*

[143] *Id.*

[144] *See* Petitioners' Comments at 19.

[145] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(c).

[146] We calculated the number of piece of fingerlings by multiplying the average stocking density per hectare by the median average size per farm, then by the number of farms, and finally by the average harvest per year, *i.e.*, (2017 all months, 25,000 × 4 × 45 × 1.5 = 6,750,000 pieces); (2018 all months, 25,000 × 4 × 38 × 1.5 = 5,750,000 pieces); and (2018 POR months, 25,000 × 4 × 34 × 1.5 = 5,100,000 pieces).

of whole fish.[147]  Using the average FCR (1.405) along with the volumes of whole live fish above, the fish feed prices in the *Fishing Chimes* are based on approximately 12.7 million kilograms of feed in 2017 and 2018, and approximately 5.3 million kilograms of feed during the POR.[148]  By any measure, this is significant.

In the context of the *Fishing Chimes* whole live fish, fingerlings, and fish feed data, the petitioners attempt to introduce particular data requirements, such as an unidentified minimum number of respondents and particularized volume data.  These critiques are especially suspect here, where the survey was based on a large number of responses and covered a large volume of transactions indicating the representativeness of the *Fishing Chimes* data.

The petitioners next present several cursory arguments regarding the *Undercurrent News* data; they assert that there is no volume information or identification of the number of farmers interviewed (or details regarding their locations).[149]  Although the *Undercurrent News* database screenshots do not provide details on the individual survey respondents, with respect to the data series provided for whole live fish and fingerlings, the publication states:  "Data collected via interviews with farmers in all major producing regions."[150]  With respect to the data series provided for fish feed, the publication states:  "Data collected via interviews with feed mills in all major producing regions."[151]  The data themselves also provide no indication that the underlying volume might be inconsistent or otherwise lead to artificial price volatility; for example, the 2019 month-to-month prices for whole live fish range from 75-80 rupees/kg, and

---

[147] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-4(b) and SV-4(c).
[148] We calculated the volume of *pangasius* fish feed by multiplying the volume of whole live fish by the average FCR, *i.e.*, (2017/2018 all months, 9,028,200 × 1.405 = 12,684,621 kg); and (POR months, 3,753,600 × 1.405 = 5,273,808 kg).
[149] *See* Petitioners' Comments at 19-20.
[150] *See, e.g.*, Vinh Hoan's November 15, 2020 SV Submission at Exhibits FDSV-6, FDSV-9, and FDSV-10.
[151] *Id.* at Exhibits FDSV-7 and FDSV-8.

the prices for fingerlings range from 3.10 to 3.20 rupees/piece, or 4.00 to 4.20 rupees/piece, depending on size.

The petitioners also assert that the *Undercurrent News* datasets relied on here were outliers because "release of Indian pangasius prices were not regular or announced, unlike other prices reported by *Undercurrent News*."[152]  The record does not support this assertion.  The petitioners' citation to several press releases relating to other *Undercurrent News* datasets does not establish that the publication had a standard process for announcing all dataset releases or that, even if such announcements were typical, deviation from that practice would call the dataset into question.  We also note that the excerpts from the *Undercurrent News* website show that the company releases a large number of datasets.[153]  The petitioners' implication that – because the Indian *pangasius* datasets were limited in number, the underlying data were suspect – is without any basis.  For the vast majority of the data series topics shown on the website, the publication provided one or a small number of datasets; there is nothing anomalous about the Indian data in this regard.[154]

As noted in the underlying administrative review, and in these final results of redetermination, the Indian data unambiguously relate to the particular species in question, *i.e.*, *pangasius hypophthalmus* (or *patin siam* as it is known in Indonesia).  The Indonesian data are not exclusive to the species in question.[155]  An affidavit provided by the petitioners, from a government official at the Ministry of Marine and Fisheries - Directorate General of Aquaculture, states that the data "contained in the IAS {Indonesia government source} listed

---

[152] *See* Petitioners' Comments at 20.
[153] *See* Petitioners' Letter, "CFA Comments and Rebuttal Factual Information Pertaining to Vinh Hoan's November 15, 2020 Surrogate Value Submission and Response to Vinh Hoan's November 18, 2020 Pre-Prelim Comments," dated November 24, 2020 (Petitioners' Pre-Preliminary Comments), at Appendix 1.
[154] *Id*. at Appendix 2.
[155] *See, e.g.*, Petitioners' April 24, 2020 SV Submission at Exhibit 2-F (Attachment 2).

