NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>QMC FOODS, INC., *et al.*,<br><br>    Defendant-Intervenors. | Before: Hon. M. Miller Baker, Judge<br><br>Court No. 21-00380<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages 46-49 |

## <u>PLAINTIFFS' COMMENTS IN OPPOSITION TO THE REMAND RESULTS</u>

NON-CONFIDENTIAL VERSION

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC  20036
(202) 719-7000

***Counsel to the Catfish
Farmers of America and
individual U.S. catfish
processors America's Catch,
Inc., Alabama Catfish, LLC
d/b/a Harvest Select Catfish,
Inc., Consolidated Catfish
Companies, LLC d/b/a
Country Select Catfish, Delta
Pride Catfish, Inc., Guidry's
Catfish, Inc., Heartland
Catfish Company, Magnolia
Processing, Inc. d/b/a Pride of
the Pond, and Simmons Farm
Raised Catfish, Inc.***

Dated: December 21, 2023

Ct. No. 21-00380                                   NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................ 1

II.  BACKGROUND ............................................................... 2

III. ARGUMENT ..................................................................... 6

   A.  Commerce's Economic Comparability Analysis Requires
       Further Remand ......................................................... 6

   1.  Commerce's "Sequential" Methodology and Focus on
       Economic "Same"-Ness ............................................... 8

   2.  Commerce's Surrogate Country List and Its Assessment
       of the Economic Comparability of Indonesia and
       Vietnam ................................................................... 15

   3.  Conclusion ............................................................... 21

   B.  Commerce's Analysis of Indonesian and Indian Data is
       Flawed .................................................................... 21

   1.  Commerce's Valuation of the Main FOP ...................... 22

   2.  Commerce's Valuation of Financial Factors ................. 33

   3.  Commerce's Valuation of Labor and Other FOP ........... 40

   4.  Conclusion ............................................................... 50

IV.  CONCLUSION ................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Corp. v. United States,*
   Consol. Ct. No. 11-00451, slip op. 13-106
   (Ct. Int'l Trade Jan. 9, 2014) ............................................................... 45

*Albemarle Corp. v. United States,*
   27 F. Supp. 3d 1336 (Ct. Int'l Trade 2014) ......................................... 46

*Algoma Steel Corp. v. United States,*
   865 F.2d 240 (Fed. Cir. 1989) ................................................................. 9

*An Giang Fisheries Imp. & Exp. Joint Stock*
   *Co. v. United States,*
   317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018) ................................. 47, 48

*Boading Yude Chem. Indus. Co. v. United States,*
   25 CIT 1118, 170 F. Supp. 2d 1335 (2001) .......................................... 13

*Catfish Farmers of Am. v. United States,*
   No. 21-00380, slip op. 23-97
   (Ct. Int'l Trade July 7, 2023) ...................................................... *passim*

*Clearon Corp. v. United States,*
   No. 13-00073, slip op. 15-91
   (Ct. Int'l Trade Aug. 20, 2015)..................................................... 11, 12

*Clearon Corp. v. United States,*
   No. 13-00073, slip op. 16-110
   (Ct. Int'l Trade Nov. 23, 2016)...................................................... 10, 11

*Heze Huayi Chem Co. v. United States,*
   532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) ................................. 13, 14

*Jacobi Carbons AB v. United States,*
   313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ....................................... 11

*Juancheng Kangtai Chem. Co. v. United States*,
    Ct. No. 14-00056, slip op. 15-93 (Ct. Int'l Trade
    Aug. 21, 2015) ................................................................ 13

*NTSF Seafoods Joint Stock Co. v. United States*,
    No. 20-00104, slip op. 22-38
    (Ct. Int'l Trade Apr. 25, 2022) ........................... 24, 33, 34, 41

## Statutes

19 U.S.C. § 1677b(c)(1) ...................................................... 2, 42

19 U.S.C. § 1677b(c)(1)(B) ...................................................... 3

19 U.S.C. § 1677b(c)(4) ............................................... 3, 8, 9, 14

19 U.S.C. § 1677b(c)(4)(A) ............................................... 6, 15

## Regulations

19 C.F.R. § 351.408(c)(2) ........................................................ 3

Import Administration Policy Bulletin 04.1,
    *Non-Market Economy Surrogate Country Selection
    Process* (Mar. 1, 2004),....................................... 3, 15, 20, 42

## Administrative Materials

*Certain Activated Carbon from the People's Republic of
    China*, 87 Fed. Reg. 67,671 (Dep't Commerce Nov. 9,
    2022) ................................................................................ 45

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 86 Fed. Reg. 36,102 (Dep't Commerce July 8,
    2021) .................................................................................. 2

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21,
    2022) ................................................................................ 18

Ct. No. 21-00380                               NON-CONFIDENTIAL VERSION

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 72 Fed. Reg. 52,052 (Dep't Commerce Sept. 12, 2007) ..................................................... 37

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016) ..................................................... 43

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016) ..................................................... 44

*Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020) ..................................................... 38

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) ..................................................... 43

*Monosodium Glutamate from the People's Republic of China*, 79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) ..................................................... 44

Ct. No. 21-00380                                    NON-CONFIDENTIAL VERSION

# <u>GLOSSARY</u>

**CFA**

Catfish Farmers of America, et al.

**Dharma**

PT Dharma Samudera Fishing Industries Tbk

**FOP**

Factor of Production

**GNI**

Gross National Income

**IDM**

Issues and Decision Memorandum

**Japfa**

PT Japfa Comfeed Indonesia Tbk

**ME**

Market Economy

**NME**

Non-Market Economy

**OP**

Office of Policy

**POR**

Period of Review

**SV**

Surrogate Value

Ct. No. 21-00380                                   NON-CONFIDENTIAL VERSION

## I.   __INTRODUCTION__

On behalf of the Catfish Farmers of America and individual U.S.

catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a

Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC

d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish,

Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride

of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively,

"CFA"), we respectfully submit these comments in opposition to the

remand results issued by the U.S. Department of Commerce

("Commerce") on November 6, 2023. *See* Final Results of

Redetermination Pursuant to Court Remand (Nov. 6, 2023), ECF No.

69-1, P.R.R. 6, Appx_____-_____ ("Remand Results").[1] As detailed below,

Commerce's remand results do not adequately explain or support the

agency's selection of India as the primary surrogate country in the

2018-2019 administrative review of the antidumping duty order on

---

[1]      In this submission, CFA uses "C.R.R." and "P.R.R." to identify
documents listed in the confidential and public remand record indices
filed with the Court on November 20, 2023. *See* ECF Nos. 70-1 and 70-
2. CFA uses "C.R." and "P.R." to identify documents listed in the
confidential and public pre-remand record indices filed with the Court
on October 12, 2021. *See* ECF Nos. 22-1 and 22-2.

NON-CONFIDENTIAL VERSION

Vietnamese frozen fish fillets, and therefore should be remanded for a second time.

## II.   <u>BACKGROUND</u>

These remand proceedings arise from the 2018-2019 administrative review of an antidumping duty order on frozen fish fillets from Vietnam, a non-market economy ("NME"). *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't Commerce July 8, 2021) (final results admin. rev.), P.R. 552, Appx_____-_____, and accompanying Issues and Decision Memorandum, P.R. 540, Appx_____-_____ ("IDM"). Commerce calculates antidumping duty margins in NME cases by comparing the respondent companies' U.S. prices against proxy prices built from surrogate, market-economy values for (1) production inputs ("factors of production" or "FOPs"), (2) general expenses and profit, and (3) packing costs. 19 U.S.C. § 1677b(c)(1). In selecting surrogate values, Commerce is required to:

> utilize, to the extent possible, { } prices . . . in one or more market economy countries that are—
>
> > (A) at a level of economic development comparable to that of the nonmarket economy country, and
> >
> > (B) significant producers of comparable merchandise.

