# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| _____ ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | Court No. 21-00380 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| QMC FOODS, INC., *et al.*, ) | |
| ) | |
| Defendant-Intervenors ) | |
| _____) | |

## DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
K. GARRETT KAYS
Of Counsel
Office of the Chief Counsel

KARA M. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch

  for Trade Enforcement & Compliance
U.S. Department Of Commerce
Kenneth.Kay@trade.gov

P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571
Fax: (202) 514-8640

February 16, 2024

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES................................................ iii

DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION.............................................................1

BACKGROUND .......................................................................2

    I.    Commerce's Final Results And The Court's Remand Order..2

    II.    Remand Results ....................................................................4

        A.    Commerce's Selection Of India As The Primary Surrogate Country ........................................................5

        B.    The Indian Data Are The Best Available Information .9

ARGUMENT ..........................................................................10

    I.    Standard Of Review .............................................................10

    II.    Commerce's Remand Results Comply With The Remand Order ....................................................................................11

        A.    Commerce' Selection Of India As The Primary Surrogate Country Is Supported By Substantial Evidence And Is In Accordance With Law ..................12

            1.    Commerce's Economic Comparability Standard....................................................................12

            2.    Commerce's Evaluation Of Indonesia As Compared To India Is Reasonable......................16

i

B.  Substantial Evidence Supports Commerce's Determination That Indian Surrogate Values Are The Best Available Information...........................22

    1.  Commerce's Preference For Indian Data Reflects The Standard Application Of The Sequential Surrogate Country Selection Process.................23

    2.  Substantial Evidence Supports Commerce's Analysis Of Record Evidence For The Main Inputs.................................................................25

        a.  Substantial Evidence Supports Commerce's Determination That Indian Data Are The Best Available Information For Valuing Main Inputs................................................25

            i.  *Fishing Chimes*.................................26

            ii.  *Undercurrent News*..........................31

        b.  Substantial Evidence Supports Commerce's Determination That Indian Data Are Preferrable To Indonesian Data For Main Inputs......................................................33

    3.  Commerce Explained Its Reliance On Indian Financial Statements As Preferred....................37

    4.  Commerce's Reliance On Indian Data For Labor And Other FOPs Is Supported By Substantial Evidence...........................................................43

CONCLUSION ..........................................................................50

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
618 F.3d 1316 (Fed. Cir. 2010)............................................................... 38

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018) ........................... 46, 47, 48

*Baoding Yude Chem. Indus. Co., Ltd. v. United States*,
170 F. Supp. 2d 1335 (Ct. Int'l Trade 2001) ........................................ 13

*Catfish Farmers of America, et al. v. United States*,
Ct. No. 21-00380, Slip Op. 23-97, 2023 WL 4560815 (Ct. Int'l Trade
July 7, 2023) .................................................................................. passim

*Clearon Corp. v. United States*,
Consol. Ct. No. 13-00073, 2016 WL 6892556 (Ct. Int'l Trade Nov. 23,
2016), *aff'd, Clearon Corp. v. United States*,
711 F. App'x 648 (Fed. Cir. 2018) .......................................................... 7

*Clearon Corp. v. United States*,
Consol. Ct. No. 13-00073, 2015 WL 4978995 (Ct. Int'l Trade Aug. 20,
2015) ....................................................................................................... 19

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ............................................................................... 10

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1996) ............................................................................... 10

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010)............................................................... 22

*Fresh Garlic Producers Ass'n v. United States*,
121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015) ........................................ 20

*Heze Huayi Chem Co. v. United States*,
532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) ....................................... 17

*Heze Huayi Chemical Co., Ltd. v. United States*,
Ct. No. 17-32, 2018 WL 2328183 (Ct. Int'l Trade 2018) ..................... 43

*Home Meridian Int'l, Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014) ........................................................... 42

*Jacobi Carbons AB v. United States*,
222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017) .................................. 20, 22

*Jacobi Carbons AB v. United State*,
313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .......................... 13, 14, 17

*Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*,
396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019) ....................................... 43

*Jianxing Bro. Fastener Co., Ltd. v. United States*,
961 F. Supp. 2d 1323 (Ct. Int'l Trade 2014) ....................................... 37

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016) ..................................................... passim

*JMC Steel Corp. v. United States*,
24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ............................. 29, 33, 35

*Juangcheng Kangtai Chem. Co., Ltd. v. United States*,
Consol. Ct. 14-56, 2015 WL 4999476
(Ct. Int'l Trade Aug. 21, 2015) ................................................ 12, 13, 15

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ......................................... 9

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014) ........................................................... 34

*QVD Food Co. v. United States,*
   658 F.3d 1318 (Fed. Cir. 2011) ............................................... 20

*Save Domestic Oil, Inc. v. United States,*
   357 F.3d 1278 (Fed. Cir. 2004) ............................................... 13

*Shenzhen Xinboda Indus. Co. v. United States,*
   456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ....................... 42

*Tri Union Frozen Prods., Inc. v. United States,*
   163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016), *aff'd,* 741 F. App'x 801
   (Fed. Cir. 2018) .......................................................................... 17

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) ................................................................... 20

*Uttam Galva Steels Ltd. v. United States,*
   No. 2021-2119, 2022 WL 1419596 (Fed. Cir. May 5, 2022) ........... 24, 39

# STATUTES

19 U.S.C. § 1516(b)(1)(B)(i) ........................................................ 10

19 U.S.C. § 1677b(c)(1) ................................................................ 39

19 U.S.C. § 1677b(c)(1)(B) .......................................................... 43

19 U.S.C. § 1677b(c)(4) ....................................................... passim

19 U.S.C. § 1677b(c)(4)(A) .......................................................... 22

# REGULATIONS

19 C.F.R. § 351.408(c)(2) ....................................................... 41, 44

# FEDERAL REGISTER NOTICES

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
   74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17, 2009) ..................... 38

*Citric Acid and Certain Citrate Salts from the People's Republic of China*,
  74 Fed. Reg. 16,838 (Dep't of Commerce Apr. 13, 2009) ................... 45

*Utility Scale Wind Towers from the People's Republic of China*,
  77 Fed. Reg. 75,992 (Dep't of Commerce Dec. 24, 2012) .................... 33

*Certain Hardwood Plywood Products from the People's Republic of China*,
  85 Fed. Reg. 77,157 (Dep't of Commerce Dec. 1, 2020) ...................... 40

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
  86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021) ........................ 2

*Certain Activated Carbon from China*,
  87 Fed. Reg. 67,671 (Dep't of Commerce Nov. 9, 2022) ...................... 45

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*,<br><br>     Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>     and<br><br>QMC FOODS, INC., *et al.*,<br><br>     Defendant-Intervenors. | Court No. 21-00380 |

## DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to

the comments filed by the plaintiffs, Catfish Farmers of America,

America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select

Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country

Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc.,

Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of

the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA),

ECF Nos. 74 and 75 (CFA Cmnts.), concerning the United States

Department of Commerce's (Commerce) final results of redetermination

filed in accordance with this Court's decision and remand order in *Catfish*

*Farmers of America, et al. v. United States*, Ct. No. 21-00380, Slip Op. 23-

97, 2023 WL 4560815 (Ct. Int'l Trade July 7, 2023). *See* Final Results of

Redetermination Pursuant to Court Remand, Nov. 6, 2023 (Remand

Results), ECF No. 69 (Remand P.R. 6), Appx21965-22018.[1]  For the

reasons explained below, we respectfully request that the Court sustain

Commerce's remand results and enter judgment for the United States.

