Slip Op. 24-67

## UNITED STATES
## COURT OF INTERNATIONAL TRADE

Court No. 21-00380

CATFISH FARMERS OF AMERICA
and eight of its individual members,

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and

QMC FOODS, INC.; COLORADO BOXED BEEF
COMPANY; VINH HOAN CORPORATION; and
NAM VIET CORPORATION,

*Defendant-Intervenors.*

Before: M. Miller Baker, Judge

## OPINION

[The court sustains in part the agency's redetermination and remands for further proceedings.]

Dated: June 5, 2024

*Nazak Nikakhtar*, *Maureen E. Thorson*, and *Stephanie M. Bell*, Wiley Rein LLP, Washington, DC, on the comments for Plaintiffs.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; and *Kara M. Westercamp*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the comments for Defendant. Of counsel on the comments was *K. Garrett Kays*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

*Matthew McConkey*, Mayer Brown LLP, Washington, DC, on the comments for Defendant-Intervenors Vinh Hoan Corporation and Nam Viet Corporation.

    *Baker*, Judge: This case involving the 16th administrative review of an antidumping duty on Vietnamese catfish returns following remand to the agency. The court presumes the reader's familiarity with its previous opinion, including its discussion of jurisdiction and the standard of review. *See Catfish Farmers of Am. v. United States*, Ct. No. 21-00380, Slip Op. 23-97, 2023 WL 4560815 (CIT July 7, 2023).

    In that decision, the court held that the Department of Commerce erred by excluding Indonesia from consideration as a surrogate country because it is not at the "same" level of economic development as Vietnam despite the statutory standard being "comparable." *See id.* at 15–20, 2023 WL 4560815, at **5–7. The court directed the agency to reconsider its choice of India as the appropriate surrogate. *Id.* at 20, 2023 WL 4560815, at *7.

Commerce defensively stood its ground, explaining why it thinks the statute permits exclusion of a potential surrogate that is not at the "same" level of economic development as the nonmarket-economy country. *See* Appx21971–21982, Appx21996–22003. But because the Department this time nevertheless went ahead and compared the quality of the dueling Indian and Indonesian data sets on the merits rather than preemptively disqualifying the latter as before, *see* Appx21982–21989, Appx22004–22017, the court agrees to disagree with the agency's flawed interpretation of the legal standard. A remand on that issue would serve no purpose given that the rest of Commerce's analysis mitigates that error. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) (noting that harmless error applies to administrative law).

The remaining issue, therefore, is data quality. Agency guidance states that where multiple nations are "economically comparable" to the nonmarket-economy country whose products are at issue and "significant producers" of that merchandise,[1] "the country with the best factors data is selected as the primary surrogate . . . ." Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004).[2]

The Department compared the Indian and Indonesian data in the record and found the former superior.

---

[1] There is no dispute that Indonesia is a significant producer of frozen fish fillets.

[2] http://enforcement.trade.gov/policy/bull04-1.html.

*See* Appx21982–21989. Plaintiffs (Catfish Farmers) challenge three aspects of that finding: (1) the Indian sources used to value the "main" factors of production (whole live fish, fingerlings, and fish feed), *see* ECF 81, at 22–34; (2) the use of Indian financial statements, *see id.* at 34–40; and (3) the valuation of labor and certain by-products and co-products, *see id.* at 40–50. The court addresses each issue in turn, bearing in mind that its "duty is not to evaluate whether the information Commerce used was actually the best available, but rather whether a reasonable mind could conclude that [it] chose the best available information." *Jiangsu Zhongji Lamination Materials Co. (HK) v. United States*, Ct. No. 21-00138, Slip Op. 23-84, at 11, 2023 WL 3863201, at *4 (CIT June 7, 2023) (cleaned up) (quoting *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)). "Affirming the Department's determination requires a reasoned explanation from Commerce that is supported by the administrative record." *Id.* (cleaned up).

