A-552-801
Remand
Slip Op 24-67
POR:  08/01/2018 – 07/31/2019
**Public Document**
E&C/OV:  RG, JB

***Catfish Farmers of America, et al. v. United States***
**Ct. No. 21-00380, Slip Op. 24-67 (CIT June 5, 2024)**
**Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion of the U.S. Court of International Trade (the

Court) in *Catfish Farmers of America, et al. v. United States*, Court No. 21-00380, Slip Op. 24-

67 (CIT June 5, 2024) (*Second Remand Opinion*).  These final results of redetermination concern

the *Final Results* in the 16th administrative review of the antidumping duty (AD) order on certain

frozen fish fillets from the Socialist Republic of Vietnam (Vietnam)[1] covering the period of

review (POR) August 1, 2018, through July 31, 2019.[2]

On November 6, 2023, in response to the *First Remand Opinion*,[3] Commerce issued the

First Remand Redetermination.[4]  There, in accordance with the Court's directive, we compared

---

[1] *See Notice of Antidumping Duty Order:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 36102 (July 8, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Catfish Farmers of America v. United States*, Court No. 21-00380, Slip Op. 23-97 (CIT July 7, 2023) (*First Remand Opinion*).
[4] *See* Final Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Court No. 21-00380, Slip Op. 23-97 (CIT July 7, 2023), dated November 6, 2023, available at https://access.trade.gov/Resources/remands/23-97.pdf (First Remand Redetermination).

the surrogate value (SV) data offered by India and Indonesia and continued to find India to be the appropriate primary surrogate country in this review.

In the *Second Remand Opinion*, the Court sustained in part, and remanded in part, the *Final Results*.[5]  In particular, the Court remanded for a second time the following aspects of Commerce's decision:  (1) reliance on the publications *Fishing Chimes* and *Undercurrent News* (*UCN*) as SV sources for whole live fish, fingerlings, and fish feed;[6] (2) reliance on non-contemporaneous labor data;[7] and (3) analysis of the SV used to value certain by-products.[8]  In compliance with the *Second Remand Opinion*, Commerce further explains its findings regarding these issues, as discussed below.[9]

## II.      BACKGROUND

### A.      Commerce's *Final Results*

On October 7, 2019, Commerce initiated the 16th administrative review of the *Order*.[10] On December 13, 2019, Commerce selected Bien Dong Seafood Co., Ltd. (Bien Dong) and Vinh Hoan Corporation (Vinh Hoan) as mandatory respondents.[11]  Because all review requests for Bien Dong were timely withdrawn, on January 22, 2020, Commerce selected Seafood Joint Stock Company No.4 Branch Dongtam Fisheries Processing Company (DOTASEAFOOD) as an additional mandatory respondent.[12]

---

[5] *See generally Second Remand Opinion*.

[6] *Id*. at 2-8.

[7] *Id*. at 12-14.

[8] *Id*. at 15-19.

[9] In our analysis, we have examined Indonesia and India both as potential primary surrogate countries and have, under respectful protest, afforded India no preference despite its inclusion on the surrogate country list issued on the record of this segment.  *See Viraj Group v. United States*, 343 F. 3d 1371 (Fed. Cir. 2003); and Commerce's Letter, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated April 2, 2020, at Attachment 1 (Surrogate Country List).

[10] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 53411 (October 7, 2019).

[11] *See* Memorandum, "Selection of Respondents for Individual Review," dated December 13, 2019.

[12] *See* Memorandum, "Selection of Replacement Respondent for Individual Review," dated January 22, 2020.

On December 28, 2020, Commerce published the *Preliminary Results*.[13]  In the

*Preliminary Results*, Commerce calculated a dumping margin for Vinh Hoan and, in so doing,

selected India as the primary surrogate country because we found that it:  (1) was at the same

level of economic development as Vietnam; (2) was a significant producer of comparable

merchandise; and (3) provided appropriate information with which to value Vinh Hoan's factors

of production (FOPs).[14]

On July 8, 2021, Commerce published its *Final Results*.[15]  In the *Final Results*,

Commerce continued to select India as the primary surrogate country.[16]  Commerce also again

provided its analysis regarding the three surrogate country selection criteria:  level of economic

development; significant producer of comparable merchandise; and data availability and

quality.[17]  We found that India was a significant producer of comparable merchandise.[18]  With

regard to level of economic development, Commerce stated:

> {b}ecause Vietnam is {a non-market economy (NME)} country, when calculating
> {normal value}, section 773(c)(4) of {the Tariff Act of 1930, as amended (the Act)}
> requires Commerce to value the FOPs, to the extent possible, in a surrogate country
> that is:  (a) at a level of economic development comparable to Vietnam; and (b) a
> significant producer of comparable merchandise.  Section 773(c)(4)(A) of the Act
> is silent with respect to how Commerce determines that a country is at a level of
> economic development comparable to the NME country in question.   Thus,
> Commerce's longstanding practice has been to identify those countries that are at a
> level of economic development similar to the NME in question based on gross
> national income (GNI) data reported in the *World Bank Development Report*.
> Using 2018 GNI data, Commerce provided parties with a list of potential surrogate

---

[13] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission of the Antidumping Duty Administrative Review; 2018-2019*, 85 FR 84300 (December 28, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[14] *Id.* at 12-15.
[15] *See generally Final Results*.
[16] *See Final Results* IDM at Comment 3.
[17] *Id.*
[18] *Id.* ("Record evidence supports our determination and shows that India is a significant producer of comparable merchandise.  Specifically, the record indicates that India exported 955,000 kg of frozen fish fillets which, as we have noted previously, constitutes comparable merchandise.") (internal citation omitted).

countries found to be at Vietnam's level of economic development, including Angola, Bolivia, Egypt, Honduras, Nicaragua, and India.

The petitioners note that economic comparability is not always the exclusive starting point for selecting a primary surrogate. In certain past reviews of this AD order, Commerce has indeed used Indonesia as the primary surrogate country even when it was not on the non-exhaustive list of countries, due to the other countries on that list not being significant producers of comparable merchandise and/or lacking suitable {SV} data. Unlike those segments, however, and as discussed in further detail below in the "Significant Producer of Comparable Merchandise" and "Data Considerations" subsections of this issue, this is not the case in this administrative review. Here, record information shows that India, which is on the list of economically-comparable surrogate countries, is a significant producer of comparable merchandise.

…

Moreover, with respect to economic comparability, beyond the fact that India is on the Surrogate Country List and Indonesia is not, Indonesia's per-capita GNI of $3,840 is not at the same level of economic development as Vietnam. Specifically, Vietnam's 2018 GNI is $2,400, and the highest GNI reflected on the Surrogate Country List is Angola's GNI of $3,370.

…

{W}e find that Indonesia is not at the same level of economic development as Vietnam, while India is, and, thus, we disagree that we should accord Indonesia the same weight and consideration by Commerce as a potential surrogate country with respect to this criterion.[19]

Therefore, Commerce found it appropriate to rely on SV data from a country that most closely approximated Vietnam's level of economic development, in terms of GNI.

Notwithstanding our assessment that a country on the Surrogate Country List[20] provided usable data, we also referenced the relative quality of the Indian data as compared with the Indonesian data.[21] We explained that, when considering what constitutes the best available information, Commerce considers several criteria, including whether the SV data are

---

[19] *Id*. (internal citations omitted).
[20] *See* Surrogate Country List.
[21] *See Final Results* IDM at Comment 3.

contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question.[22]  Then, applying those criteria to the record, consistent with our *Preliminary Results*, we explained that such considerations weighed in favor of using the Indian SV data.  We highlighted that:

> for the most important input (whole live fish), the Indonesian data include other species of fish and are, thus, not species-specific, unlike the Indian data … with regard to another main input, fingerlings, {the Indonesian data} are not contemporaneous and are only partially specific (*i.e.*, specific with respect to size) unlike the Indian data … {and} the Indonesian data for another main input, fish feed, are not contemporaneous with the POR, and are only partially specific with regard to protein content, unlike the Indian data.[23]

We concluded that the Indian data were the superior source for purposes of the administrative review, and stated that "{n}o new information on the record exists to make us reverse our finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data."[24]  In the *Final Results*, using India as the surrogate country, we calculated a weighted-average dumping margin of $0.00/kilogram (kg) for Vinh Hoan.[25]

Additionally, in the *Final Results*, we assigned DOTASEAFOOD to the Vietnam-wide entity, granted a separate rate to Nam Viet Corporation (Nam Viet), and determined that two domestic wholesalers had standing to request review.  The petitioners[26] appealed.

### B.    *First Remand Opinion*

On July 7, 2023, the Court issued its *First Remand Opinion*.[27]  The Court upheld Commerce's *Final Results* regarding the following:  (1) the granting of a separate rate to Nam

---

[22] *Id*.
[23] *Id*. (internal citations omitted).
[24] *Id*.
[25] *See Final Results*, 86 FR at 36103.
[26] The petitioners are the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.
[27] *See generally First Remand Opinion*.

Viet, and the selection of that rate; (2) our treatment of DOTASEAFOOD as part of the Vietnam-wide entity; and (3) our finding that two domestic wholesalers had standing to request review.[28]  However, the Court remanded Commerce's selection of India as the primary surrogate country for valuing FOPs.[29]

With respect to the selection of India as the primary surrogate country, the Court found that "Commerce applied the wrong legal standard in its surrogate country selection" by favoring countries within the GNI range set forth in the Surrogate Country List (*i.e.*, countries designated as being at the "same" level of economic development as Vietnam) while the Act requires only that surrogate countries be at a "comparable" level of economic development to the NME in question.[30]  The Court also found that Commerce "has given no indication as to what criteria it employs (other than looking to a range of GNI chosen via unspecified means) to determine what constitutes either 'the same' or 'a comparable' level of economic development."[31]  Thus, the Court held:

> Because the administrative record shows that Commerce applied the wrong legal standard in its surrogate country selection, and because there is nothing in the administrative record showing what GNI level Commerce considered 'economically comparable,' Commerce's surrogate country selection is both contrary to law and not supported by substantial evidence.  The court therefore remands that issue for {Commerce} to conduct a new analysis using the correct standard.[32]

## C.    First Remand Redetermination

In the First Remand Redetermination, Commerce further explained its *Final Results*.[33]

We provided additional discussion of our surrogate country selection process and our generation

---

[28] *Id*. at 35-36.
[29] *Id*. at 35.
[30] *Id*. at 20.
[31] *Id*. at 18.
[32] *Id*. at 20.
[33] *See generally* First Remand Redetermination.

of the Surrogate Country List. We also provided additional explanation as to why such a process is appropriate in Commerce's administrative proceedings, and why there is a need to limit the scope of Commerce's universe of potential sources for surrogate valuation. We explained that this decision was not only consistent with administrative practice and court precedent relating to our sequential surrogate country selection practice, but it was also warranted by the fact that India's GNI was far more proximate than Indonesia's to Vietnam's GNI.[34] Nonetheless, in compliance with the Court's directive, we compared the Indonesian data on the record to the Indian data used in the underlying review. Consistent with our analysis in the *Final Results*,[35] we continued to find that the Indian data were superior to the Indonesian data, on balance, and that the Indian data were, therefore, appropriate for valuing Vinh Hoan's reported FOPs.

