## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| CATFISH FARMERS OF AMERICA, *et al.*, |
| Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| QMC FOODS, INC., *et al.*, |
| Defendant-Intervenors. |

Before: Hon. M. Miller Baker, Judge

Court No. 21-00380

## <u>CFA'S COMMENTS IN OPPOSITION TO THE REMAND DETERMINATION</u>

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Tatiana Sainati, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202)719-7000

*Counsel to the Catfish Farmers of America, et al.*

Dated: January 30, 2025

Ct. No. 21-00380

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   BACKGROUND ................................................................. 1

III.  ARGUMENT ....................................................................... 5

      A.    Commerce Failed to Use the Best Available Information to Value Key Inputs ............................................ 7

           1.    *Fishing Chimes* and *Undercurrent News* Are Unreliable and Do Not Provide Data Reflecting Broad Market Averages ................................................. 9

           2.    The Indonesian Data for Whole Live Fish, Fingerlings, and Feed Is Superior .............................. 20

      B.    Commerce Refuses to Utilize Best Available Information for Labor Data ................................................ 39

           1.    Commerce Ignores Its Statutory Mandate. ................. 40

           2.    Commerce's Newly Submitted Indian Data Are Inferior to Indonesian Data in the Record ................. 42

      C.    Commerce Continues to Fail to Explain or Support Its Use of Indian Data for By- and Co-Products .................. 45

IV.  CONCLUSION ............................................................... 51

Ct. No. 21-00380

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bristol Metals L.P. v. United States,*
    34 CIT 478, 703 F. Supp. 2d 1370 (2010) .......................................... 5, 7

*Bush v. United States,*
    599 F.3d 1352 (Fed. Cir. 2010) ............................................................ 42

*Clearon Corp. v. United States,*
    37 CIT 220 (2013) ................................................................................ 41

*Dixon v. United States,*
    381 U.S. 68 (1965) .................................................................................. 6

*Fresh Garlic Producers Ass'n v. United States,*
    83 F. Supp. 3d 1330 (Ct. Int'l Trade 2015) ................................... 12, 14

*Jinging Yongjia Trade Co. v. United States,*
    34 CIT 1510 (2010) ........................................................................ 12, 14

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ........................................................................ 6, 41

*Qingdao Qihang Tyre Co. v. United States,*
    308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ...................................... 40

*Shrimp Trade Action Comm. v. United States,*
    618 F.3d 1316 (Fed. Cir. 2010) ..................................................... 12, 14

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    44 F.3d 978 (Fed. Cir. 1994) ................................................. 25, 26, 30

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ....................................................................... 15, 16

**Statutes**

19 U.S.C. § 1677(b)(c)(1) ............................................................................ 5

Ct. No. 21-00380

19 U.S.C. § 1677b(c) .................................................................... 6

19 U.S.C. § 1677b(c)(1)(B) ......................................................... 6

**Administrative Materials**

*Certain Frozen Warmwater Shrimp from the Socialist
    Republic of Vietnam*, 81 Fed. Reg. 62,717
    (Dep't Commerce Sept. 12, 2016) ...................................... 46

*Certain Pneumatic Off-the-Road Tires from the People's
    Republic of China*, 80 Fed. Reg. 20,197
    (Dep't Commerce Apr. 15, 2015)......................................... 46

*Monosodium Glutamate from the People's Republic of China*,
    79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) ...................... 46

**Other Authorities**

*Import Administration Policy Bulletin 04.1, Non-Market
    Economy Surrogate Country Selection Process*
    (Dep't Commerce Mar. 1, 2004) .................................... 6, 20

Ct. No. 21-00380

# <u>GLOSSARY</u>

**APO**
    Administrative Protective Order

**Commerce**
    Department of Commerce

**Fish Fillets**
    Certain Frozen Fish Fillets

**FOP**
    Factors of Production

**NME**
    Non-Market Economy

**POR**
    Period of Review

**SV**
    Surrogate Value

**Vietnam**
    Socialist Republic of Vietnam

Ct. No. 21-00380

## I.     <u>INTRODUCTION</u>

On behalf of the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively "CFA"), we respectfully submit the following comments in opposition to the December 2, 2024 remand results filed by the U.S. Department of Commerce ("Commerce") in this action. *See* Final Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America v. United States*, Ct. No. 21-00380, Slip Op. 24-67 (CIT June 5, 2024) (Dec. 2, 2024), ECF No. 95, 2P.R.R. 22, Appx____-____ ("Final Remand Results").

## II.     <u>BACKGROUND</u>

The Final Remand Results arise from a second remand concerning the final results of the administrative review of the antidumping duty order on certain frozen fish fillets ("fish fillets") from the Socialist Republic of Vietnam ("Vietnam") covering the period of review ("POR")

1

Ct. No. 21-00380

from August 1, 2018, through July 31, 2019. *See, e.g.*, *Catfish Farmers of America, et al. v. United States*, Ct. No. 21-00380, slip op. 24-67 (Ct. Int'l Trade Dec. 2, 2024) ECF No. 87 ("Slip Op. 24-67").

In Slip Op. 24-67, the Court considered Commerce's comparison of the quality of "dueling Indian and Indonesian data sets" offering potential surrogate values for whole live fish, fingerlings, feed, labor, and co- and by-products. *Id.* at 3. The Court questioned, for the second time, Commerce's continued reliance on two Indian trade press sources—*Fishing Chimes* and *Undercurrent News*—to value whole live fish, fingerlings, and fish feed. The Court explained that the data in these sources was "vague and unsupported," did not "represent a 'broad market average'," was "not supported by substantial evidence," and did no "more than create a suspicion of the existence of the fact to be established." *Id.* at 4-8. The Court accordingly remanded with instructions that Commerce "reconsider its reliance" on these publications. *Id.* at 6, 8.

The Court also rejected Commerce's use of outdated Indian labor data because Commerce relied on its internal "preference" for single-country inputs to justify ignoring plainly superior Indonesian data

2

Ct. No. 21-00380

instead of demonstrating that the Indian alternative was the "best available." *Id.* at 14. Indeed, the Court found "every indication that the agency selected {the Indian information} *despite* its deficiencies." *Id.*[1] (emphasis in original). The Court accordingly remanded to Commerce to "reconsider whether the problems it identified with the Indian data warrant using the Indonesian counterpart." *Id.*

Finally, the Court concluded that Commerce "stated its conclusion" regarding Indian data for by- and co-products "with no meaningful citation to the record." *Id.* at 18. Rather, Commerce "simply said"—without explanation or analysis—that the Indian data were representative and "not distortive." *Id.* at 18-19 . The Court thus remanded on this issue, too, with instructions that Commerce answer "the fundamental question of whether the Indian by-product and co-product data are in fact reliable and the best available information for *those* factors." *Id.* at 19 (emphasis in original).

Commerce issued draft results on October 1, 2024. *See* Draft Results of Redetermination Pursuant to Court Remand (Oct. 1, 2024),

---

[1]         Unless otherwise indicated, all emphases have been added and all citations have been cleaned up.

Ct. No. 21-00380

2P.R.R. 17, Appx_____-_____ (the "Draft Results"). In the Draft Results, Commerce failed to heed the Court's instructions regarding each of the above-stated issues. Instead, it continued to rely on the "vague," "unsupported," and otherwise limited Indian data for whole live fish, fingerlings, and feed. *Id.* at 4-8, Appx_____-_____. The remainder of Commerce's analysis rested upon this flawed evidentiary foundation and thus suffered a fatal structural defect. Specifically, because Commerce relied on logic already rejected by the Court to insist on the superiority of Indian surrogate values for whole live fish, fingerlings, and feed, Commerce maintained its reliance on Indian data for labor and by and co-products without meaningful analysis or explanation. But, as discussed in detail below, the Indonesian data is superior for each of these inputs, and Commerce cannot prioritize its regulatory preference over its statutory obligation to use the "best information available."

