# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 21-00380 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| QMC FOODS, INC., *et al.*, | ) ) | |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION

OF COUNSEL:

K. GARRETT KAYS
Of Counsel
Office of the Chief Counsel
 For Trade Enforcement & Compliance
 U.S. Department of Commerce
 Kenneth.Kays@trade.gov

YAAKOV M. ROTH
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

KARA M. WESTERCAMP
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station

Washington D.C. 20044
Tel: (202) 305-7571
Fax: (202) 514-8640

March 14, 2025                    Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ..................................................................... iii

DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND
REDETERMINATION ................................................................................ 1

BACKGROUND ........................................................................................... 2

    I.    Commerce's Final Results ............................................................ 2

    II.    The Court's First Remand Order And Commerce's First
        Remand Results ......................................................................... 4

    III.    The Court's Second Remand Order ....................................... 6

    IV.    Commerce's Second Remand Results .................................... 8

ARGUMENT ............................................................................................... 10

    I.    Standard Of Review ............................................................... 10

    II.    Commerce's Second Remand Results Comply With The
        Second Remand Order And Are Supported By Substantial
        Evidence ................................................................................... 10

        A.    Substantial Evidence Supports Commerce's Reliance
            On Indian Data For Whole Live Fish, Fingerlings,
            And Fish Feed ............................................................. 11

            1.    Indian Data Reflect A Broad Market Average
                And Are The Best Available Information For SV
                Selection ............................................................. 12

2.    Substantial Evidence Supports Commerce's Determination That Indonesian Data Are Not The Best Available Information ........................24

a.    Whole Live Fish .........................................25

b.    Fingerlings .................................................27

c.    Feed ............................................................37

B.    Substantial Evidence Supports Commerce's Selection Of Indian Labor Data As The Best Available Information ....................................................45

C.    Substantial Evidence Supports Commerce's Reliance On Indian Data For By-Products................................49

CONCLUSION ........................................................................54

# TABLE OF AUTHORITIES

## CASES

*An Giang Fisheries Import and Export Joint Stock Company v. United States*,
  317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018)........................................50

*Catfish Farmers of Am. v. United States*,
  No. 21-00380, 2023 WL 4560815 (Ct. Int'l Trade July 7, 2023) ............4

*Catfish Farmers of Am. v. United States*,
  No. 21-00380, 2024 WL 2843039 (Ct. Int'l Trade June 5, 2024) . 2, 6, 50

*Catfish Farmers of Am. v. United States*,
  No. 20-105, 2025 Ct. Intl. Trade LEXIS 24 (Ct. Int'l Trade Mar. 10,
  2025)........................................................................................................ 14

*Clearon Corp. v. United States*,
  37 C.I.T. 220 (2013) ............................................................................... 46

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015) .............................................................. 36

*Gov't of Argentina v. United States*,
  542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021)................................. passim

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
  335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018)........................................ 15

*Hangzhou Yingqing Material Co.  v. United States*,
  195 F. Supp. 3d 1299 (Ct. Int'l Trade 2016)........................................ 13

*Jacobi Carbons AB v. United States*,
  F. Supp. 2d 1360 (Ct. Int'l Trade 2014) ............................................... 46

*Jiaxing Brother Fastener Co. v. United States*,

822 F.3d 1289 (Fed. Cir. 2016) ........................................................... 45

*MacLean-Fogg Co. v. United States,*
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................ 10

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................... 10

19 U.S.C. § 1677b(c)(1) ....................................................... 3, 45

## REGULATIONS

19 C.F.R. § 351.408(c)(2) ................................................... 45, 46

## FEDERAL REGISTER NOTICES

*Certain Tissue Paper Products from the People's Republic of China,*
74 Fed. Reg. 52,176 (Dep't of Commerce Oct. 9, 2009) ....................... 51

*Frontseating Service Valves from the People's Republic of China,*
76 Fed. Reg. 70,706 (Dep't of Commerce Nov. 15, 2011) .................... 21

*Certain Frozen Fillets from the Socialist Republic of Vietnam,*
86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021). ...................... 2

*Raw Honey from the Socialist Republic of Vietnam,*
87 Fed. Reg. 22,184 (Dep't of Commerce Apr. 14, 2022) ................... 16

*Utility Scale Wind Towers from the People's Republic of China,*
77 Fed. Reg. 75,992 (Dep't of Commerce Dec. 24, 2012) .................... 43

# GLOSSARY

| | |
|---|---|
| CFA: | Catfish Farmers of America, *et al.* |
| CPP: | Central Protein Prima |
| FOP: | Factors of Production |
| IDM: | Issues and Decision Memorandum |
| ILOSTAT: | Indian International Labor Organization |
| MMAF: | Ministry of Marine Affairs and Fisheries |
| PDM: | Preliminary Decision Memorandum |
| POR: | Period of Review |
| SV: | Surrogate Value |

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 21-00380 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| QMC FOODS, INC., *et al.*, | ) ) | |
| Defendant-Intervenors. | ) ) ) | |

## DEFENDANT'S RESPONSE IN SUPPORT
## OF THE REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to

the comments filed by the plaintiffs, CFA[1], ECF No. 99 (CFA Cmnts.),

---

[1] Catfish Farmers of America, America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA) are the petitioners, representing the domestic industry, in the underlying review.

concerning the United States Department of Commerce's (Commerce) second final results of redetermination filed in accordance with this Court's decision and remand order. *See Catfish Farmers of Am. v. United States*, No. 21-00380, 2024 WL 2843039 (Ct. Int'l Trade June 5, 2024) (*CFA II*); *See also* Final Results of Redetermination Pursuant to Court Remand, Dec. 2, 2024 (Second Remand Results), ECF No. 95, Appx____-____. For the reasons explained below, we respectfully request that the Court sustain Commerce's second remand results and enter judgment for the United States.

## BACKGROUND

### I.    Commerce's Final Results

On July 8, 2021, Commerce published its final results in the 2018-19 administrative review of the antidumping duty order covering certain frozen fish fillets from Vietnam. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021) (final results), Appx___-____, and accompanying Issues and Decision Memorandum (IDM), Appx____-_____. To determine normal value, the statute directs Commerce to value factors of production (FOPs) with the "best available information" from a market economy

country or countries, as Commerce considers appropriate. *See* 19 U.S.C. § 1677b(c)(1). In its final results, Commerce selected India over Indonesia as the primary surrogate country because it was at the same level of economic development as Vietnam; a significant producer of merchandise comparable to the subject merchandise based on the information available; and provided the best data and information with which to value the factors of production. *See* IDM at 14-33, Appx_____-_____. When considering what constitutes the "best available information," Commerce considers the following several criteria, including whether the data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question. *See id.* at 25, Appx_____; *see also* 19 U.S.C. § 1677b(c)(1). Commerce explained that no factor is dispositive, and its preference is to satisfy the breadth of the above criteria. IDM at 25, Appx____. Thus, even though Commerce explained its practice of selecting India as its primary surrogate country from those countries at the "same" level of economic development and that are significant producers of comparable merchandise, *id.* at

14-21, Appx___-____, Commerce also explained why the Indian surrogate value (SV) data (for fingerlings, fish feed, whole live fish, by-products, and financial ratios) are preferrable under each criterion and, as a whole, further support a selection of India as its primary surrogate. *See id.* at 21-33, Appx_____-_____. Accordingly, Commerce used Indian SV data to value factors of production, with the exception of the fish oil by-product, for which it used Indonesian data. *See id.* at 30, Appx_____.

II.    The Court's First Remand Order And Commerce's First
       <u>Remand Results</u>

On July 7, 2023, the Court sustained, in part, and remanded, in part, certain aspects of the final results. *See Catfish Farmers of Am. v. United States*, No. 21-00380, 2023 WL 4560815, at *5-12 (Ct. Int'l Trade July 7, 2023) (*CFA I*). The Court primarily remanded Commerce's primary surrogate country selection for further analysis. *Id.* at *7. For the remaining issues, the Court sustained Commerce's determinations. *See id.* at *7-12.