under the common name Patin (*Pangas Cat Fishes*) can contain data related to any of the …

subspecies; the data is not limited to *Pangasius Hypopthalmus*."[156]  Another affidavit states that

the "production of patin siam {*i.e.*, *pangasius*} is more dominant than the production of patin

jambal and patin pasopati … {but} we do not have any data on the percentage of such dominant

species."[157]  Yet another affidavit, also from a government official, states that "more than 90% of

pangasius farmers grow patin siam."[158]  Against this context, the petitioners emphasize that there

is another affidavit on the record from an industry expert who states that it is his "professional

opinion that 99% of the production volumes and values for pangasius data {from the IAS} …

represent *patin siam*."[159]  However, we see no basis to find that this proffered evidence is more

accurate or reliable than the information obtained from the various government sources

(including the agency involved in collecting the data).

 With respect to fingerlings, Commerce stated that the proposed Indonesia government

data were not contemporaneous and not size-specific for fingerlings over six inches in length.

The petitioners do not directly dispute either point but, with respect to the latter, they assert that

there are alternate Indonesian data for fingerlings of six to seven inches and seven to eight inches

on the record.[160]  However, such data are not favored, because they are based on price lists,

rather than from a published source, which often represent a starting point in negotiations rather

than a final price, and frequently do not reflect the experience of the market as a whole.[161]  This

---

[156] *Id*. at Exhibit 2-F (Attachment 2).

[157] *Id*. at Exhibit 2-F (Attachment 5).

[158] *Id*. at Exhibit 2-F (Attachment E).

[159] *See* Petitioners' November 13, 2020 SV Submission at Exhibit 3.

[160] *See* Petitioners' Comments at 21.

[161] *See Utility Scale Wind Towers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 24, 2012) (*Wind Towers from China*), and accompanying IDM at 12 ("Moreover, {Commerce} generally does not use price lists to value FOPs because (1) these prices often represent a starting point in a negotiation that could result in a significantly different final sale price and (2) price lists reflect the experience of a single producer rather than a broad market average."); *see also Certain Tissue Paper Products from*

preference has been consistently applied in Commerce's analysis of data for FOPs.[162]  (Indeed, in the underlying administrative review, the petitioners primarily proffered such data to corroborate the published government data.[163])  We acknowledge that the Indian data source for fingerlings over six inches in length relates solely to 2018.  Nonetheless, because such data overlap the 2018 portion of the POR (*i.e.*, the data are not available for 2019), and given that we have full POR data for the other fingerling sizes, we do not find that to be a significant distinction.  For these reasons, we do not find that the Indonesian fingerling data offer an advantage as compared with the Indian data.

With respect to feed, we stated that the proffered Indonesian data[164] are not contemporaneous with the POR and are only partially specific with regard to protein content. Although the petitioners do not dispute this characterization of the Indonesia published data, they again point to alternative data, *i.e.*, price lists, which provide contemporaneous values for the 22 percent feed and 26 percent feed.[165]  As above, the petitioners' pivot to the alternative data on the

---

the People's Republic of China:  Final Results and Partial Rescission of the 2007-2008 Antidumping Duty Administrative Review and Determination Not To Revoke in Part, 74 FR 52176 (October 9, 2009), and accompanying IDM at Comment 3 ("Price quotes are merely that, and may not reflect actual transaction values. Further, they are easily subject to manipulation and may be dependent on various factors not evident on the administrative record."); *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances:  Certain Polyester Staple Fiber from the People's Republic of China*, 72 FR 19690 (April 19, 2007), and accompanying IDM at Comment 7 ("When other usable and reliable information is available, it is the Department's practice to not use price quotes to value FOPs."); *Certain Cased Pencils from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 70 FR 42301 (July 22, 2005) (*Pencils from China*), and accompanying IDM at Comment 2; *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (CIT 2010) (*Bristol Metals*).

[162] *See Wind Towers from China* IDM at 12; *Pencils from China* IDM at Comment 2; and *Bristol Metals*, 703 F. Supp. 2d at 1376.