*Id.* § 1677b(c)(4). The agency "normally will value all factors in a single surrogate country" that complies with the statutory requirements. 19 C.F.R. § 351.408(c)(2). If more than one country meets those requirements, Commerce will rely on values from the country providing the highest quality data. Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004), https://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin"). In all cases, Commerce must rely on the "best available information." 19 U.S.C. § 1677b(c)(1)(B).

Commerce selected India as the primary surrogate country for the 2018-2019 review, over CFA's arguments that Indonesia should have been selected. *See, e.g.*, IDM at 14, 28, Appx_____. After CFA appealed, this Court remanded Commerce's surrogate country selection for further consideration. *Catfish Farmers of Am. v. United States*, No. 21-00380, slip op. 23-97 at 15-20 (Ct. Int'l Trade July 7, 2023) ("Slip Op. 23-97"). The Court held that Commerce had misapplied the statutory standard for assessing economic comparability between potential surrogate countries and the subject country. *Id.* Noting that the statute calls for Commerce to select a surrogate country at a level of economic

3

development "comparable" to that of the subject country, the Court
found that Commerce had incorrectly considered only countries at the
"same" level of development. *Id.* at 17-18. The Court also found that
Commerce failed to provide any "indication as to what criteria it
employs (other than looking to a range of {Gross National Income
("GNI")} chosen via unspecified means) to determine what constitutes
either 'the same' or 'a comparable' level of economic development." *Id.* at
18. The Court accordingly remanded for the agency "to conduct a new
analysis using the correct standard." *Id.* at 20.

Commerce issued draft remand results on October 4, 2023. Draft
Results of Redetermination Pursuant to Court Remand, *Catfish
Farmers of America v. United States*, Court No. 21-00380, Slip. Op. 23-
97 (Ct. Int'l Trade July 7, 2023), Certain Frozen Fish Fillets from the
Socialist Republic of Vietnam (Dep't Commerce Oct. 4, 2023), P.R.R. 1,
Appx_____-_____ ("Draft Results"). Commerce explained that it has a
"sequential" surrogate country selection process, in which it first
assesses the economic comparability of potential surrogate countries
before going on to consider whether potential surrogate countries have
significant production, etc. *Id.* at 7-14, Appx_____-_____. Commerce

then explained that it developed the list of economically-"same" countries that it used in selecting the primary surrogate country in the 2018-2019 review consistently with its normal process for developing such lists. *Id.* at 14-18, Appx_____-_____. Finally, Commerce explained that, even if it considered Indonesia economically comparable with Vietnam, it would not select Indonesia as the primary surrogate country, due to the superior data offered by India for the main FOPs, financial factors, and certain other FOPs. *Id.* at 18-24, Appx_____-_____.

CFA filed comments on the draft results, arguing that they neither adequately addressed the Court's concerns nor fairly assessed the Indian and Indonesian data for valuing whole live fish, fingerlings, feed, financial factors, labor, or co- and by-products. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Comments on Draft Results of Redetermination* (Oct. 13, 2023), C.R.R. 1, P.R.R. 5 at 3, Appx_____ ("CFA Draft Comments"). On November 6, 2023, Commerce issued its final remand results, continuing to select India as its primary surrogate country. *See* Remand Results at 1-2, Appx_____-_____.

## III.  **ARGUMENT**

This Court should remand Commerce's selection of India as the
primary surrogate country for a second time. Commerce's remand
results do not adequately explain or support the agency's conclusion
that Indonesia is not economically comparable with Vietnam. Further,
the agency has not adequately explained or supported its conclusion
that India provides superior data for valuing the main FOPs, financial
factors, labor, or co-/by-product FOPs.

### A.  **Commerce's Economic Comparability Analysis Requires Further Remand**

In remanding Commerce's selection of India as the primary
surrogate country, the Court found that by limiting its pool of potential
surrogate countries to only those countries that the agency deemed to
be at Vietnam's "same" level of economic development, Commerce
unlawfully strayed from the plain terms of 19 U.S.C. § 1677b(c)(4)(A).
Slip Op. 23-97 at 17-18, 20. The Court also found that the agency erred
in failing to explain the criteria it employs generally, or employed
specifically here, to determine the range of GNIs defining either the
"same" or "comparable" levels of development. *Id.* at 18-20.

As in its draft remand results, Commerce explains in its final results that it employs a "sequential" analysis in selecting a primary surrogate country, in which it first assesses the economic comparability of potential surrogate countries before going on to consider other factors. Remand Results at 7-14, 33-37, Appx_____-_____, Appx_____-_____. Commerce moreover asserts that—notwithstanding the Court's finding to the contrary—it has reasonably determined to consider only countries with the "same" level of economic development as the subject country as potential surrogate countries. *Id.* at 8-10, 32-37, Appx_____-_____, Appx_____-_____. The agency then purports to explain how its Office of Policy ("OP") develops surrogate country lists, and argues that its exclusion of Indonesia from the list used here—and selection of India as the primary surrogate country—was justified based on the relative GNIs of Indonesia, India, and Vietnam. *Id.* at 14-18, 37-39, Appx____-____, Appx____-____.

Commerce's explanations do not adequately address the Court's concerns. Commerce's discussion of its "sequential" methodology and defense of focusing on countries at the "same" level of economic development as the subject country do not establish the appropriateness

of its surrogate country selection process here. Further, Commerce has yet to adequately demonstrate, explain, or support the basis on which it determined that the range of GNIs here (and only that range) reflected countries at the "same" level of development as that of Vietnam, or its conclusion that Indonesia was not appropriately economically comparable with Vietnam during the 2018-2019 review period.

1. *Commerce's "Sequential" Methodology and Focus on Economic "Same"-Ness*

Commerce devotes substantial time to defending its use of a "sequential" analysis, in which it considers economic comparability before moving on to consider whether potential surrogate countries are significant producers of relevant goods and can provide good quality data. Remand Results at 7-14, 33-37, Appx_____-_____, Appx_____-_____. But the Court did not find fault with this aspect of Commerce's primary surrogate country selection methodology. Slip Op. 23-97 at 16-20. Rather, the Court found that the agency could not lawfully consider countries with only the "same" level of economic development as the subject country to be potential surrogates, given the plain language of 19 U.S.C. § 1677b(c)(4), and that the agency had moreover failed to

ground its economic comparability analysis in articulable standards. Slip Op. 23-97 at 16-20.

Nor has CFA challenged the precise order in which Commerce considered the statutory factors of 19 U.S.C. § 1677b(c)(4). Rather, CFA's argument has been that regardless of the order in which the factors are considered, the agency's economic comparability analysis must be statutorily sound and reasonable overall. *See, e.g.*, Mem. in Supp. of the Rule 56.2 Mot. For J. on the Agency R. Filed by Pls., CFA *et al.* (Feb. 11, 2022), ECF No. 34 at 12-18 ("CFA 56.2 Brief"). Commerce's emphasis on its authority to begin its primary surrogate country selection process with an analysis of economic comparability is thus largely—if not entirely—beside the point.

Commerce goes on to defend its "same"-level methodology, which the Court has held unlawful. Remand Results at 8-10, 32-37, Appx_____-_____, Appx_____-_____; Slip Op. 23-97 at 16-17. Commerce cites various judicial and administrative precedents in a bid to demonstrate the lawfulness of its approach, but these precedents are not binding. Remand Results at 8-10, 32-37, Appx_____-_____, Appx_____-_____; *see, e.g.*, *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir.

1989) (explaining that a judge of this Court is not bound by prior decisions issued by the other judges of the Court). Further, the cited precedents are not germane to the issue of whether Commerce here appropriately found Indonesia not economically comparable with Vietnam.