## BACKGROUND

I.    Commerce's Final Results And The Court's Remand Order

On July 8, 2021, Commerce published its final results in the

2018-19 administrative review of the order covering certain frozen

fish fillets from Vietnam.  *See Certain Frozen Fish Fillets from the*

*Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't of

Commerce July 8, 2021) (final results) (P.R. 552), Appx1088-1091,

---

[1] Citations to the public record "P.R. _" and confidential record "C.R._" refer to the underlying administrative review record. Citations to "Remand P.R._" and "Remand C.R._" refer to the public and confidential record of the remand redetermination, respectively accompanying Issues and Decision Memorandum (IDM) (P.R. 540), Appx1042-1087.

and accompanying Issues and Decision Memorandum (IDM) (P.R. 540), Appx1042-1087.  In its final results, Commerce selected India as the primary surrogate country because it was at the same level of economic development as Vietnam; a significant producer of merchandise comparable to the subject merchandise based on the information available; and provided the best data and information with which to value the factors of production.  *See* IDM at 14-33, Appx1055-1074.  Accordingly, Commerce used Indian surrogate value data to value mandatory respondent Vinh Hoan's factors of production, with the exception of the fish oil by-product, for which it used Indonesian data.  *See id.* at 30, Appx1071.

CFA filed an action challenging certain aspects of Commerce's final results.  For the purposes of this remand, CFA primarily challenged Commerce's selection of India as the primary surrogate country.  On July 7, 2022, the Court sustained, in part, and remanded, in part, certain aspects of the final results.  *See Catfish*, 2023 WL 4560815, at *5-12.

The Court remanded Commerce's primary surrogate country selection for further analysis.  *Id.* at *7.  Specifically, the Court held that "Commerce applied the wrong legal standard in its surrogate country

selection, and because there is nothing in the administrative record showing what {Gross National Income (GNI)} level Commerce considered 'economically comparable,' Commerce's surrogate country selection is both contrary to law and not supported by substantial evidence." *Id.* On remand, the Court directed Commerce to "conduct a new analysis using the correct standard."[2] *Id.* For the remaining issues, the Court sustained Commerce's determinations. *See id.* at *7-12.

## II.   Remand Results

Commerce complied with the Court's remand order by providing additional explanation relevant to the issues remanded in the Court's opinion. *See generally* Remand Results, Appx21965-22018.   On remand, Commerce further explained why it had selected India as the primary surrogate country, provided additional discussion of its surrogate country selection process, and considered the merits of the provided Indonesia data relative to the Indian data on the record.  *See*

---

[2] Commerce explained in the remand results that "{w}hile the Remand Order stated that Commerce could explain 'why India is not at a 'comparable level of economic development,'" Commerce "clarif{ied} {it} did not find that India is not at a comparable level of economic development during this administrative review."  Remand Results at 18 n.54, Appx21982.  "Thus, Commerce has further explained in this draft redetermination its finding that *Indonesia* is not at a comparable level of economic development with India." *Id.*

*generally id.*

A.    Commerce's Selection Of India As The Primary Surrogate Country

The Court remanded to Commerce "to conduct a new analysis using the correct standard" holding that Commerce "applied the wrong legal standard in its surrogate country selection." *Catfish*, 2023 WL 4560815, at *7. On remand, Commerce provided extensive explanation of its sequential surrogate country selection process, why record evidence warranted the selection of India as the primary surrogate country, and the relative merits of the Indian data compared to the Indonesian data. *See* Remand Results at 7-25, 32-53, Appx21971-21989, Appx21996-22017.

Generally, Commerce explained that in selecting surrogate values for factors of production in a non-market economy (NME) country, the statute mandates that Commerce shall, to the extent possible, use the best available information from a market economy country or countries that are at a level of economic development *comparable* to the NME and are significant producers of comparable merchandise. *Id.* at 3-4, 7 Appx21967-21968, Appx21971 (citing 19 U.S.C. § 1677b(c)(4)). However, Commerce explained that the statute is "silent with respect to

how, or on what basis, Commerce may make this determination." *Id*. at 7, Appx21971.

As a result, Commerce explained that it has developed a "sequential" surrogate country selection process that is "guided by Policy Bulletin 04.1[3] and subsequent case law." *Id*. at 7-14, Appx21971-21978. As Commerce explained, "{t}hrough this approach, Commerce first analyzes which countries meet the level of economic development and significant producer criteria; then, Commerce will rely on the data considerations prong to facilitate the selection of a country where *multiple* countries have met the first two criteria." *Id*. at 7-8, Appx21971-21972 (emphasis added).

Regarding how Commerce determines whether a country is at a "comparable" level of economic development to the NME in question, Commerce first establishes a surrogate country list of countries "that are considered to be at the same level of economic development for surrogate country selection purposes" using World Bank *per capita* GNI data. *Id*. at 8, Appx21972. While Commerce prefers to rely on data from countries

---

[3] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process" (Mar. 1, 2004) (Policy Bulletin 04.1), available at https://enforcement.trade.gov/policy/bull04-1.html.

that are at the same level of economic development, "{s}urrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country" will still be considered "to the extent that data considerations outweigh level-of-economic-development differences or significant producer considerations." *Id.* at 9, Appx21973; *see also id.* at 11-14 & n.41, Appx21975-21978 (citing multiple administrative decisions implementing this practice); *Clearon Corp. v. United States*, Consol. Ct. No. 13-00073, 2016 WL 6892556, at *3 (Ct. Int'l Trade Nov. 23, 2016) (*Clearon III*), *aff'd*, *Clearon Corp. v. United States*, 711 F. App'x 648 (Fed. Cir. 2018) (affirming the practice). Commerce further explained that it uses the term "same" as "one of convenience," in that it means that the selected "countries are most proximate in their level of economic development to the level of economic development of the NME country under consideration." Remand Results at 7 n.31, Appx21971.

In compiling the surrogate country list, "Commerce considers a range of factors, including the surrogate value requirements for the existing products under examination, the expected data quality and availability of alternative surrogate countries, the economic diversity of the manufacturing sector in the alternative countries, and the degree of

7

specificity in the import data potentially relied on to value the {factors of production}." *Id.* at 15, Appx21979. Commerce explained that it "also takes certain factors into account which may influence the availability and quality of the data such as whether the country is experiencing civil unrest or extreme levels of inflation," and "tr{ies} to preserve the same number of surrogate countries above and below the {NME} country (often three countries with *per capita* GNIs each higher and lower than the *per capita* GNI for the {NME}, for a total of six)." *Id.*

Here, Commerce identified India as one of the six countries at the same level of economic development as Vietnam, based on *per capita* GNI data. *Id.* at 17, Appx21981. Commerce explained that Indonesia was outside the *per capita* GNI range set forth by the countries included in the Surrogate Country List, which Commerce determined were at the same level of economic development as Vietnam, and that "Commerce has indeed used Indonesia as the primary surrogate country even when it was not on the non-exhaustive list of countries, due to the other countries on that list not being significant producers of comparable merchandise and/or lacking suitable {surrogate value (SV)} data." *Id.* at 3, Appx21967.