I.    *Whole live fish, fingerlings, and fish feed*

The Indian data for whole live fish, fingerlings, and fish feed came from two trade press sources: *Fishing Chimes* and *Undercurrent News*. The Department found them publicly available, contemporaneous with the period of review, representative of broad market average pricing data, tax- and duty-exclusive, and specific to the inputs (including the particular species in question). Appx21983. Catfish Farmers object to both sources.

Ct. No. 21-00380                                      Page 5

### A.      Fishing Chimes

Catfish Farmers note that "[t]he Court remanded the use of [the *Fishing Chimes*] data in the [15th] review over concerns that it did not reflect broad-market averages," and they argue, without elaboration, that "[t]he same issues . . . are present here." ECF 81, at 23 (citing *NTSF Seafoods Joint Stock Co. v. United States*, Ct. Nos. 20-00104, 20-00105, Slip Op. 22-38, at 41–48, 2022 WL 1375140, at \*\*14–16 (CIT Apr. 25, 2022)). The court would not ordinarily entertain that argument because it is unsupported by either a citation to the record or an explanation of why a ruling from a different review applies here. After all, "[e]ach [segment] is a separate exercise of Commerce's authority and allows for different conclusions based on different facts in the record." *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1353 (CIT 2020) (quoting *ABB Inc. v. United States*, 437 F. Supp. 3d 1289, 1301 (CIT 2020)).

The Department itself, however, cited the prior review as a reason for finding *Fishing Chimes* reliable. *See* Appx22004 ("Consistent with Commerce's extensive analysis of this issue in the context of the prior review, we continue to find that *Fishing Chimes* data are representative of a broad market average."). That finding opened the door for Catfish Farmers to refer to the court's remand decision.[3]

---

[3] In discussing "economic comparability," the Department itself emphasized that its "long-standing practice" is to treat the investigation and each administrative review "as

In its decision regarding the 15th review, the court noted that while *Fishing Chimes* estimated that pangasius is farmed in more than 300 villages in two districts in the Indian state of Andhra Pradesh, it stated that only 46 of the 300 villages the study covered were in those two districts. "By negative implication, that means the other 254 studied villages were *not* so located." *Catfish Farmers of Am. v. United States*, Ct. No. 20-00105, Slip Op. 24-23, at 8, 2024 WL 775181, at *4 (CIT Feb. 26, 2024) (emphasis in original). That is, if the study covered 300 villages of which 46 were in the two districts, the rest must be somewhere else. The court remanded because it was not apparent how a study focusing on fish farming in a significant minority of villages could represent a "broad market average." *Id.* Because Commerce evidently based its finding on its past analysis that the court remanded as inadequate, it is not supported by substantial evidence, so the court remands.[4]

---

independent segments with separate records and which lead to independent determinations." Appx21978. If Commerce elects to refer to analysis from prior segments, then parties can do the same in seeking to discredit that analysis.

[4] The government cites Commerce's finding that *Fishing Chimes* involved farms that produce a "significant volume of fish." ECF 82, at 29 (quoting Appx22006). It contends that because the "data represent a large volume of transactions," Catfish Farmers failed to demonstrate that the Department's "finding that the *Fishing Chimes* data are representative of a broad market average was unreasonable." *Id.* at 30. That argument fails. The mere existence of a "large volume of transactions" does not establish a "broad

B.    Undercurrent News

Catfish Farmers assert that *Undercurrent News* has "no volume information for any of the data sets, making it impossible to determine how much trade the prices represent. Nor is there any identification of the number of farmers/mills interviewed or their locations." ECF 81, at 27 (citations to Appx21457–21521 omitted). Commerce acknowledged that the "database screenshots do not provide details on the individual survey respondents," but cited the publication's references to "[d]ata collected via interviews with farmers in all major producing regions" and "[d]ata collected via interviews with feed mills in all major producing regions." Appx22008 (citing Appx21470–21482; Appx21483–21495). Insofar as the court can discern, those are the only two statements the Department made about *Undercurrent News* that can reasonably be construed as referring to the "broad market average" issue.