With respect to the main inputs, we found that the Indian data sources (*Fishing Chimes* and *UCN* publications) met Commerce's SV selection criteria. In particular, we found that they reflected broad market averages for key inputs, including live fish, fingerlings, and fish feed. We emphasized that the *Fishing Chimes* publication sourced the underlying data from a survey of major fish-producing districts within the state of Andhra Pradesh, which was the predominant location of *pangasius* production in India, and noted that the study covered large volumes of fish, fingerlings, and feed.[36] We also emphasized that the *UCN* database stated that the underlying data were collected via interviews with farmers in all major producing regions.[37]

In addition, we explained why it was appropriate for Commerce to rely on 2006 Indian labor data. Despite certain flaws associated with the data, they were usable once inflated. We

---

[34] *See* First Remand Redetermination at 7-19 and 32-39.
[35] *See Preliminary Results* PDM at 15 (noting that the "Indonesian data generally are less preferable than the Indian data for use in this review"); and *Final Results* IDM at Comment 3 ("No new information on the record exists to make us reverse our {preliminary} finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data.").
[36] *See* First Remand Redetermination at 18-21 and 40-45.
[37] *Id*. at 44.

also explained that Commerce strongly favors selecting all SVs from a single country, to the extent possible, pursuant to 19 CFR 351.408(c)(2).[38]

Finally, we explained the Indian SVs used to value offsets for Vinh Hoan's frozen by-products and fish meal were appropriate. Despite the petitioners' assertion that these by-products were more valuable on a weight basis than whole live fish (*i.e.*, the main input into the processing stage of production), we explained that these by-products[39] have undergone different levels of additional processing, which make such a comparison inappropriate.[40] In light of these considerations,[41] we continued to find that India was the most appropriate surrogate country.

### D.    *Second Remand Opinion*

On June 5, 2024, in the *Second Remand Opinion*, the Court sustained in part, and remanded in part, the First Remand Redetermination.[42] Although the Court found that Commerce's comparison of the Indian and Indonesian data complied with the *First Remand Opinion*, the Court remanded certain aspects of Commerce's analysis relating to the relative data quality.[43]

First, the Court again remanded our analysis regarding whether the *Fishing Chimes* and *UCN* sources for whole live fish, fingerlings, and fish feed reflected a broad market average.[44]

---

[38] *Id*. at 51.

[39] We note that, although fish meal has been referenced by Commerce and interested parties as a "co-product" in this review (and in numerous prior reviews), we have, in fact, treated it as a "by-product." Specifically, we made a deduction to normal value to account for the value of the fish meal (and for other products, such as fish oil). Accordingly, we refer to fish meal and the frozen by-products as "by-products" herein.

[40] *Id*. at 51-53.

[41] In the First Remand Redetermination, we also explained our reliance on the three Indian financial statements on the record. *Id*. at 21-23 and 48-50. The Court has not remanded that portion of the analysis. *See Second Remand Opinion* at 12 ("{Commerce} compared the statements and found neither one to be superior, so it used a regulatory preference to decide the issue. That was permissible.").

[42] *See Second Remand Opinion* at 1.

[43] *Id*. at 3.

[44] *Id*. at 2-8.

With respect to the former, citing its decision related to the prior administrative review, the Court held:

> while *Fishing Chimes* estimated that pangasius is farmed in more than 300 villages in two districts in the Indian state of Andhra Pradesh, it stated that only 46 of the 300 villages the study covered were in those two districts … That is, if the study covered 300 villages of which 46 were in the two districts, the rest must be somewhere else. {*It is*} *not apparent how a study focusing on fish farming in a significant minority of villages could represent a 'broad market average*.'[45]

With respect to *UCN*, the Court determined that, although Commerce noted that the publication referred to "{d}ata collected via interviews with farmers in all major producing regions" and "{d}ata collected via interviews with feed mills in all major producing regions," this was insufficient. Specifically, the Court found that "Commerce essentially accepted *UCN*'s vague and unsupported reference to an unspecified number of farmers and feed mills in 'all major producing regions,'" and remanded for Commerce to reconsider its reliance on *UCN*.[46]

Second, the Court again remanded Commerce's reliance on non-contemporaneous Indian labor data.[47] In the First Remand Redetermination, Commerce acknowledged the drawbacks of the Indian data – *i.e.*, that they were from 2006 and had to be inflated to the POR, and that the record was unclear as to whether the data were industry specific – but found that reliance on the data was nonetheless appropriate, in light of Commerce's regulatory directive to rely on the primary surrogate country to the greatest extent possible. The Court disagreed, finding that the problem with Commerce's "analysis is that the statute requires, in all instances, the use of 'the best available information'" and further found that "{t}he 'regulatory preference,' in other

---

[45] *Id*. at 6 (emphasis added).
[46] *Id*. at 8.
[47] *Id*. at 12-14.

words, is a mere tiebreaker, not a rule of decision, and here, Commerce jumped to the tiebreaker without first declaring the game to be tied."[48]

Third, the Court remanded for further explanation Commerce's discussion of the SV selected for certain by-products (*i.e.*, frozen by-products and fish meal).[49]  In the First Remand Redetermination, Commerce explained why use of a by-product SV that resulted in values greater than the underlying input value on a constant weight basis may be acceptable (and why no "cap" was necessary).  In particular, we explained that such SVs related to by-products that underwent different levels of processing than the whole live fish and, therefore, Vinh Hoan incurred additional costs to bring the material into the form in which it was sold.  The Court, however, found that "Commerce stated its conclusion with no meaningful citation to the record. It simply said the by-products and co-products have undergone different levels of processing from the inputs and that the result is not distortive."[50]  The Court remanded the *Final Results* for a second time and directed Commerce to address each of these issues.[51]

On September 27, 2024, Commerce issued its Draft Results.[52]  On October 11, 2024, the petitioners and Vinh Hoan submitted comments on the Draft Results.[53]

---

[48] *Id*. at 14.
[49] *Id*. at 15-19.
[50] *Id*. at 18-19.
[51] *Id*. at 19.
[52] Commerce inadvertently issued an incorrect version of the document on September 27, 2024.  On October 2, 2024, Commerce replaced the September 27, 2024 version of the document with a corrected version, which was unchanged in substance.  *See* Memorandum, "Reject and Remove Document from ACCESS," dated October 2, 2024.  *See also* Draft Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Ct. No. 21-00380, Slip Op. 24-67 (CIT June 5, 2024), issued October 2, 2024 (Draft Results).
[53] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated October 11, 2024 (Petitioners' Comments); and Vinh Hoan's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated October 11, 2024 (Vinh Hoan's Comments).

### III.    ANALYSIS

As noted above, the Court remanded three specific issues related to our assessment that India provides the best overall source of SV data.  We address each issue, in turn.

#### A.    *Fishing Chimes and UCN*

We find that *Fishing Chimes* and *UCN* are appropriate sources for surrogate valuation of Vinh Hoan's main inputs and that the data in these publications reflect broad market averages, as the phrase is understood and intended in the context of Commerce's SV analysis.  Below, we provide additional explanation of Commerce's approach to analyzing this criterion in its SV assessment.  We also note that the broad market average consideration – like all of the SV criteria – is one factor among many that must be analyzed in selecting SVs (and in making the concomitant primary surrogate country selection, when considering sources for potential SVs in the aggregate).

As the Court noted,[54] in the underlying review Commerce found that the Indian data for whole live fish, fingerlings, and feed were publicly available, contemporaneous, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs, including the particular species of *pangasius* in question.  In the First Remand Redetermination, Commerce discussed several aspects of the *Fishing Chimes* and *UCN* publications that spoke to the representativeness of the data.  For instance, regarding *Fishing Chimes*, we pointed to the large number of survey respondents, the significant number of harvests covered by the data,[55] the estimated overall substantial volume covered by the study,[56] and the various explicit statements

---

[54] *See Second Remand Opinion* at 4.
[55] *See* First Remand Redetermination at 40-42.
[56] *Id*. at 42-43.

made by the researchers to demonstrate that they took steps to obtain generalizable data.[57]  With respect to the *UCN* publication, we noted that, here too, the study explicitly stated that the scope of its study was a broad one, containing statements such as "{d}ata collected via interviews with farmers in all major producing regions" in each instance where it presented quantitative data.[58]  Because the Court remanded our analysis of the broad market average criterion for further explanation with respect to *Fishing Chimes* and *UCN*, we provide such additional explanation here.

In the *Second Remand Opinion*, the Court expressed concerns regarding the *Fishing Chimes* study's coverage.  The study stated that farming was carried out in 300 villages in certain major fish-producing districts and that researchers "interviewed 54 farmers in 46 villages to obtain the general trend."[59]  The Court questioned whether "a study focusing on fish farming in a significant minority of villages could represent a broad market average."[60]  While we acknowledge that the harvest data were sourced from only a subset of the 300 villages, this fact does not detract from our conclusion that the *Fishing Chimes* study is a reasonable source to use.  Instead, the more salient fact is that the survey rests on information derived from a substantial number of data points from sources within the mainstream of the Indian fishing industry,

---

[57] *Id*. at 43 (noting, for instance, that the "study team focused on Andhra Pradesh as it has *major representation* in production of pangasius") (internal citations omitted and emphasis added).

[58] *Id*. at 44 (citing Vinh Hoan's Letter, "Vinh Hoan Corporation – Final Direct Surrogate Values," dated November 15, 2020 (Vinh Hoan November 15, 2020 SV Submission), at Exhibit FDSV-6).

[59] *Id*.  We also point out that all of the 300 villages referenced in the report were located in those two districts, and, thus, the other 254 villages were not elsewhere in India beyond those two districts.  Rather, they simply were not villages from which the researchers obtained quantitative survey data.  *See* Vinh Hoan's Letter, "Vinh Hoan Corporation - Surrogate Values," dated April 24, 2020 (Vinh Hoan's April 24, 2020 SV Submission), at Exhibit SV-4(c) (containing the *Chepala Sandadi* version of the data, which states "Pangasius farming is carried out {in} more than 300 villages in West Godavari and Krishna districts {of Andhra Pradesh}... Out of 300 villages {the} study covered 46 villages in these two districts.").  Moreover, we note that the *Fishing Chimes Journal* (July 2019 edition) states that "field visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh" and "data sets were collected from … 54 farmers {in 46 villages}").  *Id*. at Exhibit SV-4(b).

[60] *See Second Remand Opinion* at 6 (internal citations and quotations omitted).

rendering them representative of a "broad market average" as that term must be understood in the context of Commerce's SV analysis.

There is no question that the survey relied on a large number of data points from the Indian state (Andhra Pradesh) that accounted for a clear majority of India's production.[61]  The *Fishing Chimes* publication, in multiple instances, laid out the explicit steps that the researchers took to achieve generalizable data, *i.e.*, results reflective of a broad market average.  The authors explained that they "interviewed 54 farmers in 46 villages to obtain the *general trend*" and stated that "using statistical methods {the researchers} analyzed data for qualitative and quantitative results."[62]  The source also states that, following field collection, "{f}or cross verification of economic data outcomes, farm-gate prices were also obtained from vernacular newspapers from 2017 & 2018."[63]  The number of survey respondents and the method of sample selection all support Commerce's decision to rely on the *Fishing Chimes* data.

We agree with the Court's statement that "{t}he mere existence of a large volume of transactions does not establish a broad market average."[64]  However, we note that the opposite also can be true:  a limited number of data points does not, in and of itself, render the data unrepresentative of a broad market average.[65]  What is pivotal to the analysis is how the data were collected, from where the data were sourced (*e.g.*, mainstream vs. niche or specialty producers), and the data pool from which the data were derived.  In this case, it is evident that the

---

[61] Although 15 Indian states produced *pangasius* during the period, about 60 percent was produced in Andhra Pradesh during 2018, and Table 1 of the exhibit shows that no other state is close to Andhra Pradesh in terms of production volume (the next two largest states account for 150,000 MT, and 120,000 MT, respectively, and the remaining states represent a tiny percentage of the country-wide total).  *See* Vinh Hoan's April 24, 2020 SV Submission at SV-4(c) (emphasis added).  In addition, the researchers explicitly stated that the "study team focused on Andhra Pradesh as it has major representation in production of *pangasius*.  *Id*.

[62] *See* Vinh Hoan's April 24, 2020 SV Submission at SV-4(c) (emphasis added).

[63] *Id*.

[64] *See Second Remand Opinion* at 6-7 n.4.

[65] Though, here, the data are not derived from a small number of data points (*i.e.*, there are 108 data sets gathered over two years), as discussed above.

*Fishing Chimes* survey was designed to address each of these considerations, with a goal of showing the "general trend" of fish prices in India as a whole (and not solely in Andhra Pradesh).