CFA filed comments on the Draft Results on October 11, 2024, in which it highlighted Commerce's failure to comply with the Court's instructions and its refusal to fairly compare Indonesian and Indian data. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain*

*Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments on Draft Results of Redetermination* (Oct. 11, 2024) at 4, 2P.R.R. 21, Appx_____ ("CFA Draft Comments"). CFA demonstrated that the Draft Results failed to follow the Court's instructions and its own statutory mandate, appropriately assess the quality of Indian versus Indonesian data, demonstrate that the Indian data is preferable and/or otherwise reliable, and misread and mischaracterized record data from Indonesia. *Id.* In the Final Remand Results, Commerce continued to use India as the primary surrogate country and to rely on Indian data to value all factors of production ("FOP"). *See* Final Remand Results at 11-19, 27-44 (data regarding fish, fingerlings, and feed), Appx____-____, Appx____-____; *see also id.* at 19-25 (labor and by- and co-product data), Appx_____-_____.

## III.  <u>ARGUMENT</u>

In determining the normal value of a product from a non-market economy ("NME") like Vietnam, the Tariff Act "requires, in all instances, the use of 'the best available information' about the value of {FOP}" from a surrogate country." Slip Op. 24-67 at 13, Appx____ (quoting 19 U.S.C. § 1677(b)(c)(1)); *see also Bristol Metals L.P. v. United*

Ct. No. 21-00380

*States*, 34 CIT 478, 481, 703 F. Supp. 2d 1370, 1374 (2010) (valuation of FOPs in an NME case is governed by 19 U.S.C. § 1677b(c), which directs Commerce to use the *"best available information"* in determining SVs); 19 U.S.C. § 1677b(c)(1)(B). There is no question that an explicit obligation imposed by statute trumps any internal agency regulation, and regulations that contradict a statutory mandate are a "mere nullity." *Dixon v. United States*, 381 U.S. 68, 74 (1965). To the extent there is any dispute regarding the import of the statutory requirement to use "best available information"—and there should not be—it is the Court that interprets the Tariff Act, not Commerce. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

To implement this statutory directive to identify the *best* available information, where more than one potential surrogate country is economically comparable with the subject country, Commerce compares the relative quality of the SV data available from each to select the primary surrogate. Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Dep't Commerce Mar. 1, 2004), *available at* https://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin"). In assessing relative quality, Commerce

6

considers whether the values are (1) specific to each input; (2) tax and import duty exclusive; (3) contemporaneous with the POR; (4) representative of a broad market average; and (5) publicly available. *See Bristol Metals L.P.*, 34 CIT at 481, 703 F. Supp. 2d at 1374.

The Final Remand Results run afoul of the statutory directive to use the *best* available information to value FOP. Commerce redoubles its reliance on data for the primary inputs—whole live fish, fingerlings, and feed—that the Court has repeatedly rejected. Consequent to its continued dependence on flawed Indian data for these inputs, Commerce persists in relying on Indian labor statistics that are no better than (and in fact inferior to) the Indonesian alternatives. Finally, Commerce fails to either establish that the Indian data provides the best available surrogate values for by- and co-products or that the Indonesian SVs are worse. These failings require a third remand.

## A. Commerce Failed to Use the Best Available Information to Value Key Inputs

The key inputs for the fish fillets subject to this administrative review are whole live fish, fingerlings, and feed. Commerce's adamant refusal to reconsider its reliance on two Indian sources for SVs for these inputs is at the heart of this dispute. Specifically, Commerce relies on

whole live fish, fingerling, and feed values derived from reports of a
study of *pangasius* production in two districts within a single Indian
state published in *Fishing Chimes* and its Telegu-language sister
publication, *Chepala Sandadi*, and a pricing portal maintained by
*Undercurrent News*.[2] *See* Final Remand Results at 28, Appx____.

This Court has repeatedly questioned these sources. *See, e.g.*,
*Catfish Farmers of Am. v. United States*, Ct. No. 20-00105, slip op. 24-
23 at 6-9 (Ct. Int'l Trade Feb. 26, 2024) ("Slip Op. 24-23"); *NTSF
Seafoods Joint Stock Co. v. United States*, Ct. No. 20-00104 and *Catfish
Farmers of Am. v. United States*, Ct. No. 20-00105, slip op. 22-38 at 41-
48 (Ct. Int'l Trade Apr. 25, 2022) ("Slip Op. 22-38"). With respect to the
*Fishing Chimes* report, this Court has questioned how a study that
covers only two districts within the Indian state of Andhra Pradesh can
represent a broad market average without data demonstrating that
these districts "produced *far more fish* than anywhere else." Slip Op. 22-
38 at 44; Slip Op 24-67 at 6-7 n.4. As for *Undercurrent News*, the Court
has explained that the portal's "vague and unsupported reference to an

---

[2]     Unless otherwise indicated, all references to *Fishing Chimes*
include a reference to *Chepala Sandadi*.

Ct. No. 21-00380

unspecified number of farmers . . . in 'all major producing regions'" does not constitute substantial evidence of broad market averages. Slip Op 24-67 at 7-8. Yet Commerce persists in ignoring the Court's concerns without any credible attempt to address them. Final Remand Results at 11-16, 28-33, Appx____-____, Appx____-____. For this reason alone, Commerce's Final Remand Results must again be remanded.

1.    *Fishing Chimes* **and** *Undercurrent News* **Are Unreliable and Do Not Provide Data Reflecting Broad Market Averages**

Commerce asserts that *Fishing Chimes* reflects broad market averages for whole live fish, fingerlings, and feed, because the study "relied on a large number of data points from the Indian state (Andhra Pradesh) that accounted for a clear majority of India's production" of *pangasius* and that the researchers elaborated "the steps" taken to "achieve generalizable data." *Id.* at 30, Appx_____. Commerce similarly touts *Undercurrent News* regarding these three inputs as reliable and reflecting broad market averages for based on a reference in the pricing portal to "data collected via interviews with farmers in all major producing regions" and with "feed mills in all major producing regions." *Id.*

9

Ct. No. 21-00380

The Court has already considered—and rejected—these precise arguments. *See* Slip Op. 24-67 at 8 (concluding that Commerce's acceptance of *Undercurrent News'* "vague and unsupported reference to an unspecified number of farmers and feed mills in 'all major producing regions'" is not substantial evidence); *id.* at 6-7 & n.4 (rejecting Commerce's argument that *Fishing Chimes* study reflects a broad market average" because it allegedly involved a "large volume of transactions" and "significant volume of fish"). It should do so again.

### a. Commerce fails to address identified flaws in the *Fishing Chimes* report

The *Fishing Chimes* report concerns a study based on a "questionnaire-based survey" conducted through "direct field visits" with farmers in the state of Andhra Pradesh. Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Vinh Hoan Corporation – Surrogate Values* (Apr. 24, 2020) at Exhibit SV-4(b), p. 34, C.R. 188-201, P.R. 284-296, Appx____ ("Vinh Hoan's April 24 Submission"). The report explains that "it is estimated that, pangasius is currently being farmed in more than 300 villages in West Godavari and Krishna districts," before naming specific mandals within those districts where "major pangasius farming villages are located." *Id.*

10

at Exhibit SV-4(b), p. 35, Appx_____. The report further explains that the survey focused on villages within these mandals, before (confusingly) stating that "out of the 300 villages that the study covered, 46 of them are in these two districts." *Id*. The report then states that "{f}ield visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh. 108 data sets were collected for one crop each in 2017 and 2018 from 54 farmers." *Id*. at Exhibit SV-4(b), p. 38, Appx_____. The *Chepala Sandadi* version clarifies that the study surveyed 54 farmers in 46 of the 300 villages estimated to contain pangasius farms within the West Godavari and Krishna districts of Andhra Pradesh. *Id*. at Exhibit SV-4(c) (English translation), Appx____-____.

Based on the foregoing, Commerce asserts that there is "no question" that the survey "relied on a large number of data points from the Indian state (Andhra Pradesh) that accounted for a clear majority of India's production." Final Remand Results at 13, Appx____. But Commerce ignores that large is a relative term. There are a "large number" of stars in the Milky Way, but those stars represent only a small fraction of the overall stars in the universe. Here, as this Court

Ct. No. 21-00380

has noted, there is no way to ascertain whether the data set covered in *Fishing Chimes* is relatively large or relatively small in relation to India's overall pangasius production—although every indication points to the latter. *See* Slip Op. 24-67 at 6-7 n.4.