On remand, Commerce continued to select India as the primary surrogate country from its list of countries that it considered to be at the "same" level of economic development as

Vietnam.  *Final Results of Remand Redetermination Pursuant to Court Remand*, ECF No. 69 (Nov. 20, 2023) (First Remand Results) at 6-25, 32-54, Appx_____-_____, Appx_____-_____.  Further, Commerce explained that the Indian SV sources were preferable on balance and best met the above-referenced SV selection criteria.  *See id.* at 18-19, Appx___-___.  Commerce stated that the Indian data sources – the *Fishing Chimes* publication – represented a broad market average for key inputs, including whole live fish, fingerlings, and fish feed, because the data were sourced from a survey of major fish-producing districts within the state of Andhra Pradesh, which was the predominant location of pangasius production in India.  *Id.* at 42-43, Appx___-____.  Additionally, Commerce explained that the record contained an article from *Undercurrent News* represented a broad market average because the data were collected from "all major producing regions."  *Id.* at 44, Appx___.  Commerce explained that the Indian labor data were usable once inflated to reflect the period of review and its reliance on the 2006 Indian labor data was appropriate in light of Commerce's practice to rely on a single country for SVs, to the

extent possible. *Id.* at 23, 50-51, Appx____, Appx____-_____.

Finally, Commerce continued to rely on the Indian data for certain factors of production (FOP) values, including frozen byproducts and fish meal. *Id.* at 24, 51-54, Appx___, Appx____-_____. Specifically, Commerce found certain Indonesian data to be less preferable because the data is sourced from price lists. *Id.* Commerce also explained that the Indian by/co-product data were usable, despite having a greater value than the initial input (*i.e.,* whole live fish) because byproducts can be worth more on an equal volume than the underlying input after undergoing additional processing. *Id.*

III. <u>The Court's Second Remand Order</u>

In *CFA II,* the Court sustained in part, and remanded in part, certain aspects of the first remand results. *CFA II*, 2024 WL 2843039, at *1. First, the Court held that substantial evidence did not support Commerce's explanation regarding the Indian data sources for whole live fish, fingerlings, and fish feed – the *Fishing Chimes* and *Undercurrent News* publications – and their representativeness of a broad market average. *Id.* at *1-3. With

respect to the *Fishing Chimes* publication, the Court held that Commerce "evidently based its finding on its past analysis that the Court {had} already remanded as inadequate." *Id.* at *2. Regarding *Undercurrent News*, the Court noted that Commerce "essentially accepted" the "vague and unsupported reference to an unspecified number of farmers and feed mills in 'all major producing regions.'" *Id.* at *3.

Second, the Court held that substantial evidence did not support Commerce's explanation of why it relied on non-contemporaneous Indian labor data, which were from 2006 but inflated to reflect the period of review (POR). *Id.* at *4-6. The Court held that "Commerce jumped to the tiebreaker without first declaring the game to be tied," when it relied on its regulatory preference to use data from the primary surrogate country. *Id.* at *5.

Finally, the Court remanded Commerce's explanation regarding the SV selected for certain by-products (*i.e.*, frozen by-products and fish meal). *Id.* at *7. The Court noted that Commerce's "proposition that because by-products *can be* worth

7

more than the inputs, it is necessarily reasonable to assign such higher values to the former," was a "conclusion with no meaningful citation to the record." *Id.* at *6-7 (emphasis in original). In other words, "{t}hat Indian data might be better for *other* factors of production and that the Indonesian data are based on price lists and affidavits do not answer the fundamental question of whether the Indian by-product and co-product data are in fact reliable and the best available information for *those* factors{.}" *Id.* at *7 (emphasis in original).

IV.   Commerce's Second Remand Results[2]

On remand, Commerce continued to examine both India and Indonesia for its primary surrogate country and, under respectful protest, afforded India no preference despite its inclusion on the surrogate country list. *See* Second Remand Results at 2 n.9, Appx_____ (citing Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information (Apr. 2, 2020), Appx___-____). Furthermore, Commerce explained that the

---

[2] To avoid repetition, we address the specific factual issues in the argument section, below.

Indian data, via the *Fishing Chimes* and *Undercurrent News* publications, satisfy each of its SV selection criteria for the inputs at issue – fish feed, fingerlings, and whole live fish. *See id.* at 11-16, 28-45, Appx____-____, Appx____-____. For the same inputs, Commerce explained that the Indonesian data are less desirable in terms of specificity of the input and contemporaneity with the POR, among other concerns about the general reliability of the data. *Id.* at 16-18, 34-45, Appx____-____, Appx____-____.

For labor, Commerce re-opened the record on remand and placed contemporaneous International Labor Organization (ILO) data regarding sector-specific wage rates on the record for India. *Id.* at 22, Appx___ (citing ILOSTAT Periodic Labour Force Survey Data (Aug. 29, 2024), Appx___-____). In the second remand results, Commerce explained that there was contemporaneous and specific labor data on the record from both countries, such that record evidence did not warrant departing from its primary surrogate country for the usage of labor data. *Id.* at 22-23, 45-49, Appx___-___, Appx___-___. Finally, for the FOPs of frozen by-products and fish meal, Commerce continued to find the Indian

SVs were preferrable, and that the record did not support a finding

that capping such SVs was appropriate. *Id.* at 23-26, 49-52,

Appx_____-_____, Appx_____-_____.

## ARGUMENT

I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's

determinations if they are "in accordance with the remand order," and

are "supported by substantial evidence, and are otherwise in accordance

with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349,

1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

II.   Commerce's Second Remand Results Comply With The Second
      Remand Order And Are Supported By Substantial Evidence

Consistent with *CFA II*, Commerce's second remand results

provide additional explanation and address record evidence regarding:

(1) the *Fishing Chimes* and *Undercurrent News* data's

representativeness of broad market average and overall preferability for

valuing certain FOPs, (2) Commerce's reliance on contemporaneous,

specific labor data from India, and (3) its reliance on Indian SVs for

certain frozen by-products and fishmeal, and why capping such SVs is

not appropriate based on record evidence. In sum, substantial evidence

10

supports Commerce's findings that the Indian data continue to be preferable to the Indonesian data. *See generally* Second Remand Results, Appx_____-_____. The Court should reject CFA's meritless arguments that essentially request that this Court reweigh evidence, as we explain below.

A. Substantial Evidence Supports Commerce's Reliance On Indian Data For Whole Live Fish, Fingerlings, And Fish Feed

Substantial evidence supports Commerce's determination that the Indian data represent a broad market average for whole live fish, fingerlings, and fish feed because the data were sourced from a survey of major fish-producing districts within the state of Andhra Pradesh, which was home to a vast majority of pangasius production in India during the POR (*i.e., Fishing Chimes*) and from interviews with farmers and feed mills in all major producing regions (*i.e.*, *Undercurrent News*). *See id.* at 11-16, Appx_____-_____.

CFA, however, seeks to impose artificial and arbitrary restrictions on Commerce's interpretation of "broad market average." CFA Cmnts. at 10-20. Specifically, CFA argues that only sources that meet CFA's proposed geographical, temporal, and volume reporting requirements

can satisfy Commerce's requirements for "broad market average." *Id.*
The Court should reject these unprecedented, and unsupported,
restrictions on what constitutes a broad market average. Additionally,
as Commerce explained in the second remand results, the Indonesian
data also suffer from various other issues, *i.e.,* specificity,
contemporaneity, sourcing, etc., such that the Indonesian sources are
not preferrable for satisfying Commerce's SV selection criteria. *See*
Second Remand Results at 16-17, Appx____-_____.

> 1. Indian Data Reflect A Broad Market Average And Are
>    The Best Available Information For SV Selection

Commerce explained in the second remand results that the
*Fishing Chimes* publication, which provided 108 data sets from 54
farmers in 46 of the over 300 villages in the two largest pangasius
producing districts in Andhra Pradesh (*i.e.*, West Godavari and
Krishna), represented a "broad market average" because it includes
data from farmers and feed mills "in all major producing regions" of
India. *Id.* at 11-16, Appx____-_____. As Commerce explained, the term
"broad market average" is not defined by statute nor regulation. *See id.*
at 14, Appx___. Rather, Commerce interprets the term on a "spectrum"
that is "broader than a single data point (such as an offer for sale or a

transaction-specific price) and are generally reflective of market conditions on a larger scale." *Id.* at 14, 16, Appx_____, Appx_____.  For example, although Commerce explained "that having greater detail on a source is always preferable," a "determination of whether data reflect a broad market average is a consideration that is made on a spectrum{.}" *Id.* at 16, Appx___.  Accordingly, Commerce explained that it is neither problematic nor surprising if it finds that surrogate values are reflective of market conditions on a larger scale, even if those data sources reflect only a subset of an economy.  *Id.* at 15-16, Appx_____-_____; *see also Hangzhou Yingqing Material Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (Ct. Int'l Trade 2016).