[163] *See* Petitioners' Pre-Preliminary Comments at 17-18 ("To be clear, {the petitioners'} propose{ that} Commerce use the MMAF data to value Vinh Hoan's fingerling inputs and offered the price lists *to support the published statistics*.  Nevertheless, Commerce could very well rely on the submitted price lists.") (emphasis added). Additionally, there is no basis to presume that these data are more representative than the alternative (Indian) data, as the affidavit simply states that the prices were based on information from "hatchery business actors."  *See* Petitioners' November 13, 2020 SV Submission at Exhibit 3 (response to interview question 13).  Elsewhere in the response, the affiant identifies various sources that contributed to his statements, only one of which is explicitly identified as a "hatchery business actor."  *Id.* (response to interview question 19).

[164] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-B.

[165] *See* Petitioners' Comments at 21.

record is unavailing; we do not find that the Indonesian price lists reflect a more reliable basis for surrogate valuation than the published Indian data.[166]  Accordingly, we continue to find that the Indian data are preferable for this SV.

The petitioners dismiss Commerce's statement that we have relied on *Fishing Chimes* and *Undercurrent News* in other instances, asserting that Commerce's reliance on these sources elsewhere is not indicative of their reliability in this segment.  Although we do not disagree with this proposition more generally, the fact that Commerce has relied on a publication in multiple proceedings[167] (*e.g.*, *Fishing Chimes*) and the fact that Commerce has previously provided extensive analysis regarding the reliability of the data[168] continues to support reliance on the sources here.

Commerce has considered certain flaws associated with the Indian SV data (from *Fishing Chimes* and *Undercurrent News*) and has considered the Indonesian data sources on the record.  On balance, we find that the Indian data provide a superior basis for valuing whole fish, fingerlings, and fish feed, which are three key production factors.

Commerce determined that the Indian financial statements were preferable, noting that the financial statements for Mulpuri, MMC Exports, and Ananda were all reliable.[169]  The petitioners urge us to disregard the MMC Exports statements because the record suggests that the

---

[166] The petitioners also assert that the Indian SV data for feed lack 2019 data at the 22 or 26 percent content level.  However, the Indian data (from 2018) are clearly more contemporaneous that the Indonesian government-sourced data from the petitioners, and the Indian data are from a preferable source as compared with the contemporaneous price list data proffered by the petitioners.  Thus, here too, we find that the Indonesian data offer no advantage.

[167] *See, e.g.*, *Warmwater Shrimp from China* IDM at 17 (valuing shrimp larvae using an article published in *Fishing Chimes*).

[168] *See, e.g.*, *Final Results of Redetermination Pursuant to Court Remand, Catfish Farmers of America, et al. v. United States* Consol. Court No. 20-00105, Slip Op. 22-38 (CIT April 25, 2022), dated August 23, 2022, available at https://access.trade.gov/Resources/remands/22-38.pdf (still on appeal); *see also Fish from Vietnam 2017-2018* IDM at Comment 2.

[169] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-15; and Petitioners' November 13, 2020 SV Submission at Exhibit 14.

company is engaged in limited processing activities.  Under the "Corporate Information" heading of the company financial statement, it reads:  "MMC Exports Limited is engaged in the business of processing and trading of marine products and allied activities."[170]  It was on this basis that Commerce drew its conclusion.  However, the petitioners observe that "Processing and Packing Expenses" during the period constitute a small percentage of total expenses, and also note that there is no inventory of unprocessed material ("Cost of Materials Consumed") at year end, suggesting that the company primarily buys and sell marine products rather than self-processes the merchandise.[171]  We cannot state with confidence the proportion of processing activities undertaken by MMC Exports, and we agree with the petitioners that record evidence on this point suggests limited processing.  To the extent that the MMC Exports statement has drawbacks in this regard, as we noted throughout these final results of redetermination, similar drawbacks are present in the context of the Indonesian Japfa statements, because aquaculture represents under 10 percent of its operations.[172]  Thus, we do not find, even assuming *arguendo* that the MMC Exports statements are primarily for a trader, that the Japfa statements provide a superior alternative.