Commerce argues that in *Clearon Corp. v United States* the Court "squarely" affirmed Commerce's authority to limit its surrogate country selection analysis to countries with the "same" level of economic development as the subject country. Remand Results at 9-10, 33-34, Appx____-_____, Appx____-____; *see also Clearon Corp. v. United States*, No. 13-00073, slip op. 16-110 (Ct. Int'l Trade Nov. 23, 2016) ("*Clearon III*"). But the opinion, read fairly, reveals that the litigating parties accepted Commerce's "same"-level analysis implicitly. *Clearon III*, slip op. 16-110 at 5-19. As a result, while the Court "acknowledged that Commerce typically selects a country from the list of countries at the same level of economic development as the {subject} country," *id.* at 8, the Court was not required to opine on the statutory soundness of the agency's focus on "same"-level countries. Consistent with their acceptance of the "same"-level methodology, the parties opposing the

remand results in *Clearon III* focused their arguments on relative data quality and significant producer status. *Id.* at 5-19. Rather than attack the statutory soundness of Commerce's focus on "same"-level countries, they attacked the agency's treatment of economic comparability as a threshold issue, *i.e.*, what Commerce calls its "sequential" analysis. *Id.* That is not at issue here.

For that matter, in an opinion preceding *Clearon III*, the Court considered an earlier set of remand results in which "Commerce provided a reasonable explanation of how it generated the Surrogate Country List and selected the range of GNI's that qualify countries as proximate and 'economically comparable' to the PRC." *Clearon Corp. v. United States*, No. 13-00073, slip op. 15-91 at 8 (Ct. Int'l Trade Aug. 20, 2015). Similarly, *Jacobi Carbons AB v. United States* involved remand results in which Commerce explained at length the facts and analysis underlying its OP's identification of the specific "same"-level countries at issue in the relevant proceeding. Remand Results at 9-10, 33-34, Appx____-____, Appx____-____, discussing *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1316-18 (Ct. Int'l Trade 2018). Commerce has yet to provide such an explanation here, much less an

explanation that makes sense in the context of its prior treatment of Vietnam as economically comparable with Indonesia despite GNI differences of greater magnitude than were seen in the 2018-2019 review.

The other judicial precedents on which Commerce relies are no more supportive of its treatment of Indonesia as not being at the "same" level as, or otherwise appropriately economically comparable to, Vietnam. Remand Results at 7-9 nn.32-35, 33-37, Appx_____-_____, Appx_____-_____. The agency cites *Jiaxing Brother Fastener Co. v. United States* in support of its "sequential" analysis, which is not at issue here. *Id.* at 35, Appx_____. Nor, contrary to Commerce's implication, has CFA argued that Indonesia was required to be on the OP list simply because Indonesia had been on the list in the past. *See id.* Rather, the focus of CFA's challenge remains the agency's failure to provide a rational, supported, and statutorily-sound explanation for treating Indonesia as not appropriately comparable with Vietnam.

As for *Juancheng Kangtai Chemical Co.*, the Court there approved Commerce's consideration only of countries within a "narrow band" of GNIs as potential surrogates countries, but did not reach the question

of whether that specific range of GNIs was reasonable. *See Juancheng Kangtai Chem. Co. v. United States*, Ct. No. 14-00056, slip op. 15-93 at 8, 11-19 (Ct. Int'l Trade Aug. 21, 2015). The Court also found it significant that the plaintiff "argued foremost in its case brief for the use of countries that were on the OP List," waiting until late in the proceeding to submit FOP data from non-list countries for the agency's consideration. *Id.* at 17, 19. Similar facts are not present here.

Commerce cites *Boading Yude Chemical Industry Co. v. United States* for the proposition that it has substantial discretion to determine the "best information available" for surrogate valuation purposes. Remand Results at 36-37, Appx_____-_____, discussing *Boading Yude Chem. Indus. Co. v. United States*, 25 CIT 1118, 1125-26, 170 F. Supp. 2d 1335, 1343 (2001). But Commerce's discretion is bounded by its duty to make reasonable decisions supported by substantial record evidence. And as further detailed below, the agency's analysis of economic comparability here has yet to rise to that level.

As for *Heze Huayi Chemical Co. v. United States*, Commerce concedes that the case centered on the lawfulness of the "sequential" approach, but argues that by challenging the agency's determination

that Indonesia is not appropriately economically comparable with

Vietnam, CFA is undermining that approach. Remand Results at 37,

Appx____, discussing *Heze Huayi Chem Co. v. United States*, 532 F.

Supp. 3d 1301, 1318 n.9 (Ct. Int'l Trade 2021). This rejoinder makes no

sense. Simply put, Commerce's treatment of economic comparability as

a threshold issue does not insulate the substance of its comparability

analysis from scrutiny, either in general or as applied in a particular

case.

Commerce's reliance on administrative precedents is also

unpersuasive. Remand Results at 11-14, 37, Appx_____-_____,

Appx_____. Commerce's "sequential" consideration of the factors laid

out at 19 U.S.C. § 1677b(c)(4) is not at issue. And even if Commerce's

economic comparability methodology was lawful as a general matter

(and this Court has already found that it is not), these precedents do

not establish that the methodology was reasonable as applied here.

Finally, Commerce attempts to justify its "same"-level methodology

by explaining that "same"-level countries comprise the subset of

economically "comparable" countries that Commerce deems most

economically comparable with the relevant NME. Remand Results at 7

n.31 and 8, Appx_____-_____. But even taking this explanation at face value, the statute specifies that the appropriate standard is "comparable," not "same." Slip Op. 23-97 at 17-18; 19 U.S.C. § 1677b(c)(4)(A). For that matter, the Policy Bulletin observes that the Act "does not require that {Commerce} use a surrogate country that is at a level of economic development *most* comparable to the NME country." *See* Policy Bulletin.

Rather than demonstrating that its "same"-level analysis is statutorily appropriate, Commerce's remand results confirm that the agency has unlawfully narrowed its consideration of potential primary surrogate countries in a way that Congress did not intend. Further, even if Commerce were considered simply to be (inexplicably) using the word "same" to mean "comparable," with no narrowing of the latter term, this usage would not explain why Commerce deemed only the six countries included on the OP list for the 2018-2019 review to have the "same" level of economic development as Vietnam.

2.    *Commerce's Surrogate Country List and Its Assessment of the Economic Comparability of Indonesia and Vietnam*

Beyond finding that Commerce's "same"-level analysis unlawfully strays from the plain terms of 19 U.S.C. § 1677b(c)(4)(A), the Court

found that the agency erred in failing to explain the criteria it employs generally, or employed here, to determine the range of GNIs defining the "same" or "comparable" levels of development. Slip Op. 23-97 at 18-20. On remand, Commerce attempts to explain how its OP develops surrogate country lists, and provides certain information regarding the specific list that was used in the 2018-2019 administrative review. Remand Results at 14-18, 37-39, Appx_____-_____; Appx_____-_____.

Commerce states that it has developed a practice of deeming six countries, per period of review ("POR"), to be at the "same" level of development as the subject country, based on a "range of factors," such as "expected data quality," "economic diversity of the manufacturing sector," "specificity in the import data," and "whether {the} countr{ies are} experiencing civil unrest or extreme levels of inflation." *Id.* at 14-15, Appx_____-_____. The agency attempts to preserve "balance" by identifying three countries with GNIs higher than the subject country's, and three with GNIs lower. *Id.* at 15, Appx_____. Commerce explains that this methodology provides a consistent and "reasonably predictable process" that nonetheless recognizes that every segment of a proceeding is separate. *Id.* at 14-16, Appx_____-_____. The list is a "starting point"

for the parties; Commerce asserts that it will consider parties' proposals of alternative primary surrogate countries that have GNIs within (but not exceeding) the range represented in the existing list. *Id.* at 15-16, Appx____-____.  Commerce also explains that the fact that a country appears on one POR's list does not mean that it will, or must, appear on the lists developed in subsequent years. *Id.* at 16-17, Appx____-____.