B.    The Indian Data Are The Best Available Information

Next, Commerce explained why the Indian factors of production data are the best available information compared to the competing Indonesian data submitted by CFA, as directed by the Court.  *See Catfish*, 2023 WL 4560815, at *6.  Specifically, the Court remanded for Commerce to either consider CFA's data regarding Indonesia as a potential primary surrogate country or explain why Indonesia is not at a "comparable level of economic development." *Id.*

On remand, Commerce compared the Indonesian data on the record to the Indian data used for valuing factors of production and continued to find that the Indian data are superior for valuing SVs here.   Remand Results at 18, Appx21982.  When evaluating SV data, Commerce "considered several factors, including whether the SVs are publicly available, contemporaneous with the period of review, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs." *Id.* at 19, Appx21983.  While there is no hierarchy among these criteria, Commerce weighed the available information with respect to each input value and made product-specific decisions as to what constitutes the "best" available surrogate value for each input. *Id.*

Importantly, for the inputs that, in the aggregate, comprise a substantial portion of the normal value calculated for the respondent (whole live fish, fingerlings, and fish feed), Commerce found that the Indian data are superior. *Id.* at 18-21, 40-48, Appx21982-21985, Appx22004-22012. While Commerce found that the Indian surrogate value data were superior to Indonesian data in most respects, it relied on Indonesian data for one byproduct factor of production because it found the Indian data for the byproduct to be aberrational. *Id.* at 24, 48-53, Appx21988, Appx22012-22017. Commerce explained, however, that "the need to rely on a different surrogate country for one production factor {surrogate value} from Indonesia does not outweigh the various significant advantages offered by the Indian data." *Id.* at 24, Appx21988.

## ARGUMENT

### I.     Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996).

## II. Commerce's Remand Results Comply With The Remand Order

Commerce's remand results comply with the Court's remand order by providing additional explanation and addressing record evidence regarding: (1) Commerce's compliance with its statutory obligation to consider countries at a "comparable level of economic development" as potential surrogates on an equal basis with countries Commerce deems to be at "the same level of economic development," and (2) its consideration of CFA's data regarding Indonesia as a potential primary surrogate country and otherwise explained why {Indonesia} is not at a "comparable level of economic development." *Catfish*, 2023 WL 4560815, at \*6; *see also generally* Remand Results, Appx21965-22018. The Court should reject CFA's arguments that Commerce failed to provide adequate explanation to support its remand results because they are without merit, as we explain below.

11

A.     Commerce's Selection Of India As The Primary Surrogate
       Country Is Supported By Substantial Evidence And Is In
       Accordance With Law

Although CFA makes various arguments as to why Indonesia should be considered economically comparable to Vietnam, CFA's Cmnts. at 6-50, these arguments do not undermine Commerce's selection of India as the primary surrogate country.  *See* Remand Results at 7-25, 32-54, Appx21971-21989, Appx21996-22018; 19 U.S.C. § 1677b(c)(4).   As we explain below, Commerce has adequately addressed the Court's remand order and its determination to select India as the primary surrogate country is supported by substantial evidence and is otherwise in accordance with law.

       1.     Commerce's Economic Comparability Standard

CFA states that it does not challenge Commerce's sequential surrogate country selection process, but instead the reasonableness of Commerce's economic comparability analysis.  *See* CFA's Cmnts. at 8-9. However, CFA fails to acknowledge the importance of limiting economically comparable countries as part of the "sequential process." Since 19 U.S.C. § 1677b(c)(4) is silent as to how, or on what basis Commerce determines which market economy countries are "at a level of

economic development comparable to that of the nonmarket economy country," Commerce explained its consistent reliance on a surrogate country selection process that is guided by Policy Bulletin 04.1, subsequent case law and administrative practice. Remand Results at 7, Appx21971. As Commerce described, not only is this process important to provide a consistent starting point for all proceedings involving the same NME country covering the same period of review, but it also allows interested parties to rely on a predictable process when determining which surrogate values to submit from a limited list of countries, while also meeting Commerce's statutory requirements under 19 U.S.C. § 1677b(c)(4). *Id.* at 14, Appx21978. The purpose of having a "manageable set of potential surrogate countries" is so that "interested parties do not expend their resources focusing on potential surrogate countries that are not at the same level of economic development as the {nonmarket economy} country in question when there is a same-level country that provides adequate data." *Id.* at 12, 16, Appx21976, Appx21980; *see also Juangcheng Kangtai Chem. Co., Ltd. v. United States*, Consol. Ct. 14-56, 2015 WL 4999476, at *7–8 (Ct. Int'l Trade Aug. 21, 2015) (Commerce properly may "narrow a list of countries within a band for purposes of administrative feasibility") (cleaned up).

CFA argues that "the agency's economic comparability analysis must be statutorily sound and reasonable overall." CFA's Cmnts. at 8-9. We agree. Commerce's analysis is statutorily sound and reasonable, insofar as countries at the same level of economic development are "comparable" within the meaning of 19 U.S.C. § 1677b(c)(4), and Commerce's practice leaves flexibility for Commerce to rely on other economically comparable countries that are not at the same level of economic development where circumstances warrant doing so. Remand Results at 16, Appx21980. Indeed, Commerce cited various administrative and judicial precedents where Commerce applied and this Court affirmed the same methodology. *See id.* at 7-18, Appx21971-21982 (citing *Jacobi Carbons*, 313 F. Supp. 3d 1308, 1320 (Ct. Int'l Trade 2018); *Juangcheng Kangtai Chem.*, 2015 WL 4999476, at *7–8; and *Baoding Yude Chem. Indus. Co., Ltd. v. United States*, 170 F. Supp. 2d 1335, 1343 (Ct. Int'l Trade 2001)). CFA dismisses these citations as "not binding" and "not germane." CFA's Cmnts. at 9-10. CFA is incorrect.

As an initial matter, the Federal Circuit has held that where Commerce has an established practice, it must either maintain consistency with that practice or provide a reasonable explanation for departing from it. *Save Domestic Oil, Inc. v. United States*, 357 F.3d

1278, 1283-84 (Fed. Cir. 2004). Here, CFA does not assert that Commerce departed from its practice. Rather, CFA asks the Court to dismiss Commerce's consistent application of a Court-affirmed practice across numerous other administrative proceedings as statutorily inappropriate and unreasonable. *See* CFA Cmnts. at 9. This argument is directly contrary to precedents from this Court. Specifically, Commerce explained that in *Jacobi Carbons*, the Court recognized that, "{a}lthough the statute only requires Commerce to seek a surrogate market economy country whose economic development is 'comparable' to the subject nonmarket economy (NME), when possible, the agency selects a surrogate country at the same level of economic development as the NME country" and "Commerce considers those countries that occupy a 'relatively narrow per capita GNI range that is centered on the per capita GNI of the NME country' to have attained the same level of economic development." Remand Results at 10, Appx21974 (citing *Jacobi Carbons*, 313 F. Supp. 3d at 1316).

CFA further argues that Commerce's citation to *Juancheng Kangtai Chemical Co*. is misplaced. According to CFA, the Court in that case did not opine on whether the specific band of GNIs was reasonable, but CFA admits that the Court affirmed Commerce's

practice to consider only of countries within a "narrow band" of GNIs as potential surrogate countries. CFA Cmnts. at 12-13. CFA fails to consider that Commerce applied the same practice here to limit comparable countries to a "narrow band," that the Court sustained in *Juancheng Kangtai Chemical Co. See Juancheng Kangtai Chemical Co*, 2015 WL 4999476, at *7 ("The distinguishing fact here, as in the prior review of chlorisos, is that India has not been included in the list of countries at comparable economic development, and the court rejects the notion that Commerce's policy of narrowing the list of countries to a band, around a 'level,' of economic comparability is in violation of the statute.").

> 2. Commerce's Evaluation of Indonesia As Compared To India Is Reasonable

CFA argues that certain factors on which Commerce relies in its economic comparability analysis are unexplained. CFA Cmnts. at 15-21. These arguments, however, do not undermine Commerce's selection of India as the primary surrogate country. *See* Remand Results at 7-25, 32-54, Appx21971-21989, Appx21996-22018; 19 U.S.C. § 1677b(c)(4).