As Catfish Farmers argue, however, "[w]ithout volume data or even an indication of how many survey participants there are, Commerce has no way of knowing whether the prices reflect a meaningful breadth of trade." ECF 81, at 29. The government cites the Department's reference to "farmers in all major producing regions" and then argues that Catfish Farmers

---

market average." *See* Slip Op. 24-23, at 9, 2024 WL 775181, at *3 ("[A] significant volume of fish . . . does not indicate anything as to a 'broad market average' absent any discussion showing how those amounts compare to India's overall pangasius production . . . .").

"ultimately cite[ ] nothing to undermine Commerce's determination that the volume is sufficiently robust and reliable." ECF 82, at 32. That argument rests on the *assumption* that substantial evidence supports the decision. The standard of review requires the court to "hold unlawful" any determination that is "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). Catfish Farmers can therefore challenge Commerce's results in at least two ways: first, by citing contradictory record evidence that calls the conclusions into question, *see, e.g.*, *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed. Cir. 1996) ("Consideration of contradictory evidence in the record is required, since the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.") (cleaned up), and second, by explaining how the Department's analysis does not support the conclusion reached, *see, e.g.*, *Goodyear Tire & Rubber Co. v. Dep't of Energy*, 118 F.3d 1531, 1541 (Fed. Cir. 1997) (finding that "superficial observations" by an agency "are not substantial evidence").

Here, their argument is of the latter sort. Commerce essentially accepted *Undercurrent News*'s vague and unsupported reference to an unspecified number of farmers and feed mills in "all major producing regions." Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *cf. Cozart v. Sec'y of Health & Hum. Servs.*, 126 Fed. Cl. 488, 498 (2016) ("[A]bsence of evidence is not evidence."). The court remands for the Department to reconsider its reliance on *Undercurrent News*.

II.    *Financial statements*

Next, Catfish Farmers challenge Commerce's choice of Indian over Indonesian financial statements. The Department deemed the former better because they were contemporaneous to the period of review and because their subject companies "substantially engage[ ] in the processing and sales of frozen seafood products." Appx21985–21986. It found the latter "less favorable in certain aspects" because, while they were neither unusable nor unreliable, one contained an auditor's note questioning the company's ongoing viability and the other said "aquaculture" is a small fraction of the company's sales. Appx21986. It also observed that the three Indian reports were more representative of the relevant manufacturing sector than their two Indonesian analogs. Appx21986–21987.

Catfish Farmers attack the Indian statements on two grounds. First, they argue the reports cover only eight of the period of review's twelve months while the Indonesian ones cover all twelve. ECF 81, at 31–35 (citing Appx21087–21256; Appx12889–12955; Appx16369–16447; Appx16622–17015; Appx20314–20843). The Department considered that argument and responded that while the latter's full contemporaneity was an advantage, "we do not find that this factor warrants a finding that the Indonesia[n] statements are superior" because "all of the proffered statements (for either country) are contemporaneous and cover the majority of the [period of review]." Appx22014. The court cannot find fault with that explanation because the agency's guidance simply says data should be "contemporaneous with" the period of

review—it does not necessarily require contemporaneity with the *entire* period. *See* Policy Bulletin 04.1, *above* note 2.

Second, Catfish Farmers contend that the evidence does not establish that the Indian statements are for companies that "substantially" engage in processing and sales of frozen seafood and that Commerce ignored evidence contradicting its conclusion. They assert that the Indian report from MMC Exports Limited "shows no possession of relevant production assets such as deep freezers," ECF 81, at 35 (citing Appx12949), and refers to "retail sale of food in specialized stores" as accounting for 100 percent of the company's revenue, *id.* at 35–36 (quoting Appx12933). Therefore, they argue, "the financial statement indicates that [MMC] simply buys and sells at retail, making it an inappropriate proxy for a frozen seafood processor like Vinh Hoan here." *Id.* at 36. They admit the Department acknowledged that MMC engages in "limited processing" and found it no different from PT Japfa Comfeed Indonesia Tbk, whose statement showed "aquaculture" as a 10 percent portion of its overall business. *Id.* at 36–37 (citing Appx21986, Appx22012–22013). But they maintain that Japfa does engage in seafood processing, while MMC's is either minimal or nonexistent, and they contend that the agency's "treatment of the two companies as equivalent is unexplained and unsupported." *Id.* at 37.