We find it significant that no party to this proceeding has provided evidence that calls into question the representativeness of the data in general, nor has any party provided evidence to undermine the survey findings. Rather, the discussion here has centered around the meaning of the term "broad market average" itself, and whether use of this term requires a finding that the data on which the discussion is premised cover a majority of the market. In furthering this discussion, it is important to note that neither the Act nor Commerce's regulations define the term "broad market average." When Commerce uses this term, we generally mean that the data themselves are broader than a single data point (such as an offer for sale or a transaction-specific price) and are generally reflective of market conditions on a larger scale. We do not require that the parties show, or that Commerce find, that the data are absolutely representative of an entire market; such an interpretation would not only be overly restrictive, it would also be virtually impossible to achieve.

Here, the volume of merchandise covered by the study is a fraction of the total production in India; however, this is neither surprising nor a fact that renders our use of the survey unreasonable. Data analysis relying on survey methodology does not necessarily (*and typically does not*) cover the entirety of a population and they are, naturally, likely to focus on groups or regions where there is a significant concentration of data points. Some of the sources that are most frequently used by Commerce, such as the World Bank's "Doing Business" publication, are often based on survey data that focus on a subset or a region from which representative data may

be obtained.[66]  In numerous instances in this proceeding[67] and elsewhere[68] we relied on a subset

of an economy's prices and still found the data to be representative of a broad market average.[69]

Here too, beyond the size/location of the sample, there are numerous indicators in *Fishing*

*Chimes* that demonstrate that the data were tested for representativeness.  Against this

background, the record supports a finding that the data constitute a broad market average.

With respect to the *UCN* source, Commerce underscored that the publication referenced

"{d}ata collected via interviews with farmers in all major producing regions" and "{d}ata

collected via interviews with feed mills in all major producing regions."[70]  The Court found this

to be inadequate, determining that Commerce improperly "accepted *{UCN}'s* vague and

---

[66] *See, e.g.*, *Hangzhou Yingqing Material Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (December 21, 2016) (*Hangzhou Yingqing*) (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because:  (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) (*Diamond Sawblades AR 2011-2012*), and accompanying IDM at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks.  Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average"); and *Certain Steel Threaded Rod from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014) (*STR from China AR 2012-2013*), and accompanying IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business: Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

[67] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 75 FR 12726 (March 17, 2010), and accompanying IDM at Comment 1.A ("Petitioners argue that the FAO Report price does not represent as broad a market average as the Fish Pond Report, as the data contained within the FAO Report is based on only one region in Bangladesh as opposed to the Fish Pond Report data that is based on three provinces.  While Petitioners are correct that the FAO Report is not based on multiple provinces, we note that the data in the FAO Report is based on more fish farmers (60) than the Fish Pond Report (34).  Moreover, it is not clear that other provinces in Bangladesh have any meaningful production of Pangas fish.  However, the FAO Report does state why this particular region was selected (*i.e.*, importance of this region in Pangas farming, the availability of hatchery produced fry, availability of ponds, warm climate, cheap and abundant labor.)" (internal citations omitted)).

[68] *See, e.g.*, *Raw Honey from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22184 (April 14, 2022), and accompanying IDM at Comment 1 ("The five Indian news articles are specific to ingredient raw beekeeper honey, representative of the broad market average because they are from the largest raw honey producing regions of India … .").

[69] *See, e.g.*, *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311; *Diamond Sawblades AR 2011-2012* IDM at Comment 20; and *STR from China AR 2012-2013* IDM at Comment 3.

[70] *See* First Remand Redetermination at 44.

unsupported reference to an unspecified number of farmers and feed mills in all major producing regions."[71] Although we agree with the proposition that having greater detail on a source is always preferable, we believe that this aspect of the *Second Remand Opinion* imposes a bright-line standard on potential SV sources that cannot be met in many cases. In fact, various other sources on the record of this review which were proffered for key FOPs – including those relating to the Indonesian alternative SVs on this record – would not meet this stringent standard, as noted below.

Moreover, we emphasize that a determination of whether data reflect a broad market average is a consideration that is made on a spectrum; even assuming *arguendo* that the *Fishing Chimes* and/or *UCN* data were lower on such a continuum, there are still various aspects of the data that make them not only reliable but also the best SVs available for use in this segment of the proceeding. These Indian sources for whole live fish, fingerlings, and feed cannot be considered in a vacuum; regardless of the extent to which one considers that the *Fishing Chimes* and *UCN* data are representative of a broad market average, there are other SV selection criteria that must be considered.

The Indonesian data for the key inputs meet several of the SV criteria, but they also are less desirable in other respects. For instance, as we explained in the First Remand Redetermination, the Indonesian data to value whole live fish are not species-specific.[72] With respect to fingerlings, another key input, the proposed Indonesia government data were not contemporaneous; they predated the POR by approximately six years and were not size-specific

---

[71] *See Second Remand Opinion* at 8.
[72] *See* First Remand Redetermination at 46; and Petitioners' Letter, "Submission of Proposed Surrogate Factor Values," dated April 24, 2020 (Petitioners' April 24, 2020 SV Submission), at Exhibit 2-F, Attachment 2 ("The statics {sic} contained in the IAS listed under the common name Patin (Pangas Cat Fishes) can contain data related to any of the above subspecies; the data is {sic} not limited to *Pangasius Hypopthalmus*.").

for fingerlings over six inches in length.[73]  Although the petitioners identify

alternate/contemporaneous Indonesian fingerling data on the record, such data consist of prices[74]

from a small number of sources, and were obtained for the purposes of this proceeding.  We have

previously expressed concern about relying on such sources of this type, because they can be

selectively obtained for the specific proceeding and frequently do not reflect the experience of

the market as a whole.[75]  Our preference against similar sources has been consistently applied in

Commerce's analysis of potential SV data for FOPs.[76]  We also note that, here, the fingerling

prices from such affidavits were obtained from a small number of farmers.[77]  It is unclear as to

why the market coverage of such data is not equally – or more – of concern here, despite the

stringent criteria that the plaintiffs propose for the Indian data.  In short, regarding fingerlings,

there is no basis to conclude that the Indonesian government data (which are not

---

[73] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-B (containing data for 2011 and 2012).
[74] *Id*. at Exhibit 5-C and 5-D.  The petitioners referred to these data as "price lists" on numerous occasions.  *See, e.g.*, *id.* at 9; *see also* Petitioners' Letter, "CFA Pre-Preliminary Surrogate Value and Factual Information Submission," dated November 13, 2020 (Petitioners November 13, 2020), at 6.  However, on remand, the petitioners state that such pricing data were not "price lists" as that phrase is typically used, but, rather, are lists of actual historical prices from the selected farmers from which they solicited data.
[75] *See Utility Scale Wind Towers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 24, 2012) (*Wind Towers from China*), and accompanying IDM at 12 ("Moreover, {Commerce} generally does not use price lists to value FOPs because (1) these prices often represent a starting point in a negotiation that could result in a significantly different final sale price and (2) price lists reflect the experience of a single producer rather than a broad market average."); *Certain Tissue Paper Products from the People's Republic of China:  Final Results and Partial Rescission of the 2007-2008 Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 74 FR 52176 (October 9, 2009), and accompanying IDM at Comment 3 ("Price quotes are merely that, and may not reflect actual transaction values.  Further, they are easily subject to manipulation and may be dependent on various factors not evident on the administrative record."); *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances:  Certain Polyester Staple Fiber from the People's Republic of China*, 72 FR 19690 (April 19, 2007), and accompanying IDM at Comment 7 ("When other usable and reliable information is available, it is {Commerce}'s practice to not use price quotes to value FOPs."); *Certain Cased Pencils from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 70 FR 42301 (July 22, 2005) (*Pencils from China*), and accompanying IDM at Comment 2; and *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (CIT 2010) (*Bristol Metals*).
[76] *See Wind Towers from China* IDM at 12; *Pencils from China* IDM at Comment 2; and *Bristol Metals*, 703 F. Supp. 2d at 1376.
[77] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-C.

contemporaneous) or the Indonesian prices (which have several drawbacks) better meet the SV selection criteria when compared to the Indian data.

With respect to fish feed, we have similar concerns. The initially proffered Indonesian data[78] for this FOP are not contemporaneous with the POR and are only partially specific with regard to protein content. The alternative Indonesian data on the record, *i.e.*, prices solicited by the petitioners, provide contemporaneous values and additional coverage of protein contents.[79] However, for the same reasons noted in the context in of the fingerlings SV discussion – *i.e.*, that the source consists of prices obtained for this proceeding, which were obtained from a small number of sources – we do not find that the Indonesian prices reflect a more reliable basis for surrogate valuation than the published Indian data.[80]

Thus far, Commerce has limited its discussion to the specific inputs covered by the two sources identified by the Court as requiring further analysis, *i.e.*, whole live fish, fingerlings, and feed data in *Fishing Chimes* and *UCN*. However, given that Commerce's analysis of surrogate country selection must be conducted on an aggregate basis, we also note in passing that no other aspects of the available data compel a different result. Regarding the surrogate financial ratios, we relied on contemporaneous financial statements from three Indian seafood processors.[81] In the First Remand Redetermination, we explained why the statements provided a reliable basis for

---

[78] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-B.
[79] *See* Petitioners November 24, 2020 Submission at 17.
[80] The Indian SV data for feed lack 2019 data at the 22 or 26 percent content level. However, the Indian data (from 2018) are clearly more contemporaneous than the Indonesian government-sourced data from the petitioners, and the Indian data are from a preferable source as compared with the contemporaneous price list data proffered by the petitioners.
[81] *See Final Results* IDM at Comment 3.

valuing the surrogate financial ratios and determined that the Indonesia alternatives offered no advantage.[82]  The Court sustained Commerce on the issue.[83]

With respect to the other categories of data, there are limited differences across the SVs when comparing them on the dimensions identified above.  Many of the remaining material inputs are based on Global Trade Atlas (GTA) trade data, regardless of which surrogate country is selected.  Because neither country's trade data offer an advantage with respect to the evaluation criteria (*e.g.*, contemporaneity, public availability, specificity, *etc.*), there is no basis to conclude that the Indonesian data are preferable to the Indian data in this regard.[84]

In sum, given that the Indian data are preferable for the main inputs, and because the financial statements and other SV sources are not superior for Indonesia, we find that India remains the appropriate choice as the primary surrogate country in this segment of the proceeding.

### B.    Labor

Consistent with the Court's order, we have reconsidered our reliance on 2006 Indian labor data in favor of contemporaneous data from a reliable source.  Additionally, we find that the labor SVs on the record do not support reliance on Indonesia over India as the primary surrogate country.

As noted above, in the *Second Remand Opinion*, the Court again remanded Commerce's decision to rely on 2006 International Labor Organization wage data for India.[85] Notwithstanding Commerce's explanation of its regulatory preference to value SVs from a

---

[82] *See* First Remand Redetermination at 21-23.
[83] *See Second Remand Opinion* at 11 ("{Commerce} compared the statements and found neither one to be superior, so it used a regulatory preference to decide the issue. That was permissible.").
[84] We also conclude that neither country offers an advantage relating to the available labor data on the record. However, this issue was a subject of the *Second Remand Opinion* and is, accordingly, discussed separately in the next section.
[85] *See Second Remand Opinion* at 14.

single/primary surrogate country to the greatest extent possible,[86] the Court concluded that doing so was inappropriate under the circumstances. The Court found that Commerce improperly did not pick the best available information to value the labor FOP and determined that "{n}othing here shows that {Commerce} found the Indian labor data superior."[87] The Court determined that Commerce placed too much weight on its "regulatory preference" in continuing to rely on non-contemporaneous data, whereas the preference should have been treated as "a mere tiebreaker."[88]

We respectfully disagree with the Court's characterization of our regulations. The purpose of the regulatory preference is not simply to break "ties." Construed in such a manner, Commerce would be faced with potentially selecting individual SVs from a host of different surrogate countries. For instance, in a given case, Commerce might be required to pick numerous SVs from Country A, others from Country B, and still others from Country C because each country offered the best SV data *for a particular set of inputs*. The number of potential SVs is not trivial; Commerce's analysis often involves dozens of SVs and, in some cases, subject merchandise can have over a hundred FOPs; for each of these FOPs and SV combinations, interested parties may proffer data for multiple surrogate countries.[89]

Beyond such administrative considerations, there is also good reason to focus on a single country to the maximum extent possible to achieve the most accurate calculation of normal

---

[86] *See* First Remand Redetermination at 51.