The study coverage is limited to responses from 54 farmers located within 46 of the 300 villages estimated to produce *pangasius* within just two districts in a single Indian state. This alone suggests that the data does not reflect broad market averages. *See, e.g.*, *Fresh Garlic Producers Ass'n v. United States*, 83 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2015) (noting Commerce's preference for country-wide data to regional data as a better reflection of broad market averages); *Ad hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010) (same); *Jinging Yongjia Trade Co. v. United States*, 34 CIT 1510, 1527 (2010) (same).

Commerce contends that "no party . . . has provided evidence that calls into question the representativeness of the data in general," or that undermines "the survey findings." Final Remand Results at 14, Appx____. Not so. CFA has demonstrated at least five flaws with the *Fishing Chimes* data. *First*, CFA has pointed out that the *Fishing*

12

*Chimes* survey is limited to a state that represents at best sixty percent of the market "and thus 'ignores the pricing realities for the forty percent of Indian pangasius production that occurred elsewhere in that year.'" *Id.* at 31, Appx_____. Commerce disregards this limitation on grounds that the region "represents a clear majority of {the} market." *Id.* But the Court has already explained that Commerce cannot rely on the *Fishing Chimes* report for broad market averages without evidence that Andhra Pradesh produces "*far more* fish than anywhere else," Slip Op. 22-38 at 44, particularly since the competing Indonesian data is country wide.

In any event, the record does not reflect that Andhra Pradesh produced even sixty percent of Indian *pangasius* during the review period. As CFA has pointed out, Andhra Pradesh's share of *pangasius* production is on the decline. *See, e.g.*, CFA Draft Comments at 7, Appx____. Commerce has no response to this point. Indeed, Commerce effectively concedes that the *Fishing Chimes* data is extremely limited in scope, acknowledging that "the volume of merchandise covered by the study *is a fraction of the total production in India*." Final Remand Results at 14, Appx____. Commerce contends that this is unsurprising

13

Ct. No. 21-00380

and unproblematic because "{s}ome of the sources that" the agency uses "most frequently . . . such as the World Bank's 'Doing Business' publication, are often based on survey data that focus on a subset or a region{.}" *Id.*

But as already discussed, Commerce's practice is to resort to geographically limited data of the kind presented in *Fishing Chimes* if countrywide data is unobtainable—which is not the case here. *See, e.g.*, *Fresh Garlic Producers' Ass'n*, 83 F. Supp. 3d at 1337-38; *Ad hoc Shrimp Trade Action Comm.*, 618 F.3d at 1322; *Jinging*, 34 CIT at 1527. Moreover, the *Fishing Chimes* study is in no way equivalent to a regularly published World Bank publication like *Doing Business*. It is a one-off, private study that is internally inconsistent regarding its own sample size without any contextual information to support the broader conclusions about Indian *pangasius* pricing that Commerce attempts to draw.

*Second*, CFA has shown that even the data from the 54 farmers included in the *Fishing Chimes* study is lacking. *See, e.g.*, CFA Draft Comments at 7-8, Appx_____-_____. For example, surveyed farmers did not purchase fingerlings in every month covered by the study. No

14

fingerling purchases or pricing data whatsoever are available for a full ten months—forty percent of the period the study purports to cover. Vinh Hoan's April 24 Submission at Exhibit SV-4(b), p. 39, Appx____. The whole live fish data are similarly limited – reflecting a maximum of eleven farms' harvests per month, and no data at all in others. *Id.* There is no data regarding how many farms per month provided feed prices. *Id.* at Exhibit SV-4(c) (English Translation), Appx _____-_____.

Commerce dismisses these concerns on grounds that the data gaps "can readily be explained by harvesting periods or simply as a function of the survey's timing, rather than being suggestive of non-reporting or data irregularities." Final Remand Results at 30-31, Appx____-____. But there is nothing in the reports themselves to support Commerce's hypothesis. *See generally* Vinh Hoan's April 24 Submission at Exhibits SV-4(b) & SV-4(c), Appx____-____, Appx____-____. Thus, Commerce's theory is unsupported by substantial evidence and cannot stand. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (substantial evidence "must do more than create a suspicion of the existence of the fact to be established.").

Ct. No. 21-00380

*Third*, CFA has demonstrated that the *Fishing Chimes* report is silent as to how many *pangasius*-producing farms are located in Andhra Pradesh (let alone across India), information regarding the actual volume of whole live fish production accounted for by the surveyed farms, or details regarding the volume of fingerlings or feed purchased by the farmers surveyed. CFA Draft Comments at 8, Appx____. Absent this larger context, it is impossible to confirm that the data in the reports reflect broad market averages rather than a narrow view of a small slice of production within in a single Indian state. *Id.*

Commerce responds that the report "clearly states that Andhra Pradesh contains the majority of the Indian pangasius industry" and that Commerce "provided estimates of the volume covered by the study." Final Remand Results at 31-32, Appx____-____. In so doing, Commerce refers to an argument raised in the First Remand Results— namely, that *Fishing Chimes* data reflects broad market averages because it allegedly covers "a significant volume" of the FOP at issue here, such as fingerlings. *Id.* at 41, Appx____; *see also id.* at 31-32, Appx____-____. But the Court has already rejected this exact contention. *See* Slip Op 24-67 at 6 & n.4. As the Court explained, "a

significant volume of {a particular FOP} . . . does not indicate anything as to a 'broad market average' *absent any discussion showing how those amounts compare to India's overall pangasius production*." *Id.* Such discussion remains notably absent from the record and from Commerce's analysis.

*Fourth*, CFA pointed out that the information in *Fishing Chimes* is not contemporaneous with the POR since the data was collected for only ten months across 2017 and 2018 and only two of those months— September 2018 and December 2018—are within the POR. *See* CFA Draft Comments at 9, Appx____. Again, Commerce has no response.

*Finally*, CFA explained that Commerce cannot overcome the numerous deficiencies with the report data by referencing the so-called "statistical methods" that the authors allegedly used to "achieve generalizable data." *Id.* CFA elaborated that statistical sampling requires at least some consideration of the variations between the sample set and the overall population. *Id.* at 10, Appx____. The *Fishing Chimes* report does not even provide information regarding the size of the overall Indian *pangasius* producing population—let alone any discussion of the variation in the prices of whole live fish, fingerlings,

and feed between Andhra Pradesh and other regions. *Id.* CFA further

questioned the "explicit steps" used to generate "generalizable data,"

since the study states only that data was "computerized in Excel" and

subjected to an undescribed form of statistical analysis. *Id.* Rather than

confront these issues, Commerce responds that "*Fishing Chimes* is a

reputable publication of long-standing" that the agency has relied on in

the past. Final Remand Results at 32, Appx____. This retort does not

address the statistical shortcomings with the specific report that

Commerce relied upon in this case. And even if *Fishing Chimes* is

"reputable," that does not mean that the study at issue here produced

data reflecting broad market averages for key input values across India.

### b. Commerce fails to address similar flaws with the *Undercurrent News* data

*Undercurrent News* replicates the flaws that undermine the

*Fishing Chimes* reports. *Undercurrent News* states that pricing data

was "collected via interviews with farmers in all major producing

regions," but fails to identify how many interviews were conducted,

when they took place, what regions were considered major, or what

volume of trade the information from the farmers interviewed

represents. Letter from Mayer Brown LLP to Sec'y Commerce, re:

Ct. No. 21-00380

*Certain Frozen Fish Fillets from Vietnam: Vinh Hoan Corporation –*
*Final Direct Surrogate Values* (Nov. 15, 2020) at Exhibits FDSV-6 –
FDSV-10, P.R. 457-463, Appx____-____.