Here, Commerce determined that the data sourced from interviews with farmers/feed mills from major producing regions and a survey of major fish-producing districts within the state of Andhra Pradesh, which was home to a majority of pangasius production in India during the POR, represented a "broad market average."  *Id.* at 13-16, Appx_____-_____.  Indeed, Commerce does not impose a bright line rule that *only* country-wide data can satisfy its broad market average requirement, because "such an interpretation would not only be overly

restrictive, it would also be virtually impossible to achieve." *Id.* at 14,

Appx_____.  Indeed, in the immediately preceding administrative

review, this Court sustained Commerce's "finding that *Fishing*

*Chimes* represents a 'broad market average' and is preferable to the

Indonesian whole live fish data." *Catfish Farmers of Am. v. United*

*States*, No. 20-105, Slip Op. 25-24, 2025 Ct. Intl. Trade LEXIS 24, at *9

(Ct. Int'l Trade Mar. 10, 2025) (*Catfish*).  The Court should make the

same determination here, as we explain below.

CFA, nonetheless, argues that Commerce has a preference of

relying on country-wide data to represent a broad market average.  CFA

Cmnts. at 12.  There are two problems with this argument.  First,

neither the statute nor regulations require country-wide data to satisfy

Commerce's broad market average criterion; therefore, Commerce

reasonably selected a data source from the state of Andhra Pradesh

that accounted for a majority of pangasius production in India during

the POR.  *See* Second Remand Results at 13, Appx_____.  CFA's

assertion that there is a "decline" in Andhra Pradesh's share of

pangasius production, *see* CFA Cmnts. at 13-14, does not undermine

Commerce's finding regarding the representativeness of the survey data

reflecting nearly 60 percent of India's pangasius production.  Indeed,

Commerce explained that requiring a representation of every

transaction in an entire market would be "virtually impossible to

achieve."  Second Remand Results at 14, Appx_____.  Even so,

Commerce found that the *Undercurrent News* prices, collected from

interviews with farmers in all major producing regions, further

supported the representativeness of the Indian data.  *See id*. at 15-16,

Appx_____-_____.

Second, assuming *arguendo* that *Fishing Chimes* and

*Undercurrent News* are lower on a spectrum of representativeness of a

broad market average, this still does not warrant discounting the

Indian data sources, as one SV selection criterion cannot be considered

in isolation.  *Id.*  As explained further below, Commerce's analysis of the

evidence about the other SV criteria (*i.e.*, specificity, contemporaneity,

*etc.*) as applied to the Indonesian sources, does not render the Indian

and Indonesian data sources equal.  In other words, CFA's mere

disagreement with Commerce's findings that 108 data points constitute

a "large" number representing nearly 60 percent of India's entire

pangasius production which constitutes a broad market average

(therefore satisfying all SV selection criteria), does not undermine Commerce's reliance on Indian SV sources, especially when considering Commerce's concerns about the Indonesian data sources. *See id.* at 13 n.61, Appx___ (citing Vinh Hoan's Apr. 24, 2020 SV Submission at SV-4(c), Appx___-____(Vinh Hoan SV Submission)); *cf.* CFA Cmnts. at 11-13, *with Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018).

Lastly, CFA's assertion that *Fishing Chimes* is a "one-off, private study," CFA Cmnts. at 14, is contradicted by record evidence, as Commerce explained that the *Fishing Chimes* publications has been published for almost 40 years and is similar to other publications relied upon by Commerce in other proceedings, especially when reflecting a subset of an economy. *See* Second Remand Results at 15, 28, Appx_____, Appx_____ (citing *Raw Honey from the Socialist Republic of Vietnam*, 87 Fed. Reg. 22,184 (Dep't of Commerce Apr. 14, 2022) (final affirm. LTFV determ.), and accompanying IDM at Comment 1; Vinh Hoan SV Submission at Exhibits SV-4(b), Appx_____-_____, and Exhibit SV-4(f), Appx___-____).

Additionally, CFA seeks to undermine the credibility of the *Undercurrent News* publication by asserting that the "scope" of data or decades old history of the publication are not germane to the issue at hand. CFA Cmnts. at 19-20. To the contrary, Commerce found that *Undercurrent News* was reliable and referred to multiple sources of data beyond Indian aquaculture (and beyond the FOPs at issue). Second Remand Results at 28, 32-33, Appx____, Appx_____-_____.

Nonetheless, CFA asserts that Commerce does not adequately consider that the surveyed farmers in *Fishing Chimes* did not purchase fingerlings in every month of the study, that whole live fish harvests are not reflected in each month, and that there is no farm-specific data of those who provided feed prices. CFA Cmnts. at 14-15. CFA not only attempts to apply baseless and overly restrictive standards to Commerce's SV selection criteria, but in the second remand results, Commerce also handily rebuts CFA's various complaints about the harvest timing reported for each input in *Fishing Chimes*.

As Commerce explained, the lack of observations is not surprising as the *Fishing Chimes* study noted that stocking patterns for fingerlings are not constant and change according to many factors, such as market

17

price, the prevalence of other types of farming activities, and water availability. Second Remand Results at 36, Appx_____ (citing Vinh Hoan SV Submission at Exhibit SV-4(b)-(c), Appx_____-_____). Furthermore, the study observed that the peak stocking season during 2017 and 2018 was in the early part of the year. First Remand Results at 41, Appx_____. Relatedly, CFA argues that *Fishing Chimes* only reflect a maximum of 11 farms' harvest per month without data in other months. CFA Cmnts. at 14-15. Commerce explained, however, that not all farms would be expected to report data for every month, as each farm averaged three harvests over the two-year period covered by the survey. First Remand Results at 41 n.133, Appx_____ (citing Vinh Hoan's SV Submission at Exhibit SV-4(c), Appx___-____). Nonetheless, CFA argues that *Fishing Chimes* provides no data for how many farms per month provided feed prices. CFA Cmnts. at 14-15. Again, CFA offers no authority which would require this standard to be imposed on Commerce's broad market average finding. *See* Second Remand Results at 17, Appx____, 42, Appx___ (citing CFA's Apr. 24, 2020 SV Submission at Exhibit 5-C and 5-D, Appx___-____, Appx___-____).

Next, CFA argues that the *Fishing Chimes* data do not provide information regarding the number of pangasius producers in Andhra Pradesh or across India, the volume represented by the surveyed farms, or volume information regarding the number of fingerlings and feed purchased by the surveyed farmers. CFA Cmnts. at 16. Putting aside the fact that the Indonesian data sources do not satisfy Commerce's SV selection criteria and CFA's arbitrary standards, s*ee* Second Remand Results at 32, Appx___ , CFA's attempt to require reporting of the entire universe of the pangasius industry across India constitutes a "mere disagreement" with Commerce's findings regarding *Fishing Chimes* and its representativeness of the Indian pangasius production. *Id.* at 31, Appx_____; *see also Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (holding that resolving mere disagreement with Commerce's weighing of the evidence is not the function of the Court).

Second, although *Fishing Chimes* did not provide transaction-specific volumes, the study provided record evidence that enabled Commerce to determine the total volumes represented by each study. First Remand Results at 41-42 n.139, Appx_____-____. For example,

Commerce explained that *Fishing Chimes* represented approximately 9.03 million kilograms of pangasius fish in 2017 and 2018, and approximately 3.75 million kilograms during the POR.  *See* Second Remand Results at 7, Appx_____; *see also* First Remand Results at 42 n.139, Appx___ (citing Vinh Hoan's SV Submission at Exhibit SV-4(b) and SV-4(c), Appx____-_____, Appx_____-____).  *Fishing Chimes* represents approximately 12.5 million pieces of fingerlings in 2017 and 2018, and approximately 5.1 million pieces during the POR.  *See* Second Remand Results at 7, Appx___; *see also* First Remand Results at 43 nn.145 & 146, Appx___.  Finally, *Fishing Chimes* represents approximately 12.7 million kilograms of feed in 2017 and 2018, and approximately 5.3 million kilograms of feed during the POR.  *See* Second Remand Results at 7, Appx____; *see also* First Remand Results at 44 nn.147 & 148, Appx_____.