Additionally, regarding the MMC Exports statements, the petitioners observe that the statements reflect a profit of 0.01 percent.  We do not agree with the implication that there is a minimum profit rate that is required (beyond being positive).  Commerce's practice is that zero or "negative" profit statements are disfavored; there is no minimum profit threshold requirement.[173]  The MMC Exports statement reflects a low profit rate, whereas the Ananda

---

[170] *See* Vinh Hoan's April 24, 2020 SV Submission at Exhibit SV-15(b).

[171] *See* Petitioners' Comments at 24.

[172] *See* Petitioners' November 13, 2020 SV Submission at Exhibit 8-B (Note 24. Net Sales).

[173] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 11349 (March 17, 2009), and accompanying IDM at Comment 1 (noting that Commerce's "preference … is to use the financial statements of companies that have earned a profit and disregard the financial statements of companies that have zero profit.").

statement, for instance, reflects a much higher rate.  Such differences are not unexpected; here, we used three statements in constructing an average to achieve the most accurate rate possible, based on the record evidence.

The petitioners next suggest that it is insignificant that the Dharma statement contains a note regarding the company's ability to continue as a going concern.  Commerce has previously found such notes to be relevant to our assessment of whether a financial statement serves as the best available evidence as a source of surrogate financial ratios.[174]  Therefore, here too, the going concern note is relevant to our assessment, even if it may not necessarily render the statement unusable, in the absence of more appropriate alternatives.

In light of these considerations, the only advantage offered by the Indonesian statements is that they cover the full POR, whereas the Indian statements cover eight months of the POR.  Given that all of the proffered statements (for either country) are contemporaneous and cover the majority of the POR, we do not find that this factor warrants a finding that the Indonesia statements are superior.

Regarding the labor SVs on the record, the petitioners emphasize that Commerce has acknowledged that the Indonesia data are superior for this FOP.  In particular, we noted above[175] that the Indian data are not contemporaneous, and we were required to inflate the figures to the POR.  The petitioners also suggest that it "is not clear" whether or not the Indian data are

---

[174] *See Certain Hardwood Plywood Products from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017- 2018*, 85 FR 77157 (December 1, 2020), and accompanying IDM at Comment 3 (noting that "the Company recorded negative operating cash flows … {and} the Company's current liabilities exceeded its current assets … .  These events or conditions indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern … .  In this review, given the concern raised by the auditor with respect to Megamas, and in light of other usable financial statements available on the record to calculate the surrogate financial ratios, we find Megamas' financial statements do not constitute the best available information.").

[175] *See* page 23, *supra*.

industry-specific.[176]  We agree that the exhibit does not specify this information. Notwithstanding the drawbacks of the Indian labor data, we stated that we continued to rely on that value, because, overall, the Indian data are preferable.  The petitioners assert that "there seems to be no valid reason for the agency to persist in using the Indian value for this particular FOP where {Commerce} concedes that the Indonesian one is better."[177]  On the contrary, there is a valid and well-established reason for doing so:  Commerce strongly favors selecting all SVs from a single country, to the extent possible, pursuant to 19 CFR 351.408(c)(2).  Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[178]  While we made such a finding with respect to a particular SVs here (*i.e.*, a by-product and boat freight SV), we do not find the facts similar in the context of the labor SV analysis, where there are less preferable, but usable, labor data on the record.

The petitioners also present two arguments regarding by/co-products.  In calculating Vinh Hoan's margin, we declined to use a certain Indian SV for fish oil because we found the value to be aberrational,[179] and the petitioners assert that a similar rationale applies to certain other Indian by/co-product values.  Specifically, the petitioners highlight that the Indian SV used for Vinh Hoan's frozen by-products (309.80 rupees/kg) was four times higher than the SV used for whole live fish (76.20 rupees/kg) and the fish meal co-product (100.82 rupees/kg) was substantially higher as well.  However, under the circumstances, this comparison – *i.e.*, contrasting the values on an equal weight basis – is improper.

---

[176] *See* Petitioners' Comments at 26.
[177] *Id*. at 27.
[178] *See, e.g.*, *Jiaxing Brother*, 961 F.Supp.3d 1326, 1332-33 (2014), *aff'd Jiaxing Brother CAFC*.
[179] *See Final Results* IDM at Comment 3.C.2.