As to the specific list used in the 2018-2019 review, the remand results incorporate a chart that plots Indian, Indonesian, and Vietnamese GNI between 2011-2019. *Id.* at 17, Appx____. Commerce asserts that based on the "tight proximity" between Indian and Vietnamese GNI over that time and "other considerations" identified "above," it reasonably considered India a "same"-level country for purposes of the 2018-2019 review. *Id.*[2] Commerce concludes that

---

[2]     India's 2011 per capita GNI was $1,410, compared with Vietnam's $1,260. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Comments on Surrogate Country List* (Apr. 9, 2020), P.R. 227-229 at 6-8 and Exhibit 1, Appx____-____ and Appx____-____ (placing on record the OP lists from prior administrative reviews). By 2018, Vietnam's per capita GNI was $2,400, while India's was $2,020. Letter from Robert Galuntucci to All Interested Parties, re: *Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (Apr. 2, 2020), P.R. 224-225 at 1 and Attachment 1, Appx____ and Appx____-____ ("Surrogate Country Memo"). The record source for the agency's 2019 GNI comparisons is not

because India "maintained a similar GNI to Vietnam through the POR," the country best satisfied Commerce's goal of selecting "a surrogate country that reasonably represents the market values that would be present in the NME country, if it were an ME country." *Id.* at 39.

The remand results do not meaningfully address the Court's concerns. Slip Op. 23-97 at 18, 20. While Commerce provides a generalized explanation of its process for identifying "same"-level countries, it neither identifies the specific factors beyond GNI (*e.g.*, "expected data quality," "economic diversity of the manufacturing sector," "specificity in the import data," etc.) that it considered in developing the list used here, or explain how those factors were assessed. Remand Results at 14-15, Appx____-____; *see also id.* at 17, Appx_____ (purporting to identify the specific factors considered in

---

entirely clear, as the OP list it used in this review was based on 2018 GNI. *Id.* However, Commerce's issues and decision memorandum in the 2019-2020 review indicates that Indonesia's 2019 GNI was 1.59 times that of Vietnam ($4,050 against $2,540), a slight reduction from the differential in 2018. Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21, 2022) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2019-2020) at 43.

developing the list for the 2018-2019 review "above."). The remand results also cite no record evidence supporting the agency's assessment of non-GNI factors as to Indonesia, India, or any other country. *Id.*

Beyond this, the remand results do not explain why Commerce considered the particular range of GNIs here (and only that range) as determinative of economic "same"-ness. The chart included in the remand results only underscores the problem. As an initial matter, while the agency cites the "tight proximity" between Indian and Vietnamese GNI as a reason for including India on the list, the chart shows Indian GNI moving from slightly above Vietnamese GNI to consistently below Vietnamese GNI. *Id.* Not only did Vietnam's GNI overtake India's, the magnitude of difference between the countries' GNIs widened while the difference between Indonesia's and Vietnam's GNIs narrowed. *Id.*; *see also* CFA 56.2 Brief at 16.

Further, while Commerce views Indonesia's 2018 GNI as too distinct from that of Vietnam's to merit Indonesia's inclusion on the list used here, Indonesia's 2018 GNI was closer to Vietnam's than in multiple prior reviews in which the agency treated Indonesia as appropriately comparable. In the 2010-2011, 2014-2015, 2015-2016, and 2016-2017

reviews, Indonesia was treated as economically comparable despite having a GNI between 1.66 and 2.35 times that of Vietnam's. CFA 56.2 Brief at 16. In 2018, Indonesia's GNI was just 1.60 times that of Vietnam's, and the difference narrowed further in 2019. *Id.*; *see also* n.2, *supra*. Yet Indonesia was not deemed to be at the "same" economic level as, or more properly, economically comparable with, Vietnam.

While Commerce cites the "similar" nature of India and Vietnam's GNIs over time as justifying its selection of India as the primary surrogate country, Remand Results at 18, Appx_____, it remains unclear why – and with what reasonable support – Commerce treated Indonesia as inappropriately dissimilar to Vietnam despite its GNI being closer to Vietnam's than in preceding reviews in Indonesia was considered appropriately comparable. Moreover, the Act "does not require that {Commerce} use a surrogate country that is at a level of economic development most comparable to the NME country{.}" *See* Policy Bulletin. Indeed, Commerce treats all countries on the OP list as being at the "same" level of development as the subject country, rather

than privileging the country with the most similar GNI. *See, e.g.*, Surrogate Country Memo at Attachment 1, pp.1-2, Appx_____-_____.[3]

### 3. *Conclusion*

Commerce has yet to adequately address the Court's concerns. Rather than abandon its statutorily infirm "same"-level analysis, Commerce has retained it. Nor has Commerce adequately explained – or justified – the manner in which it determined what constituted either the "same" or a "comparable" level of economic development generally, or in this review in particular. As such, further remand is required.

## B. Commerce's Analysis of Indonesian and Indian Data is Flawed

While concluding that Indonesia is not economically comparable with Vietnam, and thus is not a potential primary surrogate country, Commerce nonetheless analyzes the relative quality of the Indonesian and Indian data on the record for valuing the main FOP, financial factors, labor, and certain co/by-products. Remand Results at 18-25, 40-

---

[3]    Here, that included countries with GNIs ranging from $2,020 to $3,370. Surrogate Country Memo at Attachment 1, Appx_____-_____. Nor was the list comprised of the six countries with the GNIs closest to that of Vietnam. *See id.* (showing that Morocco, Ukraine, Ghana had 2018 GNIs closer to Vietnam's than certain countries on the list).

53, Appx_____-_____, Appx_____-_____. Commerce ultimately concludes

"that the Indian data are superior to the Indonesian data," and that

there is no basis to find otherwise. *Id.* at 18-19, 21, 24, 40, Appx_____-

_____, Appx_____, Appx_____, Appx_____. But as explained below,

Commerce's analysis is flawed.

### 1. *Commerce's Valuation of the Main FOP*

Commerce first compares the Indian and Indonesian data for valuing

the main FOP: whole live fish, fingerlings, and feed. *Id.* at 19-21, 40-48,

Appx_____-_____, Appx_____-_____. Commerce explains that it assesses

the relative quality of surrogate values ("SVs") based on a non-

hierarchical list of factors, "including whether the SVs are publicly

available, contemporaneous with the POR, representative of a broad

market average, tax- and duty-exclusive, and specific to the inputs." *Id.*

at 19, Appx_____. Commerce then finds Indian data "best meet" these

criteria and thus provide "superior" data for the main FOPs. *See id.*

Commerce explains that the Indonesian whole live fish data are not

"exclusively species-specific." *See id.* at 19-20, Appx____-____.

Commerce also finds that Indonesian data for fingerlings is non-

contemporaneous, only partially specific to size, and potentially non-

species specific, while Indian data covers the period from 2017-2019 and are species-specific. *Id.* at 20, Appx_____. With respect to feed, Commerce finds that Indonesian data are not contemporaneous and are only partially specific as to protein content, whereas Indian data are contemporaneous and "more closely match the respondent's protein content." *Id.* at 21, Appx_____. Commerce further notes that the Indian data are sourced from publications on which it has relied in multiple segments of this proceeding and elsewhere. *Id.*

Commerce fails to adequately explain or support its position. First and foremost, while the agency concludes that the Indian data used to value the main FOPs reflect broad market averages, it has failed to reasonably account for record information showing otherwise. Beyond this, it has yet to fairly assess the relative merits of the Indonesian and Indian data for valuing the main FOPs.

### a.   *Commerce Has Not Established That the Indian Data Reflect Broad Market Averages*

Commerce valued the main FOP based on data obtained from *Fishing Chimes* and *Undercurrent News*. The *Fishing Chimes* data consist of an article detailing the results of a private survey of 54 pangasius farmers in two districts of the Indian state of Andhra

Pradesh. Letter from Mayer Brown LLP to Sec'y Commerce, re: *Vinh Hoan Corporation – Surrogate Values* (Apr. 24, 2020), C.R. 188-201, P.R. 284-296 at Exhibits SV-4(b), SV4(c), Appx_____-_____, Appx_____-_____ ("VH April 24 Submission"). The Court remanded the use of this data in the 2017-2018 review over concerns that it did not reflect broad-market averages. *NTSF Seafoods Joint Stock Co. v. United States*, No. 20-00104, slip op. 22-38 at 41-48 (Ct. Int'l Trade Apr. 25, 2022) ("Slip Op. 22-38"). The same issues that led the Court to remand the 2017-2018 review are present here. *See, e.g., id.*; *see also* Letter from Mayer Brown LLP to Sec'y Commerce, re: *Vinh Hoan Corporation – Surrogate Country Comments* (Apr. 16, 2020), P.R. 253 at Exhibit 4, Appx_____-_____ (indicating that Andhra Pradesh accounted for 80% of 2017 Indian pangasius production, but that this amount fell to 60% by 2018).

Further, while the *Fishing Chimes* data are based on 108-question questionnaires sent to 54 study participants, not all participants responded to every question. VH April 24 Submission at Exhibit SV-4(c), English Translation at p. 4, Appx_____. For example, the whole live fish data reflect farm-gate prices from a maximum of eleven farmers monthly, and even then, for only one month of the August 2018

- July 2019 POR. VH April 24 Submission at Exhibit SV-4(b), p. 39,

Appx____; *id.* at Exhibit SV-4(c), p. 20 and English Translation at p. 8,

Appx_____ and Appx_____. Accordingly, even if the farms providing

prices for whole live fish were located in an Indian state that represents

a meaningful portion of India's pangasius production, Remand Results

at 42, Appx_____, too few farms provided data for Commerce to

reasonably conclude that the data for any month, or as a whole,

reflected broad market averages. CFA Draft Comments at 19,

Appx_____. Compounding the problem, *Fishing Chimes* data do not

indicate what volume of fish is reflected in the monthly prices; nor do

they provide participant numbers or volume data for fingerlings and

feed prices. *Id.*

Rather than appropriately confront these problems, the remand

results mischaracterize CFA's arguments. Remand Results at 40-41,

Appx_____-_____. CFA has not argued that eleven farms produced 83

harvests over two years, but that for the months within the POR, each

month's whole live fish prices are based on as few as two reporting

farms, and no more than eleven. CFA Draft Comments at 19,

Appx_____. Commerce rejoins that while no more than eleven farms

may have provided prices in any given month of the POR, 83 farms provided such prices in total, including 34 farms during the POR. Remand Results at 40-41, Appx_____-_____. To reach this conclusion, Commerce appears to have added up the number of reporting farms for each month in 2017 and 2018, while simultaneously assuming that no farm provided data in more than one month. But its interpretation makes no sense, given (1) the study's identification of a maximum of 54 surveyed farms, and (2) Commerce's own assumption that each reporting farm had three harvests apiece across 2017-2018. VH April 24 Submission at Exhibit SV-4(b), p. 35, Appx____; *id.* at Exhibit SV-4(c), English Translation at pp. 1-2, Appx_____, Appx_____-_____; Remand Results at 41, Appx_____. And while Commerce finds the lack of pricing data for certain months not "suspect," Remand Results at 41, Appx_____, it further undermines the agency's conclusion that the data reflect broad market averages.

Commerce attempts to address the *Fishing Chimes* pricing data's lack of volume information with highly dubious estimates. Remand Results at 41-44, Appx_____-_____. For example, Commerce assumes that every farm reporting whole live fish prices had a size, productivity,

and harvesting frequency that equaled the study average. *Id.* at 41-42,

Appx_____-_____. Commerce relies on a similar set of assumptions to

estimate the coverage of the study's fingerings and feed data. *Id.* at 43-

44, Appx_____-_____. These multi-layered exercises in speculation do

not amount to substantial evidence, particularly given that the *Fishing*

*Chimes* data reflect only the subset of respondents that deigned to

respond to any particular question in the survey.

    The *Undercurrent News* data suffer from similar problems, which

the agency has also not adequately considered or addressed. There is no

volume information for any of the data sets, making it impossible to

determine how much trade the prices represent. Letter from Mayer

Brown LLP to Sec'y Commerce, re: *Vinh Hoan Corporation – Final*

*Direct Surrogate Values* (Nov. 15, 2020), P.R. 457-463 at Exhibits

FDSV-6 – FDSV-10, Appx_____-_____. Nor is there any identification of

the number of farmers/mills interviewed or their locations. *Id.*

    The data also show evidence of irregular collection and release, as

well as being unusually specific to both the review period and the main

FOP relative to other pricing data provided by *Undercurrent News*. For

example, while Vietnam is a major producer of pangasius, the

*Undercurrent News* portal provides no data on Vietnamese feed or fingerlings prices. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief of the Catfish Farmers of America, et al* (Feb. 3, 2021), C.R. 617, P.R. 510 at 26-27 and Attachment B, Appx_____-_____, Appx_____-_____ ("CFA's Case Brief"); Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *CFA Comments and Rebuttal Factual Information Pertaining to Vinh Hoan's November 15, 2020 Surrogate Value Submission and Response to Vinh Hoan's November 18, 2020 Pre-Prelim Comments* (Nov. 24, 2020), P.R. 480-484 at 11-12 and Appendices 1 and 2, Appx_____-_____ and Appx_____-_____ ("November 24 Cmts").

Commerce waves these issues aside, noting that the *Undercurrent News* pricing portal indicates that the data were collected via interviews with farmers and feed mills in "all major producing regions." Remand Results at 44-45, Appx_____-_____. Commerce further states that the pricing data is relatively stable, indicating a lack of variability in the number of monthly survey respondents. *Id.* Commerce also concludes that the record indicated that there was nothing unusual

about the frequency of the data's release, and that the "limited" number of Indian *pangasius* datasets is not suspect. *Id.*

These defenses are unavailing. Without volume data or even an indication of how many survey participants there are, Commerce has no way of knowing whether the prices reflect a meaningful breadth of trade. Lack of volatility in the pricing data also says nothing about the number of participants or volume of trade. Commerce does not meaningfully confront the oddly lagging release of the data (release in October of 2020 of data only through January of that year). As for the "limited" number of Indian pangasius datasets, this was never CFA's concern. Rather, CFA pointed out that the Indian data sets were unusually specific to the main FOP and the review period. *See, e.g.*, November 24 Cmts at 11-12, Appx_____-_____. In any event, Commerce has yet to support its conclusion that the Indian data reflect broad market averages and are otherwise reliable.

  b.  *Commerce Has Not Otherwise Fairly or Reasonably Assessed the Indonesian and Indian Data for Valuing the Main FOPs*

As discussed above, Commerce's failure to address the *Fishing Chimes* and *Undercurrent News* data's unreliability and lack of breadth

renders the remand results' analysis of the SVs for the main FOPs fatally flawed. Further, Commerce's reasons for finding the Indonesian SV data for these inputs inferior do not withstand scrutiny.

Commerce finds that the Indonesian data for whole live fish and fingerlings are not input-specific, because Indian governmental fisheries statistics cover certain species in addition to *pangasius hypophthalmus*. Remand Results at 19-20, 45-46, Appx_____-_____, Appx_____-_____. While conceding that there is record evidence indicating that *pangasius hypophthalmus* is the "dominant" species reflected in the statistics, Commerce finds that evidence either speculative or unconvincing. *Id.* But it fails to acknowledge the lack of any evidence indicating that *pangasius hypophthalmus* is *not* predominately represented in the statistics. Indeed, the record evidence agrees that it is. *See* CFA's Case Brief at 31-32, Appx_____-_____ (summarizing record evidence); Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Surrogate Country Selection Comments* (Apr. 16, 2020), C.R. 170-187, P.R. 234-252 at Exhibit 7-I, Attachments 3 and 5, Appx_____-_____, Appx_____-_____ (Letter to MMAF and responsive letter from MMAF Director General  confirming that while

the statistics reflect several pangasius subspecies, *pangasius hypotphthalmus* is predominant subspecies raised in the country and the data mainly reflect fish raised through the methods most common to *pangasius hypotphthalmus*); Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *CFA Pre-Preliminary Surrogate Value and Factual Information Submission* (Nov. 13, 2020), P.R. 444-456 at Exhibit 3, Appx_____ (industry expert attesting that the statistics for fish and fingerlings are 99% related to *pangasius hypotphthalmus*) ("CFA Nov. 13 Submission"); Letter from Cassidy Levy Kent (USA) LLP, re: *CFA Additional Pre-Preliminary Surrogate Value and Factual Information Submission* (Nov. 16, 2020), P.R. 464-468 at Exhibit, Attachment 3, English Translation at p. 3, Appx_____ (2020 affidavit of Indonesian fisheries official confirming that *pangasius hypophthalmus* is the "predominant" species cultivated in Indonesia).

Commerce acknowledges that Indonesian SV data covers fingerlings both below and above 6" in length, but criticizes the data for fingerlings above 6" as based on price lists. Remand Results at 20, 46, Appx_____, Appx_____. The agency similarly criticizes Indonesian SV data for feed with the 22% and 26% protein used by the mandatory respondent here

as based on price lists. *Id.* at 21 n.71, 47-48, Appx_____, Appx_____-

_____.

Commerce explains that it is reluctant to rely on price lists because

they may not reflect "final" prices or "the experience of the market as a

whole." *Id.* at 46, Appx_____. But this is primarily a complaint that such

data may not reflect broad market averages. Given that Commerce has

not reasonably established that the Indian data reflect such averages or

are otherwise reliable, Commerce's basis for finding the Indonesian

data inferior is inadequate. Commerce also does not squarely grapple

with the Indian surrogate data's lack of 2019 information on feed at

either a 22% or 26% content. Remand Results at 21, 46-47, Appx_____,

Appx_____-_____.

While acknowledging that the *Undercurrent News* data—its only

source for Indian fingerlings values in 2019—does not cover fingerlings

over 6", Commerce finds this insignificant because it has 2018 data

from *Fishing Chimes. Id.* at 47, Appx_____. Again, however, Commerce

has not established that the *Fishing Chimes* data reflect broad market

averages. Nor can Commerce establish the reliability of either that data

or the *Undercurrent News* data on the basis that it has used these

sources before. The use of both data sources in other segments of this proceeding has been continuously questioned and challenged, and the Court has previously remanded Commerce's reliance on *Fishing Chimes* data. Slip Op. 22-38 at 41-48; *see also Catfish Farmers of America v. United States*, Ct. No. 22-00125 (CFA's challenge to the use of the *Fishing Chimes* and *Undercurrent News* data in the 2019-2020 administrative review).

Importantly, even if the Indonesian data for the main FOP are imperfect, the agency has yet to fairly assess the relative quality of those data in light of the Indian data's unreliability and lack of breadth. Simply put, the agency cannot undertake a fair and reasonable assessment of the Indian and Indonesian data sources without evenhandedly acknowledging the Indian data's flaws. Viewed in the context of the whole record, the Indonesian data provide more reliable SV data for the main inputs, based on broad-market averages. The Indian data, by contrast, are both unreliable and lacking in breadth.

2.   *Commerce's Valuation of Financial Factors*

On remand, Commerce finds that the record regarding financial factors favors India's selection as the primary surrogate country.

33

Remand Results at 21-23, 48-50, Appx_____-_____, Appx_____-_____.

Commerce finds that the record contains three contemporaneous Indian

financial statements, all from "companies {that} substantially engage{}

in the processing and sales of frozen seafood products." *Id.* at 21-22,

Appx_____-_____. Although it deems the Indonesian statements neither

unusable nor unreliable, the agency concludes that they are both fewer

in number than the Indian statements and have other flaws. *Id.* at 22,

Appx_____. Commerce's analysis once again shows a lack of even-

handedness. Specifically, the agency ignores palpable flaws in the

Indian statements, while adducing flimsy bases for finding the

Indonesian statements inferior.

 First, while Commerce applauds the contemporaneity of the Indian

statements, those statements were only partly contemporaneous with

the review period, covering August 2018 - March 2019. IDM at 30,

Appx_____; CFA Nov. 13 Submission at Exhibit 14, Appx_____-_____,

VH April 24 Submission at Exhibit SV-15, Appx_____-_____. By

contrast, the Indonesian statements covered the entirety of the POR.

Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce re:

*Submission of Proposed Surrogate Factor Values* (Apr. 24, 2020), P.R.

255-282 at Exhibits 12-A and 12-D, Appx_____-_____, Appx_____-_____

("CFA April 24 Submission"); CFA Nov. 13 Submission at Exhibits 8-A

and 8-B, Appx_____-_____.

Further, while Commerce describes the Indian statements as

uniformly relating to "companies {that} substantially engage{} in the

processing and sales of frozen seafood products," evidence for this

conclusion is lacking, and Commerce fails to meaningfully confront

evidence undermining the conclusion. Remand Results at 22,

Appx_____. Most pertinently, and as CFA pointed out in its comments

on the draft remand results, the financial statement of MMC Exports

Limited ("MMC") shows no possession of relevant production assets

such as deep freezers. VH April 24 Submission at Exhibit SV-15(b)

("Note – 5"), Appx_____. The statement also describes MMC's

"principal" activity as "retail sale of food in specialized stores,"

accounting for 100% of revenue. *Id.* at Exhibit SV-15(b) ("Extract of

Annual Return – Principal Business Activities of the Company"),

Appx_____. Consistent with this description, the statement reflects

minimal processing expenses; just 0.15% of the company's 2019 and

0.13% of the company's 2018 expenses related to "processing and

packing" taken together. *Id.* at Exhibit SV-15(b) (Statement of Profit

and Loss, Section IV), Appx_____-_____. The statement also reflects no

opening or closing stock in the schedule of consumed materials – only

purchases. *Id.* at Exhibit SV-15(b) (Note – 9), Appx_____. Rather than

supporting the conclusion that MMC is "substantially engage{d} in the

processing and sales of frozen seafood products," the financial statement

indicates that the company simply buys and resells at retail, making it

an inappropriate financial proxy for a frozen seafood processor like Vinh

Hoan here.

In the final remand results, Commerce concedes that the MMC

statement reflects "limited" processing, but argues that this makes the

company no different than PT Japfa Comfeed Indonesia Tbk ("Japfa").

Commerce criticizes Japfa's statements as indicating that

"Aquaculture" represents a relatively small portion (10%) of its overall

business, which is that of a producer and processor of a wide variety of

agricultural goods, including animal feeds, poultry and beef. Remand

Results at 22, 48-49, Appx_____, Appx_____-_____; *see, e.g.*, CFA April

24 Submission at Exhibit 12-D (Summary Schedule of Japfa 2018

statements and 2018 Annual Report at pp. 44, 72-73), Appx_____,

Appx_____-_____. But there is a clear difference between a company like

Japfa, which is clearly engaged in seafood processing—albeit as part of

its larger agricultural production and processing portfolio—and a

company like MMC, which appears to engage in only the most minimal

processing, if it processes at all. Commerce's treatment of the two

companies as equivalent is unexplained and unsupported.

Commerce also does not adequately explain its lack of concern over

MMC's 0.01% profit rate. Remand Results at 49-50, Appx_____-_____;

VH April 24 Submission at Exhibit SV-15(c), Appx_____. It is not

readily apparent why a profit rate of 0.01% appropriately "account{s} for

the interconnectedness of {} overhead and SG&A," and thus reflects

reliable and appropriate surrogate financial information. Issues and

Decision Memorandum accompanying *Certain Frozen Warmwater*

*Shrimp from the Socialist Republic of Vietnam*, 72 Fed. Reg. 52,052

(Dep't Commerce Sept. 12, 2007) (final results of the first antidumping

duty admin. rev. and first new shipper rev.) at cmt. 2B.

Nor has Commerce appropriately explained or supported its concern

over a note in the financial statements of PT Dharma Samudera

Fishing Industries Tbk ("Dharma"). Commerce observes that although

containing an unqualified auditor's opinion, the 2019 statements include a note regarding the company's ability to continue as a going concern. Remand Results at 22, Appx_____. Commerce asserts that it has previously found such notes relevant to its consideration of whether a particular financial statement is an appropriate source of surrogate financial ratios. *Id.* at 50, Appx_____ (citing Issues and Decision Memorandum accompanying *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020) (final results of antidumping duty admin. rev.; 2017-2018) at cmt. 3 ("*Hardwood* IDM")).  A comparison of the facts here with those of the plywood case is instructive.

In the plywood case, the relevant company "recorded negative operating cash flows." *Hardwood* IDM at 21-22. Further, its "current liabilities exceeded its current assets." *Id.* Neither factor is present here. Indeed, the auditor's report shows that Dharma had positive cash flow in both 2018-2019; the report also shows that the company achieved net profitability in both years and that its management believes it will continue to deliver positive results. CFA Nov.13 Submission at Exhibit 8-A, Auditor's Report at Consolidated Statement

of Cash Flows & Note 37 ("Going Concern"), Appx_____ and Appx_____;

*see also id.* at Exhibit 8, Appx_____ (indicating 1.94% 2018 profit ratio

for the company, and 2019 profit ratio of 2.56%). Current assets

exceeded current liabilities in both years. *Id.* at Exhibit 8-A, Auditor's

Report at Consolidated Statement of Financial Position, Appx_____-

_____. Beyond this, total assets in 2019 were 391,479,346,685 rupiah,

while total assets in 2018 were 404,997,860,246 rupiah, far exceeding

the company's "accumulated deficits" of 92,141,303,468 rupiah, or the

total liabilities in either 2018 or 2019. *Id.* at Exhibit 8-A, Auditor's

Report at "Emphasis of Matter" and Consolidated Statement of

Financial Position), Appx_____, Appx_____-_____. Commerce's concern

regarding the note appears unwarranted, especially given its apparent

unconcern for MMC's 0.01% profit margin.

Commerce also cites the fact that there are more Indian (three) than

Indonesian (two) statements as a point in India's favor. Remand Results

at 22-23, Appx_____-_____. But as noted above, the record indicates that

MMC's statement, at least, should not be under consideration.

Moreover, the Indonesian statements cover the entirety of the POR. All

told, Commerce's assessment of the relative virtues of the Indonesian

and Indian data for valuing financial factors is unsupported and
inadequately explained, and lends no support to its selection of India as
the primary surrogate country.

### 3.   *Commerce's Valuation of Labor and Other FOP*

Next, the remand results consider the Indian and Indonesian data
regarding labor and other FOP. The agency concedes that the
Indonesian labor data are "better" than the data on the record for India.
Remand Results at 23, Appx_____. However, it does not find this to be a
reason to select Indonesia as the primary surrogate country or even
simply to use Indonesian data to value labor, reasoning that once the
Indian data are inflated to account for their extreme non-
contemporaneity, they are not "anomalous." *Id.* at 23-24, 50-51,
Appx_____-_____, Appx_____-_____. Commerce also states that while
Indonesia provides the best SV for by-product fish oil (which it relied
on), Indonesian data are not better than Indian data for other by- or co-
products and, in fact, Indian data are in some cases superior. *Id.* at 24,
51-53, Appx_____, Appx_____-_____.

Once again, Commerce has failed to consider the record
evenhandedly, or to explain or support its conclusions.

Regarding the labor data, Commerce concedes that the Indonesian information "fare{s} better," yet concludes that it should not even rely on that data solely for valuing labor, given its regulatory preference of valuing all FOP in a single country. *Id.* at 23, 50-51, Appx_____, Appx_____-_____. But not only is the Indian data woefully out of date (a fact that led the Court to remand the use of the data in the 2017-2018 review), they are not clearly industry-specific, unlike the Indonesian data, which is both contemporaneous with the review period and specific to "agriculture" and "manufacturing" workers. Slip Op. 22-38 at 48-49; VH April 24 Submission at Exhibit SV-9, Appx_____-_____; CFA April 24 Submission at Exhibit 9, Appx_____-_____. And although Commerce concludes that its inflated Indian data are not anomalous, it supports its finding simply by comparing the contemporaneous, specific Indonesian value of $0.71/hr. with the inflated Indian value of $0.90/hr. Remand Results at 23-24, Appx_____-_____. Why the comparison inherently indicates a lack of anomaly in the Indian value is not apparent. More to the point, there seems to be no valid reason for the agency to persist in using the Indian value for this particular FOP where it concedes that the Indonesian one is "better," particularly given

its duty to seek the "best available information" for each FOP, and its policy of relying on non-primary country data where it is of higher quality. 19 U.S.C. § 1677b(c)(1); *see also* Policy Bulletin.

Finally, on remand, Commerce finds that the record regarding by-products/co-products favors India's selection as the primary surrogate country. Remand Results at 24, 51-53, Appx_____, Appx_____-_____. While recognizing that Indonesia has a superior SV data for fish oil, Commerce finds that the remaining Indonesian SVs for by-products are either equivalent or inferior to those from India. *Id.* In support of this conclusion, Commerce states only that "Indian data for certain by products are superior as they are from publications or subscription services (*i.e.,* *Fishing Chimes*/GTA) rather than price quotes." *Id.* at 24, Appx_____. As with other inputs, Commerce's analysis of the by-product SVs is uneven, unsupported, and unexplained, as the agency summarily dismisses the Indonesian data and fails to acknowledge the inherent flaws in the India data. *See* Remand Results at 31, Appx_____.

As explained in CFA's comments on the draft remand, the record shows that the Indian SVs for certain by-products/co-products are unreasonable. Notably, the Indian SV for Vinh Hoan's frozen by-

Ct. No. 21-00380                           NON-CONFIDENTIAL VERSION

products[4] (309.80 Rs./kg) is more than four times the Indian SV for the

input from which the by-product is generated, *i.e.*, whole live fish (76.20

Rs./kg).  Final Analysis Memo at Attachment 1, Appx_____. The Indian

SV for Vinh Hoan's fish meal co-product (100.82 Rs./kg) is likewise

substantially higher than the whole live fish SV. *Id.*

Commerce "has a long-standing practice of rejecting or capping the

by-product SV in instances where the by-product SV exceeds the SV of

the product from which it was derived." Issues and Decision

Memorandum accompanying *Certain New Pneumatic Off-the-Road*

*Tires from the People's Republic of China*, 80 Fed. Reg. 20,197 (Dep't

Commerce Apr. 15, 2015) (final results of antidumping admin. rev.;

2012-2013) at 52; *see also Certain Frozen Warmwater Shrimp from the*

*Socialist Republic of Vietnam*, 81 Fed. Reg. 62,717 (Dep't Commerce

---

[4]     Frozen by-products include frozen fish stomach, frozen fish fin,
frozen fish skin, and frozen fish broken meat. *See* Letter from Mayer
Brown LLP to Sec'y Commerce, re: *Frozen Fish Fillets from the*
*Socialist Republic of Vietnam: Vinh Hoan Corporation – Section D*
*Questionnaire Response* (Jan. 30, 2020), C.R. 96-105, P.R. 172 at 31-32,
Appx_____-_____ ("Vinh Hoan Sec. DQR"). The same SV was used to
value each of these frozen by-products. *See* Memorandum from Javier
Barrientos to The File, re: *Final Results Analysis Memorandum for*
*Vinh Hoan Corporation* (June 25, 2021), C.R. 632, P.R. 542 at
Attachment 1, Appx_____ ("Final Analysis Memo").

43

Sept. 12, 2016) (final results of antidumping admin. rev.; 2014-2015) at 58. Indeed, the agency has recognized that a "by-product *by definition* is less valuable than the input from which it is derived." Issues and Decision Memorandum accompanying *Monosodium Glutamate from the People's Republic of China*, 79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) (final deter. of sales at less than fair value and the final affirmative deter. of critical circumstances) at 21 (emphasis added) ("*Glutamate* IDM"). As a result, Commerce has found that, unless there is "evidence that the by-product is a value-added by-product, assigning a by-product a value that is higher than the value of the input from which it is derived *is unreasonable.*" *Id.* at 21 (emphasis added); *see Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016) (final results of AD admin. rev.; 2014-2015) at 58 ("{C}onsistent with our practice, we find it unreasonable to assign a higher value to a waste product, such as heads and shells, than to its input product, a whole shrimp.").

Here, the significantly higher SVs renders the Indian data for these by/co-products unreasonable. Commerce, however, argues that it has in

some cases recognized that a by-product can be valued higher than the original input. Remand Results at 52, Appx_____. But this is the exception, not the rule, and it does not apply here. As the agency has explained, it only uses a by-product SV that exceeds the main input SV only where the record affirmatively demonstrates that such an outcome is reasonable. *Glutamate* IDM at 21.

Indeed, in the case that Commerce cites in its remand results, Remand Results at 52, Appx_____, the agency found that a higher SV for a by-product was warranted only after identifying specific record evidence showing that the by-product was value-added to an extent that rendered a higher price reasonable. Issues and Decision accompanying *Certain Activated Carbon from the People's Republic of China*, 87 Fed. Reg. 67,671 (Dep't Commerce Nov. 9, 2022) (final results of the antidumping duty admin. rev.; and final deter. of no shipments; 2020-2021) at 11-12. Where the record does not support such a conclusion, a higher by-product SV is inappropriate. *See* Final Results of Redetermination Pursuant to Court Remand, *Albemarle Corp. v. United States*, Consol. Ct. No. 11-00451, slip op. 13-106 (Ct. Int'l Trade Jan. 9, 2014) at 8-10 ("CCT did not report that the by-products undergo any

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

further manufacturing or any other treatment, such that higher values than that of the main input may be considered reasonable SVs.  Thus, nothing on the record indicates that the SVs for these byproducts should exceed the SV for the main input."), *aff'd*, 27 F. Supp. 3d 1336 (Ct. Int'l Trade 2014).

Commerce undertook no such analysis here. Commerce asserts that "the fish meal by-product and frozen by-products have undergone different levels of additional processing, as compared with the whole fish input{.}" Remand Results at 52, Appx_____. Yet, the agency points to no record evidence to support this conclusion, much less evidence showing that any processing is sufficient to increase value to the point reflected in the Indian SV. *Id.*

Further, Commerce's unexplained and unsupported statement does not withstand scrutiny. Notably, Vinh Hoan's reporting shows that broken meat and fish skin, fin, and stomach [

] and Vinh Hoan did not report any additional materials, labor, or energy associated with these by-products. Vinh Hoan Sec. DQR at 29-32 and Exhibit 6, Appx_____-_____, Appx_____-_____. Commerce did not identify these by-products as

being further processed in its preliminary SV memorandum.

Memorandum from Javier Barrientos to The File, re: *Surrogate Values for the Preliminary Results* (Dec. 15, 2020), P.R. 498 at 6, Appx_____ ("Preliminary SV Memo").  While fish meal did undergo some additional processing, Vinh Hoan reported only the consumption of power and labor [                    ] in conjunction with this processing.[5] Vinh Hoan Sec. DQR at 30 and Exhibit 4 (tabs "ELECoP" and "LABORCoP"), Appx_____, Appx_____-_____. Commerce has failed to provide any discussion or explanation of how this renders a substantially higher fish meal SV reasonable. Remand Results at 52, Appx_____.

Moreover, the Court has recognized that Commerce reasonably rejects SV data where a disparity between the by-product value and the input value raise questions as to the reasonableness of the former. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304, 1311-12 (Ct. Int'l Trade 2018). Commerce dismisses this case because, in *An Giang*, Commerce had considered both the value

---

[5]     Specifically, Vinh Hoan reported that it utilized [

]. Vinh Hoan Sec. DQR at Exhibit 4 (tabs "ELECCoP" and "LABORCoP"), Appx_____-_____.

and the specificity of the by-product SV at issue. Remand Results at 52, Appx_____. But this does not distinguish *An Giang* from the present case, as the same lack of specificity is present here. *See* CFA 56.2 Brief at 34. Indeed, Commerce acknowledges the lack of specificity, yet then summarily dismisses it by concluding that this "is not dispositive as to whether the heading provides an appropriate basis for SVs." Remand Results at 52, Appx_____. This misses the point. An examination of the record as a whole—which shows that the Indian SVs for certain by-products are not specific to the inputs at issue and are substantially higher than the input from which they are derived—demonstrates that the Indian data are unreasonable SVs. Commerce does not address this.

Commerce also asserts that the fish meal and frozen by-products "are not distortive here" in light of "their contribution to the total normal value figure . . . ." *Id.* at 52-53, Appx_____-_____. Here, too, Commerce fails to explain its conclusion. For example, Commerce provides no discussion of how it determined whether an input's "contribution" to normal value was significant enough to be distortive. This is particularly problematic given record evidence that undermines Commerce's conclusion. Notably, the record shows that, for [

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

]. Final

Analysis Memo at Attachment 3, pdf p. 46, Appx_____.[6] Thus, it is not

self-evident that—and Commerce has not explained how—unreasonable

SVs for these inputs would not be distortive.

    Finally, Commerce's analysis fails to show the alleged superiority of

the Indian data. Commerce relies on the fact that these data are from

"publications or subscription services." Remand Results at 24,

Appx_____. But there is no obvious reason why being sourced from a

publication or subscription service would render an anomalous or non-

specific value superior (or even lawfully usable), and Commerce's brief

statement does not explain otherwise. As described above, the Indian

SVs for frozen by-products and fish meal are highly problematic and

cannot be rehabilitated simply because they are from a subscription

---

[6]    Specifically, Commerce's [



]. Final Analysis Memo at Attachment 3, pdf p. 46, Appx_____.

49

service. Similarly, with respect to the Indian SV for fresh by-products, which was obtained from *Fishing Chimes*, data are unreliable and do not reflect a broad-market average, as discussed above. *See* Preliminary SV Memo at 5, Appx_____.

    *4.*    *Conclusion*

Overall, the remand results do not reflect a fair and reasonable assessment of the relative quality of Indonesian and Indian data for valuing FOP, financial factors, labor, and co-/by-products. Commerce fails to recognize flaws in the Indonesian data, while asserting that the Indonesian data are flawed in ways that they are not. As Commerce has not undertaken a fair and appropriate assessment of the record evidence with respect to these FOP, its conclusion that these factors bolster its primary surrogate country selection is unsupported.

## IV.  **CONCLUSION**

Commerce has yet to appropriately address the Court's concerns. Rather than conduct the economic comparability analysis that the Court ordered, the agency has hewed to an unsound methodology. It has also failed to adequately explain or support its determination that Indonesia was not economically comparable with Vietnam. Its

assessment of the relative merits of the Indian and Indonesian data for

valuing the main FOPs, financial factors, labor, and by/co-products is

also inadequately explained and supported. Accordingly, Commerce's

remand results should be remanded for further consideration.

> Respectfully submitted:
>
> */s/ Nazak Nikakhtar*
> Nazak Nikakhtar, Esq.
> Maureen E. Thorson, Esq.
> Stephanie M. Bell, Esq.
>
> *Counsel to the Catfish Farmers of*
> *America and individual U.S. catfish*
> *processors America's Catch, Inc.,*
> *Alabama Catfish, LLC d/b/a Harvest*
> *Select Catfish, Inc., Consolidated*
> *Catfish Companies, LLC d/b/a*
> *Country Select Catfish, Delta Pride*
> *Catfish, Inc., Guidry's Catfish, Inc.,*
> *Heartland Catfish Company,*
> *Magnolia Processing, Inc. d/b/a Pride*
> *of the Pond, and Simmons Farm*
> *Raised Catfish, Inc.*

Dated: December 21, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Comments in Opposition of the Remand Results, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 9,676 words.

<u>/s/ *Nazak Nikakhtar*</u>
(Signature of Attorney)

<u>Nazak Nikakhtar</u>
(Name of Attorney)

<u>Catfish Farmers of America, et al.</u>
(Representative Of)

<u>December 21, 2023</u>
(Date)