CFA first argues that the determination to exclude Indonesia from the surrogate country list is unexplained because over the period of review because "the magnitude of difference between {India's and

Vietnam's} GNIs widened while the difference between Indonesia's and Vietnam's GNIs narrowed." CFA's Cmnts. at 19-20. CFA further argues that in various prior reviews, "Indonesia was treated as economically comparable despite having a GNI between 1.66 and 2.35 times that of Vietnam's," whereas, "{h}ere, Indonesia's GNI was just 1.60 times that of Vietnam's, and the difference narrowed further in 2019." *Id.* at 20.

In addressing similar arguments in *Jiaxing Brothers Fastener Co., Ltd. v. United States*, the Federal Circuit explained, "Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition." 822 F.3d 1289, 1299 (Fed. Cir. 2016) (rejecting Jiaxing's argument that Commerce failed to explain why its practice changed when India had served as a surrogate country to China for nearly three decades, but was not included on the surrogate country list in the instant review). As the court held, although India had been on the surrogate country list in past reviews, it "discern{ed} nothing in the statute that requires Commerce to consider any particular country as a surrogate country." *Id.* at 1295, 1298. CFA argues, however, that Commerce's reference to *Jiaxing Brother* is inapposite because the treatment of the "sequential" analysis is not at issue here. CFA Cmnts. at 12. But CFA fails to recognize the Federal Circuit's affirmation of

Commerce's ability to limit potential surrogate countries based on GNIs during that period of review, consistent with its sequential country selection process. *See Jiaxing Bro. Fastener Co.*, 822 F.3d at 1299 (stating that the Federal Circuit "disagree{d} that Commerce is forever bound by its past practices" in keeping any particular country on a surrogate country list). *See also Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255, 1275 n.14 (Ct. Int'l Trade 2016), *aff'd*, 741 F. App'x 801 (Fed. Cir. 2018); *Heze Huayi Chem Co. v. United States*, 532 F. Supp. 3d 1301, 1318 n.9 (Ct. Int'l Trade 2021) (noting that data considerations were developed to serve as a tiebreaker between multiple potential surrogates).

CFA also attempts to distinguish *Jacobi Carbons* on the basis that, here, Commerce has not articulated how it creates its surrogate country list. CFA Cmnts. at 11-12. This is incorrect. In a manner similar to *Jacobi Carbons*, Commerce explained on remand how it narrows comparable countries to a relatively narrow band of countries based on their GNIs. *See* Remand Results at 8-17, Appx21972-21981. In *Jacobi Carbons*, the Court sustained the reasonableness of Commerce's practice to adjust the list of economically comparable countries based on the changes to a country's GNI and "re-centering" of the list based on a

country's expansion. *Jacobi Carbons.*, 313 F. Supp. 3d at 1317-23. The Court endorsed Commerce's explanation that, "{t}he GNI data on which the surrogate country list is based in a fluid measurement that can change from year to year." *Id.* at 1322. Commerce tries to "preserve the same number of surrogate countries on the list (*e.g.*, three countries each with per capita GNIs higher and lower than the NME country, for a total of six) to limit the number of potential surrogate countries for analysis." Remand Results at 16, Appx21980. "If Commerce were required to maintain Indonesia on the list, despite the relative changes in economic development and per capita GNIs of Vietnam and Indonesia and other potential surrogate countries over time," then "Commerce would potentially have to include numerous additional countries on the list in any given year (*i.e.*, by necessarily broadening the outer bounds of the list to force the inclusion of all countries that previously had been on the list), which defeats the purpose of Commerce's court-approved approach in this regard." *Id.* at 16-17, Appx21980-21981.

CFA also criticizes Commerce's reliance on numerous factors in determining the list of countries Commerce determined to be at the same, and therefore comparable level of economic development, claiming that Commerce failed to explain how it assessed these factors. CFA Cmts. at

19

18-19. However, Commerce thoroughly explained how it compiles its list of countries that are at the "same" level of economic comparability as the country in question. For its starting point, Commerce starts with the GNI data from the World Bank and compares the change in the country's per capita GNI to the respective changes in per capita GNIs of the surrogate countries from the list from the prior list. *See* Remand Results at 3, Appx21967. When analyzing primary surrogate countries, Commerce tries to strike a balance of economies that have greater GNIs and lower GNIs, to allow interested parties to provide surrogate value data from either larger or smaller economies. *Id.* Next, Commerce has discretion to use its professional judgment and experience "on a range of factors when considering to add or remove countries from the list, including the surrogate value requirements for the existing products under investigation, the data quality and availability of alternative surrogate countries, economic diversity of the manufacturing sector in the alternative countries, and the degree of specificity in the import data relied on to value the {factors of production}." *Clearon Corp. v. United States*, Consol. Ct. No. 13-00073, 2015 WL 4978995, at *2 n.5 (Ct. Int'l Trade Aug. 20, 2015).

Moreover, on remand, Commerce stated that it prefers not to rely on

surrogate country data from market economies that are experiencing civil unrest or extreme levels of inflation. *See* Remand Results at 15, Appx21979. Thus, CFA's argument that the factors used to compile its surrogate country list are unexplained is not persuasive. Additionally, as CFA acknowledges, CFA Cmts. at 17, Commerce will consider parties' proposals of alternative primary surrogate countries that have GNIs within the range reflected in the surrogate country list. Remand Results at 15-16, Appx21979-21980.

In sum, Commerce adequately explained the factors that it uses to develop its surrogate country list and its reliance on these factors, to exclude certain countries, based on their failure to provide usable data. *Id.* This Court has repeatedly "affirmed Commerce's discretion to exclude countries from consideration on the basis of economic comparability." *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1172 (Ct. Int'l Trade 2017) (citing *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1341 (Ct. Int'l Trade 2015)). Also, Commerce enjoys broad discretion in determining what constitutes the "best available information" for valuing factors of production in nonmarket economy proceedings. *See Jiaxing Bro.*, 822 F.3d at 1293 (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)). While CFA posits

that Commerce should have determined Indonesia as more economically comparable to Vietnam than India, Commerce need only come to a reasonable determination based on substantial evidence on the record, which it has done here.  *See United States v. Eurodif S.A.,* 555 U.S. 305, 316 n.6 (2009).  Thus, the Court should hold that Commerce's determination to select India as the primary surrogate country is supported by substantial evidence and in accordance with law.

> B.     Substantial Evidence Supports Commerce's Determination That Indian Surrogate Values Are The Best Available Information

Notwithstanding Commerce's economic development analysis above, at the Court's direction, Commerce also analyzed the Indonesian information on the record to determine if it was preferable to the competing Indian data.  *See Catfish*, 2023 WL 4560815, at *6.  Like the underlying administrative review, Commerce continued to find that the Indian data are superior to the Indonesian data, and that the Indian data are appropriate for valuing surrogate values in the review.  *See* Remand Results at 18, Appx21982.  CFA's arguments to the contrary are meritless.

1.  Commerce's Preference For Indian Data Reflects The
    Standard Application Of The Sequential Surrogate
    Country Selection Process

As an initial matter, Commerce explained that this administrative review did not present an issue where "none of the countries on the list are significant producers of comparable merchandise or have suitable sources of surrogate value data," requiring Commerce to go "off-list" and examine the Indonesian data. *See* Remand Results at 18, Appx21982. While no party contests whether India is a significant producer of comparable merchandise, *see id.* at 3 n.12, Appx21967, the Federal Circuit's rationale in *Dorbest* is instructive on the issue of suitable sources of surrogate value data. *See Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010). Specifically, the Federal Circuit held that 19 U.S.C. §1677b(c)(4)(A) requires use of data from economically comparable countries *except* in situations where such data were not available or were irretrievably tainted by some statistical flaw. *Id.* at 1371-72. The statute requires Commerce to use data from economically comparable countries "to the extent possible." *Id.* (citing 19 U.S.C. § 1677b(c)(4)(A)).

"In other words, Congress has instructed Commerce to first select an appropriate market economy country (or countries), and then evaluate, *from the range of data available from those countries*, what constitutes the

'best available information.'" *Jacobi Carbons*, 222 F. Supp. 3d at 1175 n.14 (emphasis added). What Congress has not instructed, is for "Commerce to first look for the 'best available information' from some unspecified list of countries and then decide which of that information comes from countries that are economically comparable significant producers of comparable merchandise, nor has Congress instructed Commerce to simultaneously weigh the statutory factors." *Id.*

Here, consistent with its sequential approach to surrogate country selection, Commerce first determined that India is economically comparable to Vietnam. Remand Results at 2-5, Appx21966-21969. Having also determined that India is a significant producer of comparable merchandise, Commerce then determined that India offers surrogate data that meet its criteria for data availability and quality. *Id.* at 3, Appx21967. Thus, Commerce reasoned that the Indian data were superior and "in view of the usable data from a country at the same level of economic development as the NME in question, consideration of countries at comparable, but not the same, levels of development was unwarranted." *Id.* at 12, Appx21976. In any event, even if the Court disagrees with Commerce's determination in this regard, Commerce's remand results should still be sustained because Commerce reasonably found that the Indian data are the best

available information for valuing main inputs.

> ### 2. Substantial Evidence Supports Commerce's Analysis of Record Evidence For The Main Inputs
>
> #### a. Substantial Evidence Supports Commerce's Determination That Indian Data Are The Best Available Information For Valuing Main Inputs

In the underlying review, Commerce valued whole, live fish, fingerlings, and fish feed using data from industry publications *Fishing Chimes* and *Undercurrent News*. Commerce found that these sources were publicly available; contemporaneous; representative of broad market average pricing data; tax- and duty exclusive; and specific to the inputs being valued, including the particular species of *pangasius* used by respondents. *See* Remand Results at 19, Appx21983. In contrast, the Indonesian data did not satisfy each factor, as Commerce found that the whole live fish data were not species-specific, the fingerling data were not contemporaneous and not size-specific, and the fish feed data were not contemporaneous and are only partially specific regarding protein content. *See id.* at 46-48, Appx22010-22012.

CFA challenges Commerce's continued reliance on *Fishing Chimes* and *Undercurrent News* data as unrepresentative and unreflective of broad

market averages with respect to whole, live fish, fingerlings, and fish feed. CFA's Cmnts. at 23-33. These arguments are without merit. As discussed below, CFA fails to show that the administrative record can lead to "one and only one reasonable outcome," *Uttam Galva Steels Ltd. v. United States*, No. 2021-2119, 2022 WL 1419596, at *4 (Fed. Cir. May 5, 2022), that would warrant setting aside Commerce's primary surrogate country selection.

i. *Fishing Chimes*

With respect to *Fishing Chimes*, CFA argues that "too few farms provided data for Commerce to reasonably conclude that the data for any month, or as a whole, reflected broad market averages." CFA Cmnts. at 23-25. In particular, CFA asserts that the *Fishing Chimes* prices are based on too few data observations, are missing data for certain months, and lack information regarding volumes reflected in the prices. *See id.* These arguments lack merit.

Commerce relied on the *Fishing Chimes* survey results because it included 108 data sets that were collected in 2017 and 2018 from 54 farmers in Krishna and West Godavari, *i.e.*, the two largest *pangasius*-producing districts in Andhra Pradesh. *See* Remand Results at 42, Appx22006. Importantly, the *Fishing Chimes* data stated that it "focused

26

on Andhra Pradesh as it has major representation in production of *pangasius*," which is the same fish species that respondents reported using in production of subject merchandise. *Id.* at 42-43, Appx22007-22008. Therefore, Commerce found that the *Fishing Chimes* data represent a broad market average for purposes of valuing whole live fish, fingerling, and fish feed. *See id.*

CFA asserts that the *Fishing Chimes* data, which surveyed 54 *pangasius* farmers, is not sufficiently robust because "not all participants responded to every question" in the survey and "each month's whole live fish prices are based on as few as two reporting farms, and no more than eleven." CFA Cmts. at 25. CFA further asserts that Commerce unreasonably found that "while no more than eleven farms may have provided prices in any given month of the {period of review}, 83 farms provided such prices in total, including 34 farms during the {period of review}." *Id.* at 26.

However, Commerce did not purport to find that there were prices for 83 farms in the *Fishing Chimes* data, but rather 83 *harvests* in 2017-2018; 34 of those *harvests* occurred during the period of review. *See* Remand Results at 41, Appx22005. Additionally, Commerce explained that the record does not demonstrate that there were only 11 farms

providing survey responses during the period of review and since the names of the individual respondent entities are not indicated in the survey, it is simply speculation to assume the same 11 responders, or a subset of those same responders, are the only entities providing a response to the survey. *See id.* Furthermore, even accepting CFA's argument that the same 11 responders replied each month, Commerce disagreed that numerous data points over time, from 11 responders, would necessarily be insufficient to establish that data represent a broad market average or be otherwise unreliable. *Id.*

CFA is also incorrect that the lack of pricing for whole live fish data for certain months "undermines the agency's conclusion that the data reflect broad market averages." CFA's Cmnts. at 26. Commerce explained that this gap is not the result of missing data, but rather, "the study noted that stocking patterns are not constant and change according to many factors, such as market prices, the prevalence of other types of farming activities, and water availability." Remand Results at 41, Appx22005. Further, the "clustering of reporting times is a result of the nature of the farmers' stocking patterns and subsequent harvesting." *Id.*

CFA also argues that Commerce's determination that the Fishing Chimes data are sufficiently voluminous is based on "dubious estimates."

CFA Cmnts. at 26-27. CFA specifically asserts that "Commerce assumes that every farm reporting whole live fish prices had a size, productivity, and harvesting frequency that equaled the study average." *Id.* CFA's argument, however, does not undermine Commerce's reliance on the *Fishing Chimes* surveys merely because it is based on study averages, which CFA considers to be "assumptions." Although the *Fishing Chimes* survey data did not include "transaction-specific or entity-specific information," Commerce explained that the survey data did allow Commerce to make a reasonable estimate for volume, by multiplying the number of farms by the average production per hectare, by the median farm-size of four hectares. *See* Remand Results at 41-42 & n.139, Appx22005-22006. Commerce's calculations resulted in "approximately 9.03 million kilograms of *pangasius* fish in 2017 and 2018, and approximately 3.75 million kilograms during the {period of review}," which it found to be "a significant volume of fish." *Id.* at 42, Appx22006. CFA fails to show that this is an unreasonable interpretation of record evidence.

CFA also fails to undermine Commerce's analysis with respect to fingerlings and fish feed. *See* CFA Cmnts. at 27. Taking a consistent approach with the surrogate values for whole live fish, Commerce

explained its reliance on average numbers from the *Fishing Chimes* survey to find that its data provided the required pricing information for a representation of a broad market average for the other major inputs – including fingerlings and fish feed. Remand Results at 42, Appx22006. Like its approach for live fish, to calculate the number of fingerlings, Commerce multiplied the average stocking density per hectare by the median average size per farm, then by the number of farms, and finally by the average harvest per year. *See* Remand Results at 43, Appx22007. It found the resulting 5.1 million pieces produced during the period of review to again be "a significant quantity of fingerlings." *Id.* Additionally, for the volume of fish feed, Commerce multiplied the volume of whole live fish by the average feed conversion ratio. *See id.* These estimates showed that the *Fishing Chimes* data represent a large volume of transactions. *Id.* Thus, CFA fails to demonstrate that Commerce's finding that the *Fishing Chimes* data are representative of a broad market average was unreasonable. *See JMC Steel Corp. v. United States*, 24 F. Supp. 3d 1290, 1313 (Ct. Int'l Trade 2014) ("it is not the Court's place to re-weigh the evidence or to suggest that another alternative was the only appropriate choice").

ii.    *Undercurrent News*

CFA also argues that the *Undercurrent News* data – on which

Commerce relied to value whole live fish, fingerlings, and fish feed —

have certain shortcomings, such as the absence of volume information

and information related to the number of farmers/mills interviewed or

their locations.  *See* CFA Cmnts. at 27-29.  CFA also expresses concerns

with the "irregular" collection and release of the *Undercurrent News* and

the "unusual{}" specificity of the data to both the review period and the

main factor of production relative to other pricing data provided by

*Undercurrent News*.  *Id.*  In other words, CFA seeks to impose additional

criteria to show that the *Undercurrent News*, which gathers data from "all

major producing regions," does not represent a broad market average.

*See* Remand Results at 44, Appx22008.

However, Commerce reasonably explained that the interviews from

producers of the major factors of production – whole live fish, fingerlings,

and fish feed – come from "farmers in all major producing regions."  *Id.*

Additionally, Commerce explained that there is nothing on the record to

raise concern regarding any price volatility or inconsistent pricing

volumes for the underlying pricing data for these factors of production,

specifically stating that the 2019 month-to-month prices for whole live fish range within a narrow band from 75-80 rupees per kilogram, and the prices for fingerlings range from 3.10 to 3.20 rupees per piece, or 4.00 to 4.20 rupees per piece, depending on size. *Id.* at 43-44, Appx22007-22008. While CFA argues that the lack of price volatility "says nothing about the number of participants of volume of trade," CFA Cmts. at 29, CFA ultimately cites nothing to undermine Commerce's determination that the volume is sufficiently robust and reliable. Remand Results at 43-44, Appx22007-22008.

Additionally, CFA's concerns regarding any "lagging" release of any data that was "unusually specific" to the factors of production at issue during the period of review, CFA Cmts. at 29, do not meaningfully draw into question Commerce's reliance on this source of data. Commerce explained that the *Undercurrent News* website shows that the company releases many datasets; "{f}or the vast majority of the data series topics shown on the website, the publication provided one or a small number of datasets." Remand Results at 45, Appx22009. Thus, in terms of the reliability of the *Undercurrent News* source for factors of production data, Commerce reasonably found that there is nothing "anomalous" about this

source of data.  *Id.* at 44, Appx22008.

        b.    Substantial Evidence Supports
             Commerce's Determination That Indian
             Data Are Preferrable To Indonesian Data
             For Main Inputs

When comparing Indian and Indonesian data, Commerce also
reasonably found that certain shortcomings of the Indonesia data made
it less preferable to Indian factors of production data.  Remand Results
at 45-48, Appx22009-22012.  One of the most important factors for
Commerce's preference for the Indian factors of production data is that
the Indian data unambiguously relates to the particular species
processed by the respondents in the production of subject merchandise,
*i.e.*, *pangasius hypophthalmus* (or *patin siam* as it is known in
Indonesia); the Indonesian data does not.  *See id.* at 18-20, Appx21982-
21984.  CFA argues that the Indonesian data "predominantly" include
*pangasius hypophthalmus* and states that Commerce failed to
adequately consider record evidence allegedly supporting this
conclusion.  *See* CFA Cmnts. at 29-31.  However, Commerce did consider
the evidence proffered by CFA, but simply reached an opposing
determination and found Indonesia less preferable.

Although CFA submitted an affidavit from an industry expert, in

which he states that "99% of the production volumes" represent *pangasius hypophthalmus,* Commerce noted that two affidavits from government officials that offered contradictory record evidence, indicating that the data was not limited to *pangasius hypophthalmus.* *See* Remand Results at 45-46, Appx22009-22010. Specifically, the government officials' affidavits stated that "the data is not limited to *Pangasius Hypopthalmus,*" "we do not have any data on the percentage of such dominant species," and "more than 90% of pangasius farmers grow *{pangasius hypophthalmus}.*" *Id.* Thus, Commerce weighed all record evidence and reasonably found that record evidence did not support a finding that the Indonesian data fully represented *pangasius hypophthalmus.* *Id.* at 46, Appx22010. CFA does not contest Commerce's finding that the Indian data undoubtedly relate to *pangasius hypophthalmus*; it merely requests a different outcome, which this Court should reject. *See JMC*, 24 F. Supp. 3d at 1313.

Additionally, Commerce found the Indonesian data to be less preferable because it relied upon "price lists" for both fingerlings and feed data. Remand Results at 46, Appx22010. Commerce cited multiple administrative proceedings where it discussed its preference to not rely on price lists. Specifically, in a prior investigation, Commerce stated that,

34

"{it} generally does not use price lists to value {factors of production} because (1) these prices often represent a starting point in a negotiation that could result in a significantly different final sale price and (2) price lists reflect the experience of a single producer rather than a broad market average." *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,992 (Dep't of Commerce Dec. 24, 2012) (final LTFV determ.), and accompanying IDM at 12. By only continuing to incorrectly argue that the Indian data are unreliable because they do not reflect a broad market average, CFA Cmnts. at 32, CFA has not offered a reasonable basis for Commerce to stray from its practice of not generally relying on price lists. Remand Results at 46, Appx22010. Thus, since the Indian data are from a published source, and are otherwise usable and reliable, as discussed above, Commerce reasonably did not rely on the Indonesian data. *Id.* at 47, Appx22011.

CFA also argues that since both the *Undercurrent News* and *Fishing Chimes* data do not reflect a broad market average and are currently being challenged at the Court for a different segment of this proceeding, They contend that Commerce cannot now say that it is "insignificant" that the *Undercurrent News* only partially covers fingerlings over 6 inches for the period of review. *See* CFA Cmnts. at 32-33. While

Commerce explained that it could not rely on *Undercurrent News* data for values of Indian fingerling over 6 inches for 2019 because the *Undercurrent News* data for fingerlings over 6 inches in length relates solely to 2018,[4] Commerce reasonably explained that it did have an alternative in the 2019 data from *Fishing Chimes* to provide the requisite values for all sizes for the entire period of review. Remand Results at 47, Appx22011. Moreover, the Court's review in this case is based on the evidence and analysis on the record of this review and not any prior segments of this proceeding. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record").

Lastly, CFA asserts that Commerce has not "evenhandedly" acknowledged the flaws of the Indian data, *see* CFA Cmts. at 33, but this is incorrect. Throughout the entire discussion of Commerce's evaluation of factors of production – not just live fish, fingerlings, and fish feed – Commerce analyzed and discussed any potential shortcomings of the Indian data. *See* Remand Results at 23, Appx21987 ("There are only two

---

[4] The period of review covers August 1, 2018 through July 31, 2019.

areas where the Indonesian data fare better."). Ultimately, CFA is unsatisfied with Commerce's weighing of the evidence, but it is not CFA's or this Court's role to reweigh evidence. *See JMC*, 24 F. Supp. ed at 1313.

### 3. Commerce Explained Its Reliance on Indian Financial Statements As Preferred

CFA further challenges Commerce's reliance on Indian financial statements, claiming that Commerce failed to consider statements from Indonesian companies with "even-handedness." CFA Cmnts. at 33-40. To the contrary, the remand results provide multiple instances that Commerce considered the merits of the Indonesian financial statements against the Indian companies, but ultimately decided that the Indian financial statements were still preferrable. Remand Results at 48-50, Appx22012-22014.

As evidence of its "even-handedness," Commerce recognized that the Indonesia financial statements covered the full period of review, while the Indian financial statements covered eight months. *See id*. at 50, Appx22014. However, Commerce found that this factor did not warrant a finding that the Indonesian statements are superior given additional record evidence that supported relying on the Indian financial statements. *See id*. Specifically, Commerce found that the record

contained Indian statements for three Indian seafood processors, Mulpuri Aqua Processors Private Ltd., MMC Exports Limited (MMC Exports), and Ananda Enterprises (India) Private Limited, each of which were engaged in the processing and sales of frozen seafood products. *See id*. at 21-22, Appx21985-21986. In contrast, Commerce determined that the alternative Indonesian financial statements on the record were less numerous and contained other flaws. For example, Commerce found that the financial statements of PT Dharma Samudera Fishing Industries Tbk (Dharma) were accompanied by an unqualified auditor's opinion noting the company's ability to continue operating as a going concern, and that PT Japfa Comfeed Indonesia Tbk (Japfa)'s sales were primarily derived from activities other than processing. Remand Results at 49-50, Appx22013-22014.

CFA also argues that Commerce disregarded evidence undermining its conclusion that MMC Exports was substantially engaged in the business of processing and trading of marine products and allied activities. *See* CFA Cmts. at 35-36. Commerce did not disregard this evidence because it acknowledged that record evidence suggests "limited processing" of marine products. Remand Results at 49, Appx22013. However, Commerce found that CFA's alternative – the Indonesian Japfa

statements – suffered similar drawbacks since aquaculture represented under 10 percent of its operation. *Id.* Thus, Commerce could not conclude that the Japfa statements were clearly superior to the MMC Exports statements in this regard. *See id.* Moreover, Commerce explained that it prefers to use multiple financial statements where possible and the useable Indian statements on the record were "more numerous" than those on the record for Indonesia. *See id.* at 22-23, Appx21986-21987; *see also Jianxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323, 1332 (Ct. Int'l Trade 2014) ("Commerce has an announced criterion of utilizing *multiple* financial statements when available to eliminate distortions that may arise from using those of a single processor."). Thus, substantial evidence supports Commerce's determination that the Indian financial statements offered an "advantage" over the Indonesian statements. Remand Results at 23, Appx21987.

Furthermore, the Court should reject CFA's attempt to impose an additional profitability requirement for MME Exports' financial statements. *See* CFA Cmnts. at 37. While Commerce explained its practice of disfavoring zero or negative profit companies, it also explained that there is "no minimum profit threshold." Remand Results

at 49, Appx22013 (citing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17, 2009) (admin. review. and new shipper review), and accompanying IDM at Comment 1 (Commerce's "preference . . . is to use the financial statements of companies that have earned a profit and disregard the financial statements of companies that have zero profit."); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1323 (Fed. Cir. 2010) ("Commerce therefore reasonably preferred to use financial statements from profitable companies when available.").  CFA has not provided a basis to find this practice unreasonable, other than claiming that it "is not readily apparent why a profit rate of 0.01% appropriately 'account{s} for the interconnectedness of {} overhead and SG&A.'"  CFA Cmts. at 37.  Again, since CFA has not shown that there is "only one reasonable outcome," *Uttam Galva*, 2022 WL 1419596, at *4, Commerce's determination to rely on MME Exports' financial statements is supported by substantial evidence.  Remand Results at 48-50, Appx22012-22014.

Lastly, CFA argues that Commerce's practice of not relying on financial statements with a "going concern" is unwarranted.  *See* CFA Cmts. at 37-39.  As noted above, Commerce explained that the

statements from Dharma are accompanied by an unqualified auditor's opinion but contain a note regarding the company's ability to continue as a going concern. *See* Remand Results at 22, 50, Appx21986, Appx22014. Commerce explained that it has previously found such notes to be relevant to its assessment of whether a financial statement serves as the best available evidence as a source of surrogate financial ratios. *See id.*; 19 U.S.C. § 1677b(c)(1). These notes are important because they are indicative of the financial health of the company, whose financial statements on which Commerce is relying. Remand Results at 50, Appx22014. For example, in *Hardwood Plywood from China¸* Commerce found that the "the Company recorded negative operating cash flows . . . {and} the Company's current liabilities exceeded its current assets . . . . These events or conditions indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern." *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't of Commerce Dec. 1, 2020) (admin. review), and accompanying IDM at cmt. 3. Thus, while the factual circumstances that would cause an auditor to raise concerns about a company's going concern vary from case to case, it is reasonable for Commerce to weigh the going concern against the financial statement for

the applicable company.  Remand Results at 50, Appx22014.

CFA attempts to distinguish the factual circumstances between this review and *Hardwood Plywood from China* by arguing that Commerce's concern regarding the going concern is unwarranted because Dharma did not have "recorded negative operating cash flows" or "current liabilities {that} exceed{} its current assets," like the company at issue in *Hardwood Plywood from China*.  CFA Cmnts. at 38-39.  However, this argument does not undermine the auditor's opinion regarding the company's ability to continue as a going concern.  At a minimum, Commerce explained that even if the going concern "may not necessarily render {Dharma's} statement unusable, in the absence of more appropriate alternatives, it is Commerce's practice to not rely on financial statements with going concerns."  Remand Results at 22, 50, Appx21986, Appx22014.  Thus, substantial evidence supports Commerce's determination that the Indian financial statements are the best available information on the record to calculate the surrogate financial ratios.  *Id.* at 22-23, 48-50, Appx21986-21987, Appx22012-22014.

4. **Commerce's Reliance On Indian Data for Labor And Other Factors of Production Is Supported By Substantial Evidence**

Commerce continued to rely on an Indian source to value labor on remand, while also acknowledging some of its shortcomings, specifically that the Indian data are not contemporaneous, and Commerce was required to inflate the figures to reflect the period of review. *See* Remand Results at 50-51, Appx22014-22015. Additionally, Commerce stated that it is unclear whether the Indian data is industry specific. *Id.* Still, CFA states that Commerce failed to consider the Indonesian data "even-handedly." CFA Cmnts. at 40. CFA, however, diminishes Commerce's regulatory preference to "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2). In accordance with this preference, Commerce explained that it will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." Remand Results at 51, Appx22015; *see also Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1302 (Fed. Cir. 2016) (acknowledging Commerce's "administrative preference to appraise surrogate values from a single surrogate country.").

Here, Commerce found that Indian data were overall superior to Indonesian data such that it was appropriate to select India as the

primary surrogate country in this case. Remand Results at 51, Appx22015. Having made that determination, Commerce explained that it was reasonable for Commerce to select a labor value from the primary surrogate country even where there were other Indonesian values on the record that may have been more contemporaneous. *See id.* at 23, Appx21987. Indeed, the Federal Circuit held in *Home Meridian* that the data on which Commerce relies to value inputs must be the "best available information," but there is no requirement that the data be "perfect." *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014). Additionally, the Federal Circuit explained that "contemporaneity" need not outweigh all other factors. *Id.*; *see Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1284 (Ct. Int'l Trade 2020) ("depending on the factual circumstances, Commerce may select non-contemporaneous data over contemporaneous data"); 19 U.S.C. § 1677b(c)(1)(B).

Even though Commerce used 2006 International Labor Organization wage data for India, it made a reasonable adjustment to inflate the India data to reflect wage rates from the period of review. *See* Remand Results at 22-23, Appx21986-21987. As Commerce explained, this did not produce an "anomalous" result stating that the Indonesian

value for labor is $0.71 per hour on average; the Indian value, after being inflated, is $0.90 per hour. *Id.* Additionally, this Court has sustained Commerce's practice of adjusting non-contemporaneous labor data to be reflective of the period of review. *See Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1350-51 (Ct. Int'l Trade 2019) ("Commerce was therefore justified in using the South African labor data despite its lack of contemporaneity because the other factors favored the South African data as a whole over the Bulgarian data"); *Heze Huayi Chemical Co., Ltd. v. United States*, Ct. No. 17-32, 2018 WL 2328183, at *8 (Ct. Int'l Trade 2018) ("Commerce was able to adjust the labor value for Mexico through its normal method of inflating the value for labor . . . to account properly for inflation or changes in the labor rate over this time period"). Thus, while CFA asks the Court to prioritize contemporaneity over other factors, CFA Cmnts at 40-43, Commerce's choice was reasonable considering its regulatory preference for using data from one primary surrogate country. *See* Remand Results at 23, 50-51, Appx21987, Appx22014-22015; 19 C.F.R. § 351.408(c)(2).

 CFA also argues that Commerce failed to support its finding that the record regarding co/by-products favored India's selection as the

primary surrogate country.  *See* CFA Cmnts. at 42-50.  In particular, CFA

argues that Commerce failed to consider evidence indicating that the

Indian surrogate values for certain co/by-products were unreasonable

because they exceeded the value from which the inputs were generated.

*Id.* at 43.

However, CFA fails to demonstrate that the Indian data are

"unavailable or unreliable" such that Commerce should have departed

from its primary surrogate county preference by using Indonesian data

for these by/co-products.[5]  *See Jiaxing Bro.*, 822 F.3d at 1302.  Initially,

Commerce's reliance on Indian data must be compared to the

Indonesian data, which Commerce found to be disfavored because they

included price lists and affidavits.  *See* Remand Results at 46-47, 53,

Appx22010-22011, Appx22017.  As discussed above, relying on price

lists for surrogate values is not consistent with Commerce's practice

where other useable data are available on the record.  *See id.* at 48

n.161, Appx22012.

Moreover, CFA's arguments regarding distortions in the co/by-

---

[5] The co/by-products include:  fish meal; frozen (broken meat, skin,
fin, stomach); and fresh (waste, bladder, stomach, broken meat, skin,
belly, fin).  *See* Remand Results at 24 n.88, Appx21988.

product values on the record are misplaced. CFA argues that Commerce has a practice of rejecting or capping surrogate values for by-products when that value exceeds the surrogate value of the product from which it was derived. *See* CFA Cmnts. at 43. However, Commerce explained that it actually has a practice of *not* capping the value of surrogate values when the downstream product is of higher value and when record evidence shows that capping is not warranted. *See* Remand Results at 52, Appx22016 (citing *Activated Carbon from China,* 87 Fed. Reg. 67,671, and accompanying IDM at cmt. 2 (explaining that capping is appropriate only "when the SV of the by-product exceeds the SV of the main input and the record evidence indicates that a higher value for the by-product than the main input is not warranted."). Furthermore, Commerce has rejected the argument that a surrogate value for a "by-product is necessarily aberrational because it is higher than the {surrogate value} of the {input} that is used as the input." *Citric Acid and Certain Citrate Salts From the People's Republic of China,* 74 Fed. Reg. 16,838 (Dep't of Commerce Apr. 13, 2009) (final LTFV determ.), and accompanying IDM at comment 7. Thus, Commerce reasonably rejected CFA's similar argument here because a showing that the value of certain co/by-products exceeds the value of the

applicable input, by itself, does not warrant the capping of values for these co/by-product factors of production. *See* Remand Results at 52, Appx22016.

As Commerce explained, fish meal by-products and frozen by-products are further processed from whole fish inputs. *See id.* at 52-53, Appx22016-22017. Since Commerce explained that certain byproducts can be worth more, on an equal volume basis, than the underlying inputs after being processed into other by-products, CFA cannot solely rely on a "higher" priced by-product to warrant the capping of the value for the by-product. *Id.*

Moreover, CFA's reliance on this Court's holding in *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304, 1311-12 (Ct. Int'l Trade 2018), is misplaced. In *An Giang Fisheries,* the Court affirmed Commerce's decision not to rely on certain surrogate values because its value was greater than that of the main input, was not "representative" of the surrogate value at issue, *and* because the surrogate value data for the input by-products raised specificity concerns. *Id.* Here, while Commerce stated that certain by-products can have a higher value than the main input, it also explained that it is reasonable to not disregard those surrogate values when

48

record evidence shows that further processing of certain byproducts can lead to a higher value, on an equal volume basis, than the underlying inputs. *See* Remand Results at 52, Appx22016. Thus, merely because the further processing of whole fish leads to a higher value by-product, does not always mean the data for these byproducts is unrepresentative or distortive in the calculation of normal value. *Id.* at 53, Appx22017. CFA's proposed blanket rule – to cap all by-products when they pose a higher value than the main input – is not warranted for products that Commerce has found to have a higher value on an equal volume basis. *Id.* at 52 n.184, Appx22016; *see also id.* at 51, Appx22015 (explaining that "contrasting the values" of co/by-products "on an equal weight basis – is improper.").

CFA also argues that Commerce failed to adequately distinguish this case from *An Giang Fisheries* on specificity grounds. CFA Cmnts. at 47-48. However, in *An Giang Fisheries*, Commerce explained that it had concerns that the HTS category in question "was too broad because it included values for both refined and unrefined fish oil, and Vinh Hoan's byproduct is solely unrefined fish oil." 317 F. Supp. 3d at 1307. Because the refining process can reasonably be understood to add value, Commerce found the inclusion of both types of oil in the

same HTS subheading to be a specificity concern.  *Id.*  CFA does not explain how the HTS subheadings at issue here raise similar concerns, and indeed Commerce explained that it is not "uncommon for an HS subheading to cover a wider set of items than the precise input/by-product that is used or generated by the respondent." Remand Results at 52, Appx22016.  Because the HTS subheading at issue included the requisite species information to ensure specificity to Vinh Hoan's byproduct, CFA fails to undermine Commerce's determination.  *Id.*  Therefore, Commerce's explanation of its reliance to rely on Indian SVs for these by-products at issue is supported by substantial evidence.  *Id.*

CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

OF COUNSEL:
K. GARRETT KAYS
Of Counsel
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce
Kenneth.Kays@trade.gov

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station Washington
D.C. 20044
Tel: (202) 305-7571
Fax: (202) 514-8640

February 16, 2024

Attorneys for Defendant

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's order regarding type-volume limitation rules. According to the word-count calculated by the word processing system with which the brief was prepared, the brief contains a total of 9,819 words.

February 16, 2024

/s/ Kara M. Westercamp
Kara M. Westercamp

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| _____ | ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Consol. |
| v. | ) ) | Court No. 21-00130 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| QMC FOODS, INC., *et al*, | ) ) | |
| Defendant-Intervenors. | ) ) | |
| _____ | ) | |

## <u>ORDER</u>

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety.

Dated: _____, 2024        _____
      New York, NY                              JUDGE