The government responds that Commerce acknowledged the contrary evidence and explained why *both* the MMC and Japfa materials had similar drawbacks such that neither was clearly superior. ECF 82, at 38–

39 (citing Appx22013). Thus, the government argues, the Department cited its preference for using multiple financial statements where possible and favored India because it had more of them on the record than Indonesia, *id.* at 39 (citing Appx21986–21987), such that "substantial evidence supports Commerce's determination that the Indian financial statements offered an 'advantage' over the Indonesian," *id.* (citing Appx21987). While there does not appear to be substantial evidence of any such "advantage," regulatory preferences "are acceptable tiebreakers, provided Commerce undertakes a fair comparison of the competing datasets." *New Am. Keg v. United States*, Ct. No. 20-00008, Slip Op. 21-30, at 34, 2021 WL 1206153, at *13 (CIT Mar. 23, 2021) (citing *Peer Bearing Co.- Changshan v. United States*, 804 F. Supp. 2d 1337, 1353 (CIT 2011)). The Department compared the statements and found neither one to be superior, so it used a regulatory preference to decide the issue. That was permissible.[5]

III.   *Labor, by-products, and co-products*

Finally, Catfish Farmers challenge the agency's choice of 2006 Indian—over contemporaneous Indone-

---

[5] Catfish Farmers also argue that MMC was not profitable enough for its statements to be useful. ECF 81, at 37 (citing Appx22013–22014; Appx12955). Commerce considered that argument and said what matters is that the company was not losing money. Appx22013. Catfish Farmers have not shown why a slim (or minimal) margin renders a financial statement problematic, much less how the court can weigh that evidence.

sian—labor data and its valuation of by-products and co-products.[6]

A.  *Labor*

Catfish Farmers argue that Commerce "concede[d] that the Indonesian labor data are 'better' than the data on the record for India." ECF 81, at 40 (citing Appx21987). The Department's finding was somewhat more nuanced: "There are only two areas where the Indonesian data fare better. First, the Indian data used to value labor inputs are not contemporaneous with the [period of review]" because they were from 2006. Appx21987.[7] The agency acknowledged that Policy Bulletin 04.1 requires contemporaneity but concluded it was more important to select data from a single country. *Id.* It therefore inflated the Indian data to 90¢ per hour, compared that to the Indonesian 71¢ per hour, and surmised that nothing on the record suggested 90¢ was "anomalous" and no party had argued such. Appx21987–21988. Catfish Farmers now assert it is "not apparent" why the comparison "inherently indicates a lack of anomaly," ECF 81, at 42, but it appears they made no such contention before the agency.

More importantly, however, Catfish Farmers argue that while the Indonesian data are both contempora-

---

[6] The Department elected to use Indonesian data to value the fish oil by-product because it found the Indian data "aberrational." Appx21988. As Catfish Farmers do not challenge that finding, the court sustains it.

[7] The second area was the fish oil by-product. Appx21988; *see also above* note 6.

neous with the period of review and "specific to 'agriculture' and 'manufacturing' workers," it is unclear whether the Indian data are specific to the relevant industry. *Id.* at 41 (citing Appx12499; Appx20845–20864). Commerce conceded the latter. Appx22015 ("We agree that the exhibit does not specify this information."). But "[n]otwithstanding the drawbacks of the Indian labor data, . . . we continued to rely on [it] because, *overall*, the Indian data are preferable." *Id.* (emphasis added). In other words, the Department found the Indian labor data better than the Indonesian because the former country's information for *other* factors is superior.

The government mimetically restates the agency's conclusion. *See* ECF 82, at 43–44 (arguing that Catfish Farmers "diminish[ ] Commerce's regulatory preference to 'value all factors in a single surrogate country'") (quoting 19 C.F.R. § 351.408(c)(2)). It maintains that the sole-country preference means it was reasonable for the agency to select the Indian data regardless of any flaws. *Id.* at 44.

The problem with both the government's argument and the Department's analysis is that the statute requires, in all instances, the use of "the best available information" about the value of factors of production "in a market economy country or countries considered to be appropriate by" Commerce. 19 U.S.C. § 1677b(c)(1). While the regulations express a preference for a single country,

> the regulation cannot be read so broadly as to
> defeat the statutory directive that the factors of

production be valued according to the best available information. In other words, the uniformity of data that results from having all surrogate values determined according to data from the same surrogate country may be a consideration in deciding which surrogate data to use for a particular factor of production. But in light of the statutory directive of 19 U.S.C. § 1677b(c)(1) to use the best available information from a surrogate country "or countries," it cannot be the *sole* consideration.

*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1352 (CIT 2018) (emphasis in original). The Department's "preference" therefore "carries the day only when it is used to support a choice of data as the best available information where the other available data upon a fair comparison, are otherwise seen to be fairly equal." *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1326–27 (CIT 2016) (cleaned up).

The "regulatory preference," in other words, is a mere tiebreaker, not a rule of decision, and here, Commerce jumped to the tiebreaker without first declaring the game to be tied. Nothing here shows that the Department found the Indian labor data superior. To the contrary, every indication is that the agency selected that information *despite* its deficiencies and because of the preference. Accordingly, that choice is not supported by substantial evidence. A remand is necessary for the Department to reconsider whether the problems it identified with the Indian data warrant using the Indonesian counterpart.

### B.    *By-products and co-products*

Catfish Farmers also object to the use of Indian data that result in by-product and co-product values worth more than the inputs from which they were generated. ECF 81, at 42–50. Commerce summarized the argument as being that because it rejected the "aberrational" Indian fish oil figure, "a similar rationale applies to certain other Indian by/co-product values." Appx22015. It said it was "improper" to "contrast[   ] the values *on an equal weight basis*" as Catfish Farmers argued,[8] *id.* (emphasis added), because it "has recognized that certain byproducts can be worth more, *on an equal volume basis*, than the underlying inputs," Appx22016 (emphasis in original). The agency found that the by- and co-products had "undergone different levels of additional processing, as compared to the whole fish input," and that "their contribution to the total normal value figure demonstrates that they are not distortive here." Appx22016–22017. Finally, it deemed the Indonesian data "disfavored" because they consisted of price lists and affidavits. Appx22017.[9]

---

[8] Catfish Farmers cited the by- and co-products' value per kilogram. Appx22015; *see also* ECF 81, at 43 (citing rupees per kilogram).

[9] The Department said it disfavors price lists because they "often represent a starting point in negotiations rather than a final price, and frequently do not reflect the experience of the market as a whole." Appx22010. It also "see[s] no basis to find that [affidavits are] more accurate or reliable than the information obtained from the various government sources (including the agency involved in collecting the data)." *Id.*

In response, Catfish Farmers cite three prior Commerce decisions. Two stated that the Department "has a long-standing practice of rejecting or capping the by-product [surrogate value] in instances where [that value] exceeds the [surrogate value] of the product from which it was derived." Issues & Decision Memo at 52 (Apr. 8, 2015) accompanying *Certain Pneumatic Off-the-Road Tires from the People's Republic of China; 2012–2013*, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015), *quoted in* ECF 81, at 44; I&D Memo at 58 (Sept. 6, 2016) (same) accompanying *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016), *cited in* ECF 81, at 44, 45. The third repeated that statement and then noted that "[a] by-product by definition is less valuable than the input from which it is derived." I&D Memo at 21 (Sept. 22, 2014) accompanying *Monosodium Glutamate from the People's Republic of China*, 79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) (*MSG*). The agency hedged a bit, however, stating that assigning the by-product a higher value than the input is unreasonable "[w]here there is no evidence that the by-product is a value-added by-product." *Id.* But it reiterated that it "has a consistent practice of rejecting or capping the by-product offset." *Id.* at 22.

Catfish Farmers object that here Commerce merely asserted, without analysis, that the by-products underwent different levels of processing than the whole live fish. ECF 81, at 46–47 ("[T]he agency points to no record evidence to support this conclusion, much less evidence showing that any processing is sufficient to increase value to the point reflected in the Indian [sur-

rogate values].") (citing Appx22016). They also contend that Vinh Hoan's reporting did not show any added materials, labor, or energy for generating byproducts, that the Department did not identify any, and that the co-product reporting reflected only minimal processing. *Id.* at 47.

The government responds that Catfish Farmers "fail[ ] to demonstrate that the Indian data are 'unavailable or unreliable' such that Commerce should have departed from its primary surrogate country preference by using Indonesian data for these by/co-products." ECF 82, at 46. It is unclear how that argument is relevant to whether the by- or co-products can be worth more than the inputs. The government further contends that the Department's "reliance on Indian data must be compared to the Indonesian data, which [it] found to be disfavored because they included price lists and affidavits." *Id.* Again, however, that argument says nothing about the *Indian data's* value and simply presumes their reliability. Finally, the government cites a decision saying that "where a by-product yields a higher value than the input, capping of the [surrogate value] at the value of the input is not warranted." I&D Memo at 11 (Nov. 2, 2022) accompanying *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Administrative Review; and Final Determination of No Shipments; 2020–2021*, 87 Fed. Reg. 67,671 (Dep't Commerce Nov. 9, 2022), *cited in* ECF 82, at 47.

Based on those three points, the government argues that "[s]ince Commerce explained that certain by-products can be worth more, on an equal volume basis,

than the underlying inputs after being processed into other by-products, [Catfish Farmers] cannot solely rely on a 'higher' priced by-product to warrant the capping of the value for the by-product."[10] *Id.* at 48 (citing Appx22016–22017). That assertion amounts to the proposition that because by-products *can be* worth more than the inputs, it is necessarily reasonable to assign such higher values to the former. The Department's *MSG* decision discussed above forecloses that position because it requires *evidence* that processing renders the by-product more valuable than the input.

In sum, Catfish Farmers are correct that Commerce stated its conclusion with no meaningful citation to the record. It simply said the by-products and

---

[10] The parties offer conflicting interpretations of *An Giang Fisheries Import and Export Joint Stock Company v. United States*, 317 F. Supp. 3d 1304, 1311–12 & n.2 (CIT 2018), in which the court sustained Commerce's finding that it was unreasonable for a by-product's surrogate value to exceed that of the main input and the subject merchandise. The court noted that the Department "did not determine that the value was inappropriate simply because [it] was greater than the main input; instead, Commerce found the data inappropriate because of the high value in combination with" other considerations, including that the plaintiff's proposed data related to a different sort of fish oil. *Id.* at 1311 n.2. The court also found that the agency had explained why it chose the methodology it did and that the outcome was reasonable. *Id.* at 1312. *An Giang* therefore does not dictate a bright-line rule either way—it was a decision based on the facts presented. It does, however, support the government's assertion that Catfish Farmers' "proposed blanket rule—to cap all by-products when they pose a higher value than the main input—is not warranted," ECF 82, at 49, at least not automatically.

co-products have undergone "different levels of pro-cessing" from the inputs and that the result is "not dis-tortive." Appx22016–22017. That Indian data might be better for *other* factors of production and that the Indonesian data are based on price lists and affidavits do not answer the fundamental question of whether the Indian by-product and co-product data are in fact reliable and the best available information for *those* factors, so the court remands.

*   *   *

The court sustains Commerce's redetermination in part and remands for further proceedings consistent with this opinion.

Dated:  June 5, 2024              /s/ *M. Miller Baker*
        New York, NY             Judge