[87] *See Second Remand Opinion* at 14.

[88] *Id.*

[89] *See, e.g.*, *Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture from the People's Republic of China*, 72 FR 46957 (August 22, 2007), and accompanying IDM at Comment 1 ("In light of the many hundreds of factors successfully valued in this review using Indian data…"); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers from the People's Republic of China*, 69 FR 20594 (April 14, 2004), and accompanying IDM at Comment 2 ("For example, each of Changhong's reported CTV models contained hundreds of parts that {Commerce} valued using surrogate values."); and *Large Residential Washers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 FR 90776 (December 15, 2016) ("Our verification findings indicate that both companies weighed hundreds of individual parts to report their FOPs as accurately as possible, and in accordance with the requirements of {Commerce's} questionnaire.").

value. Elsewhere, the Court has recognized that deriving SV data from a single surrogate country, to the extent possible, is directed by the regulations and also limits the amount of distortion introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market.[90]

As a result, Commerce tries to "use as much data as possible from the primary surrogate country,"[91] and Commerce's preference is to rely on the primary surrogate country for SVs unless a party has demonstrated that a particular primary country SV was unreliable or aberrational.[92] Thus, the approach reflects adherence to a long-established and court-affirmed methodology designed to limit distortions resulting from mixing and matching SVs from different source countries.

Finally, the *Preamble* to Commerce's regulations explicitly characterizes this particular regulation as a *general* rule, rather than as a "tiebreaker" (*i.e.*, for use only in specific instances where individual data choices are equivalent).[93] Specifically, the *Preamble* states:

> In general, under proposed paragraph (c), we would value inputs using publicly available information regarding prices in a single surrogate country. However, we articulated certain exceptions to this general rule. First, where the NME producer purchases inputs from a market economy producer and these inputs are paid for in

---

[90] *See Clearon Corporation v. United States*, Slip Op. 13-22 (CIT February 20, 2013), at 12-14 ("{T}he court must treat seriously {Commerce's} preference for the use of a single surrogate country."); *see also Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, 1352 (CIT 2018); and *Jiaxing Brother Fastener Co. v. United States*, 822 F. 3d 1289, 1302 (Fed. Cir. 2016) (*Jiaxing Brother CAFC*) (affirming Commerce's preference to source SVs from a single surrogate country).

[91] *See, e.g.*, *Jiaxing Brother CAFC*, 822 F.3d at 1294 & n.3; and *T. T. International v. United States*, 439 F. Supp. 3d 1370, 1382 (CIT 2020); *Certain Walk-Behind Snow Throwers and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 FR 17984 (March 29, 2022), and accompanying IDM at Comment 3, n.101 ("Commerce has a regulatory preference to use as much data as possible the primary surrogate country); and *Sodium Hexametaphosphate from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment I.

[92] *See Carbon Activated Tianjin Co. v. United States*, 547 F. Supp. 3d 1310, 1318 (CIT 2021) (*Activated Carbon*) (sustaining Commerce's reliance on a single surrogate country (Malaysia), and noting that "{p}laintiffs have not provided any evidence that the Malaysian HS 2701.19 data are aberrant or unreliable. ... Accordingly, Plaintiffs' argument that Romanian HS 2701.19 data is preferable to Malaysia because . . . Romanian {HS} 2701.12 data is undistorted is without support.") (internal quotations and citations omitted); and *List Industries, Inc. v. United States*, 641 F. Supp. 3d 1400, 1413 (CIT May 2023).

[93] *See Antidumping Duties; Countervailing Duties, Final Rule*, 62 FR 27296, 27366 (May 19, 1997) (*Preamble*).

a market economy currency, we would use the price paid by the NME producer to value that input.  Second, we proposed valuing the NME producer's labor input by reference to a regression-derived calculation that effectively includes wage information from a number of countries, rather than a single country.[94]

As can be seen from the above passage, Commerce envisioned departing from the single surrogate country directive only in limited circumstances, neither of which applies here.  We also acknowledge that, at times, we have no option but to depart from the rule where necessary data for the primary surrogate country are missing or aberrational.[95]  However, that is not the case here with respect to the labor SV.  In short, the discussion above makes clear that reliance on a single surrogate country is more than a mere "tiebreaker."

Nonetheless, we recognize the Court's concern with the originally used Indian labor data, which substantially predate the POR.  As a result, Commerce reopened the record on remand and placed International Labor Organization data, *i.e.*, ILOSTAT "Periodic Labour Force Survey" data regarding sector-specific wage rates, on the record for India.[96]  As a result, the record now contains contemporaneous and specific Indian data on the record of this proceeding.  The petitioners placed contemporaneous Indonesian labor data on the record, including (i) ILOSTAT "Periodic Labour Force Survey" data regarding sector-specific wage rates in Indonesia, (ii) Indonesian labor rates for aquaculture workers prepared by Indonesia's government statistics bureau, Badan Pusat Statistic (BPS), and (iii) Indonesian labor rates for various industrial sectors (including manufacturing), also prepared by BPS.[97]  Given that contemporaneous and specific labor data are now on the record for both India and Indonesia, we do not find that the SV data

---

[94] *Id.*, 62 FR at 27366.
[95] *See, e.g.*, *Activated Carbon,* 547 F. Supp. 3d at 1318; and *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022,* 89 FR 17817 (March 12, 2024), and accompanying IDM at Comment 2 (noting that Commerce has "a practice to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable").
[96] *See* Memorandum, "Placing Data on the Record," dated August 29, 2024.
[97] *See* Petitioners' Letter, "New Factual Information," dated September 4, 2024.

offered for the labor FOP favors either potential surrogate country.  Consistent with the discussion above, regarding the overall favorability of India as a surrogate country, we recalculated the margin for Vinh Hoan using the contemporaneous Indian labor data.  Reliance on these alternative data did not result in a modified margin; the company's margin remains $0.00/kg.[98]

### C.    Frozen By-Products and Fish Meal

Commerce continues to find that the SVs relied upon to value Vinh Hoan's frozen by-products and fish meal were appropriate and, further, that capping such SVs was not appropriate in this instance.  Accordingly, our margin calculation is unchanged in this regard.

As explained in the First Remand Redetermination,[99] a by-product SV may be higher than the input SV on an equal volume (*e.g.*, per-kg) basis.  In this instance, such a result is hardly surprising, given that (i) a large percentage of the input, *i.e.*, a whole live fish, is composed of by-products, such as head, bones, skin, meat trimmings, *etc.*,[100] and (ii) the by-products in question undergo further processing prior to their sale.  However, the Court determined that Commerce did not adequately explain its decision, finding that "Commerce stated its conclusion with no meaningful citation to the record … {and} simply said the by-products and co-products have undergone different levels of processing from the inputs and that the result is not distortive."[101]

---

[98] *See* Memorandum, "Vinh Hoan Corporation – Second Remand, Calculation memorandum," dated concurrently with these draft results (Vinh Hoan Remand Calculation Memorandum).
[99] *See* First Remand Redetermination at 52.
[100] A whole live fish is roughly two-thirds composed of fresh by-products.  This estimate is calculated as 1 minus the reciprocal of the weighted average (using PRODQTY) of the "UNSOAK" variable in Vinh Hoan's FOP database (VINHFOP03).  *See* Vinh Hoan's Letter, "2nd Supplemental Section C Questionnaire Response – Vinh Hoan Corporation," dated November 9, 2020, at vinhus03 (electronic database).
[101] *See Second Remand Opinion* at 18-19.

To address the Court's concerns, we provide additional discussion and citations to record evidence supporting Commerce's analysis. Regarding the frozen by-products, Vinh Hoan reported frozen fish broken meat, frozen fish stomach, frozen fish fin, and frozen fish skin.[102] In the underlying review, Vinh Hoan submitted a production flow chart detailing the steps and inputs used in the production process for fish fillets.[103] In general, the production process follows these steps (and factors used):

(1) fish raw material receiving (whole fish/labor/water/electricity);
(2) slaughter, washing 1 (labor/water/electricity);
(3) filleting (labor/water/electricity);
(4) washing 2 (labor/water/electricity);
(5) skinning (labor/water/electricity);
(6) trimming (ice/labor/water/electricity);
(7) parasite checking (labor/electricity);
(8) pre-tumbling sizing (labor/electricity);
(9) washing 3 (labor/water/electricity);
(10) tumbling (chemicals/ice/labor/water/electricity);
(11) sizing, color grading (labor/electricity);
(12) placing in freezing pan/machine (labor/water);
(13) freezing (labor/electricity);
(14) glazing;
(15) re-freezing;
(16) packaging (packing/labor/water/electricity);
(17) metal detection (labor/water/electricity); and
(18) cold storing (labor/water/electricity).

In addition, Vinh Hoan submitted a chart detailing the FOPs used in each stage, the associated processing time for the process, the equipment used, and the number of workers involved.[104] Certain of these steps are required for by-products, as shown in the table accompanying the production flow chart (which identifies the stage at which the by-product in question is generated). For example, based on these data, one can see that all of the frozen by-

---

[102] *See* Vinh Hoan Letter, "Vinh Hoan Corporation - Section D Questionnaire Response," dated January 30, 2020 (Vinh Hoan January 30, 2020 SDQR), at 31-32.
[103] *Id*. at Exhibit 6.
[104] *Id*.

products required extra processing, *e.g.*, placing in freezing pan/machine (labor), freezing (labor/electricity), packaging (packing factors/labor/electricity), and cold storing (labor/electricity), as compared with a fish input at the time of introduction into the production process.  Frozen fish stomach and fin require extra labor to extract them from the general fish waste generated in the process.[105]  Moreover, frozen broken meat was generated as part of the filleting stage and, thus, went through some ice, washing, and filleting labor.[106]  Finally, these frozen by-products were packed and placed into cold storage.[107]  Thus, these by-products incurred significant additional processing.

The same conclusion is warranted for fish meal.[108]  Just as with frozen by-products, fish meal undergoes additional processing, using a separate production process of converting fresh fish waste (fish head, bones, guts)[109] into fish meal.  In its questionnaire response, Vinh Hoan also reported separate production factors (*e.g.*, direct and indirect labor, electricity, rice husk)[110] and packing (*e.g.*, polypropylene bag, string)[111] for this product.  Fish meal incurred a substantial amount of additional processing.

For frozen by-products and fish meal, then, the fact that the corresponding SV was higher than the SV for the underlying input (*i.e.*, whole live fish) does not signify that the SV for the by-product is distortive, and we find no reason to conclude so here.  This is especially true, given that Commerce's practice is to subtract the costs of the additional processing from the value of

---

[105] *Id*. (noting that a variety of by-products are generated concurrently during the filleting stage).
[106] *Id*.
[107] Vinh Hoan also reported the packing inputs for these frozen by-products, including:  box; strap; plastic bag; tape; and plastic sheet.  *Id*. at 34-35.
[108] *Id*. at 33.
[109] *Id*. at 29 and Exhibit 6.
[110] *Id*. at 29.
[111] *Id*. at 35.

the by-product prior to relying on it as an offset in our calculations.[112]  Just as processing results in the value of a fillet being more valuable than the raw/unprocessed fish input, substantial further processing similarly may render the value of the frozen by-products and fish meal more valuable than the input when considered on an equal weight (*i.e.*, per kg) basis.

## IV.    INTERESTED PARTY COMMENTS

As noted above, on October 11, 2024, the petitioners and Vinh Hoan submitted comments on the Draft Results.[113]  We address these comments below.

*Petitioners' Comments*

The following is a verbatim executive summary submitted by the petitioners.[114]  For further details, *see* Petitioners' Comments at 4-21.

> {Commerce} has redoubled its reliance on data for whole fish, fingerlings, and feed that the Court has repeatedly rejected.  {Commerce} continues to rely on two Indian trade publications for data regarding Vinh Hoan's primary inputs—without acknowledging or addressing the serious shortcomings in these reports. {Commerce} reiterates that the reports reflect "broad market averages" but fails to grapple with the fact that the reports lack even the basic volume or source information required to undertake a meaningful analysis of the reports' reliability. Instead, {Commerce} unquestioningly accepts that the reports convey information from farmers "in all major producing regions" and that the authors used "statistical methods" to achieve a "general trend"—simply because the authors say so.  In marked contrast, {Commerce} rejects out of hand the Indonesian data—which reflects information collected from across the country, bears the official imprimatur of the Indonesian ministry responsible for monitoring pangasius production, and is supported by signed affidavits.  {Commerce} must undertake an evenhanded review of the respective information from India and Indonesia, including by fulsomely addressing the inadequacies that CFA and the Court have identified in the Indian reports.

---

[112] *See Chlorinated Isocyanurates from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 43271 (July 7, 2023), and accompanying PDM at 40, unchanged in *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 455 (January 4, 2024); and Commerce's Letter, "Initial Questionnaire," dated December 13, 2019 (requesting information regarding inputs used in the further processing of by-products "{i}f the by-product for which you are claiming an offset is a downstream by-product.").
[113] *See generally* Petitioners' Comments; and Vinh Hoan's Comments.
[114] We have combined the petitioners' arguments concerning Commerce's procedural approach to surrogate country selection and its application of that approach, in summarizing comments here.

{Commerce}refuses to fairly compare the Indonesian and Indian labor data on the record. By continuing to rely on Indian labor data, {Commerce} disregards the statutory mandate to use the "best" available surrogate values in all cases, ignores the superiority of the Indonesian labor data—which is more specific than the Indian alternative, and adopts reasoning that flows from the flawed premise that the Indian data for the primary inputs is better than the Indonesian alternative. {Commerce}must compare the Indian and Indonesian information and adopt the data set that provides the best surrogate value for this input.

The record evidence {Commerce} cites does not establish that the Indian data provides the best available surrogate values for by- and co-products, and {Commerce} fails to assess whether the Indonesian by- and co-product values are better. {Commerce} fails to answer the Court's "fundamental question"—*i.e.*, whether the Indian data is the best available for by-and co-products. Instead, {Commerce} cites evidence that does not support the conclusion that the Indian data is reliable, and omits any comparison to or even analysis of the Indonesian information on the record.

*Vinh Hoan's Comments*

The following is a verbatim executive summary submitted by Vinh Hoan. For further details, *see* Vinh Hoan's Comments at 1-2.

On June 5, 2024, the {Court} remanded certain aspects of {Commerce}'s decision in selecting Indian surrogate value sources for valuing factors of production in the 2018-2019 administrative review of this Order. Specifically, the Court remanded: (1) reliance on the publications *Fishing Chimes* and *{UCN}* as surrogate value sources for whole live fish, fingerlings and fish feed; (2) reliance on non-contemporaneous labor data; and (3) analysis of the surrogate value used to value certain by-products. {Commerce} fully complied with the Court's remand decision, to include re-opening of the record on the valuation of labor. As such, we have no further comments and respectfully request that {Commerce}'s Draft Remand Redetermination be accepted and issued unchanged as the Final Remand Redetermination.

**Commerce Position:** We continue to find that reliance on India as the primary surrogate country is appropriate here. The petitioners present numerous arguments regarding our assessment of the relative quality of the Indian and Indonesian data, in particular concerning: (1) certain key inputs (*i.e.*, whole live fish, fingerlings, and feed); (2) labor; and (3) by-products. We address these arguments in turn.

### a) Whole Live Fish, Fingerlings, and Feed

We continue to find the Indian data superior for the main production inputs. The petitioners' assertions do not undermine Commerce's analysis regarding these inputs, *i.e.*, whole live fish, fingerlings, and feed, for which we relied on *Fishing Chimes*[115] and *UCN* for surrogate valuation.

The petitioners' most significant line of argument regarding these SV sources relates to whether they reflect broad market averages.[116] We find that they do meet that SV selection criterion, as it is understood and intended in the context of Commerce's SV analysis. And, as noted above, the broad market average consideration – like all of the SV criteria – is one factor among many that must be analyzed in selecting SVs, and, by extension, when making the concomitant primary surrogate country selection (*i.e.*, when considering sources for potential SVs in the aggregate). We also disagree with the petitioners that the *Fishing Chimes* and *UCN* data are unreliable because they lack specific data on the individual survey respondents' production volumes or due to the timing of the observations, as discussed below. Further, both publications are reputable sources on which Commerce has relied in prior segments of this proceeding;[117] indeed, *Fishing Chimes* has been published for almost 40 years and *UCN* similarly has published a variety of data series for decades.[118]

---

[115] The record contains data from *Fishing Chimes* as well as *Chepala Sandadi*, its sister publication. We refer to the sources collectively as "*Fishing Chimes*," unless otherwise noted.

[116] *See* Petitioners Comments at 5-6 ("As a primary matter, the draft results persist in relying on Indian data from two trade publications to establish surrogate values for whole fish, fingerlings, and fish feed notwithstanding the absence of evidence indicating that the data reflect a broad market average. ...The Court has repeatedly questioned {Commerce}'s reliance on the data in these sources, finding unsupported the agency's conclusion that they reflect broad market averages").

[117] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 23756 (April 29, 2020), and accompanying IDM at Comment 2; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 15912 (March 21, 2022), and accompanying IDM at Comment 10.

[118] *See, e.g.*, Vinh Hoan April 24, 2020 SV Submission at Exhibits SV-4(b) ("39th Year of Publication") and SV-4(f)

We disagree with the petitioners that the data from these publications do not represent a broad market average.  As noted above, Commerce's regulations do not define the term "broad market average."  Under Commerce's practice, Commerce has generally interpreted this term to mean that the data themselves are broader than a single data point (such as an offer for sale or a transaction-specific price) and are generally reflective of market conditions on a larger scale.[119]  Thus, we have found that data based on the experience of multiple companies – especially when accompanied by other indicia of representativeness (*e.g.*, where data are drawn from a location where the significant portion of the relevant transactions take place or are ascertained based on a trusted source/methodology) –  constitute a broad market average.[120]  The petitioners have instead mischaracterized this concept, positing that there are various specific and stringent data requirements (such as an unidentified minimum number of survey respondents and transaction-specific volume data) which must be met in order for Commerce to find the *Fishing Chimes* / *UCN* survey data represent a broad market average.  This proposed standard, however, is not required by the Act or the regulations, nor is it grounded in Commerce's practice.

---

("launched …in 1981"); and Vinh Hoan November 15, 2020 SV Submission at Exhibit FDSV-5 (identifying numerous datasets covering various products, as well as some data series "going back as far as 1980").

[119] *See, e.g.*, *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311; *STR from China* IDM at Comment 3; and *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 61172 (October 9, 2015), and accompanying IDM at 39 ("{W}e continue to find that the Doing Business data represents broad market averages representing multiple data points within Bangkok.").

[120] *See, e.g.*, *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311 (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because:  (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *Diamond Sawblades AR 2011-2012* IDM at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks.  Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average"); and *STR from China* IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business:  Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

As detailed above, the survey relied on a large number of data points from the Indian state (Andhra Pradesh) that accounted for a clear majority of India's production.[121]  Moreover, the *Fishing Chimes* publication, in multiple instances, sets forth the steps that the researchers took to achieve generalizable data,[122] and the source also states that, following field collection, the researchers engaged in "cross verification of economic data outcomes" from other sources.[123] The number of survey respondents and the method of sample selection all support Commerce's decision to rely on the *Fishing Chimes* data, as well as our characterization of these data as representative of a broad market average.  With respect to the *UCN* source, Commerce underscored that the publication referenced "{d}ata collected via interviews with farmers in all major producing regions" and "{d}ata collected via interviews with feed mills in all major producing regions."[124]

The petitioners' arguments regarding these sources are without merit.  The petitioners contend, for example, that the *Fishing Chimes* data did not consist of the same number of observations in each month.[125]  However, we find this fact neither surprising nor concerning, given that the researchers conducted a longitudinal study over a two-year period, rather than relying on a snapshot of data taken from any single month.  As a result, we do not find that the *Fishing Chimes* data are rendered unreliable by the fact that the data points – which were numerous – were not evenly distributed across the POR.  Further, while we recognize that in certain instances "farmers did not purchase fingerlings in every month"[126] we do not find this fact indicative of a flaw; trends in the number of data points over time can readily be explained

---

[121] *See* Vinh Hoan April 24, 2020 SV Submission at Exhibit SV-4(b) (citing a publication titled "Current Status of Pangasius (*Pangasianondon hypopthalmus*) Farming in India," July 2019 Edition (*Fishing Chimes*), page 35).
[122] *Id*.
[123] *Id*.
[124] *See* Vinh Hoan November 15, 2020 SV Submission at Exhibits FDSV-6-10.
[125] *See* Petitioners' Comments at 7-8.
[126] S*ee, e.g.*, Petitioners' Comments at 7-8.

by harvesting periods or simply as a function of the survey's timing, rather than being suggestive of non-reporting or data irregularities.

The petitioners also assert that *Fishing Chimes* data were deficient because the study was based on a region, *i.e.*, Andhra Pradesh, which represents "only" 60 percent of the market and thus "ignores the pricing realities for the forty percent of Indian pangasius production that occurred elsewhere in that year."[127]  We disagree with the implication that a region that represents a clear majority of a market should be considered unrepresentative because it does not represent an even greater majority percentage of the Indian market.  As is the case throughout these remand proceedings, the petitioners impose arbitrary standards in their analysis of the Indian data, yet appear willing to overlook similar (and often even more pronounced) flaws in their preferred Indonesian data.

 Similarly, the petitioners assert that "{n}either report indicates how many pangasius-producing farms are located overall in Andhra Pradesh (let alone how many farms are located in India more broadly) … {or} information regarding the actual volume of whole live fish production accounted for by the surveyed farms … {or} details regarding the volume of fingerlings or feed purchased by the farmers surveyed" and contend that "{w}ithout this larger context, there is simply no way to confirm that the data provided in the reports reflects broad market averages rather than a narrow view of specific market practices in a single Indian state."[128]  This, again, reflects the selective application of an arbitrary standard to this source.  First, the report clearly states that Andhra Pradesh contains the majority of the Indian pangasius industry, and, based on information contained in the report, Commerce provided estimates of the

---

[127] *Id*. at 7.
[128] *Id*. at 8.

volume covered by the study.[129]  Second, and most important, the petitioners' effort to suggest

that the Indian data do not cover a sufficiently high percentage of the Indian market must be

juxtaposed against the alternative data on the record.  The Indonesia data are in some cases less

specific, in other cases they are clearly non-contemporaneous, and – with respect to the "broad

market criterion" consideration in particular – are based on prices from as few as three sources.

The notion that a handful of Indonesian prices from three farmers better meet the "broad market

average" criterion than a two-year survey covering 54 farmers from 46 villages in the epicenter

of pangasius production in India is simply not tenable.

For the same reason, the petitioners' lengthy explanation of the minimum requirements

of statistical sampling are inapposite.  For instance, the petitioners argue that Commerce should

disregard the *Fishing Chimes* statements regarding statistical analysis and cross-validation

because "the report lacks even the most basic information regarding the variance between the

sample set and the overall population" and because of the "failure to clearly describe the

statistical methods used in the analysis."[130]  As noted above, *Fishing Chimes* is a reputable

publication of long-standing, and Commerce has a history of relying on the data that it publishes.

In contrast, while we do not dispute that the MMAF is also a reputable source, the data provided

from it is unaccompanied by any reference whatsoever to statistical analyses.  Further, despite

the petitioners' argument regarding sample size and variance, several of the alternative

Indonesian sources are based on miniscule samples.

The petitioners' remaining arguments are similarly without merit.  Concerning the *UCN*

data, the petitioners assert that representatives from the publication "refused to engage with

independent market researchers" and make the conclusory assertion that the data bear indicia of

---

[129] *See* First Remand Redetermination at 40-41.
[130] *See* Petitioners' Comments at 10.

unreliability.[131]  Regarding the petitioners' claim that *UCN* refused to engage with market researchers, the petitioners' argument is not supported by record evidence.[132]  With regard to the reliability of the data source itself, the petitioners do not expand upon this aspect of their argument.  However, we disagree that *UCN* is unreliable in general; the publication has a wide scope, and the data series extend well beyond just Indian aquaculture or data relating to whole fish, fingerling, and fish feed pricing.[133]  Further, the publication also features some data going back to 1980.[134]

The discussion of both *Fishing Chimes* and *UCN* here has primarily centered around the meaning of the term "broad market average" itself, and whether this criterion requires a finding that the data on which the discussion is premised cover a majority of the market.  The petitioners misapprehend the definition of this term and, as a result, their arguments are misplaced.  Moreover, as noted throughout this remand redetermination, the bright-line standard for potential SV sources proposed by the petitioners (*e.g.*, regarding the number of observations and market coverage) cannot be met in many cases – including in the context of many of the Indonesian SVs that the petitioners have submitted on this record, as discussed further below.  We also find it significant that, while the petitioners repeatedly attempt to identify purported shortcomings relating to the data, no party to this proceeding has provided evidence that tangibly calls into question the representativeness of the data in general, *e.g.*, evidence to undermine the survey findings.

---

[131] *Id.* at 11.
[132] Given the timing of the cited submission, it appears that the petitioners are pointing to information in another segment of this proceeding.
[133] *See* Vinh Hoan November 15, 2020 SV Submission at Exhibit FDSV-5 (referencing data pertaining to "Chinese shrimp," "Russian cod," "Skipjack tuna, Bangkok," "Fishmeal, CIF Peru," "US Shrimp," "Northeast Arctic Cod," "Alaska Salmon," "Shrimp from India, Thailand, and Vietnam," *etc.*).
[134] *Id.* ("How much historical data we have varies from product to product, with some going back as far as 1980.").

Beyond the petitioners' general arguments concerning broad market averages and the sourcing information for certain data series – which apply to the *Fishing Chimes* and *UCN* sources and to all three main inputs – we also consider below several FOP-specific arguments raised in this remand segment of the proceeding.

Whole Live Fish

With respect to whole live fish, the petitioners' characterization of the Indian and Indonesia data does not reflect a balanced treatment of the competing sources.  As discussed above, the Indian data broadly meet the SV criteria,[135] and the Indonesian data have certain drawbacks that must be acknowledged.  Regarding the specificity of the Indonesian whole live fish data, the petitioners argue that the data are species-specific, as supported by:  (1) an affidavit explaining that Indonesian farmers overwhelmingly prefer to farm *patin siam*;[136] (2) the declaration from a fisheries expert that 99 percent of the pangasius production corresponds to *Pangasius hypophthalmus*;[137] and (3) other data regarding the relative quantity of *patin siam* fingerlings cultivated in Indonesia.[138]  However, representatives from the Indonesian MMAF, the agency that collected the data, could not identify the percentage of the proffered data that related to the species in question (*i.e.*, *Pangasianodon hypophthalmus*).  Dr. Budiyanto, of the MMAF, stated that *patin djambal* "is more likeable" than *patin siam*, but that the predominant species in Indonesia was *patin siam*, while offering no insight into what he meant by "predominant" (or identifying the specific timeframe he was referencing) and without specifically indicating the

---

[135] *See* Draft Results at 10-16.

[136] *See* Petitioners' Comments at 13 (The petitioners cite to the wrong segment and date.  The actual cite is Petitioners' November 16, 2020 SV Submission at Exhibit).

[137] *Id*. at 13.  (The petitioners cite to the wrong segment and date.  The actual cite is Petitioners' November 13, 2020 SV Submission at Exhibit 3 (containing the November 11, 2020 Affidavit).

[138] *Id*. at 13.  (The petitioners cite to the wrong segment and date.  The actual cite is Petitioners' April 24, 2020 SV Submission at Exhibit 2-F (containing the July 14, 2017 Dr. Soebjakto Letter)).

extent to which other species were reflected in the presented figures.[139]  Regarding the other data on the record that the petitioners cite, we find no basis to conclude that estimates from third parties are more probative regarding the composition of the MMAF data than the information provided by the officials associated with the agency that actually collected the data.  In summary, the record shows that the Indonesian data cover multiple species, without any information that would allow us to reliably assess how much of that data relates to *Pangasius hypophthalmus*, the particular species under consideration here.

For the foregoing reasons, we find the Indian SV data for whole live fish to be superior to the Indonesian SV data.

Fingerlings

Regarding the Indian *Fishing Chimes*/*Chepala Sandadi* fingerling data, the petitioners argue that the majority of fingerling production is outside of Andhra Pradesh,[140] but that many of the surveyed farmers bought their fingerlings locally,[141] contending that there is, accordingly, a disconnect between pricing and production which make the data not representative.  However, we note that the reports suggest that most of the fingerlings produced in West Bengal, India's hub of fingerlings production, are sent to Andhra Pradesh.[142]  Thus, most of the demand (where purchasing/pricing and consumption takes place) is in one state.  It is not surprising that fingerlings are transported to the location where a consuming sector is located; nor do the petitioners provide any basis (beyond speculation) to conclude that fingerling prices in the survey are unrepresentative.  In fact, the publication explicitly contradicts the petitioners' hypothesis, stating:

---

[139] *See* Petitioners' November 16, 2020 SV Submission at Exhibit.
[140] *See* Petitioners' Comments at 8.
[141] *Id.*
[142] *Id.* (citing Exhibit SV-4(b), p. 38).

{d}uring interviews with the farmers and stakeholders, it was noted that the actual source of seed remains unknown in most of the cases. Field observations indicate that the local agents book the orders from the farmers and contact the seed suppliers in West Bengal.[143]

This passage indicates that fingerlings purchased at a nursery within the region covered by the study, for instance, could be sourced from outside the region. In short, there is no basis to conclude that the fingerling market is bifurcated or otherwise split and, in any case, the *prices* reflect the purchase price of fingerlings in the major pangasius producing region of India, and the petitioners provided no evidence to show that those prices are unrepresentative or unreliable.

The petitioners also raise several other arguments regarding the fingerling data, contending that the source: (1) does not indicate any volume; (2) does not indicate that surveyed farms purchased fingerlings in every month; (3) does not contextualize (or provide variances) on how much is purchased vis-à-vis overall production/consumption throughout the country; and (4) contains data that are not contemporaneous.[144] As discussed above, each of the arguments is unavailing. First, using estimated parameters from the study, the total volume of fingerlings covered by the survey is significant (*e.g.*, approximately 5.1 million fingerlings in 2018).[145] Second, the non-uniform timing of survey responses is not surprising, as the study noted that stocking patterns are not constant and change according to many factors, such as market price, the prevalence of other types of farming activities, and water availability.[146] Third, the petitioners' assertion that a survey must cover a certain amount of the market is misguided, for the reasons discussed above.

---

[143] *Id*.
[144] *See* Petitioners' Comments at 7-10.
[145] *See* Vinh Hoan April 24, 2020 SV Submission at Exhibit SV-4(b)-(c). *See also* First Remand Redetermination at 43.
[146] *See* Vinh Hoan April 24, 2020 SV Submission at Exhibit SV-4(b)-(c).

Regarding contemporaneity, the *Fishing Chimes* data reflect prices in 2017-2018, while the *UCN* data reflect prices in January – July 2019.[147]  It is true that, for a subset of these data, *i.e.*, fingerlings 6-9 inches, we relied on 2017-18 data which we inflated to the POR; however, we do not find that inflating a subset of the data to account for the fact that the data are partially non-contemporaneous is a significant drawback of the Indian fingerling data.[148]

In contrast, the Indonesian data for this key input are flawed.  Regarding the fingerling pricing data provided by Dr. Budiyanto, we continue to find that these data are clearly less preferable than the Indian data.  The affidavit containing the 2018-2019 Indonesian fingerling pricing data (which was provided in response to Question 13) states:

> Based on information from hatchery business actors, the price of seeds highly depends on the consumers (rearing farmers and production costs).  For the price ranges, sizes ¾ - 3 inches have price range of Rp 15 – Rp 35/fish, while for size 3 - 6 inches have price range of Rp 50 – Rp 80/Kg. For > 6 inches, they have range of 40 - 70, as follows:[149]

However, the source of these data:  (1) does not define/identify "hatchery business actors"; (2) does not state the number of such actors; (3) does not state if this information was collected by the MMAF or is third party information; (4) does not state the collection methods relied upon by the unidentified data gatherer; (5) does not state if they are farm-gate prices exclusive of taxes; (6) states the information is for "seed," but makes no mention of what type/species of seed are included; (7) does not provide volumes; and (8) are not published.  Further, the figures do not reconcile with the statement introducing the table.  For example, the narrative statement says that prices for ¾ - 3 inches are Rp 15-35/fish, but in the table the prices are Rp 60-180; similarly, the

---

[147] *See* Preliminary SV Memorandum.
[148] Here too, the petitioners' arguments regarding contemporaneity are contradictory, as they critique the *Fishing Chimes* data for being partially non-contemporaneous while, elsewhere, urge Commerce to use fish feed data that predate the POR by six years.
[149] *See* Petitioners November 16, 2020 SV Submission at Exhibit (Attachment 3: Answer to Question 13).

statement says that prices for 3-6 inches are Rp 50-80/Kg, and for >6 inches are Rp 40-70, yet in the table the prices for those sizes are Rp 175-400 and Rp 350-500, respectively. Thus, it is unclear which, if any, of the data are accurate.

The petitioners provided another set of 2011-2012 fingerling data in a different affidavit.[150] In the Draft Results, Commerce noted that these proposed Indonesia government data were not contemporaneous; they predated the POR by approximately six years and were not size-specific for fingerlings over six inches in length.[151] Furthermore, these data: (1) are not species-specific; (2) do not mention the number of data points for this information; (3) do not mention who the participants were; (4) do not state the collection methods relied upon by the data gatherer; (5) do not state if they are farm-gate prices exclusive of taxes; (6) do not provide volumes; and (7) are not published.

The petitioners attempt to dismiss Commerce's concerns regarding the data by asserting that they "reinforced" the data with "an affidavit from an associate at an Indonesian law firm who collected *pangasius hypophtalmus* fingerling prices from three sellers in Indonesia."[152] The fact that the record contains certain data that are flawed as non-contemporaneous and other data that are flawed for other reasons (*e.g.*, they are data solicited for the purposes of this proceeding from three individual sellers) does nothing to resolve the defects we have identified in the Indonesian data in the aggregate. In any case, it remains unclear how such data "reinforce" or otherwise corroborate the other data on the record. For instance, fingerlings in the 5-6 inch range were approximately 800-1200 Indonesian Rupiah (IDR) per piece in the affidavits from three

---

[150] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-B (containing data for 2011 and 2012).
[151] *Id.*
[152] *See* Petitioners' Comments at 14.

sources, whereas the 2012 data for fingerling in this size range were 400 IDR/piece.[153]  (And, as noted above, there are inconsistencies in the pricing data from Dr. Budiyanto that prevent us from confidently relying on those data.)  Thus, the petitioners' conclusory statement that the data they obtained for this proceeding are corroborated is unsupported and, at the very least, not explained on the record.

To the extent that the petitioners proffer the price data they solicited from three sellers as a potential alternative basis for surrogate valuation (as they did in the underlying review[154]), we have concerns with these data in their own right.  The petitioners argue that these data are reliable and are not similar to price quotes *per se* because they do not represent a starting point in price negotiations; rather each farmer provided a signed and notarized document providing "the prices of *patin siam* fish fingerlings *that I sold* in 2018 and 2019."[155]  However it appears that the prices/quantities may be based on a one-time observation, as:  (1) the fingerling length provided in the chart equals the length measured, in the pictures, to three decimal places for just one fingerling, for each price category presented; (2) the pictures from all the sellers appear to be taken on same day with the same person holding the fingerlings; and (3) the same weight scale and ruler is used in all nine pictures.[156]  Stated differently, there is a serious disconnect between the historical "prices" presented in the document – assuming they were in fact prices charged during the 2018-19 period, rather than "price lists," as the petitioners previously characterized these data – and the corresponding sizes which appear to have been recorded in one day for just one fingerling in each instance.  Moreover, the prices presented in the affidavits provided do not

---

[153] *See* Petitioners' April 24, 2020 SV Submission at Exhibit 5-B (containing data for 2011 and 2012) and Exhibit 5-C (containing prices solicited for this proceeding).
[154] *See* Petitioners' Letter, "CFA Comments and Rebuttal Factual Information Pertaining to Vinh Hoan's November 15, 2020 Surrogate Value Submission and Response to Vinh Hoan's November 18, 2020 Pre-Prelim Comments," dated November 24, 2020, at 17-18.
[155] *See* Petitioners' Comments at 14 (citing Petitioners April 24, 2020 SV Submission at Exhibit 5-C.)
[156] *See* Petitioners April 24, 2020 SV Submission at Exhibit 5-C.

change from 2018 to 2019 for any seller for each size of fingerling.  Thus, Commerce's
significant concerns regarding the data, which were obtained for the purpose of this proceeding
rather than reflecting data that are gathered consistently or for the purpose of publication, are
warranted regardless of whether these particular price points reflect actual prices or proposed
prices.[157]

In addition, as we stated in the Draft Results, the fingerling prices from such affidavits
were obtained from a small number of farmers (three).[158]  It is unclear as to why the market
coverage of such data is not of concern here, despite the stringent criteria that the plaintiffs
propose for the Indian data.  (For instance, the petitioners contend that the *Fishing Chimes* data,
based on 54 farmers surveyed over the course of two years, "ignores the pricing realities for the
forty percent of Indian pangasius production that occurred elsewhere in that year"[159] and is
insufficient, while, at the same time, they assert that Commerce could rely on affidavits
concerning a much smaller number of transactions from three farmers.)

The Indonesian fingerling data, then, are either from (1) a source that contains significant
inconsistencies and limited information on the underlying data, or (2) are from a small number of
disfavored prices obtained for the purpose of this proceeding, or (3) are clearly non-
contemporaneous data for which the record does not establish specificity.  In contrast, the Indian
data are from two reliable/established sources and, when one uses a common standard to

---

[157] *See, e.g.*, *Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 81 FR 13331 (March 14, 2016), and accompanying IDM at Comment 2 ("Our general practice is not to use price quotes to value factors of production.  {Commerce} often does not know the conditions under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes.  Without access to all of the information on how the price quotes were obtained (including any negotiations or agreed-upon adjustments), it is impossible to confirm that quotes reflect a typical broad market average cost.").
[158] *See* Petitioners April 24, 2020 SV Submission at Exhibit 5-C.
[159] *See* Petitioners' Comments at 7.

evaluate the various data sources, it is clear the Indian data provide the superior source for the SVs relied upon in this proceeding.

Feed

The petitioners raise a number of arguments concerning the Indian feed data, including ones which are similar to those raised for other SVs: (1) the data do not represent a broad market average; (2) the data are lacking volume information; and (3) the data are not contemporaneous with the POR.[160] These arguments are addressed above and further below.

With respect to the question of whether the data represent a broad market average, this is addressed in the separate discussion above. Regarding the volume underlying the data, using estimated parameters from the study, we have noted that the total volume of feed covered by the *Fishing Chimes* study is significant (*e.g.*, 12.7 million kilograms of feed during the 2017-2018 period), which is a substantial volume of feed.[161] Further, while the petitioners question the timing of survey responses, we do not find the timing to be surprising, as the study noted that stocking patterns are not constant and change according to many factors, such as market price, the prevalence of other types of farming activities, and water availability.[162] More broadly, this is, again, an instance where the petitioners selectively and inconsistently attempt to impose volume requirements on the feed data. The petitioners assert that *Fishing Chimes*, for instance, provides no data on the "volume of fingerlings or feed purchased by the farmers surveyed—or how that volume compares to the number of fingerlings and feed sold within Andhra Pradesh or

---

[160] *Id.* at 8.
[161] *See* First Remand Redetermination at 44; *see also* Vinh Hoan April 24, 2020 SV Submission at Exhibit SV-4(b)-(c).
[162] *See* First Remand Redetermination at 41.

India overall,"[163] even where the alternative data they propose is based on a small number of transactions that clearly do not represent a meaningful percentage of the Indonesian market.

With respect to the contemporaneity of the data, it appears that the petitioners made a blanket argument[164] that the *Fishing Chimes* data largely predate the POR.  However, the feed data we relied upon from this publication are dated during the POR.[165]  The *UCN* data are also contemporaneous with the POR.[166]  Thus, we do not find this to be a deficiency of the Indian feed data.

Regarding the Indonesian feed data, the petitioners state that they "provided Indonesian price lists for fish feed specific to the type used by Vinh Hoan together with sworn affidavits explaining their collection methodology and corroborated by country-wide feed pricing data from the Indonesian government and Indonesian feed mill association."[167]  Regarding the prices, the petitioners argue that these prices do not represent a starting point for negotiations, but rather the farmers "state that the data demonstrate, the prices of fish feed *that I sell*."[168]  We disagree that this statement provides definitive evidence that the farmers' prices are not subject to negotiation, especially in light of the fact that the petitioners refer to these prices as "price lists" on numerous occasions.  But even assuming that this were the case, our other considerations are plainly relevant; for instance, the prices were selectively obtained from a small number of sources for the purpose of this proceeding, rather than reflecting data that are gathered and/or published on a consistent basis.[169]

---

[163] *See* Petitioners' Comments at 9.
[164] *Id.*
[165] *See* Vinh Hoan April 24, 2020 SV Submission at Exhibit SV-4(b)-(c).
[166] *See* Vinh Hoan November 15, 2020 SV Submission FDSV7-8.
[167] *See* Petitioners' Comments at 15 (citing Petitioners April 24, 2020 SV Submission at Exhibit 5-D; and Petitioners November 13, 2020 SV Submission at Exhibit 6)
[168] *Id.* (citing Petitioners April 24, 2020 SV Submission at Exhibit 5-D; and Petitioners November 13, 2020 SV Submission at Exhibit 6.)
[169] *See* Draft Results at 17.

In addition, the price list has serious inexplicable flaws.  For example, in the price list that the petitioners submitted, the affiant listed the "Feed Product" or the name of feed in the summary chart.[170]  They also submitted an affidavit from the attorney, hired by the petitioners, that gathered the information.[171]  In the affidavit, the attorney states that "I, my associates, or the independent consultants took photographs of the different fish feed products they sold," and that "{t}he photographs that were obtained during these visits are appended hereto at Attachment 2."[172]  Among the 50 pictures provided there is a picture of the bags, the name ("Feed Product"), and the type of feed next to the picture.[173]  Of the 50 pictures provided, only 18 are for type: "Catfish" and the rest are for:  "Milkfish," "Carp Fish," "Fresh Water Fish," "Tilapia Fish," "Fish Feed," "Various Fish," "Starter Fish," "Gourami," "Shrimp," and "Not Stated."  Moreover, and more importantly, all the names ("Feed Product") of feed in the price list chart are for feed other than Catfish (as confirmed by cross-referencing with the name and type of feed next to the pictures).[174]  Furthermore, in the statements from the feed sellers that the affiant obtained, the feed sellers state "the prices of feed that I sell" without specifically stating what type of feed they are selling.[175]  Thus, it appears that the types of feed in the price list chart are for feed other than "Catfish" and, as such, are not specific.

Regarding the feed pricing data from the Indonesian government, the data are contained in an affidavit (February 2019) from Mr. Mimid Abdul Hamid, which the petitioners placed on the public record but which does not contain published data.[176]  These data:  (1) are not species-

---

[170] *See* Petitioners November 13, 2020 SV Submission at Exhibit 6 (this is the same as Petitioners April 24, 2020 SV Submission at Exhibit 5-D, for the most part).

[171] *See* Petitioners November 13, 2020 SV Submission at Exhibit 6.

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

specific; (2) do not mention the number of data points for this information; (3) mention the source as "GPMT", but make no mention of who or what GPMT is; (4) do not state the collection methods relied upon by the data gatherer; (5) do not state if they are farm-gate prices exclusive of taxes; (6) do not provide volumes; and (7) are not published.

The record also contains another Indonesian source to value feed, data contained in an affidavit (April 2020) from Dr. Budiyanto, which the petitioners placed on the public record but which does not contain published data.[177]  These data are not specific to the particular type of feed applicable here.  In particular, we note that, although the question requested data on "*patin siam* fish feed" pricing, the data clearly are not limited to this type of feed, as two of the entries explicitly state that the pricing is "specifically for marine fish."[178]  The affidavit also states that the information was not collected by the MMAF, but rather was obtained from a single third-party source (Mr. Deni of Central Protein Prima or "CPP"), with no mention of any collection methods or discussion of how the collected data are representative of data throughout the Indonesian market as a whole.[179]  The affidavit similarly does not indicate whether the prices are those of CPP alone or whether they also include prices from other sources.  Even more concerning, it is unclear whether the prices are market prices, given that the affidavit states that "{t}he low price of independent feed is because the independent feed is not taxed, and no investment calculation because all the equipment is supported by MMAF, therefore the only calculation is the variable cost."[180]  Finally the source provides no volume data which, again, was cited as a flaw in the competing Indian data.

---

[177] *See* Petitioners November 16, 2020 SV Submission at Exhibit.
[178] *Id*. (response to question 16).
[179] *Id*.
[180] *Id*.

Given the deficiencies present in the Indonesian data, and in light of the considerations outlined above, we find that the Indian data are clearly superior for this input.

<u>Summary Regarding Main Inputs</u>

We have reviewed the information on the record for the whole live fish, fingerlings, and fish feed inputs and addressed the favorable aspects and shortcomings of each. In each instance, there are deficiencies with the Indonesian data that prevent them from being a superior option to the Indian data. The petitioners' arguments to the contrary reflect the selective application of arbitrary data standards to the Indian data and, ultimately, amount to a request that Commerce reweigh the data to overlook flaws in their preferred sources. However, when the totality of the record is considered, for the reasons stated above, we find that the data for India are better in the aggregate for the three main inputs into the production of subject merchandise.

        *b)  Labor*

We find the Indian labor data on the record to be an appropriate SV for use in our margin analysis. The petitioners' assertions misstate Commerce practice, and the arguments the petitioners presented on the Draft Results do not undermine the approach adopted by Commerce.

The petitioners maintain that Commerce should rely on the Indonesian data for the SV for labor, asserting that Commerce's duty is to seek the "best" available information for each FOP.[181] This is a partially accurate, but incomplete, statement of Commerce's practice in this regard. As noted above, Commerce's court-affirmed practice is to value as many FOPs as possible from a single surrogate country.[182] Specifically, pursuant to 19 CFR 351.408(c)(2) and administrative practice, Commerce will "only resort to a secondary surrogate country if data

---

[181] *See* Petitioners' Comments at 4-5.
[182] *See Clearon*, Slip Op. 13-22 at 6 ("{T}he court must treat seriously {Commerce's} preference for the use of a single surrogate country."); *see also Fine Furniture*, 353 F. Supp. 3d at 1352; and *Jiaxing Brother CAFC*. 822 F. 3d at 1302 (affirming Commerce's preference to source SVs from a single surrogate country).

from the primary surrogate country are unavailable or unreliable."[183]  The Court has held that Commerce's regulatory directive to value FOPs with information from a single surrogate country, where possible, is reasonable, given that deriving surrogate data from one surrogate country limits the amount of distortion introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market.[184]  As a result, Commerce tries to "use as much data as possible from the primary surrogate country."[185]  Thus, we disagree with the petitioners that Commerce's "duty" is to evaluate the potential SVs in a vacuum, with no consideration given as to whether those SVs are sourced from the primary surrogate country.

The petitioners also mischaracterize Commerce's determination by arguing that Commerce is required to use the best available information, not merely data that are usable.[186] We agree with the petitioners' statement to the extent that it applies to data choices within a given primary surrogate country; however, we find that the alternative that the petitioners propose here would lead to absurd results.  Specifically, the petitioners appear to be arguing that Commerce must select the "best" SV data on a factor-specific basis, regardless of the primary surrogate country *chosen on an aggregate basis*.  Pursuant to this interpretation, Commerce could elect to source SVs from a wide range of countries, on an *ad hoc* basis, simply because

---

[183] *See Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332-1333  (CIT 2014) (internal citations omitted).
[184] *See Clearon*, Slip Op. 13-22, at 12-14; *see also Hand Trucks and Certain Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 44008 (July 29, 2014), and accompanying IDM at Comment 2.
[185] *See, e.g.*, *Jiaxing Brother CAFC*, 822 F.3d at 1294 & n.3; and *T. T. International v. United States*, 439 F. Supp. 3d 1370, 1382 (CIT 2020); *Certain Walk-Behind Snow Throwers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 87 FR 17984 (March 29, 2022), and accompanying IDM at Comment 3, n.101 ("Commerce has a regulatory preference to use as much data as possible the primary surrogate country); and *Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment I.
[186] *See* Petitioners' Comments at 4-5.

each country offers the best data for valuing a particular FOP. However, this is not the surrogate country process that is contemplated in Commerce's regulations[187] nor the approach that is applied by Commerce. Moreover, as noted above, the courts have recognized that the decision to source SVs from multiple surrogate countries can introduce distortions into the calculation and, accordingly, Commerce only does it to the extent necessary.[188] Thus, we disagree with the petitioners' contention that Commerce's approach is contrary to the statutory language, or that our explanation regarding the foundation of this preference is otherwise inappropriate.

In any case, the petitioners have not accurately framed the issue remanded by the Court here. They assert that Commerce "continues to use flawed Indian data for these inputs, the agency has relied on Indian labor statistics that are admittedly no better than (and in fact inferior to) the Indonesian information available."[189] That is not correct. It is true that, in the First Remand Redetermination, although Commerce acknowledged deficiencies in the Indian labor data -- especially relating to non-contemporaneity, but also with respect to ambiguity regarding whether the data were specific -- we maintained that such data were still usable given the totality of our analysis comparing the Indian data with the Indonesian data.[190] Here, however, in response to the *Second Remand Opinion*, Commerce opened the record for additional factual information; the record now contains contemporaneous labor data for India that are specific to

---

[187] *See* 19 CFR 351.408(c)(2) ("The Secretary normally will value all factors in a single surrogate country").
[188] We note that, as with the Indonesian data, the Indian labor data were sourced from the International Labor Organization, and it is Commerce's preference to rely on that source for valuing labor. *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36,092 (June 21, 2011).
[189] *See* Petitioners' Comments at 6.
[190] *See* First Remand Redetermination at 23-24 and 50-51.

the sector in which the respondent operates,[191] thus mitigating the concern associated with the labor data used in the *Final Results*.

Against this backdrop, the petitioners still urge Commerce to value labor using labor wage rates from Indonesia. Specifically, they assert that the Indian data represent average wages for "skilled agricultural and fishery workers," which is purportedly a broader category than the Indonesia alternative, which "reflects labor rates for aquaculture workers."[192] We do not find that the record demonstrates that the Indonesian data are more specific than the (new) Indian data. Vinh Hoan's business consists of aquaculture, processing, and storage activities. Thus, it is not apparent that the aquaculture-specific data are preferable to the Indian data, given that these data may not encompass the full scope of processing activities.

Processing labor, for instance, involves bleeding, washing, filleting, trimming, inspecting, re-washing, soaking/tumbling, sorting, weighing, re-washing, and freezing the resulting fillets.[193] The petitioners, essentially, make the assumption that this type of labor is covered by the "aquaculture" labor data for Indonesia, while providing no evidence that this type of labor is classified as such. Furthermore, the petitioners' aquaculture labor only encompasses "harvesting" and "plowing" farm labor,[194] while the source makes no mention of other types of farming labor (*e.g.*, breeding, raising, or processing labor). Moreover, the petitioners point to no evidence that the respondent's processing labor is not of a type captured by the "skilled fisheries worker" coverage of the Indian data. (The Indian data are classified as "skilled" whereas the Indonesian agriculture or manufacturing data are not; however, this fact provides no basis to

---

[191] *See* Memorandum, "Placing Data on the Record," dated August 29, 2024.
[192] *See* Petitioners' Comments at 17 (citing Petitioners September 4, 2024 SV Submission at Attachment 2 (which contains Indonesian aquaculture or "aqua culture" data from the Badan Pusat Statistic (BPS), or Statistics Indonesia data: Table 6.2 and 6.3).
[193] *See* Vinh Hoan January 30, 2020 SDQR at Exhibit 6.
[194] *See* Petitioners September 4, 2024 SV Submission at Attachment 2 (BPS, or Statistics Indonesia data: Table 6.2 and 6.3)

conclude that the Indonesia data are more specific or otherwise preferable in this context.) On balance, while we recognize that the record does not permit a definitive determination as to whether the Indian or Indonesian data are more specific, it is reasonable to conclude that a company that processes fish would be classified as part of the fisheries industry, supporting Commerce's use of the Indian data as specific to the labor input at issue. Moreover, Commerce has a preference for relying on ILOSTAT data to value labor rates, and this record contains India data from this source.[195] In short, we find that there is no basis to determine that the Indonesian labor data are preferable to the new Indian data on the record for this FOP.

### c) By-products

We find that the SVs we relied upon to value Vinh Hoan's frozen by-products and fish meal were appropriate and, further, determine that capping the value of such SVs was not appropriate under the circumstances. We continue to apply the approach adopted in the *Final Results* in this remand redetermination.

As in the context of the labor SV, the petitioners again fail to properly acknowledge the scope of the remand. They argue that, "rather than engage meaningfully with the Indonesian data for co- and by-products, {Commerce} attempts to explain away discrepancies in the Indian data for these SVs."[196] We disagree.

First, the Court found significant that "Commerce stated its conclusion with no meaningful citation to the record" when it "{s}imply said the by-products and co-products have

---

[195] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36092 (June 21, 2011); and *Diamond Sawblades Mfrs. Coal. v. United States*, 301 F. Supp. 3d 1326, 1341 (CIT 2018) ("Commerce's preferred method of valuing the labor FOPs is to use industry-specific data from the primary surrogate country published in Chapter 6A of the International Labor Organization ("ILO") Yearbook of Labor Statistics when available."). We note that the record also contains Indonesian ILOSTAT data, but there is no basis to conclude that such data are preferable to the Indian equivalent.
[196] *See* Petitioners' Comments at 5.

undergone different levels of processing from the inputs."[197]  Thus, our discussion of the record

on this point was to address the Court's concern.  Accordingly, we have, at length, explained

(and cited to record evidence, above in section III.C.), the extra processing that frozen by-

products and fish meal incur that renders them more valuable on a per-kg basis than the

unprocessed live whole live fish input (which is approximately two thirds composed of by-

products).

   The petitioners argue that "this evidence does not establish that the steps involved in

"processing" by/co-products cost more than the steps involved in raising commercial grade

pangasius."[198]  With this line of argument, the petitioners ignore the fact that many of the costs

associated with producing the by-products are the same as the costs to produce the subject

merchandise, beginning with the introduction of fingerlings and subsequent feeding for many

months (when they are farmed), or with the purchases of whole live fish.  This is because the

eventual fillet and concomitant by/co-products share the same inputs (farming inputs or whole

live fish) until filleting starts.  Thus, we disagree with the petitioners that the cost/value of by/co-

products begins with the steps involved in further processing the by-products.

   In any case, the appropriateness of the India data relied upon in the *Final Results* must

also be viewed against the backdrop of the alternative (Indonesian) data for these by-products.

The petitioners provided seven prices for fish meal and between one and five prices for frozen

by-products from Indonesian sellers.[199]  However, such prices are, more generally, a disfavored

type of source[200] because the circumstances of their acquisition are not clear and they frequently

---

[197] *See Second Remand Opinion* at 19.
[198] *See* Petitioners Comments at 19.
[199] *See* Petitioners' April 24, 2020 SV Submission at Exhibits 10-A & 10-B.
[200] *See, e.g.*, *PET Resin from China* IDM at Comment 2 ("Our general practice is not to use price quotes to value factors of production.  {Commerce} often does not know the conditions under which price quotes were solicited and

do not reflect the experience of the market as a whole.[201]  While the petitioners argue that the

Indonesian data are superior, as they are reinforced by information from a pangasius expert and

Indonesian official and are accompanied by sworn affidavits detailing the manner in which the

data were obtained,[202] our preference against such sources has been consistently applied in

Commerce's analysis of potential SV data for FOPs.[203]

      The petitioners proffered additional Indonesian SVs for frozen by-products from the

April 22, 2020 Budiyanto affidavit.[204]  These data were provided in response to question 17 of

the petitioners' request for pricing data, which asked for prices for several by-products, including

frozen by-products and fish meal from 2016-2019.[205]  While the response included a table,

ostensibly with prices[206] for 2016-2019 for several by-products, this table did not include prices

for fish meal.  Moreover, regarding the values for the other by-products, the document provides:

(1) no values for frozen fin or stomach; (2) no volumes; (3) no clear/specific source for each by-

product; (4) no indication of number of data points; and (5) no indication of the collection

---

whether or not these were self-selected from a broader range of quotes.  Without access to all of the information on how the price quotes were obtained (including any negotiations or agreed-upon adjustments), it is impossible to confirm that quotes reflect a typical broad market average cost.").

[201] *See Wind Towers from China* IDM at 12 ("Moreover, {Commerce} generally does not use price lists to value FOPs because (1) these prices often represent a starting point in a negotiation that could result in a significantly different final sale price and (2) price lists reflect the experience of a single producer rather than a broad market average."); *Certain Tissue Paper Products from the People's Republic of China:  Final Results and Partial Rescission of the 2007-2008 Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 74 FR 52176 (October 9, 2009), and accompanying IDM at Comment 3 ("Price quotes are merely that, and may not reflect actual transaction values.  Further, they are easily subject to manipulation and may be dependent on various factors not evident on the administrative record."); *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances:  Certain Polyester Staple Fiber from the People's Republic of China*, 72 FR 19690 (April 19, 2007), and accompanying IDM at Comment 7 ("When other usable and reliable information is available, it is {Commerce}'s practice to not use price quotes to value FOPs."); *Pencils from China* IDM at Comment 2; and *Bristol Metals*, 703 F. Supp. 2d at 1376.

[202] *See* Petitioners' Comments at 19-20.

[203] *See Wind Towers from China* IDM at 12; *Pencils from China* IDM at Comment 2; and *Bristol Metals*, 703 F. Supp. 2d at 1376.

[204] *See* Petitioners' November 16, 2020 SV Submission at Exhibit.

[205] *Id*.

[206] The values in the table do not appear to be prices, as the table suggests, as the values are in the hundreds of millions of Rp.

methods relied upon. Moreover, it does not appear to reflect data that are regularly collected, much less published, by the MMAF, *i.e.*, these are data provided solely through an affidavit to the law firm. It bears noting again that, according to the petitioners, deficiencies of this exact nature would render data unusable for surrogate valuation, as seen throughout their arguments above regarding various Indian data on the record. In the context of key inputs such as fish feed, for example, or regarding the by-products discussed here, they appear unconcerned when the Indonesian data are missing detailed source information or are unaccompanied by volume figures. We do not believe that applying different standards to the data is appropriate. Thus, the petitioners' proffered fish meal and frozen by-products SV sources offer no advantage over the Indian data, and, instead, suffer from multiple significant defects.

## IV.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Second Remand Opinion*, and in light of the record evidence, Commerce has provided additional explanation regarding its analysis of key Indian SV sources (including how they reflect a broad market average) and an explanation of the SV selection for frozen by-products and fish meal. Commerce has also, consistent with the Court's directive, relied on a new Indian labor source in its margin calculation. Vinh Hoan's dumping margin remains $0.00/kg.[207]

12/2/2024

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia,
Deputy Assistant Secretary
  for Enforcement and Compliance.

---

[207] *See* Vinh Hoan Remand Calculation Memorandum.