The Court has already rejected the argument that *Undercurrent*
*News*' "vague and unsupported references to an unspecified number" of
farmers and feed mills "in 'all major producing regions'" constitutes
substantial evidence of broad market averages for the primary inputs.
Slip Op. 24-67 at 7-8. Commerce essentially accepts the Court's
conclusion but argues that it "imposes a bright-line standard on
potential SV sources that cannot be met in many cases." Final Remand
Results at 16, Appx____. Commerce also notes that *Undercurrent News*
"has a wide scope," with "data series" that extend "well beyond just
Indian aquaculture" and "some data going back to 1980." *Id.* at 33,
Appx____.

These arguments are not germane to the issue at hand. The fact
that at *Undercurrent News* also publishes data of unknown reliability
on unrelated species and from unrelated countries going back to 1980 is
irrelevant to the quality of the data on the record regarding Indian
*pangasius* production between 2018 and 2019. Commerce's concern

19

about an overly stringent data standard also misses the mark. The Tariff Act directs Commerce to rely on the best available information in selecting SVs. In undertaking its analysis, Commerce cannot simply assume that the data it selects is "sufficiently robust and reliable." Slip Op. 24-67 at 8. Rather, Commerce must demonstrate that the data in fact *is* sufficiently robust and reliable vis-à-vis the other available sources on the record. *Id.*

In this regard, the Court's opinion tracks Commerce's own policy regarding data considerations. In Commerce's own words, "*data quality is a critical consideration* affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability *is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable*." Policy Bulletin. Under Commerce's own logic, if the *Undercurrent News* data is the best Commerce can muster from India, India is not of much use as a primary surrogate country.

### 2. The Indonesian Data for Whole Live Fish, Fingerlings, and Feed Is Superior

Commerce concedes that the Indonesian data for whole fish, fingerlings, and feed "meet several of the SV criteria," but asserts that

they are "less desirable" than the Indian alternatives "in other respects." Final Remand Results at 16, Appx____. As for whole live fish, Commerce objects to the Indonesian data on grounds that they are not species specific. *Id.* Commerce rejects Indonesian fingerling data from the Indonesian government as not contemporaneous or size specific. *Id.* at 16-17, Appx____-____. The agency likewise rejects alternative contemporaneous fingerling data because it is allegedly based on price lists. And Commerce dismisses fingerling prices set out in affidavits as from "a small number of farmers." *Id.* at 17, Appx____. Finally, with respect to feed, Commerce expresses "concerns" that the originally offered data is "not contemporaneous" and "only partially specific," and that alternate data reflects price list information. *Id.* at 18, Appx____. All of these criticisms misstate the record evidence.

*Whole fish.* The Indonesian data for whole live fish were provided via letter from the head of the Indonesian fisheries ministry's statistical center. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Submission of Proposed Surrogate Factor Values* (Apr. 24, 2020) at Exhibit 2-C (Mar. 26, 2019 Letter and Attachments), P.R. 255-282,

Ct. No. 21-00380

Appx____-_____ ("CFA April 24, 2020 SV Submission").[3] His information comes from the Ministry of Marine Affairs and Fisheries ("MMAF"), the Indonesian government ministry responsible for collecting and disseminating aquaculture statistics, giving his data an official imprimatur. There is no dispute that the information he shared is nationwide, based on a sufficient volume of information, and freely and publicly available.

Commerce nevertheless rejects the data on grounds that it "cover{s} multiple species, without any information that would allow us to reliably assess how much of that data relates to *Pangasius hypopthalmus*, the particular species under consideration here." Final Remand Results at 34-35, Appx____-_____. This is incorrect. The record includes the affidavit of Dr. Ir. Agus Oman Sudrajat. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: CFA Pre-*

_____

[3]    As Commerce notes, certain citations included in CFA's comments on the draft results with respect to Indonesian data for whole live fish incorrectly reflected dates for filings made on the record of the 2019-2020 review. Final Remand Results at 34 nn.136-138. However, as Commerce appears to concede, the record of the 2018-2019 review contained substantively identical data. *See id.*

*Preliminary Surrogate Value and Factual Information Submission*
(Nov. 13, 2020) at Exhibit 3, P.R. 444-456, Appx____-____ ("CFA
November 13 SV Submission"). Dr. Sudrajat is a Professor in the
Department of Aquaculture and on the Fisheries and Marine Science
Faculty at Bogor Agricultural University—a leading Indonesian
aquaculture research institution. *Id.* He specializes in pangasius fish
breeding and production and is "very familiar with pangasius
cultivation and aquaculture practices in Indonesia." *Id.*

Dr. Sudrajat was specifically asked "whether the 2017 and 2018
pangasius production data" published by the Indonesian government
"represent production quantity and value information for *patin siam*,
*patin pasupati*, and/or *patin jambal*" as well as "the predominant
species of pangasius fingerlings cultivated in Indonesia." *Id.* He
explained that the government's data "reliably represent production
quantity and value information for *patin siam*," because production of
other *pangasius* species "is extremely small in Indonesia," "very
limited" and "not profitable." *Id.* He further stated his "professional
opinion that 99 percent" of the data published by the government
"represent *patin siam* fish" since that species "is widely and successfully

grown in Indonesia." *Id.* This opinion is based on his "professional experience" with the widespread and successful cultivation of *patin siam* in the country. *Id.*

Commerce provides no basis to question Dr. Sudrajat's experience or qualifications and points to nothing in the record to discredit his opinion. *See* Final Remand Results at 34-35, Appx____-____. And, indeed, his opinion is consistent with other evidence in the record regarding the relative quantity of *patin siam* cultivated in Indonesia, CFA April 24, 2020 SV Submission at Exhibit 2-F, Appx____-____, and statements from another Indonesian ministry official explaining that Indonesian farmers overwhelmingly prefer to farm *patin siam*. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: CFA Additional Pre-Preliminary Surrogate Value and Factual Information Submission* (Nov. 16, 2020), at Exhibit, P.R. 464-468, Appx____-____ ("CFA November 16, 2020 SV Submission") ("{P}atin siam is the predominant in aquaculture because it is easy to produce and has larger meat yield{.}"). Commerce's professed inability to confirm that the Indonesian data covers *patin siam* is thus unsupported by substantial

evidence. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (Commerce "must take into account whatever in the record fairly detracts" from the weight of its purported "substantial evidence.").

*Fingerlings*. CFA provided Indonesian government-sourced fingerling pricing data for the review period from hatcheries throughout Indonesia for fingerlings overlapping in size with all of Vinh Hoan's fingerling size ranges (4-5 inches, 5-6 inches, and greater than 6 inches). *See, e.g.*, CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response), Appx____-____. Specifically, Dr. Dwi Budiyanto Trisnoharjono, a 29-year veteran of the MMAF, provided "information from hatchery business actors" for numerous fingerling sizes in 2017, 2018, and 2019. *Id.* at Exhibit (April 22, 2020 Response, Answer 13), Appx____-____. Commerce alleges numerous problems with this data, but none withstand scrutiny. Commerce complains that Dr. Budiyanto does not define or identify "hatchery business actors." Final Remand Results at 37, Appx____. This is inaccurate. Dr. Budiyanto described two types of hatcheries: (1) BBI, which operate under the "management and supervision of the Regency/City Office" and have

Ct. No. 21-00380

numerous duties relating to the development of hatchery techniques and fish seed quality; and (2) People Hatchery Units or Household Scale Hatcheries, which are "small-scale seed/fry production business units owned by individuals that are grouped into Fish Cultivator Groups." CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response, Answer 12), Appx____-____.

Commerce further asserts that Dr. Budiyanto does not "state the number of such actors," or provide "volumes" for fingerlings. Final Remand Results at 37, Appx____. This, too, is incorrect. Dr. Budiyanto provided estimates for "the number of seed and seed farmers of patin" in Indonesia. CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response, Answer 12), Appx____-____. In 2017, that number was 13,500. In 2018, it was 14,532. And in 2019, it was 15,851. *Id.* Dr. Budiyanto also provided estimations for the number of fingerlings produced in Indonesia in each of those years: 594,014,571 in 2017, 726,609,000 in 2018, and 871,828,286 in 2019. *Id.* These volumes are significantly larger than those that Commerce has calculated as being represented by the competing Indian sources. *See* Final Remand

26

Ct. No. 21-00380

Results at 36, Appx____ (approximating 5.1 million fingerlings in 2018 and describing this volume as "significant").

Commerce also alleges that Dr. Budiyanto does not explain by whom or how the data was collected. *Id*. at 37, Appx____. Here, too, Commerce fails to consider the information holistically. Dr. Budiyanto sets forth the source of his information in response to question 19. CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response, Answer 19), Appx____.

Commerce then contends that it is unclear whether the data are "farm-gate prices exclusive of taxes." Final Remand Results at 37, Appx____. Not so. Dr. Budiyanto confirmed that the tax exclusivity of the prices. CFA November 16, 2020 SV Submission at Exhibit (November 10, 2020 Response, Question 2), Appx____-____; *see also id*. at Exhibit (November 10, 2020 Response, Appendix A, Question 4), Appx____-____.

Commerce next asserts that the data "makes no mention of what type/species of seed are included," Final Remand Results at 37, Appx____. Commerce overlooks that Dr. Budiyanto explained that the data does not distinguish between *pangasius hypophthalmus* and other

27

pangasius for fingerling prices. CFA November 16, 2020 SV Submission at Exhibit (November 10, 2020 Response, Appendix A, Question 3), Appx____-____. The lack of explicit distinction does not, however, mean that the data are not species specific given the uncontroverted record evidence that 99% of *pangasius* produced in Indonesia is *pangasius hypophthalmus*. CFA November 13 SV Submission at Exhibit 3, Appx_____-_____; *see also* CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response, Question 4), Appx_____.

Commerce additionally notes that the data provided by Dr. Budiyanto are not published, but this does not mean that the data are not publicly available. To the contrary, the record reflects that the Indonesian government makes the data available upon request. *See, e.g.*, CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response), Appx_____-_____ (responding to letter for information on pangasius fingerling prices).

Finally, Commerce argues that it "is unclear which, if any, of the data are accurate," because of a difference between the pricing provided in Dr. Budiyanto's narrative statement and supporting chart. Final Remand Results at 37-38, Appx____-____; *see also* CFA November 16,

Ct. No. 21-00380

2020 SV Submission at Exhibit (April 22, 2020 Response, Answer 13),

Appx____-____. But the record as a whole confirms that the mixed

values in the narrative are in error, while the chart contains

contemporaneous and correct prices per fish.

Consider that the chart provides a 2019 price of 320-400 Indian

rupiah per 5"-6" fingerling, with those fingerlings weighing between

6.34 – 6.8 grams each, making for a price of 50 – 59 rupiah per gram.

CFA November 16, 2020 SV Submission at Exhibit (April 22, 2020

Response, Questions 13-14), Appx_____-_____. Letters from MMAF

officials regarding the price of fingerlings in 2012 confirm that the price

per 5"-6" fingerling was 400 Indian rupiah per fish, with each fish

estimated at weighing 10 grams, for a per-gram cost of 40 rupiah. CFA

April 24, 2020 Submission at Exhibit 5-B (January 2, 2014 Letter),

Appx_____-_____. The record also contains contemporaneous prices of

1000 – 1300 Indian rupiah per fish for 5"-6" fingerlings weighing 33.33

– 34.64 grams each, or 29 – 39 rupiah per gram. *Id.* at Exhibit 5-C,

Appx_____-_____.

These sources are consistent with per gram pricing somewhere in

the range of several dozen rupiah, and per-kilogram pricing of several

Ct. No. 21-00380

dozen thousand rupiah. Notably, these prices are consistent with how Commerce has valued fingerlings based on Indonesian data in prior administrative reviews. *See id.* at Exhibit 3, p. 3, Appx_____ (valuing fingerlings at 49,675 rupiah/kg); CFA November 13 SV Submission at Exhibit 2 (Exhibit 1 to 2012-2013 surrogate value memorandum and Attachment 1, p. 1 to 2016-2017 surrogate value memorandum), Appx_____-_____.

In sum, once Dr. Budiyanto's data is considered holistically—in the context of all the information that he provided, rather than in the context of a single response to a single question—each of Commerce's concerns fall away. Commerce's failure to consider the record as a whole—including the information that contradicts the conclusion the agency wants to draw—reinforces that the Final Remand Results are not supported by substantial evidence. *See Suramerica de Aleaciones Laminadas, C.A.*, 44 F.3d at 985.

In addition to Dr. Budiyanto's contemporaneous data, CFA provided Indonesian government-sourced fingerling pricing information for 4-5 inch, 5-6 inch, and greater than 6 inch *pangasius hypopthalmus* from 2011 and 2012. CFA April 24, 2020 SV Submission at Exhibit 5-B,

Ct. No. 21-00380

Appx____-____. CFA reinforced this data with an affidavit from an

associate at an Indonesian law firm who collected *pangasius*

*hypophtalmus* fingerling prices from three sellers in Indonesia in 2018.

*Id.* at Exhibit 5-C, Appx____-____.

Commerce rejects the earlier government data on grounds that it

is not "size-specific," contemporaneous, species-specific, unclear as to

volumes or number of data points reflected in the information,

ambiguous as to collection methods, unpublished, and vague regarding

the identities of participants. Final Remand Results at 38, Appx____.

Here, too, Commerce takes the data out of context. The information

provides pricing details for 4-5 and 5-6 inch fingerlings and is sourced

from "the Directorate General of Aquaculture." CFA April 24, 2020 SV

Submission at Exhibit 5-B, Appx____-____. The information is publicly

available and "can be obtained at Directorate of Hatchery, Directorate

General of Aquaculture." *Id.* While the data is not explicitly species

specific, that is of limited concern given the evidence that 99% of patin

production in Indonesia is *pangasius hypophthalmus*. And the data's

non-contemporaneity is of little import given the pricing confirmation

provided by contemporaneous sources—namely, the seller affidavits.

31

Ct. No. 21-00380

Commerce contests the reliability of these affidavits on grounds that they present a limited snapshot of fingerling pricing and that they were obtained for the purpose of this proceeding. *See* Final Remand Results at 39-40, Appx____-____. Such apprehension is misplaced since the affidavits only confirm other data in the record. In this regard, while Commerce argues that the affidavits do not confirm the reliability of the inflation-adjusted government pricing from 2011 and 2012, this is simply not the case. *Id.* at 38-39, Appx____-____. Consider that the inflation adjusted MMAF value for fingerlings between 5.5" – 6" is 34,404 Indonesian rupiah/kg. *See, e.g.*, CFA November 13 SV Submission at Exhibit 1, Appx____.[4] The three affiants sold such fingerlings for 1,000 – 1,300 rupiah per fish, and those fish weighed between 33.33 – 34.64 grams apiece, and therefore had a value of value of 28,868 – 39,000 rupiah per kilogram. CFA April 24, 2020 SV

---

[4]    The three size ranges of fingerlings at issue here were 3.9" – 5.1", 5.5"-6", and 6" plus. *See, e.g.*, Memorandum from Javier Barrientos, Senior Case Analyst, through Robert Galantucci, Program Manager, Off. V, Enf't & Compl., to The File, re: *16th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary Results* (Dec. 15, 2020) at 3 and Attachment 1, p. 1, C.R. 611, P.R. 498 Appx_____, Appx_____ ("Preliminary SVs").

Submission at Exhibit 5-C, Attachment 2, Appx_____-_____. The inflation-adjusted MMAF value is almost precisely dead-center of these contemporaneous values.[5] In any event, Commerce's concern boils down to an assertion that even if the 2012 MMAF data reflect broad market averages, the contemporaneous affidavits may not. But since Commerce has not established that the Indian data reflect such averages, this cannot be the basis for Commerce to conclude that the Indonesian data is inferior.

*Feed.* The record includes Indonesian price lists for fish feed specific to the type used by Vinh Hoan together with sworn affidavits explaining their collection methodology and corroborated by country-wide feed pricing data from the Indonesian government and an Indonesian feed mill association. CFA's November 13 SV Submission at Exhibits 1 & 6, Appx_____-_____, Appx_____-_____; CFA's April 24, 2020 Submission at Exhibit 5-D, Appx_____-_____. It also includes data from

---

[5]    The math works similarly for the other sizes of fingerlings. The affiants' values for fingerlings in the 3.9" – 5.1" size range were between 37,629 – 46,926 Indonesian rupiah per kilogram; the adjusted surrogate is just over 46,000 rupiah per kilogram. The affiants' values for fingerlings greater than six inches ranged between 26,659 and 33,308 Indian rupiah per kilogram; the adjusted surrogate value was 34,000 Indonesian rupiah per kilogram.

Ct. No. 21-00380

three fish feed sellers collected to complement and reinforce the broader data set. CFA's November 13 SV Submission at Exhibit 6, Appx____-____.

Commerce takes issue with the data collected from these sellers on grounds that it consists of price lists from a small number of sources and is only partially species specific. Final Remand Results at 42-43, Appx____-____. As an overarching matter, Commerce ignores that this set of data serves to complement and reinforce the broader data set. As for the specific criticisms, they do not withstand scrutiny. CFA explained that the sellers did not provide "price lists," but rather gave "the prices of fish feed *that I sell*." CFA's November 13, 2020 Submission at Exhibits 1 & 6, Appx____-____, Appx____-____; CFA's April 24, 2020 Submission at Exhibit 5-D, Appx____-____. Commerce contends that this statement does not provide "definitive evidence" that the affidavits reflect sale prices rather than a starting point for negotiations. Final Remand Results at 42, Appx____. But the statements speak for themselves.

As for Commerce's assertion that the feed is not wholly species specific, it rests on the observation that the attorneys who collected

34

data from the fish feed sellers provided 50 photographs of the different feed products sold. Final Remand Results at 43, Appx____. Of those 50 photographs, only 18 are for type "Catfish." *Id.* Once again, Commerce fails to consider the record holistically. As Dr. Budiyanto explains, patin fish farmers are not limited to just patin-specific fish feed. "{T}his is because patin culture . . . stresses the low cost of feed, the cheaper the feed the more efficient the patin culture would be." CFA November 16, 2020 SV Submission at Exhibit, Appx____-____. In other words, the record reflects that patin farmers feed their fish a variety of feed—not just feed specifically marketed for patin fish.

Commerce also raises a series of concerns regarding the feed pricing data from the Indonesian government, each of which is unfounded and all of which fail to consider the entire record. First, Commerce asserts that the government data is not species-specific. But, as already explained, 99% of all *pangasius* production in Indonesia is *pangasius hypophthalmus*. Second and third, Commerce complains that there is no mention of the number of data points used for the information or the volume of feed covered. This overlooks that the data was provided "on behalf of {the} Director General of Aquaculture,

Ct. No. 21-00380

Director of Fish Feed and Medicine" and clearly conveys an overview of the broad Indonesian fish feed market. CFA November 13 SV Submission at Exhibit 6, Appx____-____. The representativeness is confirmed by the description the Ministry provides, namely, "information regarding the price of Patin feed *circulated in Indonesia*." *Id.* Fourth, Commerce claims that the information does not "state the collection methods relied upon by the data gatherer." Final Remand Results at 44, Appx____. Commerce ignores that the data has an official imprimatur and, thus, a presumption of legitimacy (unlike the one-off, private studies in *Fishing Chimes* or the data from *Undercurrent News*). Fifth, Commerce asserts that it is unclear whether the data reflect farm-gate prices exclusive of taxes. *Id.* But the letter responds to a request that specifically noted the need for "information excluding any taxes and other charges." CFA November 13 SV Submission at Exhibit 6, Appx____-____. Absent an indication that it was impossible to obtain the requested information, there is no basis for Commerce to assume that the Ministry did not provide farm-gate, tax-free prices. Sixth, Commerce questions that the Ministry "mention{s} the source as 'GPMT'" without explaining what that is. Final Remand Results at 44,

Appx____. But the record clarifies that GPMT is the Farmer Feed

Entrepreneurs Association—a source that the Ministry trusts to obtain

valid pricing data. CFA November 16, 2020 SV Submission at Exhibit,

Appx____-____. Finally, Commerce asserts that the data are not

published—but they are readily available through a public agency.

Commerce also questions additional feed pricing data supplied by

Dr. Budiyanto on equally specious grounds. First, Commerce contends

that the data is not species specific because the information he provided

for 38% and 40% protein content feed is "specifically for marine fish."

Final Remand Results at 44, Appx____. But feed of that protein content

was not an FOP in this review. *See* Preliminary SVs at 3 and

Attachment 1, p. 1, Appx_____, Appx_____; Memorandum from Javier

Barrientos, Senior Case Analyst, Off. V, AD CVD Operations, through

Robert Galantucci, Program Manager, Off. V, AD CVD Operations, to

The File, re: *16th Administrative Review of Certain Frozen Fish Fillets*

*from the Socialist Republic of Vietnam: Final Results Analysis*

*Memorandum for Vinh Hoan Corporation* (June 25, 2021) at

Attachment 1, C.R. 632, P.R. 545. Appx____-____ ("Vinh Hoan Final

Mem."). Commerce's concern is irrelevant, and divorced from the issues
at hand.

Commerce next notes that the data "was not collected by the
MMAF, but rather was obtained from a single third-party source (Mr.
Deni of Central Protein Pima or 'CPP')," and that it is unclear whether
the prices reflected are from CPP alone. Final Remand Results at 44,
Appx____. Here, Commerce misreads the record evidence. Dr.
Budiyanto stated that Deni Indrajaya  confirmed a single fact, namely,
that "the prices of feed do not increase from 2017 until now," but he
went on to explain that the feed prices provided are "{f}rom *all*
information sources," not just Mr. Indrajaya. CFA November 16, 2020
SV Submission at Exhibit (April 22, 2020 Response, Question 16),
Appx____; *see also id*. at Question 19, Appx____ (identifying
information sources). In any event, the fact that MMAF relies on Mr.
Indrajaya's expertise as the general manager of a feed company and
former chairman of GPMT, a trade association of Indonesian feed
producers, reinforces the legitimacy of that source.

Commerce next expresses concern that it is "unclear whether
prices are market prices" since the affidavit describes the low price of

Ct. No. 21-00380

independent feed that is "supported by MMAF." Final Remand Results

at 44, Appx____. This concern is readily addressed by a careful review of

the source. As Dr. Budiyanto explains, *independent feed with a 16%*

*protein content* is sold at low prices because it is not taxed and

supported by the ministry. CFA November 16, 2020 Submission at

Exhibit, Appx____-____. Dr. Budiyanto does not state or suggest that

the prices for the 22% to 28% protein content feed at issue here receive

similar treatment. *Id.*

   In sum, Commerce fails to fairly assess the relative quality of the

Indonesian and Indian data because the agency refuses to grapple

with—or even acknowledge—the serious flaws with the latter, while

mounting phantom criticisms of the former. Viewed in the context of the

record as a whole, the Indonesian data—obtained from reliable

government sources, reflecting nation-wide patterns, and corroborated

by actual farmers and sellers—provide more reliable SV data for the

main inputs.

## B.  Commerce Refuses to Utilize Best Available Information for Labor Data

Commerce similarly digs in its heels with respect to labor data. For

the second time before this Court, Commerce disregards the statutory

mandate to use the "best" available surrogate values and imposes its own regulatory preference. This contradicts both the Tariff Act and the Court's explicit instruction that Commerce must put aside its unfounded "preference" and evaluate whether Indonesian labor data is the "best available information." Final Remand Results at 13-14. Appx____-____. Commerce further ignores the superiority of the Indonesian data, and wrongly relies on inferior Indian labor data.

### 1. Commerce Ignores Its Statutory Mandate

As the Court explained, because the Tariff Act requires "in all instances, the use of the 'best available information' about the value of factors of production," Commerce cannot issue a regulation that "defeat{s} the statutory directive." Slip Op. 24-67 at 13-14 (quoting *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1352 (Ct. Int'l Trade 2018)). Thus, as it has in numerous other cases, the Court concluded that Commerce may rely on its preference to use the primary surrogate country for all SVs as "a mere tiebreaker, {but} not a rule of decision." Slip Op. 24-67 at 14; *see New Am. Keg d/b/a Am. Keg Co. v. United States*, Ct. No. 20-00008, slip op. 21-30 at 34 (Ct. Int'l Trade Mar. 23, 2021) (remanding Commerce's selection of the labor

Ct. No. 21-00380

surrogate value because the agency relied on its preference for using a
single surrogate country without analyzing whether these data
constituted the best available information); *Clearon Corp. v. United
States*, 37 CIT 220, 229 (2013).

Commerce argues that the Court's construction would wreak
administrative havoc on its SV analysis, conflicts with past CIT
decisions that "direct{}" Commerce to derive SV data from a single
surrogate country, and that Commerce's regulation is more of a "general
rule" than a "tiebreak{ing}" preference. Final Remand Results at 20-21,
Appx____-____. Each of these arguments miss the mark.

The Court interpreted Commerce's obligations in light of the
underlying statutory regime, and agency regulations—particularly
when they come into conflict with the Tariff Act—are not entitled to
deference. *See Loper Bright*, 603 U.S. at 392. The Court's interpretation
is not a "mischaracteriz{ation}," of the regulation, as Commerce argues,
Final Remand Results at 46, Appx____, but a direct command from the
Court. The Court plainly held that Commerce's preferred interpretation
of the regulation (one in which the regulation creates a "general rule"),
Final Remand Results at 21, Appx____, is not valid under the statute.

41

Ct. No. 21-00380

No matter how serious the problem Commerce purports to solve, the agency's rationale "cannot override the clear command of the statute." *Bush v. United States*, 599 F.3d 1352, 1361 (Fed. Cir. 2010). Commerce provides no basis or reason to deviate from this basic principle of administrative law.

### 2. Commerce's Newly Submitted Indian Data Are Inferior to Indonesian Data in the Record

Commerce compounds its legal error with a factual one by favoring inapt Indian labor data over clearly superior Indonesian labor data. As an initial matter, Commerce effectively concedes that the 2006 labor data that it previously utilized is unreliable, discarding it entirely in the Final Remand Results. *See* Final Remand Results at 47, Appx____. Commerce, instead, substitutes newly submitted ILOSTAT data for average wages paid to Indian "skilled agricultural and fishery workers." Memorandum to the File from Javier Barrientos, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2018-2019*: *Draft Results of Redetermination Analysis Memorandum for Vinh Hoan Corporation* (Sept. 27, 2024) at Surrogate Values (PD) Excel, "Labor" Tab, Appx____-____. This data is inferior to the more specific Indonesian data in the record.

42

Ct. No. 21-00380

*First*, the Indian data is not representative of the workers at issue here. The "skilled agricultural and fishery workers" ILOSTAT category, includes workers who cultivate or harvest any type of trees, shrubs, or wild plants, breed or hunt any type of animals, produce any type of animal husbandry products, cultivate or exploit forests, breed or catch fish, or gather any forms of aquatic life. Thus, the Indian data encompasses a broader swath of workers than those involved in *pangasius* production. *See* Final Remand Results at 48, Appx____ ("Vinh Hoan's business consists of aquaculture, processing, and storage activities"). Further, the Indian data reflects "skilled" workers—rather than low-level aquaculture workers that predominate in the pangasius industry. *Compare* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: New Factual Information* (Sept. 4, 2024) at Attachment 1, Appx____-____ (reflecting Indonesian labor value for "skilled agricultural and fishery workers"), *with id.* at Attachment 2A, Appx____-____ (reflecting reduced labor rates for "Fishery Subsector – Aqua Culture 2018-19 Harvesting" in Indonesia). Accordingly, the Indian ILOSTAT data is non-representative both because it covers an overbroad category of workers,

Ct. No. 21-00380

and because the skill-level of those workers does not align with that of *pangasius* production workers.

Meanwhile, the available Indonesian data is more precise and therefore superior. As noted above, it reflects labor rates for aquaculture workers—a specific category of laborers involved in breeding and raising fish—exactly the type of activity at issue in this case. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: New Factual Information* (Sept. 4, 2024), 2 P.R.R. 3-6, Appx____-____. Additionally, the Indonesian data reflects a broader base of information sources. Beyond ILOSTAT data for Indonesia—covering multiple categories of workers[6]—the record contains review period aquaculture labor rates prepared by Indonesia's governmental statistics bureau, Badan Pusat (BPS), or Statistics Indonesia, *id.* at Attachment 2B, Appx____-____, and Indonesian labor rates for additional industrial sectors derived from BPS's August 2019 report titled "Indikator Pasar Tenaga Kerja

---

[6]    Commerce states that it "has a preference for relying on ILOSTAT data to value labor rates," but entirely fails to acknowledge the Indonesian ILOSTAT data in the record. Final Remand Results at 52, Appx____.

Indonesia," or in English, "Indonesian Labor Market Indicators." *Id.* at Attachment 3B, Appx____-____. Commerce fails to meaningfully engage with this additional record evidence, arguing merely that the "record does not permit a definitive determination as to whether Indian or Indonesian data are more specific." Final Remand Results at 49, Appx____. That is wrong. The extensive Indonesian data in the record reflects consistency and internal reliability, making it a better set of data than the single ILOSTAT submission provided for India.

Due to the clear superiority of the Indonesian data, and the statutory mandate to use "best available information," Commerce erred in using Indian labor data. Even if Commerce were correct in using its preference of a single surrogate country (it is not), such preference is inapplicable here, because there is no "tie" between the two data sets. The Court must, therefore, remand with instructions for Commerce to utilize the Indonesian record data as "best available information" for this particular SV and recalculate the appropriate margin.

## C. Commerce Continues to Fail to Explain or Support Its Use of Indian Data for By- and Co-Products

Like the labor data discussed above, Commerce continues to prefer inferior Indian data with respect to determining SVs for by- and

Ct. No. 21-00380

co-products. In remanding the case, the Court instructed Commerce to "answer the fundamental question of whether the Indian by-product and co-product data are in fact the best available for *those* factors." Slip Op. 24-67 at 19 (emphasis in original). In response, Commerce just uses more words to repeat the argument the Court has already rejected.

There is no dispute that—in general—a by-product is less valuable than its input. Issues and Decision Memo accompanying *Monosodium Glutamate from the People's Republic of China*, 79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) (final deter. of sales at less than fair value and the final affirm. deter. of critical circumstances) at 21. Nor is there any dispute that Commerce "has a consistent practice of rejecting or capping the by-product offset." *Id.* at 22; Issues & Decision Memorandum accompanying *Certain Pneumatic Off-the-Road Tires from the People's Republic of China*, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) (final results of antidumping duty admin. rev.; 2012-2013) at 52 (Commerce "has a long-standing practice of rejecting or capping the by-product {SV} in instances where {that value} exceeds the {SV} of the product from which it was derived"); Issues & Decision Memorandum accompanying *Certain Frozen Warmwater*

46

Ct. No. 21-00380

*Shrimp from the Socialist Re-public of Vietnam*, 81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016) (final results of antidumping duty admin. rev.; 2014-2015) at 58 (same). Based on Commerce's own precedent, the Court therefore concluded that Commerce must present "evidence that processing renders the by-product more valuable than the input" to overcome the presumption regarding the respective values of inputs and by-products. Slip Op. 24-67 at 18. Commerce has failed to do so here.

Instead, Commerce continues to rely on an Indian surrogate value for Vinh Hoan's frozen by-products that was *four times greater* than the surrogate value for the input: whole live fish. *See* Preliminary SVs at Attachment 1, p. 1, Appx_____; Vinh Hoan Final Mem. at Attachment 1, Appx_____. And Commerce used an Indian surrogate value for Vinh Hoan's fish meal co-product that was substantially higher than whole live fish. *See* Preliminary SVs at Attachment 1, p. 1, Appx_____; Vinh Hoan Final Mem. at Attachment 1, Appx_____. Commerce provides no explanation or support regarding the Indian data's value or *why* it relies on the Indian data, doing exactly what the Court previously

47

Ct. No. 21-00380

disallowed and "simply presum{ing} {the Indian data's} reliability." Slip Op. 24-67 at 17.

Commerce attempts to rationalize these discrepancies—and establish that it makes sense for the by- and co-products to cost more than the primary input—by citing a flow chart that Vinh Hoan submitted "detailing the steps and inputs used in the production process for fish fillets." Final Remand Results at 24, Appx____. But the chart does nothing to show that the Indian data is reliable or that its use is not distortive. Nor does it establish that the steps involved in "processing" by- and co-products cost more than the steps involved in raising commercial grade *pangasius*. In other words, despite its prolix response, Commerce has not pointed to any evidence on the record that explains why by- and co-products cost more to produce—and thus have a higher value—than the whole live fish input. Commerce also provides no explanation as to why the discrepancy between the whole live fish and by/co-product values is not distortive: the second, key point asserted by Commerce and requiring a response by the Court's prior Order. *See* Slip Op. 24-67 at 19. The lack of evidence in this regard is particularly telling since the Indonesian data for co- and by-products

reflects lower surrogate values than the whole live fish. *See, e.g.,* CFA November 13, SV Submission at Exhibit 1, Appx_____.

Additionally, Commerce has failed to establish why the Indian inputs are better than the Indonesian alternatives. Nor can it. The Indonesian price lists on the record represent a broad-market average of *pangasius* by-product, fish meal, and fish oil prices specific to Vinh Hoan's claimed by-products/co-products. They are also publicly available and are tax and duty exclusive. The data are further reinforced by information from Dr. Budiyanto. CFA's November 16, 2020 SV Submission at Exhibit (April 22, 2020 Response, Question 17), Appx____. And the price lists come with sworn affidavits detailing the manner in which they were obtained, establishing their reliability.

Commerce's attempts to criticize the Indonesian data fall flat. For example, in the Final Remand Results, Commerce claims that price lists are disfavored—largely due to a lack of information regarding the conditions under which price quotes were solicited, Final Remand Results at 50 n.200, Appx____—but fails to even respond to the point that the price lists in *this case* do not suffer from that concern, as they are accompanied by sworn affidavits establishing their reliability. Here,

49

Commerce again resorts to its "preference" of rejecting price list data, rather than analyzing the data in the record. Final Remand Results at 51, Appx____.[7] And while Commerce criticizes the by-product data provided in Dr. Budiyanto's affidavit—claiming that it lacks values for fish meal, and that certain data for other by-products is absent. But his data on by-products was not put forward as a source of SVs – rather, it is an Indonesian government official's expert, corroborative information that reinforces the reliability of the pricing data.

It is Commerce's job to evaluate the evidence in the record and determine SVs accordingly; but here Commerce has already determined that it will use Indian SVs and is unwilling to acknowledge the flaws in that data or superiority of other record information. The Court must remand with instructions for Commerce to set aside its bias against Indonesian data and undertake a fair and evenhanded calculation based on the best available data.

---

[7]    For that matter, the agency used Indonesian price lists to value fish oil. *See* Preliminary SVs at 6, Appx____; Vinh Hoan Final Mem. at Attachment 1, Appx____.

Ct. No. 21-00380

## IV.  <u>CONCLUSION</u>

Commerce's continued reliance on India as a primary surrogate country remains insufficiently explained and unsupported by substantial evidence. Likewise, Commerce has yet to adequately explain or support its reliance on Indian SVs and its rejection of Indonesian SVs for the FOPs.

CFA respectfully requests that the Court remand for a third time with instructions that Commerce reevaluate the relative quality of the Indian and Indonesian data on the record as to primary surrogate country selection and the valuation of individual FOPs. Commerce must pay careful attention to the reliability and quality of the *Undercurrent News* and *Fishing Chimes* for valuing the primary inputs and objectively assess these data against the Indonesian alternatives. Any such assessment must fairly and fully acknowledge the serious limitations with the Indian sources. The agency must also reevaluate its reliance on Indian labor data, which Commerce chose in large part due to a legal error about the weight of its regulatory preferences and which is less specific than the Indonesian data on the record. Finally, Commerce must reconsider its selection of data for valuing by-and co-

Ct. No. 21-00380

products, including by comparing the relative quality of the Indonesian and Indian data.

Respectfully submitted:

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Tatiana Sainati, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to the Catfish Farmers of America, et al.*

Dated: January 30, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Catfish Farmers of America's Comments in Opposition of Remand Determination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 9,837 words.

*/s/ Nazak Nikakhtar*
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

Catfish Farmers of America, et al.
(Representative Of)

January 30, 2025
(Date)

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>
CATFISH     FARMERS     OF<br>
AMERICA, *et al.*,<br>
          **Plaintiffs,**<br>
   v.<br>
UNITED STATES,<br>
          **Defendant,**<br>
    and<br>
QMC FOODS, INC., *et al.*,<br>
          **Defendant-<br>Intervenors.**
</td></tr>
</table>

Before: Hon. M. Miller Baker,
Judge

Court No. 21-00380

## ORDER

Upon consideration of the comments filed by Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA") regarding the December 3, 2024 remand results filed by the U.S. Department of

Commerce ("Commerce"), and all other papers and proceedings herein, it is hereby

ORDERED, that the December 3, 2024 remand results filed by Commerce are remanded to Commerce for further consideration; and it is further

ORDERED, that Commerce on remand shall reconsider its reliance on Indian data to value whole live fish, fingerlings, feed, labor, and by- and co-products in light of:

(1) the overall statutory directive that the agency rely on the "best available information";

(2) the need to evenhandedly and appropriately consider the relative merits of Indian and Indonesian surrogate value data, while adequately explaining and supporting its surrogate value selections; and it is further

ORDERED, that this case will proceed with the following schedule:

(1) Commerce shall file its remand determination on or before 120 days after the date of entry of this order;

(2) Commerce shall file the administrative record on or before fourteen days after the date on which it files the remand determination;

(3)   No later than fourteen days after Commerce files the administrative record, the parties shall file a proposed scheduling order advising the Court of which appendix preparation option the parties have selected and proposing due dates for parties' comments, the Remand Appendix, and any motions for oral argument. The proposed due dates should reflect the appendix preparation option the parties choose; and

(4)   The parties' proposed scheduling order must prescribe deadlines for the intervenor's comments that are later than the deadlines for the parties the intervenors support in order to avoid repetition of arguments, and include an appropriately-reduced word count limitation for the intervenor's comments. The Court normally allows an intervenor half the words available to the party-in-chief; if the parties believe that some other word count is necessary, the parties shall explain why; and it is further

**ORDERED**, that Joint Appendix Preparation instructions posted to the Court's website will govern preparation of the post-remand Joint Appendix, with the following exceptions:

(1)    The Joint Appendix in the post-remand proceedings must be titled "Remand Appendix" (clarified, if necessary, with "Public" and "Confidential" designations as appropriate, as well as with volume numbers indicating the page ranges contained in each volume, again as appropriate);

(2)    The Remand Appendix must include all pages cited in the parties' post remand comments to this Court, even if they were previously included in the original Joint Appendix;

(3)    Any page repeated from the original (pre-remand) Joint Appendix will bear the same Appx page number it bore in the original appendix—*e.g.*, page Appx1776 remains Appx1776. New pages not contained in the original Joint Appendix will receive page numbers that continue the numerical sequence from the last page of the original Appx page numbering. The process for numbering pages, and then for determining the actual pages to be included in the Remand Appendix, will follow the Joint Appendix Preparation instructions.

**SO ORDERED.**

Dated: _____, 2025    _____

     New York, N.Y.    M. Miller Baker, Judge