CFA asserts that this information is irrelevant in the absence of any analysis comparing Andhra Pradesh's pangasius production to the India's entire market.  *See* CFA Cmnts. at 16-17.  Commerce, however, explained that among the 15 states in India, Andhra Pradesh produced nearly 60 percent of the country's pangasius production.  First Remand

Results at 13 n.61, Appx_____ (citing Vinh Hoan's SV Submission at SV-4(c), Appx___-____).  Commerce also explained that the next two largest states accounted for 150,000 MT, and 120,000 MT (compared to Andhra Pradesh's 500,000 MT), respectively, and the remaining states represented a tiny percentage of the country-wide total.  *Id.*  In addition to CFA's attempts to impose arbitrary standards on Commerce's findings regarding what constitutes a broad market average, CFA's arguments fail to establish that Commerce's Second Remand Results do not comply with the remand order in *CFA II*.

CFA next argues that *Fishing Chimes* is not contemporaneous with the POR, as the publication only provides data for two months of the POR.  CFA Cmnts. at 17.  This argument does not *per se* render the source non-contemporaneous as Commerce's practice still finds SV sources to be contemporaneous when only part of the POR is covered by the source.  *See Frontseating Service Valves from the People's Republic of China*, 76 Fed. Reg. 70,706 (Dep't of Commerce Nov. 15, 2011) (final results), and accompanying IDM at Comment 9.  Consistent with its practice, Commerce explained that *Fishing Chimes* for each of the main SVs contained data for months in 2018 and 2017 during the POR.  *See*

Second Remand Results at 19, Appx___ (citing Vinh Hoan's SV

Submission at Exhibit SV-4, Appx___-____ (containing 2018 monthly

prices for whole live fish for the POR months)); *see also id.* at 20,

Appx___ (citing Vinh Hoan's SV Submission at Exhibits SV-4(c),

Appx____-_____, and SV-5, Appx___-____ (fingerlings)); *id.* at 21,

Appx___ (Vinh Hoan's SV Submission at Exhibit SV-4(c), Appx____-

_____, and SV-6, Appx____-_____) (feed)).  Moreover, CFA does not

challenge the contemporaneity of *Undercurrent News*, which reflects the

2019 months of the POR.  *Id.* (citing Vinh Hoan's SV Submission, at

Exhibit FDSV-6, Appx___-____ (containing 2019 monthly prices for

whole live fish); Exhibits FDSV-9 and FDSV-10, Appx____-_____,

Appx___-____ (fingerlings); Exhibits FDSV-7 and FDSV-8, Appx____-

_____, Appx____-_____ (feed)).

Moreover, Commerce explained that *Fishing Chimes* stated that

"using statistical methods {the researchers} analyzed data for

qualitative and quantitative results" and following field collection, "{f}or

cross verification of economic data outcomes, farm-gate prices were also

obtained from vernacular newspapers from 2017 & 2018."  *Id.* at 13,

Appx_____ (citing Vinh Hoan's SV Submission at SV-4(c), Appx___-

____).  Nonetheless, CFA argues that there are "statistical shortcomings" with the survey methods from *Fishing Chimes*, arguing that the publication did not provide certain information to support its conclusion regarding its procedures to calculate "generalizable data." CFA Cmnts. at 17-18.  CFA merely disagrees with Commerce's findings regarding the reliability of *Fishing Chimes*.  As Commerce explained, contrary to CFA's Indian data that "is unaccompanied by any reference whatsoever to statistical analyses," the *Fishing Chimes* data is a long-standing, reputable publication, and "Commerce has a history of relying on the data that it publishes."  Second Remand Results at 32, Appx_____.  Also, Commerce noted that it was "significant that, while {CFA} repeatedly attempt to identify purported shortcomings relating to the data, no party to this proceeding has provided evidence that tangibly calls into question the representativeness of the data in general, *e.g.*, evidence to undermine the survey findings."  *Id.* at 33, Appx____.  Thus, substantial evidence supports Commerce's determination that the *Fishing Chimes* and *Undercurrent News* publications represent a broad market average.  *See id.* at 32-34, Appx____-____.

23

2.    Substantial Evidence Supports Commerce's
Determination That Indonesian Data Are Not The Best
Available Information

Commerce found that the Indonesian data satisfy several of the

SV selection criteria, but that the Indonesian data are less preferable

for several reasons. *See id.* at 16-17, Appx_____-_____.  In contrast, as

explained above, Commerce found that the Indian data satisfied each of

its SV selection criteria (contemporaneous, publicly available, tax and

duty exclusive, representative of a broad market average, and specific to

the inputs in question). *Id.* at 11, Appx_____.  Additionally, Commerce

explained that the Indian data provided sufficient detail regarding the

survey and volume information from India's largest pangasius

producing areas, to satisfy Commerce's practice regarding the

representativeness of a broad market average. *Id.* at 11-12,

Appx_____-_____.  Commerce also explained that the Indian data

provided greater clarity and detail regarding the sourcing and collection

methodology, and was not collected for the purposes of this proceeding

(*i.e.,* from a constant publication of prices using survey methods that

reflect statistical methods with cross verification of farm-gate prices).

*Id.* at 28, Appx_____.

24

Regarding the Indonesian data, Commerce explained that the data for whole live fish were not species specific; the fingerling data were not contemporaneous or size-specific, came from a limited number of sources, and were obtained for the purposes of this proceeding; and the feed data sources were not contemporaneous, partially specific with regard to protein content, were obtained from a small number of sources, and obtained for the purposes of this proceeding. *Id.* at 34-43, Appx____-_____. "Commerce has adequately explained why it deems the Indonesian whole live fish data inferior" to the Indian data. *Catfish*, 2025 Ct. Intl. Trade LEXIS 24, at *9. This Court should reject CFA's various arguments as they merely, again, constitute requests of this Court to reweigh evidence, as we explain below. *See Gov't of Argentina*, 542 F. Supp. 3d at 1395.

a.    Whole Live Fish

As explained above, Commerce found that the record evidence supported a finding that the Indonesian data included multiple species, without any information that would allow Commerce to reliably assess how much of that data relates to *pangasius hypophthalmus*. *See* Second Remand Results at 34-35, Appx_____-_____. For example, Commerce

25

found that individuals who worked for the Indonesian government agency, Ministry of Marine Affairs and Fisheries (MMAF), charged with collecting the data offered by CFA, could not identify the percentage of the proffered data (nor the timeframe) that related to the species in question. *Id.* at 34, Appx_____. Specifically, Dr. Budiyanto of the MMAF stated that *patin djambal* "is more likeable" than *patin siam* and that the predominant species in Indonesia was *patin siam*, while offering no insight into what he meant by "predominant" and without indicating the extent to which other species were reflected in the presented figures. *Id.* at 35, Appx____ (citing CFA's Nov. 16, 2020 SV Submission at Exhibit, Appx_____). Ultimately, it was reasonable for Commerce to conclude that Dr. Budiyanto's statements did not provide the clarity necessary to reliably assess how much of the Indonesian data specifically relate to *pangasius hypophthalmus*. *Id.*

CFA urges this Court to import more weight to Dr. Ir. Agus Oman Sudrajat's affidavit, which states, among other things, that 99 percent of Indonesia's production represents *Pangasius hypophthalmus*, CFA Cmnts. at 21-25 (citing CFA's Nov. 13, 2020 SV Submission at Exhibit 3, Appx_____-_____), but CFA does not rebut Commerce's explanation

that Dr. Budiyanto's responses, as an official with the agency that

collected the data, provides the most probative information regarding

the composition of the MMAF data.  Second Remand Results at 35,

Appx_____.  CFA's argument that the Court should credit its

characterizations of the affidavits over Commerce's findings again

amount to a request to reweigh the evidence and select the inferior

quality Indonesian data.  *See Gov't of Argentina*, 542 F. Supp. 3d at

1395.

b.  <u>Fingerlings</u>

Regarding Indonesian fingerling data, Commerce found multiple

areas where these data sources were less preferable.  The Court should

find that Commerce "adequately explained why it found the Indian data

superior and responded to Catfish Farmers' objections."  *Catfish*, 2025

Ct. Intl. Trade LEXIS 24, at *11.  Specifically, Commerce explained the

Indonesian government fingerling data were not contemporaneous, as

they predated the POR by approximately six years, and were not size-

specific for fingerlings over six inches in length.  *See* Second Remand

Results at 16-17, Appx___-____ (citing CFA's Apr. 24, 2020 SV

Submission at Exhibit 5-B, Appx___-____).  Commerce explained that

27

CFA's proffered alternative fingerling prices on the record had

numerous drawbacks, such as the data had omitted sourcing

information, information about whether the prices are exclusive of

taxes, and species information, and that the data had been collected

from a small number of sources and had been obtained for the specific

purposes of this proceeding. *See id.* at 17, 37, Appx____, Appx_____.

Ironically, CFA's preferred data omit farm-specific and volume

information[3] (which, it bears noting, is a requirement that CFA seeks to

apply to Indian sources). *See* CFA Cmnts. at 16. Furthermore,

Commerce questioned how the data sources from three farmers, which

was acquired specifically for the purposes of this proceeding, could

represent the actual experience of the overall Indonesian market, which

was purportedly a deficiency of key Indian surrogate value offerings

which represented data from 54 farmers. Second Remand Results at

37, Appx_____.

---

[3] As explained above, although *Fishing Chimes* did not provide transaction-specific volumes, the study provided record evidence which enabled Commerce to determine the total volumes represented include approximately 12.5 million pieces of fingerlings in 2017 and 2018, and approximately 5.1 million pieces during the POR. *See* Second Remand Results at 7, Appx_____; *see also* First Remand Results at 43 nn.145 & 146, Appx_____.

Fundamentally, Commerce explained that the Indonesian government fingerling data have various deficiencies, *see id.* at 38, Appx_____, which CFA fails to address. First, CFA does not acknowledge that this data is missing an entire portion of necessary FOPs (*i.e.,* fingerlings larger than six inches). Although CFA confusingly states that the government-sourced fingerling data includes information for fingerlings greater than six inches, that is not true. *Cf.* CFA Cmnts. at 30-31, *with* CFA Apr. 24, 2020 SV Submission at Exhibit 5-B, Appx____-____. Also, CFA provided no other sourcing, volume, or survey/farmer-specific information and only states that the data came from "the Directorate General of Aquaculture." CFA Cmnts. at 31. Furthermore, as an attempt to remedy the shortcomings regarding the lack of species-specific information, CFA seemingly references the declaration from Dr. Sudrajat for its assertion that 99 percent of Indonesia's patin production in Indonesia is *pangasius hypophthalmus*. *Id.* But there is nothing on the record to support a finding that Dr. Sudrajat was involved in the creation of this MMAF data, whereas Dr. Budiyanto, an official of the MMAF, merely stated that *patin djambal* "is more likeable" than *patin siam*, and claimed that

29

the "predominant" species in Indonesia was *patin siam* (without specifying the meaning of "predominant"). Second Remand Results at 34-35, Appx___-___ (citing CFA's Nov. 16, 2020 SV Submission at Exhibit, Appx___-____). Thus, CFA again seeks favoritism for its own data whereas it was highly critical of the Indian data for alleged similar shortcomings.

Moreover, CFA argues that Commerce's concern regarding the lack of contemporaneity of the Indonesian government fingerling data "is of little import" given that there are affidavits from three farmers on the record, further supposedly corroborating the prices of the non-contemporaneous Indonesian government pricing. CFA Cmnts. at 31-32. This argument is unpersuasive, especially when CFA argues that Commerce should reject data as non-contemporaneous for other SVs when only *part* of the POR is covered by the source, *see id.* at 17 (Indian whole live fish data), yet maintains that Commerce should have relied on Indonesian data that pre-dates the POR by six years. Second Remand Results at 38-40, Appx____-_____.

Further, Commerce specifically explained its skepticism that the prices from the affidavits, reflecting the experience of only *three*

30

Indonesian sellers that were obtained for the purposes of this proceeding (to corroborate the 2011-2012 MMAF fingerling data), could reflect the Indonesian market as a whole. *Id.* Again, CFA's attempt to undermine Commerce's reliance on *Fishing Chimes* and its surveying of 54 farmers for whole live fish and fingerling data as not sufficiently representative, rings hollow when CFA's alternative data are the contemporaneous experience of only *three* Indonesian sellers. *Id.* at 32, 38-40, Appx_____, Appx_____-_____; *see also* CFA Cmnts. at 14-15. Further, Commerce explained its justified concerns with these three affidavits, stating that the prices/quantities appear to be based on a one-time observation, stating that there is a disconnect between the historical "prices" and the corresponding sizes which appear to have been recorded in one day for just one fingerling in each instance. Second Remand Results at 39, Appx_____. In other words, Commerce explained that the record evidence does not demonstrate that the 2018-2019 prices of particular fingerlings are connected to the pictures of particular fingerlings, later taken in March 2020. *Id.* (citing CFA's Apr. 24, 2020 SV Submission at Exhibit 5-C, Appx_____-_____). Thus, CFA's arguments provide no basis for a finding that the Indonesian

data are preferable for fingerlings. *See Gov't of Argentina*, 542 F. Supp. 3d at 1395.

Next, Commerce addressed the alternative Indonesian fingerling data source on the record, provided by Dr. Budiyanto with the MMAF. Specifically, this data source provided the following details:

> Based on information from hatchery business actors, the price of seeds highly depends on the consumers (rearing farmers and production costs). For the price ranges, sizes ¾ - 3 inches have price range of Rp 15 – Rp 35 {per} fish, while for size 3 - 6 inches have price range of Rp 50 – Rp 80 {per kilogram}. For > 6 inches, they have range of 40 - 70, as follow.

Second Remand Results at 37, Appx___ (citing CFA's Nov. 16, 2020 SV Submission at Exhibit, Appx___-____ (Attachment 3: Answer to Question 13, Appx___-____). Commerce raised various concerns with this data source. First, Commerce explained the term "hatchery business actors" and the number thereof involved in the production of this data, is not defined. *Id*. Although CFA argues that Dr. Budiyanto provided information from different "{h}atcheries locations" including the "BBI" and "The People Hatchery Units and/or Household Scale Hatcheries" and "the number of hatchery farmers", CFA Cmnts. at 25-

26, this does not address Commerce's well-founded concern.[4]  By their

plain meaning, "hatchery business actors" and "{h}atcheries"/"hatchery

farmers" are not the same term.  Second Remand Results at 37,

Appx____.  Thus, because Dr. Budiyanto stated that the pricing

information came from "hatchery business actors," it is reasonable for

Commerce to scrutinize the definition of that term.  *See id.*

   Next, regarding Commerce's concern regarding the lack of detail

for sourcing and collection methods relied upon by the unidentified data

gatherer, *see id.*, CFA merely points to the laundry list of vague sources

and collections methods offered by Dr. Budiyanto, CFA Cmnts. at 27

(citing CFA Nov. 16, 2020 SV Submission at Exhibit (Attachment 3:

Answer to Question 19, Appx___), none of which explain which source

provided the *actual* prices for each size fingerling.  In other words,

contrary to CFA's assertions, Commerce explained that these flaws

warrant a finding that there is no basis to conclude that the Indonesian

data are more detailed than the Indian data regarding their sourcing

---

[4]  Here, too, CFA is unphased by the vague and ambiguous
description of their sources while, at the same time, CFA finds the
description of the underlying sources in *Fishing Chimes* and
*Undercurrent News* to be inadequate.

methodology.  Second Remands Results at 37, Appx_____.

Although Commerce stated that Dr. Budiyanto's prices do not provide whether the prices are farm-gate prices exclusive of taxes, *id.*, CFA disagrees, and points to a chart and questionnaire response which states that the prices are tax-exclusive.  CFA Cmnts. at 27.  From the outset, CFA's references to Question 2 are simply inapposite, as they merely reference the tax-exclusivity of the SVs for by-products, *not fingerlings.  Id.* (citing CFA Nov. 16, 2020 SV Submission at Exhibit (Nov. 10, 2020 Response, Question 2, Appx_____-_____)).  A simple review of CFA's other referenced chart and prices indicate that Dr. Budiyanto's assertions regarding the tax exclusivity of these fingerling prices refer to a completely different set of prices than the prices CFA wishes Commerce to rely upon for the purposes of fingerling SVs.  *See* CFA Nov. 16, 2020 SV Submission at Exhibit (Nov. 10, 2020 Response, Appendix A, Question 1, 3, and 4), Appx_____-_____, Appx____-____) (stating that the prices in tables 1 and 2 are tax-exclusive (which also exclude 2019 prices and prices for fingerlings greater than 4 inches), and which are significantly different from those mentioned in the CFA Nov. 16, 2020 SV Submission at Exhibit (Attachment 3: Answer to

Question 13), Appx____-____).  Put simply, CFA requests this Court to
take certain assertions from *other sources* and assume, without any
evidentiary support, that the data CFA seeks Commerce to rely upon is
substantially the same as data from other sources.  The Court should
decline to do so.

Commerce further found that Dr. Budiyanto's fingerling data
source is not species-specific.  Second Remand Results at 37, Appx____.
CFA concedes that the prices do not distinguish between *pangasius*
*hypophthalmus* and other types of pangasius.  *See* CFA Cmnts. at 27-
28.  Despite this concession, CFA argues that 99 percent of pangasius
production in Indonesia is *pangasius hypophthalmus* according to
Dr. Sudrajat.  *Id.* at 28.  CFA has cited no record evidence that
Dr. Sudrajat was involved in the production of the MMAF data and that
he can speak to the specific inclusion of particular species in this
particular data series, beyond generalized assertions regarding
Indonesian production, as a whole.  *See id.*

Indeed, Commerce explained that these fingerling prices were less
preferable to the Indian data and highlighted that they are not
gathered and/or published on a consistent basis.  Second Remand

Results at 37, Appx_____.  CFA asserts that these data sources are publicly available because "the Indonesian government makes the data available upon request."  CFA Cmnts. at 28.  However, that was not Commerce's critique, and this observation does not detract from Commerce's concern that these prices are less reliable, for numerous reasons set forth in the second remand results (*i.e.*, from an affidavit which contained inconsistencies and ambiguities regarding the data presented), as opposed to a regularly available, decades-old publication in *Fishing Chimes* and *Undercurrent News*.  *See* Second Remand Results at 37-38, Appx_____-_____.

Further addressing the source's reliability, Commerce explained that there were certain inconsistencies in the evidence between the prices in the narrative portion and those prices in the table.  *Id.* at 38, Appx____ (citing CFA's Nov. 16, 2020 SV Submission at Exhibit (Attachment 3: Answer to Question 13, Appx___-____)).  Specifically, Commerce explained that the narrative statement says that prices for ¾ - 3 inches are Rp 15-35 per fish, but in the table the prices are Rp 60-180; similarly, the statement says that prices for 3-6 inches are Rp 50-80 per kilogram, and for >6 inches are Rp 40-70, yet in the table the

prices for those sizes are Rp 175-400 and Rp 350-500, respectively. *Id.*
It remains "unclear" to Commerce how that data could "reinforce" or
"otherwise corroborate the other data on the record." *Id.*

Undeterred, CFA contends that Commerce should ignore these
discrepancies and ascribe them merely as "error{s}" because 2012 data
and data from three farmers, reflects similar prices on a per gram basis.
CFA Cmnts. at 28-29. However, CFA's inability to square the
discrepancies between the narrative statement and price table is a
relevant consideration in assessing the reliability of proffered data, as
Commerce explained. *See* Second Remand Results at 37-38, Appx_____-
_____. Although CFA attempts to dismiss these inconsistencies as
"error{s}" within a "consistent" range, CFA again merely disagrees with
the weight of evidence that Commerce assigned to such inconsistencies.
*See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377
(Fed. Cir. 2015).

c.    Feed

Commerce explained that the initial Indonesian data placed on
the record were not contemporaneous with the POR and only partially
specific regarding protein content. Second Remand Results at 18,

Appx_____ (citing CFA's Apr. 24, 2020 SV Submission at Exhibit 5-B,

Appx_____-____).  Although CFA's alternative data on the record, *i.e.,*

prices, are contemporaneous and include values for missing protein

contents, Commerce explained that these data sources were obtained

for the purpose of this proceeding and from a small number of sources,

such that these sources do not provide a more reliable basis for feed SVs

than the published Indian data.  *Id.* (citing CFA's Nov. 24, 2020

Submission at 17, Appx___).

CFA makes various meritless arguments against Commerce's

rejection of the Indonesian government feed data.  First, regarding

Commerce's concern that the Indonesian government data are not

species specific, *id.* at 43-44, Appx_____-_____ (citing CFA's Nov. 13,

2020 SV Submission at Exhibit 6, Appx_____-____), CFA, again, points

to Dr. Sudrajat's statement to argue that 99 percent of pangasius

production in Indonesia is *pangasius hypophthalmus*.  CFA Cmnts. at

35.  This rebuttal does not address the fact that Dr. Sudrajat was not

involved in the production of this fish feed data source, and an MMAF

official from MMAF stated that *patin siam* is the "predominant" species

but could not provide a specific percentage, as Commerce explained.

Second Remand Results at 34, Appx___ (citing CFA Nov. 16, 2020 SV

Submission at Exhibit (Apr. 22, 2020 Response, Question 4), Appx_____-

_____).

Next, as Commerce explained, record evidence is not available to

understand how many data points or volume that the feed data

represents.  *Id.* at 44, Appx_____.  CFA argues that the sourcing from

the government agency that was "circulated in Indonesia" sweeps this

concern away.  CFA Cmnts. at 35-36.  Again, CFA's proposed data

sources do not even pass CFA's own arbitrary standards that CFA seeks

to impose on the Indian data.  *See id.* at 16, Appx_____ (arguing that

*Fishing Chimes* does not provide the same information).

CFA also disagrees with Commerce's explanation about the

discrepancies between the Indian and Indonesian data.  CFA points out

that the data were sourced from the GPMT, which is the Farmer Feed

Entrepreneurs Association, *id.* at 36-37, but there is no information to

conclude whether this data came from one company or multiple

companies.  For example, Commerce explained that these data do not

state if the farm-gate prices are exclusive of taxes.  Second Remand

Results at 43-44, Appx_____-_____.  Although CFA points out that the

39

questionnaire asked for data to be tax free and exclusive of other

charges, CFA Cmnts. at 36-37, that assertion alone does not resolve the

issue.  The questionnaire requested, "*{i}f possible*, we need such

information excluding any taxes and other charges."  CFA Nov. 13, 2020

SV Submission at Exhibit 6, Appx____-____ (emphasis added).  Nowhere

in the price chart does it explain that the prices exclude taxes or other

charges.  *Id.*  Without any assertion that data were exclusive of such

charges, it is reasonable for Commerce to find that the data source is

ambiguous in this respect.  Second Remand Results at 44, Appx_____.

Finally, even though these prices were provided from a "public agency,"

that does not address Commerce's concern regarding its collection for

the purposes of this proceeding, as opposed to a constant, decades-old

publication.  *Id.*

 Commerce also explained its concerns regarding an additional

Indonesian feed price source, an affidavit from Dr. Budiyanto.  *Id.*

(citing CFA's Nov. 16, 2020 SV Submission at Exhibit, Appx___-____).

First, Commerce explained that that this feed is not specific, such that

particular protein percentage levels are "specifically for marine fish,"

*i.e.*, a much broader category than the one specific to relevant

production here.  *Id.*  Although CFA argues that these protein levels are

not FOPs in this review, CFA Cmnts. at 37, this argument does not

undermine Commerce's concerns about the specificity of this data, as

other evidence shows that this data is only for "patin feed", even though

the question asked for fish feed for *"patin siam*."  Second Remand

Results at 44, Appx_____.

    Without support, CFA disagrees with Commerce's analysis of the

sourcing for these prices.  For example, although Commerce explained

that the data were obtained from a single third-party source – Mr. Deni

of Central Protein Prima (CPP) – with no other mention of how the data

were collected, CFA states that Commerce misread evidence and

explained that the feed data came from "all information sources."  CFA

Cmnts. at 38.  It is reasonable, however, that Commerce raised

concerns regarding the lack of specificity of this response.  *See* Second

Remand Results at 44, Appx_____.  In other words, without more detail

regarding the sourcing of this feed price data ("CPP" vs. "all information

sources"), Commerce explained that it is difficult to determine the

representativeness of the data and whether the data represent the

Indonesian market as a whole, which – at least in the context of the

Indian data – CFA argued was significant. *Id.*

Next, Commerce explained that it is unclear whether the prices are market prices, given that the affidavit states that "{t}he low price of independent feed is because the independent feed is not taxed, and no investment calculation because all the equipment is supported by MMAF, therefore the only calculation is the variable cost." *Id.* (citing CFA's Nov. 16, 2020 SV Submission at Exhibit, Appx____-_____). CFA again disagrees with how Commerce weighed this evidence, stating that the statement was limited to feed only at a 16 percent protein content. CFA Cmnts. at 38-39. But without record evidence to show that 16 percent protein feed comes from a different source than the 20 percent protein feed source (for example), it is reasonable for Commerce to interpret this record evidence to raise concern about the entire data source. *See* Second Remand Results at 44, Appx_____. CFA also does not address the *zero* volume information from Dr. Budiyanto's provided feed prices, further making it difficult to determine the market-wide representativeness of this information.

The final Indonesian feed source on the record constitutes "Indonesian price lists for fish feed specific to the type used by Vinh

42

Hoan together with sworn affidavits explaining their collection

methodology and corroborated by country-wide feed pricing data from

the Indonesian government and Indonesian feed mill association." *Id.*

at 42, Appx_____ (citing CFA's Apr. 24, 2020 SV Submission at Exhibit

5-D, Appx_____-_____; CFA's Nov. 13, 2020 SV Submission at Exhibit

6, Appx___-_____).  Although Commerce has explained that prices on

price lists often reflect a starting point in a negotiation that could result

in a significantly different final sale price and that price lists often

represent the experience of a single producer rather than a broad

market average, *id.*, CFA argues that its prices are not price lists *per se*

(despite CFA's own characterization as such) because they do not reflect

the starting point in negotiations because the affiants stated that the

prices are "the prices of fish feed *that I sell*."  CFA Cmnts. at 31 (citing

CFA's Apr. 24, 2020 SV Submission at Exhibit 5-D, Appx_____-_____;

CFA's Nov. 13, 2020 SV Submission at Exhibit 6, Appx___-____); *see*

*also Utility Scale Wind Towers from the People's Republic of China*, 77

Fed. Reg. 75,992 (Dep't of Commerce Dec. 24, 2012) (final LTFV

determ.), and accompanying IDM at 12 (explaining Commerce's

preference to not use price lists).  Commerce explained that this

43

evidentiary statement did not provide definitive evidence that the prices

from the price lists are not open to negotiation, especially against the

backdrop of CFA's frequent reference to them as "price lists." Second

Remand Results at 42, Appx_____ (citing CFA's Oct. 11, 2024

Comments on Draft Results of Redetermination at 15, Appx_____).

CFA disagrees with Commerce's analysis of this vague assertion, CFA

Cmnts. at 34, but does not rebut Commerce's explanation that these

prices were selectively obtained from a small number of sources for the

purpose of this proceeding as opposed to being a consistently

gathered/published data source. Second Remand Results at 42,

Appx_____.

Finally, Commerce explained that it found these data to be less

specific than Indian data on the record, as the data listed the "Feed

Product", but was supported by 50 pictures of feed bags and only 18 of

such bags are for "Catfish." *Id.* at 43, Appx_____ (citing CFA's Nov. 13,

2020 SV Submission at Exhibit 6, Appx_____-____). CFA downplays

Commerce's concerns regarding specificity, stating that patin farmers

consume a variety of feed types, referencing a statement from Dr.

Budiyanto, which explains "patin culture . . .that stresses the low cost of

feed, the cheaper the feed the more efficient the patin culture would be."
CFA Cmnts. at 35. Beyond the fact that Dr. Budiyanto was not
involved in the production of these price lists (nor do the prices come
from his agency, the MMAF), CFA minimizes Commerce's preference
for specificity in its SV data, by advocating for the use of data that lacks
specificity based on a vague assertion that farmers prefer lower feed
prices. *See id.* Indeed, Commerce explained that the affiants provided
"the prices of feed that I sell" with no indication what type of feed is
actually sold. Second Remand Results at 43, Appx_____ (citing CFA's
Nov. 13, 2020 SV Submission at Exhibit 6, Appx_____-_____). Thus,
Commerce reasonably found that the record did not support a finding
that these prices are specific.

> B. Substantial Evidence Supports Commerce's Selection Of
> Indian Labor Data As The Best Available Information

Commerce relied upon contemporaneous Indian ILOSTAT labor
data that was specific and for "skilled agricultural and fishery workers."
Second Remand Results at 22, 48, Appx_____, Appx_____ (citing
ILOSTAT Periodic Labour Force Survey Data (Aug. 29, 2024),
Appx____-_____). Commerce explained that because there are
contemporaneous and specific labor data for both India and Indonesia

on the record, it did not find that the SV data for the labor FOP favors either potential surrogate country. *Id*. at 22, Appx_____.

CFA makes two arguments – one factual and the other legal – to argue that Commerce's reliance on India labor data is unwarranted. Neither have merit. First, CFA argues that Commerce's reliance on its primary surrogate country – either with or without a "tie" among usability of certain SVs – is inconsistent with the statutory directive to rely on the "best available information." CFA Cmnts. at 40-42 (citing 19 U.S.C. § 1677b(c)(1)). CFA, however, does not consider Commerce's explanation of how 19 C.F.R. § 351.408(c)(2) is both consistent with the statute and Federal Circuit precedent.

For example, the Federal Circuit has recognized that Commerce has discretion to determine what constitutes the best available information, as this term is not defined by statute. *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016). The Federal Circuit has also explained that there is no legal error (or inconsistency with the statute), underlying Commerce's preference to rely on its regulatory preference to value all FOPs with SVs from a single surrogate country, if Commerce finds the data satisfy its SV

selection criteria. *Id.* at 1302 (citing 19 C.F.R. § 351.408(c)(2)).

Moreover, although CFA seeks to limit Commerce's application of the

regulatory preference on an FOP-by-FOP basis, Commerce explained

the administrative difficulty of analyzing SVs from a wide range of

countries for dozens or hundreds of FOPs. Second Remand Results at

20, Appx_____. Additionally, Commerce explained that analyzing SVs

on an aggregate, country-wide basis best satisfies the statutory

standard to rely on the "best available information" as it limits the

amount of distortion introduced into the calculations, because a

domestic producer (*i.e.,* Indian pangasius farmer) would be more likely

to purchase a product available in the domestic market (*i.e.,* feed,

fingerlings, etc.) and would result in the most accurate calculation of

normal value. *Id.* at 20-21, Appx_____-_____; *see also Clearon Corp. v.*

*United States*, 37 C.I.T. 220, 229 (2013); *Jacobi Carbons AB v. United*

*States*, F. Supp. 2d 1360, 1376-77 (Ct. Int'l Trade 2014).

    Second, regarding CFA's factual assertions regarding its

preference for Indonesian labor data, these arguments merely

constitute requests to have this Court reweigh evidence. CFA disagrees

with Commerce's finding that the Indian ILOSTAT data for "skilled

agricultural and fishery workers" are specific, arguing that the labor

data are overly broad including other kinds of workers and labor values

that are "skilled." CFA Cmnts. at 43-44. CFA, however, points to no

evidence that the respondent's processing labor is not of a type captured

by the "skilled agriculture or fisheries worker" covered of the Indian

data. Second Remand Results at 48, Appx_____. In other words, both

Commerce and CFA state that Vinh Hoan's business consists of

aquaculture, processing, and storage activities, but CFA points to no

evidence that these activities do not involve "skilled" laborers or that

"skilled fisheries workers" does not include processing (or other kinds

of) labor. *Id.*

On the other hand, CFA points to no record evidence that its

proposed Indonesian data for "aquaculture workers" covers the full

scope of processing activities. Indeed, other Indonesian labor sources

only cover "harvesting" and "plowing" farm labor with no other

mentions of other forms of farming or processing labor. Second Remand

Results at 48, Appx_____ (citing CFA's Sept. 4, 2024 SV Submission at

Attachment 2 (BPS, or Statistics Indonesia data: Table 6.2 and 6.3,

Appx_____-_____). Thus, it is reasonable for Commerce to find that the

record does not permit a definitive determination as to whether the

Indian or Indonesian data are more specific, and that a company that

processes fish would be classified as part of the fisheries industry.  *See*

*id.*

Similar to the prior administrative review, Commerce "analysis

{w}as a finding that neither country's labor data were superior on their

own merits," and "{t}o break the tie, Commerce had to choose between

two regulatory preferences—one favoring contemporaneous data, the

other data from a single country where possible."  *Catfish*, 2025 Ct. Intl.

Trade LEXIS 24, at *13.  It was reasonable for Commerce to find "the

latter more important" and "{s}uch weighing of preferences is the

agency's prerogative."  *Id.*

### C. Substantial Evidence Supports Commerce's Reliance On Indian Data For By-Products

For the frozen by-products and fish meal, Commerce explained

that it continued to rely on Indian by-product SVs, even though the

values are greater than the underlying input (*i.e.,* whole live fish) value

*on an equal volume basis* and why capping the by-product values at the

value of whole live fish is not appropriate here.  Second Remand Results

at 23, Appx_____.  Specifically, Commerce explained that such higher

49

values are hardly surprising, given that (i) a large percentage of the input, *i.e.*, a whole live fish, is composed of by-products, such as head, bones, skin, meat trimmings, etc., and (ii) the by-products in question undergo significant additional processing prior to their sale. *Id.* To address the Court's concerns regarding Commerce's observations about the impact of additional processing on the value of these by-products, Commerce referenced evidence from Vinh Hoan indicating the additional processing, packaging, and storing of these frozen by-products, compared to underlying input (*i.e.,* whole live fish). *Id.* at 24-25, Appx_____-_____ (citing Vinh Hoan Jan. 30, 2020 Supp. Section D Questionnaire Resp. at 31-32, 34-35, Appx_____-_____, Appx_____-_____, and at Exhibit 6, Appx_____). Similarly with fish meal, record evidence supports a finding that this by-product undergoes substantial additional processing, using a separate production process of converting fresh fish waste (fish head, bones, guts) into fish meal with additional FOPs (*e.g.*, direct and indirect labor, electricity, rice husk, packing, polypropylene bag, string). *Id.* (citing Vinh Hoan Jan. 30, 2020 Supp. Section D Questionnaire Resp. at 29, 35, Appx_____, Appx_____, and Exhibit 6, Appx_____-_____). Thus, based on the substantial additional

processing of frozen by-products and fish meal, the fact that the corresponding SV was higher than the SV for the underlying input does not signify that the SV for the byproduct is distortive, and Commerce found no reason to conclude so here.  *See id.*

Nonetheless, CFA argues that there is no dispute that a by-product is less valuable than its input and that Commerce has a consistent practice of rejecting or capping the by-product offset.  CFA Cmnts. at 46.  However, this Court rejected CFA's proposed (automatic) blanket rule to cap all by-products when they pose a higher value than the main input.  *See CFA II*, 2024 WL 2843039, at *6 n.10 (citing *An Giang Fisheries Import and Export Joint Stock Company v. United States*, 317 F. Supp. 3d 1304, 1311–12 & n.2 (Ct. Int'l Trade 2018)).  In the second remand results, similar to the facts underlying *An Giang*, Commerce explained why the additional processing of whole live fish into frozen by-products and fish meal support the use of Indian SVs. Second Remand Results at 26, Appx_____ ("Just as processing results in the value of a fillet being more valuable than the raw/unprocessed fish input, substantial further processing similarly may render the value of the frozen by-products and fish meal more valuable than the input

when considered on an equal weight (*i.e.*, per kg) basis."); *see An Giang*, 317 F. Supp. 3d at 1311 n.2 ("Commerce found the data inappropriate because of the high value in combination with the fact that the heading contained refined fish oil where Vinh Hoan's fish oil is unrefined.").

Despite CFA's assertion that Commerce has not cited evidence that by-products cost more to produce than the whole live fish input, CFA ignores the fact that many of the costs associated with producing the by-products are the same as the costs to produce the subject merchandise, beginning with the introduction of fingerlings and subsequent feeding for many months (when they are farmed), or with the purchases of whole live fish. Second Remand Results at 50, Appx_____. This is because the eventual fillet and concomitant by/co-products share the same inputs (farming inputs or whole live fish) until filleting starts. *Id.* Although CFA asserts that "Commerce provides no explanation or support regarding the Indian data's value or why it relies on the Indian data," CFA Cmnts. at 47-48, Commerce explained that additional processing/packaging/storing creates additional costs, does not create a distortive SV, and therefore a higher SV on a per

52

kilogram basis is reasonable.  Second Remand Results at 23-26, 49-52,

Appx_____-_____, Appx_____-_____.

Next, CFA argues that the Indonesian data are superior, and that

they satisfy the SV selection criteria.  CFA Cmnts. at 49.  Commerce,

however, questioned the reliability of these sources, as price lists are

less preferable as SV sources, in addition to the minimum information

explaining the sourcing of such prices.  Second Remand Results at 51,

Appx_____; *see also Certain Tissue Paper Products from the People's

Republic of China*, 74 Fed. Reg. 52,176 (Dep't of Commerce Oct. 9, 2009)

(final results and partial recission), and accompanying IDM at

Comment 3 ("Price quotes . . . may not reflect actual transaction values.

Further, they are easily subject to manipulation and may be dependent

on various factors not evident on the administrative record.").

Although CFA offered an affidavit from Dr. Budiyanto purportedly

to "reinforce{} the reliability of the pricing data," the sourcing and data

suffer multiple deficiencies, such that multiple FOPs were missing and

there was no sourcing/collection/volume information for each FOP.

Second Remand Results at 51, Appx_____ (citing CFA's Nov. 16, 2020

SV Submission at Exhibit, Appx___-____).  The fact that CFA now

backtracks from the proffered prices from Dr. Budiyanto for by-

products, whereas CFA tries to rely on prices from Dr. Budiyanto for

other FOPs, further evidences the shortcomings of this data source and

their reliability.  Thus, Commerce reasonably found that CFA's

proffered fish meal and frozen by-products SV sources offer no

advantage over the Indian data, and, instead, suffer from multiple

significant defects.  *Id.* at 52, Appx_____.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain

Commerce's second remand results and enter judgment in favor of the

United States.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
K. GARRETT KAYS                        /s/ Kara M. Westercamp
Of Counsel                             KARA M. WESTERCAMP
Office of the Chief Counsel            Senior Trial Counsel
  for Trade Enforcement & Compliance   U.S. Department of Justice
U.S. Department of Commerce            Civil Division
Kenneth.Kays@trade.gov                 Commercial Litigation Branch

P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7571
Fax: (202) 514-8640

March 14, 2025                            Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's order regarding type-volume limitation rules.  According to the word-count calculated by the word processing system with which the brief was prepared, the brief contains a total of 9,984 words.

March 14, 2025                    /s/ Kara M. Westercamp
                                 Kara M. Westercamp

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Consol. |
| v. ) | Court No. 21-00130 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| QMC FOODS, INC., *et al*, ) | |
| ) | |
| Defendant-Intervenors. ) | |

_____

## <u>ORDER</u>

Upon consideration of the Department of Commerce's final second results of redetermination pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety.

Dated: _____, 2025      _____
New York, NY                  JUDGE