In *An Giang*, cited by the petitioners,[180] the Court considered whether Commerce's decision to disregard a proffered SV for fish oil was unreasonable.  The Court explained:

> Commerce explained that this lack of specificity of the {Harmonized System (HS)} import data is concerning and significant on these facts, where the import data value is high relative to the main input, whole, live fish.  Given the price disparity between the {HS} data and the main input, Commerce determined that the {HS} data is more representative of refined than unrefined fish oil.[181]

The finding by Commerce in that case, and the Court's decision to affirm, was not based simply on a side-by-side comparison of the values but also was based on a consideration of the SV's specificity.  As the Court explained:  "Commerce did not determine that the value was inappropriate simply because its value was greater than the main input; instead, Commerce found the data inappropriate because of the high value *in combination with the fact that the heading contained refined fish oil where Vinh Hoan's fish oil is unrefined*."[182]  The Court did not directly opine on the interested party's assertion that "the correct inquiry is not the value of the byproduct but the value applicable to the amount of fish oil obtained from the FOPs used to obtain 1 kg of the subject merchandise, which will only be a fraction of {normal value}."[183]  This is significant, because Commerce has recognized that certain byproducts can be worth more, *on an equal volume basis*, than the underlying inputs.[184]  In this case, the fish meal by-products and frozen by-products have undergone different levels of additional processing, as compared with the whole fish input; additionally, whether considered individually or in conjunction with all other

---

[180] *See An Giang*, 317 F. Supp. 3d at 1311.
[181] *Id*.
[182] *Id*., 317 F. Supp. 3d at 1311 n2 (emphasis added).
[183] *Id*.
[184] *See, e.g.*, *Activated Carbon from China 2020-2021* IDM at Comment 2 ("Commerce determined that the value of the by-product should be capped at the SV for the main input, when the SV of the by-product exceeds the SV of the main input *and the record evidence indicates that a higher value for the by-product than the main input is not warranted*.  Further, Commerce's practice is to value {a by-product} with the {HS} category most representative of the input, and we have previously determined that where a by-product yields a higher value than the input, capping of the value of the SV at the value of the input is not warranted.") (internal citations omitted) (emphasis added).

by/co-products, their contribution to the total normal value figure demonstrates that they are not distortive here.[185]

Finally, the petitioners contend that the Indian import data that Commerce used to value Vinh Hoan's frozen by-products and fish meal were insufficiently specific, as the data relate to by-products from non-*pangasius* frozen fillets and "frozen fish paste," respectively.[186]  Although the HS subheading includes imports of merchandise that may be distinct from the by-products in question (*e.g.*, are not derived from the same species of fish), that is not dispositive as to whether the heading provides an appropriate basis for SVs.  It is hardly uncommon for an HS subheading to cover a wider set of items than the precise input/by-product that is used or generated by the respondent, despite the frequent use of trade data in SV-based margin calculations.[187]  In any case, the viability of these data must also be viewed against the backdrop of the alternative data submitted by the petitioners for these by-products, which are price lists/affidavits, that are disfavored for the reasons stated above.

In conclusion, throughout their comments, the petitioners essentially ask that we reweigh the evidence to favor certain SV selection criteria over others, in order to find the Indonesian data superior.  We decline to do so because, on balance, the surrogate criteria demonstrate that India offers the best information on the record for valuing SVs.  Additionally, even assuming *arguendo* that the Indonesian data and Indian data were equivalent, this would not change the result here, as Commerce has the discretion to choose between potential surrogate countries and can properly base such a decision on economic or other considerations.

---

[185] *See, e.g.*, Memorandum, "Final Results Analysis Memorandum for Vinh Hoan Corporation," dated October 13, 2023, at PDF page 182.
[186] *See* Petitioners' Comments at 28.
[187] Although we would prefer that the by-product (non-subject merchandise output) be as specific as possible, species is crucial for "inputs" to produce the subject merchandise, as it is a physical characteristic in the construct of the control number (also known as the "CONNUM").

## V.      FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Opinion*, we have further explained Commerce's surrogate country selection process and provided a revised analysis regarding the selection of India as the appropriate primary surrogate country in this review.  Based on the foregoing and in light of the record evidence as a whole, Commerce continues to find that its selection of India as the primary surrogate country was appropriate.

11/6/2023

X _____

Signed by: International Trade Administration

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance